# Exhibit 7

192-3191

# UNITED STATES OF AMERICA
# BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:      Lina M. Khan, Chair
                        Noah Joshua Phillips
                        Rebecca Kelly Slaughter
                        Christine S. Wilson
                        Alvaro M. Bedoya

|  |  |
|---|---|
| **In the Matter of**<br><br>**OPENDOOR LABS INC., a corporation,** | **DOCKET NO.** |

## COMPLAINT

The Federal Trade Commission, having reason to believe that Opendoor Labs Inc., a corporation ("Respondent"), has violated the provisions of the Federal Trade Commission Act, and it appearing to the Commission that this proceeding is in the public interest, alleges:

1. Respondent Opendoor Labs Inc. ("Opendoor") is a Delaware corporation with its principal place of business at 410 North Scottsdale Road, Suite 1600, Tempe, AZ 85281.

2. The acts and practices of Respondent alleged in this complaint have been in or affecting commerce, as "commerce" is defined in Section 4 of the Federal Trade Commission Act.

3. Respondent Opendoor operates an online real estate business that, among other things, buys homes directly from consumers as an alternative to sales on the open market or, as the company describes them, "traditional sales." Opendoor promised consumers that they would make more money selling their homes to it than by selling on the market. In fact, consumers who sold to Opendoor lost thousands compared to what they would have received from a market sale.

**Opendoor Promised that Consumers Would Make More by Selling Their Homes to It.**

4. Respondent advertised to consumers an "iBuyer" real estate service that directly purchases consumers' homes. Opendoor told consumers that, rather than making money from "buying low and selling high," the company made money from a fee or "service charge," which ranged from 6 to 14 percent of Opendoor's offer price. Opendoor promised to use cutting-edge technology to save consumers money if they sold their homes to it by providing "market-value" offers and reducing transaction costs. Indeed, Opendoor provided consumers selling their homes with a chart comparing the consumers' projected net proceeds from selling to it versus selling "traditionally" by listing on the market. These charts almost always projected that consumers would receive thousands more by selling to Opendoor, even accounting for Opendoor's

substantial fee. In fact, the vast majority of consumers who sold to Opendoor lost thousands compared to what they would have realized in net proceeds from selling on the market because Opendoor's offers have been below market value on average and its costs have been significantly higher than what consumers typically pay.

5.      Opendoor designed its marketing to convince consumers that they would make more money selling their homes to it. Opendoor's advertising and website promised "fair market" or "market value" offers with lower costs. When consumers requested an offer, Opendoor provided a multi-page document claiming to provide a market-value offer and a custom chart comparing the net proceeds the consumer should expect from selling to Opendoor versus on the market. For more than ▮ percent of consumers who received these comparisons and sold to Opendoor, the comparisons projected that the consumers would realize more in net proceeds selling to Opendoor.

*Opendoor Promised Consumers "Market Value" for Their Homes.*

6.      Respondent advertised its home-buying service by claiming that Opendoor made "fair market" or "market value" offers. For example, on Facebook, Opendoor claimed that it allows consumers to "[g]et a fair market offer on [their] home without ever listing."



7.      Opendoor similarly claimed on social media that its offers represent "our best estimate of full market value":



2

8.      Opendoor's mail advertisements encouraged consumers to request offers from Opendoor to find out "how much [their] home is worth" and claimed that:

> Until now, there hasn't been a fast and simple way to check on the true market value of your home. At opendoor.com you can see how much your home is worth in minutes. Our [local] real estate experts use market data and an assessment of comparable homes near you to prepare your home price.

Other mail advertisements represented that Opendoor "aim[s] to make a competitive, fair market offer on your home using the most current data."

9.      An Opendoor video ad similarly represented that consumers who go through the process of selling their homes on the open market could get "the same offer from Opendoor" without ever listing.

10.     Opendoor's ads encouraged consumers to visit opendoor.com to request an offer. The website represented that Opendoor "aim[s] to offer fair market value for your home and take a service charge that enables us to provide world-class service from offer to closing." It further claimed that Opendoor does not make money from a "buy-low, sell-high" strategy. Similarly, if consumers called Opendoor for more information, its call scripts instructed phone representatives to say that "Opendoor only makes a small amount on each sale."

11.     A video on Opendoor's website further explained that it uses home-sales data, "local real estate experts," and sophisticated technology to provide "market value" offers:

> Every Opendoor offer relies on our robust data model that analyzes thousands of recent home sales in your market, as well as insights from our teams of local real estate experts.

12.     The website has also encouraged consumers planning to list on the market to request an Opendoor offer to learn their "home's value" because it has "a deep understanding of market conditions and trends." Respondent has specifically represented that Opendoor's calculation of "home value" "is an estimation of what your home is worth. Also referred to as fair market value, it's the price that a willing and informed buyer and a willing and informed seller can agree on."

13.     Opendoor also sent emails promising a "competitive market price" and stating, "You deserve nothing less than what your home is worth."

*Opendoor Promised to Provide Lower Costs than Traditional Sales.*

14.     Opendoor's advertising invited consumers to compare Opendoor's costs to costs associated with selling on the open market. For example, it ran the following ads on Facebook and Twitter, respectively:





15.    Opendoor's website similarly claimed that its purported lower cost structure allows it to provide more net proceeds than what consumers would obtain from a traditional sale:

> A common misconception is that you won't sell your home for top-dollar because our fee is higher than agent commissions. When you consider the cost savings we outlined above and the full range of services we provide, your net proceeds can be higher with Opendoor.

16.    Opendoor expressly claimed that its only source of profit is from its fee, which generally ranged from six to fourteen percent of the offer price. Opendoor's website represented that the

4

fee mostly consisted of costs that Opendoor anticipates paying to resell the home and that its profit was only "1% of our total service charge," and an "amount we collect for providing a stress-free experience." On a page titled, "How Opendoor calculates the value of your home," the website explained,

> We don't try to make "low ball offers" because, unlike a home flipper, our business model isn't based on buying low and selling high. The way we make money is by charging a fee for our service.

17.    Opendoor's website represented that it may require that the consumer make or pay for repairs Opendoor identifies after an in-person assessment of the property. However, the website also claimed that Opendoor merely requests the same repairs that consumers would otherwise have to make or pay for in a traditional sale. As shown in the image below, Opendoor has stated that it "ask[s] for the repairs we anticipate the next buyer of the home will ask for."



**Common Repair Items**

Like most buyers, Opendoor will assess your home to identify if any repairs are needed. After we buy your home, we'll make repairs so that the home is move-in ready for the next buyers.

Our philosophy is to ask for repairs we anticipate the next buyer of the home will ask for. We look for items that are broken, in poor condition, or can affect the safety, structure, or functionality of the home.

This list is not exhaustive, but can give an overview of the types of repairs we may ask for.

18.    Opendoor's website described the repair process as designed "to make sure the house is safe and functional" and not designed "to uncover every deficiency in your home to lower the offer." Opendoor further represented that consumers may even save money on repairs if they sell to it because "we do our best to pass wholesale savings on to you from our partnerships with local vendors."

19.    Opendoor also sent emails assuring potential consumers that the company's "goal is not to make money from repairs—in fact, we pass any discounts from our vendors directly to you."

20.    To illustrate the likely savings from selling to Opendoor, its website used its "home sale calculator" and a home with a $200,000 market value to demonstrate that consumers who choose Opendoor would save an estimated $4,400 over the costs of traditional sales:

5

| | Selling to Opendoor | Traditional home sale |
|---|---|---|
| | **6.8%**<br>average service charge* | **7-10%**<br>average costs* |
| Offer price (example) | $200,000 | $200,000 |
| **Selling process** | | |
| Average days to close transaction | Choose from 14-60 days | 50 days |
| Average days to prep and stage home | 0 days | 10 days |
| Average number of showings | 0 showings | 10 showings |
| **Transaction costs** | | |
| Average Opendoor service charge | 6.8% | — |
| Estimated real estate agent fees | — | 6% |
| Estimated seller concessions | — | 2% |
| Estimated home ownership and overlap | — | 1% |
| Repairs needed to sell home | TBD | TBD |
| **Estimated cash before closing** | $186,400 | $182,000 |

*Opendoor Promised that Consumers Will Make Money Selling to It.*

21.    To request an offer from Opendoor, consumers enter details about their homes into an online portal. Unless the homes fall into categories for which Opendoor will not make offers, such as homes built before 1960, Opendoor calculates a custom offer and fee amount.

22.    Opendoor emails consumers a link with a customized offer within a few days. As shown in the sample email below, until at least 2019, the emails have stated that Opendoor has "just finished analyzing your home's market value, and we're excited to make you an offer!" The emails have also promised that accepting the offer allows consumers to "[g]et full value without paying the many hidden costs of a traditional sale." Some versions of the email have claimed that Opendoor "strive[s] to give market value offers."



Hi Robert,

We just finished analyzing your home's market value, and we're excited to make you an offer!

I'm ███████ and I'm here to answer any questions about your offer and how Opendoor works.

Take a look and let me know what you think:

**View Offer**

You're able to:

- Choose when you move, 3 to 60 days from now.
- Skip intrusive and inconvenient home showings.
- Get full value without paying the many hidden costs of a traditional sale.

23.     Consumers who clicked the link in the email were taken to a series of webpages presenting the offer ("seller flow"). Until at least 2019, the first page of the seller flow represented that Opendoor's calculation of home value was "based on recent sales in your area," and that its repair and closing costs were "similar to what you'd expect to pay traditionally."



Hi Teresa, thanks for choosing us. Here's what's in **your offer**

**Home Value**
Estimated based on recent sales in your area

**Service Charge**
We'll compare this with the cost of selling traditionally

**Repair and closing costs**
Similar to what you'd expect to pay traditionally

**Net proceeds**
Our best estimate of the cash you'll receive at close

24.     The seller flow presented a housing-market analysis and a list of recent home sales on which Opendoor relied in calculating the offer. The seller flow described its estimate of "home value" as "based on comparable home sales and adjusting for differences like square footage, age, features, and location." The seller flow explained that "home value does not include costs associated with selling, such as repair costs."

7

25.    Finally, the seller flow revealed the offer itself within a customized cost comparison chart, similar to the website "home sale calculator" displayed in paragraph 20. The chart projected the net proceeds each consumer would receive from accepting Opendoor's offer versus selling on the market. The chart prepopulated Opendoor's proposed purchase price and the market price as identical. In some cases, the seller flow showed the repair costs in both circumstances as "TBD." In others, they showed the estimated repair costs as identical. Below is a version of the comparison chart. Opendoor used this or a similar format for all its offers.

| | Sell directly to Opendoor | | Traditional home sale |
|---|---|---|---|
| | **$200,000** | | |
| | Offer expires Thursday, September 26th | | |
| Selling process | | **VS** | |
| Estimated days to find a buyer | 0 days | | 58 days |
| Average days to close transaction | Choose from 3-60 days | | 30-60 days |
| Average number of showings | 0 showings | | 10 showings |
| Transaction costs | | | |
| Offer / Contract price | | | |
| Opendoor service charge | | | 0%    $0 |
| Real estate agent fees | $0 | | |
| Estimated repairs costs | TBD | | TBD |
| Opendoor may request repairs to improve the safety or functionality of the home, similar to a traditional sale | | | |
| Mortgage payoff | $0 | | $0 |
| ⊕ Other closing costs | | | |
| Estimated net proceeds | | | |

26.    The bottom line of the chart projected the "net proceeds" that consumers should expect to receive from a sale to Opendoor and from a traditional sale. As of November 2019, over ▮ percent of these charts used in accepted offers projected that the consumer would realize more net proceeds by selling to Opendoor. The average projected gain was more than ▮▮▮▮.

27.    Offers have also included information about market costs. As shown in the representative example below, the offers typically represented that consumers selling traditionally should expect to pay six percent in agent commissions, two percent in concessions at closing, and one percent in "home overlap costs":

8



28.     In some instances, Opendoor included two disclaimers at the end of the seller flow. Those disclaimers were not conspicuous and were in fine print. Moreover, they did not cure Opendoor's repeated representations that it provided market value offers and that consumers were likely to make more money selling to it. Rather, one merely stated that "[t]hese figures are our best estimates" and the other stated, in direct contravention to Opendoor's marketing, that the offer "does not necessarily represent the 'market value' of your home" because it was not a formal appraisal.

29.     The net proceeds comparison charts have provided more information about certain line items if consumers clicked a link adjacent to those line items. For example, if a consumer clicked an icon next to repairs on one version of the chart, a popup graphic provided the following explanation:

> Our philosophy is to ask for repairs we anticipate the next buyer of the home will ask for. We look for items that are broken, in poor condition, or can affect the safety, structure, or functionality of the home. Some examples include roof, foundation, flooring, electrical, plumbing, HVAC (heating, ventilation, and a/c systems), and appliances. On average, a typical repair request ranges from $___ to $_____, but can vary depending on the condition of your home.

9

Other versions of the offer described repair costs as "[s]imilar to what you'd expect to pay traditionally." In emails, Opendoor described its repair-assessment process as an "inspection" similar to post-contract inspections in market sales.

### Most Consumers Who Sold to Opendoor Lost Money.

30.     Contrary to Opendoor's promises, consumers actually lost thousands of dollars selling to it compared to what they would have received from a traditional sale. Its offers have not been market value but consistently averaged thousands of dollars below market value. And the costs consumers have paid when selling to Opendoor have been higher than what consumers typically pay in a market sale.

*Opendoor Offered Below Market Value for Homes.*

31.     The overwhelming majority of Opendoor's offers have been significantly below what consumers would have received if they sold on the open market.

32.     Opendoor took various steps to reduce offers below what their internal valuation system deemed to be a home's market value.

33.     In or around August 2018, Opendoor instituted a policy of lowering offers to cover anticipated repair costs. The policy reduced offers without disclosing that they were less than market value. If actual assessed repairs were lower than the amount withheld, Opendoor retained the difference as revenue. Even before implementing this policy, Opendoor would reduce certain offers to account for potential repairs, which simultaneously provided a sub-market offer and concealed assessed costs from consumers.

34.     Opendoor has used an automated system to generate expected market values for homes. In many instances, Opendoor's employees have manually adjusted these values before presenting them to consumers as offers. Opendoor's internal analyses showed that these manually adjusted offers were several percentage points below Opendoor's assessment of market value. Beginning no later than 2019, Opendoor instituted a policy to reduce its manually adjusted offers to ██ ██████ below what Opendoor assessed as market value.

35.     For automated offers, Opendoor instituted a "risk-based pricing" policy in or around June 2019 that automatically reduced offers below Opendoor's assessment of market value to account for risks inherent in reselling the home. This was contrary to Opendoor's marketing claims that the company accounted for these risks in setting the custom fee associated with each offer. For example, Opendoor's website explained that the fee varied to cover "risks and holding costs of the home."

36.     At various times, Opendoor has reduced its offer prices to enable it to understate its fees, making its services appear more financially attractive compared to traditional sales or to its competitors.

37.     Consumers had no reason to know that Opendoor had reduced their offers through the means described in paragraphs 33-36. Opendoor promoted the offers as "market value," its price comparison chart showed the same price for Opendoor's offers and market offers, and Opendoor

did not disclose these reductions thereby masking its higher costs compared to market sales and competitors.

38.     Opendoor's own internal analyses show that its offers have been, on average, below what consumers would receive on the open market. In November 2018, for example, one analysis examined properties on which Opendoor had made offers that the consumers rejected. The analysis shows that those properties sold for more on the open market than the amounts Opendoor offered, in some cases by as much as ▮▮ percent. Other internal analyses show that Opendoor's offers were consistently below market. One found in late 2018 shows that ▮▮▮▮ percent of homes on which Opendoor made an offer eventually sold on the open market for more than ▮ percent more than Opendoor's offer price. A third-party analysis performed in 2017 concluded that Opendoor's profit from buying and selling could not be fully explained by Opendoor's renovation of those homes.

39.     Opendoor claimed that it did not make money from "buying low and selling high," but from "charging a fee for [its] service." But gains from selling homes for more than its offer price are a key contributor to its revenue. A 2019 financial analysis broke down revenue from Opendoor's fee and from "net resale gain" and reported over ▮▮▮▮ in resale gains in 2018 and ▮▮▮▮▮ in projected resale gains in 2019. Presentations to investors touted "resale gain" as a significant contributor to Opendoor's revenue per home.

40.     The company also understood more generally that its offers were below market. A presentation in 2016 noted that "[s]ellers that [sic] reject OD offers make more on the open market than their OD offer." In 2019, another internal communication stated bluntly, "We don't offer a fair market value to our customers."

41.     Data from Opendoor's real estate transactions confirm that Opendoor makes money not just from its fees, but also from buying homes low and selling them high. After purchasing homes, it lists them on the open market for resale. From 2016 through February 2020, Opendoor sold ▮▮ percent of its homes for more than what it offered consumers. The average gain on these homes was ▮▮▮▮, or ▮▮ percent of the homes' average offer price of ▮▮▮▮.

*Opendoor's' Costs Were Higher than What Consumers Would Have Paid in Traditional Sales.*

42.     Contrary to Opendoor's claims that its home-buying service would save consumers money, Opendoor's costs were higher because it required consumers to pay for repairs that they would not have had to make in a traditional sale. In addition, Opendoor overstated the costs associated with traditional sales.

<u>Opendoor Demanded Repairs for Which Consumers Would Not Pay in Traditional Sales.</u>

43.     After the offer, Opendoor has required an in-person "home assessment" to reassess its estimation of value and to determine whether repairs are necessary. If Opendoor concluded that the initial offer was too high, it often rescinded the offer and re-offered a lower amount.

44.     Opendoor has almost always demanded consumers make or pay for repairs. Although its marketing has suggested that the company may not require any repairs, as of February 2020, Opendoor had demanded repairs for ▮▮ percent of homes on which Opendoor had made an offer.

Opendoor's internal study of sellers who withdrew after receiving repair demands showed that those who sold on the market did so without making all the repairs that Opendoor demanded.

45.     As part of the repair process, Opendoor has sent consumers a list of required repairs with the cost it would charge consumers if they agree to deduct the costs from their sales proceeds. The list of repairs has been typically well beyond what consumers would be responsible for in a market sale. Opendoor has routinely requested upgrades to, or replacement of, functional heating and cooling systems, flooring, and roofs. It has also frequently demanded cosmetic changes such as repainting and replacement of items that could be repaired at far lower cost.

46.     According to Opendoor's own internal study, as of March 2019, Opendoor demanded repairs that cost, on average,        . The same study concluded that, in a traditional sale, consumers spend less than        , with an average of        or less than     percent of the average purchase price. A separate internal study found that Opendoor's "repair ask" is     percent of the purchase price. Another internal survey examining consumers who cancelled after learning of Opendoor's repair assessment found that over     percent of them sold their homes without paying for any repairs and concluded that Opendoor's "repair asks are NOT in line with market."

47.     Unlike traditional sales, Opendoor demanded that consumers make or pay for all demanded repairs, even though Opendoor's own studies indicate that the parties to a market sale typically share these costs. The repair demands were not subject to negotiation.

48.     Opendoor at times has taken up to 18 days after consumers agree to the initial offer to provide them with the list of repairs. By that time, many consumers had already placed deposits on new homes and could not walk away from the new home purchase without incurring a financial penalty. Opendoor's internal communications have described the lag between the initial offer and the later, significantly lower offer as a "'bait-and-switch' operation."

49.     In or around August 2018, Opendoor implemented an "Estimated Repair Credit," which surreptitiously reduced offer prices to cover some of the repair costs. Opendoor never disclosed this "credit," and continued to describe its offers as representing the company's best estimate of market value without any adjustment.

50.     Opendoor encourages consumers to authorize it to perform the repairs and to deduct the costs from the net proceeds of the sale rather than arrange for the repairs themselves. The company has emphasized the convenience of deducting the repair costs and, as described above, suggested that the proposed repair costs are discounted and therefore less than what the consumer would pay on the open market.

51.     If the consumer decides to authorize Opendoor to complete the repairs and deduct the estimated costs from the sale proceeds, Opendoor completes the repairs after it acquires the property. If the repairs cost less than the amount deducted, Opendoor retains the excess as profit, including the undisclosed Estimated Repair Credit that Opendoor deducted from its original offer. One internal study found that for        of Opendoor's purchases, its deductions for repair costs were greater than Opendoor's actual costs, thereby "taking away        of seller equity" in each of those sales.

<u>Opendoor Overstated the Costs of Traditional Sales.</u>

52.    To make Opendoor's offers appear more financially beneficial than they actually were, it misrepresented the amounts sellers should expect to pay for certain costs of traditional sales. The net proceeds calculator stated that consumers should expect to pay nine percent in real estate agent commissions, "seller concessions," and home overlap costs. In fact, Opendoor's data showed that sellers were likely to pay much less, and the company had no other data supporting its representations about traditional costs. Its marketing also claimed that consumers would likely pay one percent of their sales price, i.e., thousands of dollars, for "staging and prep work." However, in traditional sales, many consumers do not pay to stage their homes prior to sale.

53.    During the time Opendoor made inflated claims about the costs of traditional sales, it possessed data suggesting that those claims were false. For example, it claimed that sellers should expect to pay two percent in "concessions" when selling on the market, but it only paid █ percent in concessions when it resold homes.

*Consumers Typically Lost Thousands Selling to Opendoor.*

54.    As of November 2019, Opendoor had promised more than █ percent of consumers from whom they purchased homes that they would save significant money selling to it, with an average projected savings of over █████. In fact, as it was aware, consumers were likely to lose money selling to Opendoor.

55.    Its own internal analyses show that consumers lost money selling to Opendoor. For example, a March 2019 analysis of consumers who had accepted an Opendoor offer, but withdrew after receiving Opendoor's repair demand, found that █ percent made more money selling on the open market, with an average gain of █████ compared to what they would have received from Opendoor. Other internal analyses have found similar results.

56.    Opendoor transaction data confirms that consumers who sold to Opendoor have lost money compared to what they would have received through a traditional sale. Opendoor's data shows that as of February 2020, the average resale price of its homes was █████. However, consumers received only █████ on average due to Opendoor's lower offer prices, deductions for repairs, and fees. If those consumers had instead sold on the market for the price Opendoor received on resale, they would have thousands more in net proceeds, even if they had paid the nine percent Opendoor claimed they would pay in agent fees, seller concessions, and overlap costs, and paid █████ for repairs.

**Count I**
**False or Unsubstantiated Claims**

57.    In connection with the advertising, promotion, offering for sale, or sale of its home-buying business, Respondent has represented, directly or indirectly, expressly or by implication, that consumers are likely to realize more money selling their homes to Respondent than they would realize if they sell their homes in traditional sales, such as representing that:

    a.    Respondent's offers represent its projections of the market value price of consumers' homes without any downward adjustments;

13

b.  Respondent makes money from disclosed fees rather than from "buying low and selling high";

c.  Consumers will likely pay the same amount in repair costs whether they sell their homes to Respondent or sell their homes in traditional sales; and

d.  Consumers will likely pay less in costs by selling to Respondent than they would pay in traditional sales:

58.    The representations set forth in Paragraph 57 are false or misleading, or were not substantiated at the time the representations were made.

**Violations of Section 5**

59.    The acts and practices of Respondent as alleged in this complaint constitute unfair or deceptive acts or practices in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act.

THEREFORE, the Federal Trade Commission this _____ day of _____, 20__, has issued this Complaint against Respondent.

By the Commission.


April J. Tabor
Secretary


SEAL:

14