**CLARK HILL PLC**
Daniel P. Thiel, SBN #035831
14850 North Scottsdale Road, Suite 500
Scottsdale, Arizona 85254
Telephone: 480-684-1100
Fax: 480-684-1199
dthiel@clarkhill.com

*Local Counsel for Plaintiffs*

**LABATON SUCHAROW LLP**
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

*Counsel for Plaintiffs*

[Additional Counsel on signature page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE OPENDOOR TECHNOLOGIES INC. SECURITIES LITIGATION | Case No. 2:22-CV-01717-MTL |
| | **MEMORANDUM OF LAW IN OPPOSITION TO OPENDOOR DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | CLASS ACTION |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...................................................................................................iii

I.   INTRODUCTION ......................................................................................................... 1

II.   STATEMENT OF FACTS............................................................................................ 4

    A.   Defendants Misled Investors About the Company's Business Model.......... 4

    B.   Defendants Misled Investors About the Company's Pricing
        Decisions ...................................................................................................... 4

    C.   Defendants Misled Investors About the Company's Ability to
        Maintain Positive Contribution Margins in any Housing
        Environment..................................................................................................5

    D.   Despite the Housing Market Slowing, Defendants Continued
        Misleading Investors About the Algorithm's Capabilities .......................... 6

III.   ARGUMENT ................................................................................................................. 7

    A.   The Complaint Adequately Alleges Falsity .................................................. 7

        1.   Statements Regarding the Purported Accuracy and Operability
            of the Pricing Algorithm ................................................................... 8

        2.   Statements Regarding Opendoor's Ability to Remain Profitable
            in Any Housing Market.................................................................... 12

        3.   The Remaining Statements Were also False and Misleading.......... 16

        4.   The Alleged Misstatements Were Material to Investors.................. 17

    B.   The Complaint Adequately Alleges a Strong Inference of Scienter........... 18

        1.   Wu's Insider Trading Supports a Strong Inference of Scienter ....... 19

            a.   Wu's Insider Sales Were Suspiciously Timed...................... 19

            b.   Wu's Insider Sales Were Significant in Amount.................. 22

        2.   It is Implausible to Suggest That Defendants Did Not Know
            About the Human-Driven Process for Pricing ................................ 23

        3.   Zillow's Exit From the iBuying Space Supports Scienter .............. 23

        4.   The FTC Investigation Supports Scienter....................................... 24

5.  Defendants' Statements Support Scienter ........................................ 24

6.  Defendants' Competing Inference Fails ........................................... 24

C.  The Complaint Adequately Alleges Loss Causation ................................. 25

1.  February 24, 2022 ........................................................... 26

2.  September 19, 2022 ......................................................... 28

3.  November 3, 2022 .......................................................... 29

D.  Plaintiffs' "Control Person" Claims Should Not be Dismissed for Lack of a Primary Violation ......................................................... 30

IV.  CONCLUSION ......................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Action Performance Cos. Inc. Sec. Litig.*
2007 WL 496770 (D. Ariz. Feb. 13, 2007)...................................................................... 18

*In re Alteryx, Inc. Sec. Litig.*,
2021 WL 4551201 (C.D. Cal. June 17, 2021) ............................................................ 23

*In re Amgen Inc. Sec. Litig.*,
2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)............................................................. 19

*In re AnaptysBio, Inc. Sec. Litig.*,
2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)............................................................. 22

*Berson v. Applied Signal Technology, Inc.*,
527 F.3d 982 (9th Cir. 2008) ............................................................................... 25, 26

*In re BofI Holding, Inc. Sec. Litig.*,
977 F.3d 781 (9th Cir. 2020) ............................................................................... 27, 29

*Brody v. Transitional Hosps. Corp.*,
280 F.3d 997 (9th Cir. 2002) ................................................................................... 7, 8

*In re Countrywide Fin. Corp. Derivative Litig.*,
554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...................................................................... 21

*In re Daou Systems, Inc.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................................. 26, 27

*Davidco Invs., LLC v. Anchor Glass Container Corp.*,
2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ............................................................... 21

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................................... 25

*ECA and Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase
Co.*,
553 F.3d 187 (2d Cir. 2009) ....................................................................................... 18

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) ...................................................................................... 7

iii

*Evanston Police Pen. Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) .......................................................................... 30

*Gebhart v. SEC*,
595 F.3d 1034 (9th Cir. 2010) ..................................................................................... 24

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ....................................................................................... 7

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) ....................................................................................... 17

*In re HD Supply Holdings, Inc. Sec. Litig.*,
341 F. Supp. 3d 1342 (N.D. Ga. 2018) ....................................................................... 20

*Howard Gunty Profit Sharing v. Quantum Corp.*
1997 WL 514993 (N.D. Cal. Aug. 4, 1997) ................................................................ 18

*Hunt v. Bloom Energy Corp.*,
2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ........................................................... 22

*Hutton v. McDaniel*,
264 F. Supp. 3d 996 (D. Ariz. 2017) .......................................................................... 18

*In re Int'l Rectifier Corp. Sec. Litig.*,
2008 WL 9453468 (C.D. Cal. Dec. 31, 2008) ............................................................ 30

*Jaeger v. Zillow Group, Inc.*
2022 WL 17486297 (W.D. Wash. Dec. 7, 2022) ................................................. 11, 15

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ................................................................................. 13, 16

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023) ........................................................... 22

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
416 F.3d 940 (9th Cir. 2005) ...................................................................................... 31

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .................................................................................... 28

*In re Maxim Integrated Prods., Inc. Sec. Litig.*,
639 F. Supp. 2d 1038 (N.D. Cal. 2009) ................................................................ 28, 30

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ........................................................................................ 8

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018) ............................................................................ 25, 26, 27

*In re Netflix, Inc. Sec. Litig.*,
647 F. App'x 813 (9th Cir. 2016) .................................................................................. 14

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding
Corp.*,
320 F.3d 920 (9th Cir. 2003) ....................................................................................... 7, 20

*In re Plantronics, Inc. Sec. Litig.*,
2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) ............................................................. 10

*Plevy v. Haggerty*,
38 F. Supp. 2d 816 (C.D. Cal. 1998) ........................................................................... 18

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ........................................................................... 18, 19, 20

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) .............................................................................. 19, 23, 25

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ............................................................. 18

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776, 785 (9th Cir. 2008) ............................................................................... 23

*Scheller v. Nutanix, Inc.*,
2020 WL 5500422 (N.D. Cal. Sept. 11, 2020) ............................................................ 25

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016) ........................................................................................ 8

*SEB Inv. Mgmt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020) ....................................................................... 15

*SEC v. Mozilo*,
2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ............................................................ 17

*In re SeeBeyond Tech. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ....................................................................... 22

*Shupe v. Rocket Cos., Inc.*,
2023 WL 2411002 (E.D. Mich. Mar. 8, 2023) ............................................................ 22

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ...................................................................................... 18

*Smilovits v. First Solar Inc.*,
  119 F. Supp. 3d 978 (D. Ariz. 2015), *aff'd*, 881 F.3d 750 (9th Cir. 2018)............ 28, 30

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................... 7, 19, 25

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
  2017 WL 2378369 (C.D. Cal. May 31, 2017) ....................................................... 17, 18

*Villare v. Abiomed, Inc.*,
  2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021).............................................................. 18

*Warshaw v. Xoma Corp.*,
  74 F.3d 955 (9th Cir. 1996) ............................................................................................. 8

*Willis v. Big Lots, Inc.*,
  2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ..............................................................21

*Zaghian v. Farrell*,
  675 F. App'x 718 (9th Cir. 2017) ................................................................................. 12

*Zamir v. Bridgepoint Educ., Inc.*,
  2016 WL 3971400 (S.D. Cal. July 25, 2016) ............................................................... 23

Lead Plaintiffs Indiana Public Retirement System, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association ("Lead Plaintiffs") and Additional Plaintiff Stuart Graham Hereford ("Additional Plaintiff" and together with Lead Plaintiffs, "Plaintiffs"), respectfully submit this Memorandum of Law in opposition to Opendoor Defendants' Motion to Dismiss the Consolidated Amended Complaint.[1] In an attempt to muddle the differences between Plaintiffs' Exchange Act claims and Securities Act claims, Defendants' MTD conflates the standards under Section 10(b) of the Exchange Act and Section 11 of the Securities Act. For clarity's sake, Plaintiffs address Defendants' Section 10(b) arguments in this opposition brief and address Defendants' Section 11 arguments in Plaintiffs' Opposition to Underwriter Defendants' Motion to Dismiss, filed concurrently herewith.

## I.    INTRODUCTION

This securities fraud class action arises from Defendants' repeated misrepresentations regarding Opendoor's business model and its ability to work in any housing market. Specifically, throughout the Class Period, Defendants led investors to believe that Opendoor had revolutionized the residential real estate market using technology and claimed that their proprietary pricing algorithm was the cause of the Company's success. However, in reality, Opendoor's success was driven by an undisclosed, human-driven process for pricing homes and a hot housing market. By the end of the Class Period, once the fraud was revealed, Opendoor's common stock had declined by 94% since the first day of the Class Period. This action seeks to recover those significant losses for investors.

Opendoor buys and sells residential real estate in the United States through an online process known as "iBuying." ¶51. iBuyers use technology to estimate the value of a

---

[1] Capitalized terms herein have the same meaning as set forth in the Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF No. 39) (the "Complaint"). Citations to "¶ __" refer to paragraphs of the Complaint. References to "MTD at __" are to Opendoor Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof (ECF No. 48). References to "Defendants" are to Defendants Opendoor Technologies, Inc., Eric Wu, and Carrie Wheeler only.

particular home and, based on that value, make an offer to a seller. *Id.* From the start of the Class Period, Defendants claimed that Opendoor's pricing algorithm used machine learning to estimate the value of homes accurately and profitably. ¶57. Importantly, Defendants claimed that their technology allowed them to remain profitable in ***any*** housing market. ¶60. Indeed, Defendants repeatedly touted the Company's success in delivering strong contribution margins—the key indicator of the Company's profitability—and attributed that success to Opendoor's supposedly superior pricing algorithm. *Id.*

However, Defendants concealed from investors a human-driven process that was responsible for Opendoor's success. According to several former employees, the algorithm could not accurately price homes from the start of the Class Period and, as a result, Opendoor employees manually adjusted Opendoor's offers before presenting them to customers. ¶¶62-73. Moreover, Opendoor employees charged sellers for repairs that Opendoor did not complete but would retain as extra profit. ¶¶74-84. As a result, Opendoor was susceptible to changing market conditions, contrary to what they told investors.  And that is exactly what happened in 2022 as the housing market cooled off.

Investors slowly learned the truth about the Company's business model when, on February 24, 2022, Opendoor revealed declining contribution margins for the first time. ¶130. On this news, Opendoor's stock dropped by more than 23% the very next day. ¶131. Then, on September 19, 2022, Bloomberg published an article revealing that Opendoor had lost money on 42% of its real-estate transactions in August 2022. ¶159. On this news, Opendoor's stock fell by over 12% over the next two trading days. ¶160. Finally, on November 3, 2022, Opendoor disclosed a negative 0.7% contribution margin, exposing for the first time the fundamental inadequacy of Opendoor's algorithm and business model. On this news, Opendoor's stock fell by 25% over the next two trading days. ¶¶162-63.

Nonetheless, Defendants now contend that Plaintiffs have not asserted a viable claim of securities fraud. Their arguments are without merit. First, Defendants' MTD erroneously tries to recast this case as one where an unforeseen rise in interest rates negatively impacted the Company's business. This is wrong. This case is about Defendants

making specific, materially misleading statements that concealed: (1) the true capabilities of the Company's pricing algorithm; (2) the human-driven process for pricing homes that materially contributed to the Company's success; and (3) the risk that Opendoor faced from changing market conditions due to the failure of its algorithm. Indeed, once Defendants' fraud was fully revealed, industry experts stated that the news "reveal[ed] concerning underlying problems that perhaps *go deeper than [a rise in] interest rates*." ¶164.

Second, Defendants argue that they never promised Opendoor's algorithm would work in any housing market and disclosed that humans played a role in pricing Opendoor's offers. However, this assertion is belied by the Complaint's allegations. Defendants did in fact promise that Opendoor's algorithm worked in any housing market. On November 10, 2021, Defendant Wheeler unequivocally stated, "*our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets*." ¶181.

Third, Defendants' scienter arguments fare no better. They claim they could not have predicted the housing downturn in 2022 or the related impacts on Opendoor's business, and thus, did not know their statements about Opendoor's ability to work in any housing market were false. However, this argument misses the mark. The Complaint specifically details that Defendants knew that they withheld from investors facts such as the human-driven process of lowering offers and charging for unnecessary repairs—which rendered their statements touting the Company's algorithm and contribution margin success false. Moreover, while knowing of the human-driven process, Wu suspiciously cashed in over $100 million in insider sales prior to Opendoor's disclosures that contribution margins were plummeting, demonstrating that the algorithm did not work.

Fourth, Defendants' loss causation arguments that the corrective disclosures did not reveal any new information is belied by the facts, including that Opendoor's stock price declined substantially in response to the new material information exposing the fundamental inadequacy of Opendoor's algorithm and business model and correcting the misleading impression—that Opendoor's algorithm was impervious to market changes— conveyed by Defendants' false and misleading statements.

3

For all these reasons, the Court should deny the MTD and sustain the Complaint.

## II.    STATEMENT OF FACTS

### A.    Defendants Misled Investors About the Company's Business Model

Founded in 2014, Opendoor buys and sells residential real estate in the United States through an online process known as "iBuying." ¶3. Critical to the success of iBuyers such as Opendoor is their pricing algorithm and ability to accurately predict house prices. ¶4. Throughout the Class Period, Defendants touted the Company's AI-pricing algorithm, claiming it used machine learning to predict and adjust to changing economic circumstances. ¶¶87, 168-69. Moreover, Defendants claimed that Opendoor's pricing algorithm was critical to the Company's profitability, specifically its "contribution margin," which they stated was "an important measure of business performance" and "[t]he ultimate measure [investors] should hold [Opendoor] accountable for." ¶59. Throughout the Class Period, Defendants touted strong contribution margins and claimed that this success was driven by Opendoor's purportedly superior algorithm. *See, e.g.*, ¶¶181, 186.

### B.    Defendants Misled Investors About the Company's Pricing Decisions

However, Defendants concealed a broader human-driven process that actually drove the Company's pricing decisions and led to the Company's success. ¶89. According to several former employees, Opendoor's algorithm could not accurately price homes, and as a result, Opendoor's pricing analysts had to manually adjust both initial and final offers. ¶¶62-73. For example, according to CW 5, approximately 50% of the initial offers had to be sent to human beings for review. ¶71. Similarly, CW 2 stated that the pricing algorithm was never accurate and, as a result, about 90% of the final offers she submitted for the homes she priced were below the number generated by the system. ¶¶64-67.

These CW allegations establish that a human driven process drove Opendoor's pricing decisions *during* the Class Period and had for years. ¶¶62-73. According to the Federal Trade Commission ("FTC"), who had been investigating Opendoor since 2019, Opendoor's employees manually adjusted offers since at least 2019. ¶¶18, 20. Indeed, after a three year long investigation, the FTC released its complaint against Opendoor on August

4

1, 2022, stating "Opendoor's internal analyses showed . . . these manually adjusted offers were several percentage points below Opendoor's assessment of market value" and that "[b]eginning no later than 2019, Opendoor *instituted a policy* to reduce its manually adjusted offers to [redacted] below what Opendoor assessed as market value." ¶144.[2] Relatedly, Defendants also misled investors about the Company's contribution margin success by hiding from investors deceptive consumer practices that contributed to the Company's success. ¶74. For example, throughout the Class Period, Opendoor charged sellers for repairs that Opendoor would not make but would retain as extra profit. ¶¶76-81. Indeed, the FTC Complaint confirmed that Defendants knew about this practice, stating that "[o]ne *internal study* found that for [redacted] of Opendoor's purchases, its deductions for repair costs were greater than Opendoor's actual costs" and explaining that in those situations, "Opendoor retains the excess as profit." *Id.* (emphasis added).

**C.     Defendants Misled Investors About the Company's Ability to Maintain Positive Contribution Margins in any Housing Environment**

During much of the Class Period, Zillow was Opendoor's main competitor in the iBuying space. ¶92. However, the entire iBuying business model came under intense scrutiny when, on November 2, 2021, Zillow announced that it was shutting down its iBuying business. ¶101. In response, the market began questioning ibuying as a whole and causing Opendoor's stock price fell by more than 14.5% ¶102. Yet, during the Company's next conference call, on November 10, 2021, analysts asked questions about the strength of Opendoor's pricing algorithm compared to Zillow. ¶107. In response, Wheeler unequivocally stated to investors that Opendoor's algorithm worked in *any* market. ¶181. Specifically, Wheeler assured investors that "*our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets*." *Id.* Based on these false reassurances, Opendoor's stock price shot back up by more than 15.5%. ¶111.

---

[2] Although the FTC Complaint became public on August 1, 2022, Defendants issued a press release the very same day which mislead investors about the findings. Specifically, the press release falsely claimed that "*the allegations raised by the FTC are related to activity that occurred between 2017 and 2019*." Thus, investors did not know that Opendoor employees continued to manipulate Opendoor's offers, i.e., humans continued to drive pricing decisions throughout the Class Period. *See* ¶¶62-73.

Defendants knew that Wheeler's statement was false and misleading and that Opendoor's algorithm was no different than Zillow's. Armed with this knowledge, just three days later, Defendant Wu sold an enormous amount of Opendoor stock, making **$57.6 million dollars** in just three days while ordinary investors were left in the dark. ¶114.

### D.     Despite the Housing Market Slowing, Defendants Continued Misleading Investors About the Algorithm's Capabilities

Investors began to learn the truth on February 24, 2022, when Opendoor revealed declining contribution margins. ¶130. Specifically, after the market closed on that day, Defendants revealed that the Company's fourth quarter 2021 contribution margin was 4.0%, which was a significant decline from the Company's fourth quarter 2020 contribution margin of 12.6%. *Id.* On this news, the price of Opendoor common stock plummeted by more than 23% the next day. ¶131.

However, Defendants continued misleading investors about the algorithm's ability to work in any housing market. For example, on March 8, 2022, Wu claimed the Company "*ha[d] good evidence that [Opendoor] can operate in [a] declining market*," and provided specific reassurance when he said, "*if you run the business model through the worst recession in U.S. history, we would still have positive contribution margins*." ¶¶189, 192. However, unbeknownst to investors, Opendoor could not adapt to changing market conditions, leading to increasing levels of excess inventory as the housing market cooled off and causing Opendoor to issue incentives and credits to buyers and use a third-party brokerage to move excess inventory, which further ate into the Company's contribution margins. ¶¶118-29. Yet Defendants continued misleading investors as the housing market got progressively worse. On August 4, 2022, Wheeler acknowledged the rise in interest rates but doubled down and reassured investors that Opendoor's "*systems are doing exactly what they're designed to do, which is responding very, very quickly, adjusting priced to market within recent spreads and new acquisitions*." ¶199. However, this was false, as Opendoor's systems were not responding to the market conditions at that point.

6

On September 19, 2022, investors learned more about Opendoor's failing business, when Bloomberg reported that Opendoor lost money on 42% of its transactions in August. ¶159. On this news, the Company's stock price fell by over 12% over the next two trading days. ¶160. Then, on November 3, 2022, Opendoor revealed that its contribution margin for the third quarter of 2022 was *negative 0.7%*, which revealed for the first time that Opendoor's pricing algorithm did not work in a down housing market as Defendants claimed. ¶162. Investors reacted immediately, as Opendoor's stock price to fall by *more than 25%* over the next two trading days to close at $1.74 per share on November 7, 2022— a *stunning 94.43% decline from the start of the Class Period*. ¶¶163, 351.

## III.    ARGUMENT

On a "motion to dismiss a § 10(b) action, courts must . . . consider the complaint in its entirety." *Tellabs Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007). They must "accept[] the plaintiff's allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1035 (9th Cir. 2016). "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings[.]" *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Dismissal is not appropriate "unless it appears beyond a doubt that the plaintiff cannot prove any set of facts in support of the claim that would entitle him or her to relief." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

### A.    The Complaint Adequately Alleges Falsity

A statement is misleading if it "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Further, "statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008).  Thus, "'once defendants cho[o]se to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that

7

cuts against the positive information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016). A court should dismiss a complaint "*only* if reasonable minds could not disagree that the challenged statements were not misleading." *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996).

### 1.    Statements Regarding the Purported Accuracy and Operability of the Pricing Algorithm

Throughout the Class Period, Defendants touted the importance and accuracy of the Company's pricing algorithm. For example, Defendants claimed that the algorithm used "*machine learning to drive pricing decisions*," ¶169, and told investors that the algorithm was critical to the Company's ability to price homes accurately and remain profitable. ¶173 (stating that Opendoor's "*proprietary, machine learning-based pricing models are key to [Opendoor's] ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation*."). Defendants also touted the algorithm's ability to react to changing market conditions, explaining that the algorithm could "*dynamically adjust to leading market indicators and react to real-time macro- and micro- economic conditions*." ¶¶169, 177. Defendants then told investors that this ability to "dynamically adjust" to changing market conditions allowed Opendoor to remain profitable in *any* housing market. For example, on February 24, 2022, Defendant Wheeler stated that Opendoor's ability to "*dynamically price homes in response to both micro and macro factors* [] *allows [Opendoor] to manage . . . within [a] 4% to 6%, annual [contribution] margin range, [] regardless of the home cycle we're operating in*." ¶186.

These statements were false and misleading because they "create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006. Specifically, Defendants created the impression that the Company's success was the result of its AI-powered algorithm, which they claimed drove pricing decisions and kept Opendoor profitable in any housing market by reacting to changing economic conditions.  However, in reality, the algorithm could not accurately

8

price homes (even in a hot market) and as such the Company's pricing decisions were based on a human-driven process that led to the Company's success.

Several former employees have confirmed that the algorithm was extremely inaccurate during the Class Period, and as a result, humans, not the algorithm, drove the Company's pricing decisions. ¶¶62-73. According to CW 5, who was brought in to price initial offers, approximately 50% of the properties were sent to human pricing analysts for review. ¶71. Moreover, CW 2 stated that her managers continuously told pricing analysts to not even use the algorithm to generate final offers because the algorithm was never accurate and would corrupt the pricing analysts' assessment of market value. ¶¶63-64.

Indeed, these CWs' statements are corroborated by the FTC's investigation, which found that, although Opendoor claimed that the algorithm generated "market based" offers, in reality, "Opendoor's employees have manually adjusted these values before presenting them to consumers as offers." ¶144. The FTC investigation further found that "Opendoor's internal analyses showed that these manually adjusted offers were several percentage points below Opendoor's assessment of market value" and explained that "[b]eginning no later than 2019, Opendoor instituted a policy to reduce its manually adjusted offers to [redacted] below what Opendoor assessed as market value." *Id.*

Moreover, the Company's success was also attributable to deceptive practices carried out by Opendoor employees. For example, Defendants never disclosed that Opendoor charged sellers for repairs that Opendoor would not make but would retain as extra profit. ¶¶76-81. The FTC investigation found that since before the Class Period, "Opendoor retain[ed] the excess as profit," and explained that an internal study—which was likely produced to the FTC during its investigation but is unavailable to Plaintiffs at this stage—showed "that for [redacted] of Opendoor's purchases, its deductions for repair costs were greater than Opendoor's actual costs." ¶148-49. The fact that this deceptive consumer practice contributed to the Company's success is further demonstrated by CW allegations that Defendants increased this fraudulent practice to try to maintain positive margins as the housing market cooled off in 2022. ¶¶81-82.

As a result, Opendoor's success was driven by human intervention and a hot housing market—which was materially different than what Defendants had investors believe, i.e., that Opendoor's tech-based business model used artificial intelligence to remain profitable in any market. Indeed, because Opendoor's success was largely attributable to human involvement and deceptive consumer practices—and because the algorithm was not working as Defendants repeatedly touted—the Company could not adjust to changing market conditions in 2022. ¶¶118-29.

Defendants argue that they never represented that all aspects of Opendoor's pricing process were fully automated and disclosed that human judgment played a role in pricing decisions. MTD at 13. However, this argument ignores the central thrust of the Complaint, which is that Defendants falsely attributed the Company's success to the algorithm while concealing that it was in fact a human-driven process that actually drove the Company's pricing decisions and significantly contributed to the Company's profitability.

Moreover, none of the purported disclosures about human judgment cited by Defendants (*see* MTD at 13) disclosed that Opendoor was forced to rely on humans to price its offers because its algorithm could not accurately price homes. ¶¶62-73. Nor did any of these purported disclosures about human judgment inform investors that the Company engaged in deceptive practices—such as manually adjusting offers below market value or charging for unnecessary repairs that Opendoor kept as profit—that contributed to the Company's profitability. ¶¶74-84, 143-49. Therefore, contrary to Defendants' argument, a reasonable investor's impression of the state of affairs at Opendoor was materially different than the one that actually existed. *See In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at *15 (N.D. Cal. Aug. 17, 2022) (rejecting argument that alleged misstatement disclosed the truth because "reasonable minds could differ as to whether the statements in question disclosed to the market the information that plaintiffs allege was omitted. . .").

The instant case is strikingly analogous to the securities fraud lawsuit against Zillow, which investors brought after Zillow left the iBuying business in November 2021. In *Jaeger v. Zillow Group, Inc.*, the plaintiffs alleged that the defendants' statements about

Zillow's pricing algorithm were false because they led investors to believe that Zillow's pricing decisions were based on the company's algorithm when, in reality, the defendants had "concealed the broader, more complicated, human-driven process." 2022 WL 17486297, at *6 (W.D. Wash. Dec. 7, 2022). Specifically, in June 2021, Zillow issued a press release stating that it had improved its pricing algorithm and that "[t]he changes allow[ed] the algorithm to react more quickly to current market trends" and as a result, the algorithm could "now react more quickly to dynamic market conditions, providing homeowners with a more accurate estimate [prediction] of a home's current value." *Id.* at *2. However, according to the complaint, behind the scenes Zillow used systematic human pricing overlays to drive up offers above the pricing indicated by Zillow's algorithm in order to increase the Company's inventory levels. *Id.* Although the defendants in *Zillow Group* similarly argued that other disclosures were sufficient to tell investors about the human-driven process of using overlays to increase inventory, the court disagreed and held that the "[d]efendants had a duty not to mislead the market to believe that Zillow was progressing automation for pricing and inventory decisions—a trend that [d]efendants had repeatedly touted—when, as the [complaint] alleges, Zillow had introduced overlays that reduced automation." *Id.* at *7 (citing *Schueneman*, 840 F.3d at 705-06).

Although Zillow employees manually *increased* the algorithm's offers and here Opendoor employees manually *decreased* the algorithm's offers, this distinction is of no moment. What matters is that both companies led investors to believe that their algorithms were responsible for that company's success—for Zillow, increasing inventory levels; for Opendoor, maintaining strong contribution margins—while concealing a broader human-driven process that contributed to each company's success and made them susceptible to additional risks from broader market movements.

Following Zillow's exit from the iBuying space, Defendants knew the market had started to question the effectiveness of Opendoor's algorithm, as Opendoor's stock fell by more than 14.5% the day after Zillow announced it could not develop an accurate pricing algorithm. ¶¶101-02. However, despite knowing that its own algorithm could not

11

accurately price homes (and that pricing decisions were made by humans), Defendants doubled down during their next earnings call in assuring investors that its algorithm was accurate and worked in all housing markets.

### 2. Statements Regarding Opendoor's Ability to Remain Profitable in Any Housing Market

On November 10, 2021—just days after Zillow's iBuying business collapsed and the market had started questioning the iBuying business model—Defendant Wheeler addressed a question about whether Opendoor could deliver positive margins in a changing housing market. In response, Wheeler stated that Opendoor had been "rigorously back testing [its] models every day" and unequivocally stated that "*our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets*." ¶181.

In their MTD, Defendants try to paint Wheeler's statement as an innocuous prediction of "Opendoor's plan of operation in a down market," which they argue was not a guarantee that the Company maintain positive contribution margins in down markets. MTD at 18-19. This reading of Wheeler's statement is tenuous at best. First, her statement was false and misleading because the algorithm did not work in any market—up, down, or otherwise—and the Company's success was the result of humans. Second, Wheeler did not say she *hoped* or *thought* the algorithm would work in a down market, or even that she *expected* it to work in a down market. Instead, the simple truth—which Defendants ignore—is that Wheeler unequivocally stated that it *works* in down markets.[3]

Moreover, the context of Wheeler's statement is important. The statement came just days after Zillow announced it was exiting the iBuying business because its algorithm could not accurately price homes, and investors started to question the iBuying business model. ¶¶101-08. Indeed, news of Zillow's exit caused *Opendoor's* stock to plummet by

---

[3] Contrary to Defendants' argument, MTD at 19 n.18, this statement is not protected by the safe harbor because Wheeler knew of facts that rendered this statement false and misleading. *See* Section III(B)(3)-(5). Moreover, the Company's generic risk factors were not meaningful because they did not disclose the risk that Opendoor was susceptible to changing market conditions due to the undisclosed human-driven process. *See Zaghian v. Farrell*, 675 F. App'x 718, 719-20 (9th Cir. 2017) ("cautionary language also must have consisted of non-boilerplate warnings that were tailored to the forward-looking statements").

more than 14.5% the very next day. ¶102. However, following Wheeler's false reassurance to the market, Opendoor's stock rebounded by more than 15.5%, as investors (wrongly) believed Opendoor's algorithm worked as Defendants represented. ¶111. Thus, investors believed, based on Wheeler's statement, that Opendoor's algorithm could adjust to changing market conditions and worked in down housing markets. As such, the Court should reject Defendants' interpretation of Wheeler's statement because in this Circuit, whether a statement is materially misleading cannot be resolved as a matter of law unless "the adequacy of the disclosure . . . is so obvious that reasonable minds could not differ." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1014 (9th Cir. 2018). Defendants' dubious attempts to reinterpret Wheeler's statement falls short of this high hurdle.

Moreover, Defendants' argument is completely obviated by later Class Period misstatements. Specifically, just months later Defendant Wu doubled down on Wheeler's statement by claiming that the Company purportedly had empirical evidence to support Wheeler's statement that the algorithm worked in all housing markets. For example, on March 8, 2022, Wu claimed that even "***if you run the business model through the worst recession in U.S. history, we would still have positive contribution margin***." ¶189. Indeed, later during the same conference, Wu again told investors that Defendants "***ha[d] good evidence that [Opendoor] can operate in [a] declining market***." ¶192. In other words, Wu told investors that Defendants knew—based on presently-known information and internal testing by Opendoor—that the algorithm worked in all housing markets.

Defendants argue that Wu's statements were "completely unremarkable" and could not have misled investors because the subprime mortgage crisis (i.e., the Great Financial Crisis or "GFC") did not involve a similar rise in interest rates and related downtown in housing prices. MTD at 19. This argument is without merit because it ignores the fact that the algorithm never worked as Defendants claimed. Indeed, since before the Class Period, the FTC had been investigating Opendoor for the undisclosed, human-driven process that rendered Defendants' statements false and misleading.

13

Defendants also argue that the challenged statements are not misleading because the Company's other disclosures put investors on notice that the algorithm might not work in every possible market. MTD at 12-13. However, these disclosures came nowhere near disclosing the truth. The boilerplate disclosures Defendants point to are a far cry from disclosing that the algorithm itself was *already* unable to accurately price homes and that the Company's success to that point was the result of humans, not the algorithm, who drove pricing decisions and inflated the Company's margins through deceptive business practices (meaning the Company was at an increased risk of fluctuating real estate markets).[4]

The simple fact is that Defendants' statements led investors to believe that Opendoor's pricing algorithm worked in all housing markets. Indeed, the Complaint adequately alleges that this is exactly what analysts and investors took away from Defendants' statements about the algorithm's ability to work in any market. For example, Wedbush stated in an analyst report that it believed Opendoor's "pricing capabilities let it optimize acquisition and resale *across all market conditions*." ¶97 (emphasis added). Similarly, *Seeking Alpha* published an article calling "Opendoor's pricing algorithm . . . the best in the business – a first of its kind machine-learning platform." ¶99. Just as the *Zillow Group* court found, here, the Complaint adequately alleges "that Defendants' disclosures were inadequate . . . [because] Plaintiff has alleged that analysts drew from Defendants' public statements the (incorrect) conclusion that Defendants had sharpened their algorithms' response to the market" and "[t]he perceptions of analysts are an acceptable measure of what reasonable investors would have understood." *Zillow Grp.*, 2022 WL 17486297, at *7. Thus, the Court must accept the Complaint's well-pled allegations that investors were misled by Defendants' false and misleading statements. *See SEB Inv. Mgmt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1131-32 (N.D. Cal. 2020)

---

[4] Defendants' citation to *In re Netflix, Inc. Sec. Litig.*, 647 F. App'x 813 (9th Cir. 2016) is inapposite. There, Netflix's CEO "refused to 'guess at what the long-term operating margins' would be" and specifically warned investors about the risk of switching from its DVD-by-mail business to online streaming. *Id.* at 815-16. Here, on the other hand, Defendants did the opposite of refusing to guess and instead promised Opendoor's algorithm worked in all housing markets, including the worst recession in U.S. history.

14

("the Court must adopt Plaintiff's interpretation that [defendant] was discussing the impact of competition generally because the Court may not resolve" factual disputes in Defendants' favor on a motion to dismiss).

Defendants also argue there are no contemporaneous allegations suggesting that their statements were false. MTD at 15. This is wrong. There are numerous corroborative allegations demonstrating that Opendoor's pricing algorithms were not accurate and could not respond to changing market conditions. *See* ¶¶44, 47, 63-71. For example, CW 2—who started working as a pricing analyst at Opendoor in July 2021—stated that the algorithm was wildly inaccurate, and as a result, 90% of the final offers were generated by pricing analysts without using the algorithm (indeed, her supervisors, who were Pricing Escalation Managers for the western U.S., even told her to not look at the algorithm's computer-generated number). ¶¶44, 63-70. Similarly, CW 5—who worked at Opendoor from November 2018 through March 2020—stated that approximately half of the initial offers sent to customers were sent to humans for pricing. ¶¶47, 71. These allegations specifically demonstrate that Opendoor's algorithm was not responsive at the start of the Class Period, and that Opendoor was simply riding a hot housing market. Then, as the hot market cooled off in 2022, several CWs explain that Opendoor could not adjust to the changing housing market, causing substantial losses for the Company. ¶¶118-29. Moreover, Defendants' argument fails to address that Defendants' statements about the algorithm's purported strengths and capabilities were false and misleading for failing to disclose the broader human-driven process. ¶171. *See Zillow Grp.*, 2022 WL 17486297, at *3, 7 ("statements about Zillow's reliance on and improvements to its algorithms" were misleading for failing to disclose the "broader, more complicated human-driven process implemented").

Finally, Defendants argue that Wheeler's statement on August 4, 2022—which reassured investors that Opendoor's "***systems are doing exactly what they're designed to do, which is responding very quickly, adjusting prices to market***"—was not false or misleading because, in the full quote, Wheeler acknowledged that Opendoor was addressing, not hiding, the Company's problems. MTD at 16. Not so. Although Wheeler's

15

full statement did acknowledge that it was "hard to forecast" the change in mortgage rates, this answer was in response to a question about whether the Company would switch to providing annual forecasts. *See* Defs. Ex. 19 at 5-6.[5] Wheeler reassured the analyst that the "very fast-moving rates in a single quarter" was difficult but that did not mean the Company could not forecast quarter-to-quarter. *Id.* Then Wheeler explained that "***our systems are doing exactly what they're designed to do, which is responding very quickly, adjusting prices to market***." *Id.* This was false and misleading because Opendoor's systems were not responding to the changing market conditions, which caused concerning levels of inventory by the time Wheeler made that statement. ¶¶118-29.

### 3.    The Remaining Statements Were also False and Misleading

Defendants also misled investors by claiming that the Company's "***business model is designed to generate margins from our service charge to sellers and adjacent products and services associated with a transaction, and not from the spread between acquisition price and resale price***." ¶175, *see also* ¶179. These statements were false because they led investors to believe that Opendoor was more than a traditional real estate company that bought low and sold high. However, as the FTC later found, although "Opendoor claimed that it did not make money from 'buying low and selling high,' . . . gains from selling homes for more than its offer price are a ***key contributor*** to [Opendoor's] revenue." ¶150.

Moreover, after the FTC released its complaint against Opendoor, Defendants falsely told investors that "***the allegations raised by the FTC are related to activity that occurred between 2017 and 2019***." ¶196. However, as described in particular detail throughout the Complaint, the activity in the FTC complaint continued throughout the Class Period. For example, the FTC alleged that Opendoor employees manually adjusted

---

[5] Plaintiffs take no position with respect to the exhibits Defendants seek to incorporate by reference (*See* Opendoor Defendants' Notice of Incorporation by Reference and Request for Judicial Notice, ECF No. 50), except to the extent Defendants offer these exhibits for the truth of the matter asserted therein. *See Khoja*, 899 F.3d at 1003 ("it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint."). Similarly, Plaintiffs object to the documents Defendants seek judicial notice of, such as Exs. 16-18, because they are offered to establish a counter-factual narrative that is improper as the motion to dismiss stage. *See id.* at 998.

the algorithm's offer and charged sellers for repairs that Opendoor did not make. ¶¶143-49. Multiple CWs detail that these deceptive practices continued throughout the Class Period. ¶¶62-84. Thus, investors were unaware of Opendoor's human-driven process.

### 4.  The Alleged Misstatements Were Material to Investors

Defendants argue that the alleged misstatements were too "generalized, non-specific, and vague" to be actionable, i.e., puffery. MTD at 15. Defendants are wrong. Statements involving matters of central importance to a company are not immaterial puffery. *See, e.g., Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *13 (C.D. Cal. May 31, 2017) ("Given the alleged importance of the BlueTEC vehicles to Defendants' business, it is plausible that a reasonable investor would view Daimler AG's failure to live up to this environmentally friendly claim as significantly altering the 'total mix' of information available."); *SEC v. Mozilo*, 2010 WL 3656068, at *11 (C.D. Cal. Sept. 16, 2010) (misstatements were material where they concerned factors affecting company's "core business"). Here, the alleged misstatements related to the ***most critical aspect*** of Opendoor's business, its pricing algorithm, which Defendants admitted was "key to [Opendoor's] ability to acquire and resell thousands of homes per month accurately [and] profitably" and "core to what we do." ¶¶108, 173.

The materiality of Defendants' statements is also highlighted by the fact that they were made in direct response to analyst questions. *See, e.g.*, ¶¶181, 186, 189, 191-92; *see also Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 769-70 (9th Cir. 2023) (statements such as "tracking very well" were not immaterial given their context, including that they "were made during earnings conference calls . . . were made in response to specific questions by financial analysts."). Moreover, that sophisticated market analysts and reporters highlighted Defendants' statements in their reports underscores that these statements were not immaterial corporate puffery. *See, e.g.*, ¶¶10, 93, 97-99, 252-53, 262; *see also In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *12 n.10 (S.D.N.Y. Apr. 22, 2016)

17

(statements more than corporate optimism where they "could and did mislead a number of reasonable investors, as evidenced by the comments of analysts").[6]

Similarly, Defendants also argue that statements about its business model were too generic to be actionable, and the Defendants were not required to take a gloomy view of Opendoor's future. MTD at 18. However, Defendants' cases are distinguishable because they dealt with general statements of optimism, such as boasting that the company was "well positioned" to "expand rapidly." *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at \*13 (S.D.N.Y. Sept. 21, 2021). Here, Defendants made concrete, false statements about the most critical part of Opendoor's business that were highly material to investors. Contrary to the generic statements in Defendants' cases, Defendants' statements about Opendoor's business were specific, induced reliance, and "significantly alter[ed] the 'total mix' of information available to investors." *Daimler AG*, 2017 WL 2378369, at \*13.[7] In any event, questions of materiality is a "fact-specific inquiry" that "should ordinarily be left to the trier of fact." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009).

**B.     The Complaint Adequately Alleges a Strong Inference of Scienter**

Scienter is mental state that includes not only an "intent to deceive, manipulate, or defraud, but also deliberate recklessness." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary

[6] As such, Defendants' cases are distinguishable, as they dealt with general statements that no reasonable investor would rely upon. *See ECA and Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827 (C.D. Cal. 1998); *Hutton v. McDaniel*, 264 F. Supp. 3d 996, 1017 (D. Ariz. 2017).

[7] Defendants' other cases are distinguishable because they too dealt with generic statements that did not induce reliance. For example, in *In re Action Performance Cos. Inc. Sec. Litig.*, the Court found the statements "benefit[s] from a strong balance sheet and business model" were not actionable because they were generic and the plaintiff did not plead any facts showing the statement was false. 2007 WL 496770, at \*7-8 (D. Ariz. Feb. 13, 2007). Similarly, *Howard Gunty Profit Sharing v. Quantum Corp.* is distinguishable because there the statements were too vague such that "no reasonable investor would rely on such vague statements." 1997 WL 514993, at \*4 (N.D. Cal. Aug. 4, 1997).

effort." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). The scienter inference "need not be irrefutable, i.e., of the 'smoking-gun' genre.'" *Tellabs*, 551 U.S. at 324. Under this rule, "the tie goes to the Plaintiff." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *8 (C.D. Cal. Aug. 4, 2014). In determining scienter, a court must review "all the allegations holistically." *Tellabs*, 551 U.S. at 326.

### 1.   Wu's Insider Trading Supports a Strong Inference of Scienter

Defendant Wu's suspicious insider sales "weigh ***heavily*** in favor of [] scienter." *Tellabs*, 551 U.S. at 325.[8] When analyzing insider trading, courts "consider, *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Quality Sys.*, 865 F.3d at 1146. Here, Wu's sales are highly indicative of scienter.

### a.   Wu's Insider Sales Were Suspiciously Timed

During the Class Period, Defendant Wu sold roughly 6 million shares of Opendoor stock, reaping approximately $112 million in proceeds. ¶246. About half of those proceeds were generated during a three-day window between November 16 and November 18, 2021, when Wu sold more than 2.6 million shares for more than $57.6 million. ¶243. The circumstances of these sales were particularly suspicious, as these trades were made outside the parameters of Wu's 10b5–1 trading plan[9] and shortly after Defendants issued a series of misleading statements that caused a sharp spike in Opendoor's stock price. ¶¶243-44.

As explained above, *see* Section II(D), the market started to question the iBuying business model following Zillow's exit from the iBuying space, causing Opendoor's stock

---

[8] However, because motive is not required to plead scienter, *id.,* Defendants' argument regarding the lack of insider sales for 11 of the 12 Individual Defendants fails. *See* MTD at 21. Moreover, this argument is misleading because Wu and Wheeler are the only individuals named in Plaintiffs' Exchange Act claims. ¶¶39-41. Indeed, the Ninth Circuit has made clear that one Defendants' suspicious sales are sufficient to find scienter. *See Quality Sys.*, 865 F.3d at 1146 (suspiciously timed sales by CEO supported strong inference of scienter as to that individual, notwithstanding lack of sales by other individual defendants).

[9] Rule 10b5-1 plans provide a mechanism for corporate insiders to purchase and sell securities by setting a pre-determined plan that specifies the share price, amount, and transaction date—thereby providing the insider with a defense to insider trading.

to decline by more than 14.5%. ¶¶101-02, 240. Then during Opendoor's November 10 earnings call for Q3 2021, Defendants assuaged these concerns by differentiating Opendoor's algorithm from its competitors. ¶¶105-10. In response to these false assurances, Opendoor's stock price rebounded, climbing more than 15.5% on November 11, 2021. ¶¶111, 242. Three trading days later, Wu began to sell a substantial number of Opendoor shares *outside the parameters of his 10b5–1 plan*, selling more than 2.6 million shares of Opendoor stock between November 16 and 18 for proceeds of more than *$57.6 million*. ¶¶113-15, 243-44. These sales, which were made just a few days after Defendants misrepresented the accuracy and benefits of Opendoor's algorithm and Opendoor's stock price spiked as a result, appear to have been "calculated to maximize the personal benefit from undisclosed inside information." *Am. W. Holding Corp.*, 320 F.3d at 938-40.[10]

Defendants argue that the November sales were not suspicious because there was purportedly no indication of pricing issues at the time. MTD at 23-24. This assertion is inaccurate. According to CW4, Opendoor was already experiencing longer selling times and lower sales prices in multiple states during the second half of 2021. ¶119. Moreover, Zillow's announced exit from the iBuying business on November 2, 2021 was a glaring red flag. Defendants contend that "Zillow's exit was not relevant to Opendoor's prospects." MTD at 24 n.21. The market, however, certainly considered it to be relevant, as reflected by the 14.5% drop in Opendoor's stock price immediately following Zillow's announcement. Further, Defendants' November 10 statements were directly aimed at differentiating Opendoor from Zillow, even though Defendants knew that Opendoor's pricing decisions, like Zillow's, were based on a human-driven process—and thus susceptible to a declining housing market. *E.g.*, ¶¶104-12.[11]

---

[10] *See also Quality Sys.*, 865 F.3d at 1146 (sales made "shortly after [defendant] boast[ed] to investors" were suspicious); *In re HD Supply Holdings, Inc. Sec. Litig.*, 341 F. Supp. 3d 1342 (N.D. Ga. 2018) (sales made "one month after Defendants falsely assured investors that the problems were 'behind us now'" were suspicious).

[11] Moreover, the FTC had been investigating Opendoor's deceptive practices since 2019, undercutting any inference that Defendants were unaware of the practices in November 2021. ¶18.

Defendants also argue that the November 16-18 sales were not suspicious because that was the "first opportunity" that Wu had to sell the shares after the expiration of a lock-up restriction on October 5. MTD at 24. This argument is also a red herring. Defendants try to muddle the waters but ignore that these sales were made *outside* of the parameters of Wu's 10b5-1 plan. If Wu had a preexisting plan to liquidate a block of his previously locked-up shares at the "first opportunity," that intention would have been reflected in his 10b5–1 plan. It was not. Instead, Wu engaged in these ***discretionary*** mid-November transactions directly after Defendants falsely reassured investors that Opendoor's algorithm worked in all housing markets.[12]

Just like when a defendant amends his 10b5–1 plan within a class period, a defendant who executes additional trades outside the parameters of a preset plan "defeat[s] the very purpose of 10b5–1 plans, which were created to allow corporate insiders to 'passively' sell their stock based on triggers, such as specified dates and prices, without direct involvement." *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1069 (C.D. Cal. 2008). Trades made outside a 10b5–1 plan reinforce, rather than negate, an inference that the trades were timed to take advantage of inside information, particularly when they are otherwise suspiciously timed. *See, e.g.*, *Willis v. Big Lots, Inc.*, 2016 WL 8199124, at *33 (S.D. Ohio Jan. 21, 2016) (insider trading supported inference of scienter where defendants "sold stock outside of their 10b5-1 plans"); *Davidco Invs., LLC v. Anchor Glass Container Corp.*, 2006 WL 547989, at *20 (M.D. Fla. Mar. 6, 2006) (sales executed after expiration of lock-up were suspiciously timed where sales were made one week after conference call in which defendants presented positive information about company and six months prior to corrective disclosure).[13]

---

[12] Wu made sales pursuant to his 10b5–1 plan on July 16, August 5, August 16, October 14, October 15, and October 18, 2021. ¶245 n.8; Defs. Ex. 26 at 5, 7, 9, 13. Thus, for a four-month period prior to the November 2021 sales, Wu engaged in a regular pattern of non-discretionary pre-scheduled sales pursuant to his 10b5–1 plan, including three sets of sales made after the expiration of the lock-up on October 5. The November 2021 sales, therefore, were a deviation from this prior pattern in addition to being suspiciously timed to follow a spike in the stock price following a key set of misrepresentations.

[13] The cases cited by Defendants in which courts found sales not suspicious because

Footnote continued on next page

### b.    Wu's Insider Sales Were Significant in Amount

Defendants argue that Wu's November 16-18 sales do not support a strong inference of scienter because they represented only about 7% of Wu's holdings at the time. MTD at 23. But even sales of a relatively small percentage of an insider's holdings can support an inference of scienter if the absolute dollar value of the transactions is high. *See, e.g.*, *In re SeeBeyond Tech. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (finding a strong inference of scienter where CEO's sales of 7.6% of holdings did not represent "a large percentage of his shares," but "the amount of income he generated through his sales, $18 million, is significant"). Indeed, Wu's $112 million of proceeds were far more substantial than the $18 million deemed "significant" in *SeeBeyond*. Moreover, other courts have rejected the "more-money-less problems argument Defendants make here." *See Shupe v. Rocket Cos., Inc.*, 2023 WL 2411002, at *23 (E.D. Mich. Mar. 8, 2023). Wu should not get the benefit of the doubt simply because he is a billionaire.

Defendants also contend that Wu's trading was not suspicious because his overall holdings of Opendoor stock increased during the Class Period. MTD at 22. Wu's acquisitions, however, were part of his compensation and thus do not undercut an inference of scienter. *See* Defs. Ex. 26 at 1-2, 11; *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) (where "the increase in holdings were the result of compensation awards," defendants' net increase in holdings during class period did not negate inference of scienter). Therefore, Wu's sales support an inference of scienter. [14]

they followed the expiration of a lock-up (MTD at 24) are inapposite, as all of the challenged trades in those cases were made pursuant to 10b5-1 plans. *See In re AnaptysBio, Inc. Sec. Litig.*, 2021 WL 4267413, at *9, 13 (S.D. Cal. Sept. 20, 2021); *Hunt v. Bloom Energy Corp.*, 2021 WL 4461171, at *18 (N.D. Cal. Sept. 29, 2021); *see also* Case No. 20-CV-565 (S.D. Cal.) (Dkt. No. 49-1, Motion to Dismiss in *Anaptys* at 19, 22, 23); Case No. 19-cv-02935 (N.D. Cal.) (Dkt. No. 129, Motion to Dismiss in *Bloom Energy* at 19).

[14] The cases relied upon by Defendants, in which courts found that large sales were not sufficient to support a strong inference of scienter, are inapposite. In *In re Alteryx, Inc. Sec. Litig.*, 2021 WL 4551201, at *4 (C.D. Cal. June 17, 2021), the defendant's $71.2 million in proceeds resulted from smaller trades evenly distributed over a six-month class period. While the court found the amount of trades, "taken alone," did not support a strong inference of scienter, its overall holding was based on multiple factors, including the innocuous timing of the trades and the fact that most were made pursuant to 10b5–1 plans. Here, Wu's $57.6 million in sales were concentrated in a three-day period, made outside

Footnote continued on next page

22

## 2.    It is Implausible to Suggest That Defendants Did Not Know About the Human-Driven Process for Pricing

Given the importance of Opendoor's iBuying business, which was the Company's *only* product, here, "it would be absurd to suggest that management was without knowledge of" the algorithm's true capabilities. *Reese*, 747 F.3d at 577. Indeed, Wheeler herself acknowledged that "pricing is absolutely core to what we do" ¶249. Similarly, the Company's 2021 Annual Report stated that "[o]ur ability to price homes competitively is fundamental to our business model." ¶250. Further, the Complaint specifically alleges Defendants were aware of facts concerning the undisclosed human-driven process. For example, the Complaint alleges that Defendants were involved in a years-long FTC investigation into these facts. ¶¶139-51. Moreover, Defendants knew about these facts because, according to the FTC complaint, Opendoor conducted "internal analyses" into this practice and Defendants even went so far as to "institute[] a policy" to do so. ¶144; *see also* ¶¶148-49. Moreover, the CW allegations demonstrate that these practices continued throughout the Class Period. *See* ¶¶62-84; *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) (core operations facts support scienter when combined with "specific allegations about management's exposure to factual information"). Thus, it would be absurd to suggest that Defendants were unaware of the concealed facts which rendered their statements false and misleading.

## 3.    Zillow's Exit From the iBuying Space Supports Scienter

Zillow's exit from iBuying supports scienter because Zillow was Opendoor's largest competitor who had just admitted that it could not maintain an accurate pricing algorithm. ¶273. Then, just a few days later, analysts asked direct questions about the sustainability of Opendoor's business given the news. ¶181. In response, Wheeler reassured investors

the scope of his 10b5–1 plan, and immediately followed a series of misleading statements and a concomitant spike in Opendoor's stock price. In *Zamir v. Bridgepoint Educ., Inc.*, 2016 WL 3971400, at *10 (S.D. Cal. July 25, 2016), defendants' insider sales of $141 million (the total proceeds for four individuals) occurred during a quarter in which the company's net loss was understated, not overstated, and the sales occurred through a tender offer approved by a special committee of independent board members. Here, where one individual made sales of more than $112 million, $57.6 million of which were particularly suspiciously timed, outside the scope of his trading plan, and subject only to his discretion.

23

that Opendoor's business worked in all housing markets. *Id.*  Thus, either Wheeler knew that this statement was false, or she did not, and was thus reckless in disregarding the risk that Opendoor did not work in a down market. *See Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010) (establishing scienter requires showing that "'the defendants either knew that the representations they made to investors were false or were reckless in disregarding a substantial risk that they were false'"). Moreover, Wu's substantial insider sales, made three days after Wheeler's false and misleading statement, further supports that Defendants knew they had misled the market about the algorithm's capabilities.

### 4.    The FTC Investigation Supports Scienter

Defendants, as the Company's highest-ranking officers, would have been aware of a years-long FTC investigation into the very conduct that the Complaint alleges was withheld from investors. Moreover, the FTC investigation found that Opendoor had conducted internal analyses showing its employees manually adjusted offers and charged for unnecessary repairs, ¶¶144, 149, thereby strengthening the inference that Wu and Wheeler must have known about the undisclosed practices.

### 5.    Defendants' Statements Support Scienter

Defendants repeatedly discussed the algorithm's capabilities and told investors that they were "rigorously back testing [Opendoor's] models every day." ¶¶108, 181. These statements support an inference that Defendants knew that the algorithm was not working. As the Ninth Circuit has explained, an assertion that defendants were unaware of the alleged issues can be "directly contradicted by the fact that [they] specifically addressed it in [their] statement[s]." *Reese*, 747 F.3d at 572. Moreover, the temporal proximity of Wheeler's August 4, 2022 false and misleading statement and the corrective disclosures supports an inference of scienter. *See Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 985 n.5 (9th Cir. 2008) (temporal proximity "bolsters the inference" of scienter).

### 6.    Defendants' Competing Inference Fails

All of these allegations, viewed holistically, *Tellabs*, 551 U.S. at 326, plead a strong inference that Defendants were at least deliberately reckless in misleading investors.

24

Defendants' competing inference—that they simply did not expect such a "dramatic" rise in interest rates—is belied by these facts. From the start, Defendants claimed their AI-powered algorithm insulated the Company from changing market conditions—like a rise in interest rates—while hiding from investors a human-driven process that made Opendoor susceptible to those changes. At most, this presents a "a close question," which, at this stage, must be resolved in Plaintiffs' favor. *Scheller v. Nutanix, Inc.*, 2020 WL 5500422, at \*9 (N.D. Cal. Sept. 11, 2020).

### C.    The Complaint Adequately Alleges Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). The Ninth Circuit's test for loss causation boils down to "the familiar test for proximate cause." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). Indeed, the Ninth Circuit has made clear that there are an "'infinite variety' of causation theories a plaintiff might allege to satisfy proximate cause." *Id.* at 754.

Plaintiffs' theory of loss causation here is simple. Throughout the Class Period, Defendants misled investors by falsely stating that the Company's pricing algorithm drove the Company's contribution margins and kept Opendoor profitable in any housing market (while hiding the human-driven process that actually drove pricing decisions and led to the Company's success). Indeed, because Defendants told investors that contribution margin was an important measure of profitability, ¶59, investors focused on contribution margin as a proxy for the Company's success. ¶61. Thus, when Defendants repeatedly touted their strong contribution margins and falsely attributed that success to their purportedly superior pricing algorithm, investors (wrongly) believed that Opendoor's algorithm was working as intended and that Opendoor was superior to other iBuyers, like Zillow. ¶¶97-99. Indeed, when Zillow exited the iBuying space, Defendants falsely assured investors that their algorithm would work in any market, including a down market. ¶181.

However, the truth regarding Opendoor's algorithm and its ability to maintain strong contribution margins in any market revealed itself throughout 2022, as the housing

25

market cooled off. As explained below, Opendoor revealed progressively worse contribution margins throughout 2022. These major declines in a key financial metric throughout 2022—which resulted in substantial stock price drops—revealed the relevant truth that Defendants' misstatements had concealed. Indeed, the Ninth Circuit has held that loss causation may be predicated on disclosures that do not reveal a defendant's fraud but instead announce an adverse financial event caused by the circumstances concealed by defendants' misrepresentations. *See First Solar*, 881 F.3d at 754 ("plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss"); *In re Daou Systems, Inc.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005) (loss causation pled where alleged corrective disclosure did not reveal defendants' improper accounting practices but revealed company's "true financial health"); *Berson.*, 527 F.3d at 989 (loss causation pled where stock drop followed announcement of drop in revenues, even though defendants' fraudulent practices were not revealed, because plaintiffs alleged that the "circumstances that the fraud concealed" caused the drop in revenues).

### 1.    February 24, 2022

On February 24, 2022, after the market closed, Opendoor announced that its Q4 2021 contribution margin was only 4%, a steep decline year-over-year from its contribution margin of 12.6% in Q4 2020. ¶183. This disclosure partially revealed that Defendants had overstated the supposed benefits and competitive advantages of the algorithm. Opendoor's stock price dropped more than 23% the next day.

Defendants argue that this announcement cannot constitute a corrective disclosure, because Opendoor had previously announced that it expected to operate within a 4% to 6% contribution margin range in Q4 2021. MTD at 28. Defendants' argument is based on the false premise that the only misrepresentation being corrected was their claim that Opendoor's model would reliably produce a contribution margin of 4% to 6% in any market conditions. The Complaint, however, alleges that Defendants made a broad range of misleading statements that caused the market to overestimate the benefits and competitive advantages of the algorithm, including, *inter alia*, statements suggesting that

26

Opendoor's pricing decisions were principally driven by its algorithm rather than humans, and that the algorithm dynamically adjusted to changing economic conditions. ¶¶168-82. The very facts that were concealed by these misrepresentations caused the decline in Opendoor's contribution margin, and the February 24, 2022 disclosure partially revealed Opendoor's "true financial health." *Daou*, 411 F.3d at 1026.

Moreover, while Opendoor's Q4 2021 contribution margin did hit the low-end of Defendants' guidance, it still was well below market expectations, as reflected by the 23% drop in Opendoor's stock price. *See First Solar*, 881 F.3d at 754 ("plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss"). This sharp decline suggests that the market considered the February 24, 2022 disclosure to be corrective of its expectations about the efficacy of Opendoor's algorithm and model.[15] This conclusion is reinforced by an article published in *The Real Deal* on February 25, 2022, which stated that "[t]he ***selloff was widely attributed to a drop in Opendoor's contribution margin***." ¶185.

Finally, the February 24, 2022 disclosure must be considered in the context of Defendants' subsequent disclosures, including the ultimate disclosure on November 3, 2022 that Opendoor's Q3 2022 contribution margin was negative 0.7%. ¶232. While the market only came to learn the truth about the reliability of Opendoor's algorithm in bits and pieces over an extended period of time, the decline on February 25, 2022 represented a key part in the dissipation of the artificial inflation of Opendoor's stock price caused by Defendants' misrepresentations. *See, e.g., Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (announcement of SEC investigation was not itself corrective, but combined with subsequent disclosure, both events cumulatively pled loss causation).

---

[15] *Cf. In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 791-92 (9th Cir. 2020) (30% drop following disclosure of whistleblower suit bolstered inference that market considered allegations material and "represented dissipation of inflation rather than a reaction to other non-fraud-related news").

### 2.    September 19, 2022

On September 19, 2022, during the trading day, Bloomberg published an article revealing for the first time that Opendoor lost money on 42 percent of its transactions in August 2022. ¶225-26. Following this report, Opendoor's stock price fell by more than 12% over two trading sessions, closing at $3.56 per share on September 20, 2022. ¶229.

Defendants argue that the Bloomberg report contained "no 'new news'" about Opendoor, because the Company had already disclosed in August 2022 that it expected to incur losses in Q3 2022 and projected a midpoint contribution margin of 1.7%. MTD at 8-9, 28. But the projection disclosed in Opendoor's August statement was not the same as the specific data that Bloomberg reported in its September report. The disclosure of a 42% loss rate for transactions in August signaled to the market a fundamental problem with Opendoor's algorithm and its ability to produce positive results that was materially more severe in magnitude than investors had been led to expect, a fact reflected by the 12% price decline over September 19 and 20. *See, e.g.*, *Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 995-96 (D. Ariz. 2015) (denying summary judgment on loss causation grounds with respect to 5.4% stock drop following announcement of revenue miss and additional accrued expenses associated with defect of solar module because a reasonable jury could find that defendants concealed "*the scope of the … defect* and its resulting financial impact"), *aff'd*, 881 F.3d 750 (9th Cir. 2018); *In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639 F. Supp. 2d 1038, 1048-49 (N.D. Cal. 2009) (supplemental disclosure revealing "scope and magnitude" of accounting restatement was sufficient to support loss causation, even though company had already disclosed that defendants had engaged in improper backdating and that the company's financial statements could not be relied upon).

Indeed, during the same August 2022 earnings call that Defendants argue fully disclosed the relevant adverse facts, Defendant Wheeler assured investors that "*our systems are doing exactly what they're designed to do, which is responding very, very quickly, adjusting prices to market within recent spreads and new acquisitions*." ¶199.

28

The September Bloomberg suggested to the market that Opendoor's algorithm and model were not adjusting to market conditions as rapidly as Defendants implied.

Defendants also argue that the Bloomberg report was based on publicly available data from Yipit. MTD at 28. Yipit, however, does not publish its data for consumption by the general public. And while the data Yipit used to calculate its loss percentage calculation was derived from public real estate records, Yipit's comparison of the prices of specific properties bought and sold by Opendoor involved time-consuming and laborious research. *See BofI*, 977 F.3d at 795 ("A disclosure based on publicly available information can, in certain circumstances, constitute a corrective disclosure.").

### 3.    November 3, 2022

On November 3, 2022, after the market closed, Opendoor announced that its contribution margin for Q3 2021 continued to plummet and was now negative 0.7%, far below the margin of 4%-6% that Defendants previously claimed Opendoor would maintain in any market and a steep decline year-over-year from its margin of 7.5% in Q3 2021. ¶232. On this news, Opendoor's stock price fell by 13.68% on November 4, 2022. ¶235.

Defendants argue this announcement was not corrective because Opendoor previously disclosed on August 4, 2022 that it expected its contribution margin to fall below the 4% to 6% range, with a midpoint of 1.7%. MTD at 29. The actual results, however, were materially below this August projection and well below market expectations, as reflected by the almost 14% drop in Opendoor's stock price. As discussed *supra*, even after a partial corrective disclosure revealing an undisclosed problem concealed by a defendant's misrepresentations, a later disclosure revealing a more significant scope or magnitude of the problem can support loss causation. *See Smilovits*, 119 F. Supp. 3d at 995-96; *Maxim*, 639 F. Supp. 2d at 1048-49.

Simply put, the November 3, 2022 disclosure revealed new information revealing the full extent of the fraud. According to a November 23, 2022 *Seeking Alpha* article, the disclosures of substantial declines in profitability at Opendoor demonstrated for the first time deep underlying problems with the Company's business model: "[T]hat these

macroeconomic changes can wreak such havoc on the profitability of this business model illustrates the inflexibility of these businesses to respond to changing circumstances and reveals concerning underlying problems that perhaps go deeper than interest rates." ¶236. This analysis, along with the sharp decline in Opendoor's stock price on November 4, supports a plausible inference that the market viewed the November 3 announcement as having disclosed new material information exposing the fundamental inadequacy of Opendoor's algorithm and business model and correcting the misleading impression conveyed by Defendants' misleading statements—particularly Wheeler's November 10, 2021 statement that Opendoor was different than its competitors because of its purportedly superior pricing algorithm that was supposed to work in any housing market. ¶181.[16]

### D. Plaintiffs' "Control Person" Claims Should Not be Dismissed for Lack of a Primary Violation

Because the Complaint adequately alleges violations of Section 10(b), and Defendants do not contest that they qualify as "control person[s]," Plaintiffs' Section 20(a) claims should be sustained. *See e.g.*, *Evanston Police Pen. Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 605 (N.D. Cal. 2019).

## IV. CONCLUSION

For all these reasons, the Court should deny Defendants' MTD in its entirety.[17]

Dated: August 29, 2023                    **CLARK HILL PLC**

By: */s/Daniel P. Thiel*
Daniel P. Thiel, SBN #035831
14850 North Scottsdale Road, Suite 500
Scottsdale, Arizona 85254
Telephone: 480-684-1100
Fax: 480-684-1199
dthiel@clarkhill.com

---

[16] Defendants also argue that the November 3, 2022 disclosure cannot be corrective because investors already filed the original complaint in this action a month earlier. MTD at 29. This is wrong. Plaintiffs to amend their complaints to add new disclosures if defendants release new fraud-revealing information. *See, e.g.*, *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 9453468, at *9 (C.D. Cal. Dec. 31, 2008).

[17] If the court grants the Defendants' MTD in any part, Plaintiff respectfully requests leave to replead. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 946 (9th Cir. 2005).

*Local Counsel for Plaintiffs*

**LABATON SUCHAROW LLP**
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

*Counsel for Plaintiffs*


**VANOVERBEKE MICHAUD & TIMMONY P.C.**

Aaron L. Castle (admitted *pro hac vice*)
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com


**GLANCY PRONGAY & MURRAY LLP**

Casey E. Sadler (*pro hac vice* motion forthcoming)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
clinehan@glancylaw.com

*Additional Counsel for Plaintiffs*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and transmittal of a Notice of Service of Electronic Filing to the individuals registered with CM/ECF.

*/s/Daniel P. Thiel*
Daniel P. Thiel, SBN #035831

32