**CLARK HILL PLC**
Daniel P. Thiel, SBN #035831
14850 North Scottsdale Road, Suite 500
Scottsdale, Arizona 85254
Telephone: 480-684-1100
Fax: 480-684-1199
dthiel@clarkhill.com

*Local Counsel for Plaintiffs*

**LABATON SUCHAROW LLP**
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

*Counsel for Plaintiffs*

[Additional Counsel on signature page]

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE OPENDOOR TECHNOLOGIES INC. SECURITIES LITIGATION | Case No. 2:22-CV-01717-MTL<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO UNDERWRITER DEFENDANTS' MOTION TO DISMISS TH E CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................ii

I.      INTRODUCTION .....................................................................................................1

II.     STATEMENT OF FACTS ........................................................................................3

        A.      Company Background ...................................................................................3

        B.      The Company Goes Public Pursuant to Offering Documents That
                Contained False Statements ...........................................................................4

        C.      Defendants Issue New Shares in a Secondary Public Offering That
                Contained False Statements ...........................................................................5

        D.      Opendoor's Stock Plummets 94% as it is Gradually Revealed that
                Opendoor's Algorithm Could Not Adjust to Changing Market
                Conditions .....................................................................................................6

III.    ARGUMENT .............................................................................................................6

        A.      Legal Standards..............................................................................................6

                1.      The Securities Act Imposes a Minimal Pleading Standard ...................7

                2.      Rule 8(a) Applies to the Securities Act Claims ....................................8

        B.      The Complaint Adequately Alleges That the Offering Documents
                Contained False Statements of Material Fact ...................................................10

                1.      Statements Regarding the Company's Pricing Algorithm ...................10

                2.      Defendants' Challenge to the CW Allegations Fails...........................12

                3.      Statements Regarding Pricing Accuracy and Automation ...................14

                4.      Statements Regarding How the Company Generated Revenue ...........15

        C.      Defendants Have not Proven Negative Causation..........................................16

IV.     CONCLUSION...........................................................................................................17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................6

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ...........................................................8, 9

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ...........................................................14

*City of Omaha Police Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ......................................................................11

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ....................................................................8, 17

*In re Daou Sys., Inc. Sec. Litig.*,
411 F.3d 1006 (9th Cir. 2005) ..................................................................................8, 13

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005) ...........................................................11

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ......................................................11

*Flynn v. Sientra, Inc.*,
2016 WL 3360676 (C.D. Cal. June 9, 2016) ............................................................9

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .....................................................................................10, 13, 14

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983) ..................................................................................................7, 8

*Hildes v. Arthur Andersen LLP*,
734 F.3d 854 (9th Cir. 2013) ....................................................................................7, 16

*Jaeger v. Zillow Group, Inc.*,
2022 WL 17486297 (W.D. Wash. Dec. 7, 2022) ......................................................12, 13

*Johnson v. Riverside Healthcare Sys., LP*,
    534 F.3d 1116 (9th Cir. 2008) ..................................................................................8

*Knollenberg v. Harmonic, Inc.*,
    152 F. App'x 674 (9th Cir. 2005) .............................................................................8

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
    416 F.3d 940 (9th Cir. 2005) .................................................................................17

*Lorenz v. Safeway, Inc.*,
    241 F. Supp. 3d 1005 (N.D. Cal. 2017)..................................................................16

*Lowthorp v. Mesa Air Grp. Inc.*,
    2021 WL 3089118 (D. Ariz. July 22, 2021) (Liburdi, J) ...........................................7

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ................................................................................................7

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ..............................................................................................7

*Pinter v. Dahl*,
    486 U.S. 622 (1988) ..............................................................................................7

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ...............................................................................13

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ...................................................................................9

*Robb v. Fitbit Inc.*,
    216 F. Supp. 3d 1017 (N.D. Cal. 2016)..................................................................13

*Rubke v. Capitol Bancorp Ltd*,
    551 F.3d 1156 (9th Cir. 2009) ......................................................................7, 9, 16

*Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*,
    243 F. Supp. 3d 1109 (E.D. Cal. 2017) ..................................................................17

*In re Talis Biomedical Sec. Litig.*,
    2023 WL 3167844 (N.D. Cal. Apr. 28, 2023).....................................................3, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................6

*Tsirekidze v. Syntax-Brillian Corp.*,
    2009 WL 275405 (D. Ariz. Feb. 4, 2009) .................................................................9

*Vancouver Alumni Asset Holdings Inc. v. Daimler AG*,
    2017 WL 2378369 (C.D. Cal. May 31, 2017)................................................................15

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) .........................................................................................15

**Statutes**

15 U.S.C. § 77k ..................................................................................................................1

15 U.S.C. §77k(a)...............................................................................................................7

15 U.S.C. §77k(e).............................................................................................................16

15 U.S.C. §77l(b) .............................................................................................................16

15 U.S.C. §77o .............................................................................................................1, 8

Rules

Fed. R. Civ. P. 8 .................................................................................................................8

Fed. R. Civ. P. 8(a).................................................................................................8, 9, 12

Fed. R. Civ. P. 9(b) .................................................................................................1, 10, 11

Fed. R. Civ. P. 12(b)(6).....................................................................................................6

Lead Plaintiffs Indiana Public Retirement System, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association ("Lead Plaintiffs") and Additional Plaintiff Stuart Graham Hereford ("Additional Plaintiff" and together with Lead Plaintiffs, "Plaintiffs"), respectfully submit this memorandum of law in opposition to: (1) Underwriter Defendants' Motion to Dismiss the Consolidated Amended Complaint (the "Complaint"); and (2) Opendoor Defendants' Motion to Dismiss the Complaint, to the extent it applies to Plaintiffs' Sections 11 and 15 claims against Opendoor Defendants.[1]

## I.    INTRODUCTION

This strict liability securities class action, brought under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o, arises from Opendoor's first ever public offering of stock in December 2020 and secondary public offering in February 2021.

Opendoor buys and sells residential real estate in the United States through an online process known as "iBuying." ¶321. iBuyers like Opendoor claim to use technology to estimate the value of a particular home and, based on that value, instantly make an offer to a potential seller. ¶322. In December 2020, Opendoor went public via a reverse-merger with Social Capital Hedosophia Holdings Corp. II ("SCH"), a "blank check company" with no operations that was created for the sole purpose of taking a company (here Opendoor) public without the rigor and regulatory scrutiny of a traditional initial public offering ("IPO"). ¶¶324, 328-30.

---

[1] All terms herein have the same meaning as set forth in the Consolidated Amended Complaint for Violations of the Federal Securities Laws (ECF No. 39) (the "Complaint"). Citations to "¶ __" refer to paragraphs of the Complaint. References to "Sec. 11 MTD at __" are to Underwriter Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof (ECF No. 51). References to "MTD at ___" are to Opendoor Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof (ECF No. 48). References to "Defendants" in this Opposition are to Opendoor and SCH (the "Corporate Defendants"), Eric Wu, Carrie Wheeler, Chamath Palihapitiya, Steven Trieu, Ian Osborne, David Spillane, Adam Bain, Cipora Herman, Pueo Keffer, Glenn Solomon, Jason Kilar, Jonathan Jaffe (the "Securities Act Individual Defendants"); and Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Oppenheimer & Co. Inc., BTIG, LLC, KeyBanc Capital Markets Inc., Wedbush Securities Inc., TD Securities (USA) LLC, Zelman Partners LLC, Academy Securities, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Co., LLC, and Siebert Williams Shank & Co., LLC (the "Underwriter Defendants").

With the benefit of less regulatory scrutiny, Defendants made several false claims about the Company's business model in the December 2020 Offering Documents (defined below), which were used to conduct Opendoor's initial offering of stock. ¶¶402-07. Defendants made those same claims a few months later, when in February 2021, Opendoor conducted a secondary public offering (the "February 2021 SPO"). ¶¶410-14. In connection with the February 2021 SPO, Opendoor issued the February 2021 SPO Documents (together with the December 2020 Offering Documents, the "Offering Documents"). ¶¶343-44.

The Offering Documents portrayed Opendoor as a tech disruptor using artificial intelligence ("AI") to buy and sell homes more profitably and efficiently than traditional real estate companies. For example, the Offering Documents claimed that the Company's pricing decisions were driven by their AI-powered algorithms that could "***dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions***." ¶¶402, 410. However, these and similar statements in the Offering Documents falsely led investors to believe that Opendoor was disrupting the real estate market with technology, when in reality, almost nothing about Opendoor was unique or revolutionary. Unbeknownst to investors, Opendoor's algorithm could not accurately price homes and thus could not adjust to market indicators or real-time economic conditions. As a result of the algorithms' inadequacies, the Company's pricing decisions were instead driven by an undisclosed human-driven process that made the Company just as susceptible to changing market conditions as every other real estate company—the opposite of what investors were led to believe.

The algorithms' inability to adjust to market indicators became apparent throughout 2022 when the housing market cooled off after an unprecedented period of home price appreciation. Throughout 2022, a series of disclosures revealed declining contribution margins—a key profitability metric for the Company—revealing the truth about Opendoor's inability to adjust to changing housing markets, causing investors significant losses. ¶¶470-73. This news culminated on November 3, 2022, when Opendoor revealed that its contribution margin for the third quarter 2022 was negative 0.7%. In total, Opendoor's stock price ***declined by 94.43%*** from the Company's initial offering price in December of 2020. ¶¶472-73.

2

Defendants now move to dismiss, arguing that the Offering Documents did not contain a single false and misleading statement. In a striking example, Defendants argue that they never claimed Opendoor's algorithm could accurately price properties, but merely that it could "dynamically adjust" to changing market conditions. This is wrong. The Offering Documents plainly stated that Opendoor's proprietary pricing algorithm used machine learning to adjust to changing market conditions and allowed the Company to "***acquire and resell thousands of homes per month <u>accurately [and] profitability</u>***." ¶¶405, 412. Moreover, Defendants withheld from investors material information about the Company's human-driven process for making pricing decisions and driving profitability, which made Opendoor susceptible to changing market conditions. Thus, the Complaint adequately alleges that the Offering documents contained materially false and misleading statements, which is all that is required under Section 11's strict liability regime.

Knowing that they face liability on the merits, Defendants prematurely advance an affirmative defense, claiming that—without any discovery or expert testimony in the case—they have conclusively established negative causation. *See In re Talis Biomedical Sec. Litig.*, 2023 WL 3167844, at *1 (N.D. Cal. Apr. 28, 2023) ("the Court finds that defendants' arguments about negative causation . . . are premature and not suitable for resolution on the pleadings."). However, Defendants come nowhere near meeting their high burden at this stage, as they offer no alternative factors to even suggest that the losses are not attributable to the alleged misstatements. Thus, the Court should deny the motions to dismiss.

## II.    STATEMENT OF FACTS

### A.    Company Background

Founded in 2014, Opendoor Technologies, Inc. ("Opendoor" or the "Company") was previously known as Opendoor Labs Inc. ("Legacy Opendoor") and operated as a private company for several years. ¶322. Since its founding, Opendoor has operated a digital platform for buying and selling residential real estate in the United States, using a featured technology called "iBuying." ¶321. Opendoor claims to use artificial intelligence ("AI") to buy and resell homes quickly using its "proprietary" pricing algorithm. ¶322.

**B.    The Company Goes Public Pursuant to Offering Documents That Contained False Statements**

In 2020, rather than go public via the traditional IPO process, Opendoor went public via a reverse merger with a SPAC. *Id.* On September 15, 2020, the SPAC, SCH, announced that it found its acquisition target—Legacy Opendoor—and had entered into an Agreement and Plan of Merger, whereby SCH and Legacy Opendoor would merge, with the surviving company being renamed "Opendoor Technologies Inc." ¶334. On November 30, 2020, the Company filed a Proxy Statement on Form 424B3 in connection with the Merger, which together with their November 2020 Registration Statement, formed the "December 2020 Offering Documents." *Id.* The December 2020 Offering Documents registered the issuance of 546,189,092 new shares of Opendoor common stock which would be listed on the NASDAQ under the symbol "OPEN." ¶336-39. On December 21, 2020, pursuant to the December 2020 Offering Documents, Opendoor's common stock and warrants began trading on NASDAQ under the symbols "OPEN" and "OPENW", respectively. ¶341.

The December 2020 Offering Documents, which were signed by Defendants Palihapitiya, Trieu, Osborne, Bain, Spillane, and Herman, contained several false and misleading statements. ¶402. The December 2020 Offering Documents portrayed Opendoor as a tech-based company that used artificial intelligence to disrupt the traditional residential real estate market. Specifically, the December 2020 Offering Documents contained false and misleading statements that the Company's pricing decisions were driven by their AI-powered algorithms, stating that Opendoor's "*algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management*." ¶402. They also stated that the Company's algorithm was highly responsive to changing market conditions, stating that Opendoor's "*systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions*." *Id.* These statements were materially false because Opendoor's pricing decisions were driven by an undisclosed human-driven process, not the algorithm. ¶¶416-27, 430.

4

The December 2020 Offering Documents also contained false statements that the Company's pricing algorithm was what drove the Company's profitability, stating that Opendoor's "*proprietary, machine learning-based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation*." ¶405. These statements were materially false because the Company's profitability was not driven by the algorithm, but rather, human intervention and deceptive consumer practices such as lowering the algorithm's offer before submitting it to the seller and charging the seller for repairs that Opendoor did not make. ¶¶416-27, 430-48.

Finally, the December 2020 Offering Documents misled investors about the Company's business model, claiming that Opendoor's "*business model is designed to generate margins from our service charge to sellers and ancillary products and services associated with a transaction, and not from the spread between acquisition price and resale price*." ¶407. This statement was materially false because the Company's business model was in reality designed to generate margins from the spread between acquisition price and resale price, i.e., from buying low and selling high, just like any other traditional real estate company that flipped homes. ¶436. Indeed, the FTC investigation later found that although "Opendoor claimed that it did not make money from 'buying low and selling high,'" in reality, "gains from selling homes for more than its offer price are a **key contributor to its revenue**." *Id.*

C.    **Defendants Issue New Shares in a Secondary Public Offering That Contained False Statements**

On February 9, 2021, Opendoor completed a secondary public offering (the "February 2021 SPO"). ¶343. On that day, pursuant to the February 2021 SPO Documents, the Company issued an additional 32,817,421 shares of its common stock at a public offering price of $27.00 per share, generating approximately $886 million in gross proceeds. *Id.* The February 2021 SPO Documents were signed by Defendants Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon, and the Underwriter Defendants served as the underwriters for the secondary offering. ¶¶376-90, 410. The February 2021 SPO Documents contained the same false and misleading statements as the December 2020 Offering Documents. ¶¶410, 412, 414.

**D.     Opendoor's Stock Plummets 94% as it is Gradually Revealed that Opendoor's Algorithm Could Not Adjust to Changing Market Conditions**

Following the Offerings, a series of disclosures revealed declining contribution margins and profitability as a result of a changing housing market, revealing that—contrary to the Offering Documents—the Company's pricing algorithm could not "dynamically adjust" to changing market conditions. ¶347. First, on February 24, 2022, Opendoor issued a press release that revealed that the Company's fourth quarter 2021 contribution margin—a key profitability metric—was 4.0%, which was a significant decline from the Company's fourth quarter 2020 contribution margin of 12.6%. ¶348. Then, on September 19, 2022, Bloomberg published an article revealing that Opendoor lost money on 42% of its transactions in August 2022. ¶349. Finally, on November 3, 2022, Opendoor revealed that its contribution margin for the third quarter of 2022 was ***negative 0.7%***—well below the Company's 4% to 6% contribution margin range and well below the Company's contribution margin of 7.5% from the third quarter of 2021. ¶350. Following the November 3, 2022 earnings announcement, Opendoor's stock price fell by $0.60 per share, or 25.85% over the next two trading days, to close at $1.74 per share on November 7, 2022—a ***94.43% decline*** from the Company's post-Merger closing stock price of $31.25 per share on December 21, 2020. ¶351.

## III.     ARGUMENT

### A.     Legal Standards

In assessing a Rule 12(b)(6) motion, the Court must consider the complaint in its entirety, "accept all factual allegations . . . as true[,]" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  A complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), but rather must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### 1.    The Securities Act Imposes a Minimal Pleading Standard

"The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce." *Pinter v. Dahl*, 486 U.S. 622, 638 (1988). The Securities Act "protects investors by ensuring that companies issuing securities . . . make a full and fair disclosure of information relevant to a public offering." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015).

Section 11 of the Securities Act imposes a "stringent standard of liability on the parties who play a direct role in a registered offering[,]" *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983), e.g., the issuer, the underwriters, and any person signing the registration statement, where the registration statement: (1) contains an untrue statement of a material fact, (2) omits to state a material fact required to be stated therein, or (3) omits to state a material fact necessary to make the statements therein not misleading.[2] *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009); *see also* 15 U.S.C. § 77k(a). A fact is material where "a reasonable investor would have viewed the nondisclosed information as having significantly altered the total mix of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 28 (2011).

Thus, a claim under Section 11 "need only [allege] a material misstatement or omission" in the registration statement, *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 856, 859 (9th Cir. 2013), and "[s]cienter is not required for liability under Section 11." *Lowthorp v. Mesa Air Grp. Inc.*, 2021 WL 3089118, at *6 (D. Ariz. July 22, 2021) (Liburdi, J). In other words, "[a] defendant 'will be liable for innocent or negligent material misstatements or omissions.'" *Id.* (citation omitted). Once a material misstatement is shown, "[l]iability against

---

[2] To the extent the challenged statements in the Offering Documents were false by omission, Defendants had a duty to disclose material information "necessary to make the statements therein not misleading." *See* 15 U.S.C. §77k(a). Specifically, Defendants had a duty to disclose that the Company's pricing decisions were driven by humans and thus the Company was susceptible to changing market conditions—which is contrary to what the Offering Documents led investors to believe.

the issuer of a security is virtually absolute, even for innocent misstatements[,]" while other "defendants bear the burden of demonstrating due diligence" at a later stage. *Huddleston*, 459 U.S. at 382. Section 15 makes an issuer's "control persons" liable for primary violations of Sections 11 and 12(a)(2). 15 U.S.C. § 77o.[3]

### 2.    Rule 8(a) Applies to the Securities Act Claims

As non-fraud claims, Securities Act allegations need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1027 (9th Cir. 2005) ("'[A]llegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a).'"). Rule 8(a) does not impose "an onerous burden" the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1122 (9th Cir. 2008).

Defendants incorrectly argue that the Complaint sounds in fraud and is subject to Rule 9(b). Sec. 11 MTD at 3-4; *see also* MTD at 11. To determine whether a Section 11 claim sounds in fraud, courts consider whether the complaint (1) expressly disclaims reliance on fraud for claims based on strict liability or negligence, (2) contains separate sections explaining the basis for each claim and segregates the counts for the claims where the nature of the allegations in each is different, and (3) does not allege the same exact claims against the same defendants. *See*, *e.g.*, *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005) (holding that claim did not sound in fraud because plaintiffs alleged omissions in the registration statement, disclaimed reliance on fraud for those allegations, and made an effort to plead a non-fraudulent basis for liability); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1163 (C.D. Cal. 2008) (applying Rule 8 to the Section 11 claims when the plaintiffs took care to delineate the negligence claims from the fraud claims); *see also Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *3 (N.D. Cal. Aug. 7, 2020) (same).

---

[3] Because the Complaint establishes a Section 11 claim, and Defendants do not seek dismissal of the Section 15 claim on any independent ground, the Section 15 claim must be sustained.

Here, the Complaint carefully segregates Plaintiffs' negligence-based Securities Act claims from the fraud-based Exchange Act claims. C*ompare* Sections I-XVI, *with* Sections XVII-XXV. Moreover, the Securities Act claims expressly disclaim any "allegations of fraud, fraudulent conduct, [] improper motive" or any "intentional or reckless misconduct." ¶¶ 320, 483, 495. Finally, the Securities Act and Exchange Act claims are distinct claims against different defendants—the Exchange Act claims are brought against the Company and Defendants Wu and Wheeler only, whereas the Securities Act claims also name as Defendants Bain, Herman, Keffer, Solomon, Kilar, Jaffe, Palihapitiya, Trieu, Osborne, and the Underwriter Defendants. This is sufficient to support a finding that Plaintiffs' Securities Act claims do not "sound in fraud." *See Tsirekidze v. Syntax-Brillian Corp.*, 2009 WL 275405, at *7 (D. Ariz. Feb. 4, 2009) (applying Rule 8's standards because "[a]lthough plaintiffs rely on the same alleged consignment sales and 'tooling deposits' in both their 1933 Act and 1934 Act claims, they have expressly plead[ed] only negligence in their Section 11 . . . claim[]").

At bottom, if Defendants' argument were taken to its logical conclusion, it would be impossible for a plaintiff to plead two causes of action even though, as here, the two claims were plead separately. *See Uber*, 2020 WL 4569846, at *4 ("In particular, the complaint states the claims against Uber are based on a strict liability theory and against all other defendants on negligence. [Plaintiff] will be held to this representation, and the heightened Rule 9(b) standard thus will not apply"); *see also Flynn v. Sientra, Inc.*, 2016 WL 3360676, at *17 (C.D. Cal. June 9, 2016) (applying Rule 8(a) even though plaintiffs' Section 10(b) and Section 11 claims were based on overlapping statements).[4] In any event, even assuming, *arguendo*, that any of Plaintiffs' Securities Act claims sound in fraud, Plaintiffs have pled their claims with particularity and have thus satisfied both the "particularity requirement and the reasonable

---

[4] None of Defendants' cited cases support elevating the pleading standard here. MTD at 11; Sec. 11 MTD at 3-4. For example, in *Rubke*, 551 F.3d at 1161, the "complaint employ[ed] the exact same factual allegations" for both the Section 10(b) and Section 11 claims. Here, on the other hand, Plaintiffs took care to allege separate factual allegations. *Compare* Section V with Sections XVIII and XXI(C)-(E). Similarly, unlike the plaintiffs in *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012), here, Plaintiffs made more than "nominal efforts to disclaim allegations of fraud with respect to its section 11 claims."

inference standard of plausibility set out in *Twombly* and *Iqbal*." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023).[5]

**B.    The Complaint Adequately Alleges That the Offering Documents Contained False Statements of Material Fact**

**1.    Statements Regarding the Company's Pricing Algorithm**

The Complaint alleges that the Offering Documents contained materially false statements about the Company's business model and the purported benefits of the Company's pricing algorithm. Specifically, the Offering Documents stated that the "***algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management.***" ¶¶402, 410. The Offering Documents also claimed that the algorithm "***can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions***." *Id.*

As alleged, these statements were materially false and misleading when made because, contrary to Defendants' assertions and undisclosed in the Offering Documents: (1) Opendoor's algorithm was inaccurate and thus could not adjust to market indicators or real-time economic conditions; and (2) as a result, the Company's pricing decisions were driven by an undisclosed human-driven process. According to several former employees, the algorithm was extremely inaccurate during the entire Class Period. ¶¶416-27. For example, CW 2 stated that the algorithm was never accurate and had a lot of flaws. ¶420. Indeed, CW 2 stated that her managers continuously told pricing analysts like herself to not even use the algorithm to generate final offers because the algorithm was never accurate and would corrupt the pricing analysts' assessment of market value. ¶¶420-21. Ultimately, according to CW 2, what she and other pricing analysts were doing to price homes was no different than what any real estate agent would do to price a home for the market. ¶427. Similarly, according to CW 5, who priced Opendoor's initial offers, approximately 50% of the properties were sent to

---

[5] A finding that Plaintiffs' Section 11 claims sound in fraud would necessarily be limited to the Exchange Act Defendants as the Complaint contains no fraud allegations against Defendants Bain, Herman, Keffer, Solomon, Kilar, Jaffe, Palihapitiya, Trieu, Osborne, and the Underwriter Defendants.

human pricing analysts for review, ¶417, and according to CW 6, the algorithm's initial offers were reviewed by pricing analysts who could manually adjust the offers. ¶418.

Indeed, these CWs' statements are corroborated by a pre-offering investigation by the Federal Trade Commission ("FTC"), which concluded in a $62 million settlement over deceptive consumer practices. ¶437. The FTC's complaint, which was released on August 1, 2022, found that although Opendoor claimed the algorithm generated "market based" offers, in reality, "Opendoor's employees have manually adjusted these values before presenting them to consumers as offers." ¶428-30. The FTC investigation further found—based on non-public documents produced by Opendoor—that "Opendoor's internal analyses showed that these manually adjusted offers were several percentage points below Opendoor's assessment of market value" and explained that "[b]eginning no later than 2019, Opendoor instituted a policy to reduce its manually adjusted offers to [redacted] below what Opendoor assessed as market value." ¶431. Moreover, the FTC investigation found that Opendoor deducted repair costs from their final offer and then pocketed the extra money as profit. ¶434. The FTC investigation confirms that the undisclosed, human-driven process that drove pricing decisions was in place before the December 2020 Offering Documents were issued.

These material adverse facts that existed prior to the December 2020 Offering (and continued after, as attested to by the former employees and the FTC's investigation), stand in stark contrast to the way the Offering Documents described the Company's business model. Thus, the challenged statements are actionably false and misleading—as other courts have found that, as here, misrepresentations concerning a company's business model are actionable under the Securities Act. *See, e.g. , In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *13 (C.D. Cal. July 21 , 2005) ("Prospectus misrepresented the recent and then-current state of DDi's business affairs"); *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *12, 26-27 (M.D. Tenn. Nov. 19, 2019) (statements regarding company's success "misleading for omitting information regarding out-of-network billing as a factor driving revenue"); *City of Omaha Police Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 402, 404 (S.D.N.Y. 2020) (business model statements actionable for failing to disclose that the

company had a "policy of terminat[ing] . . . personnel and replacing . . . them with far less qualified individuals").

Moreover, Defendants argue that the challenged statements were not false or misleading because "any alleged shortcomings in the company's model only appeared well *after* the SPO." Sec. 11 MTD at 8-9. This argument should be rejected, as it misinterprets why the statements were false and misleading. The alleged misstatements were false and misleading because they led investors to believe that advancements in the Company's algorithm drove the Company's pricing decisions and allowed Opendoor to "dynamically adjust" to changing housing markets, when in reality, the Company's algorithm was already inaccurate and the Company's pricing decisions were driven by an undisclosed human-driven process. As discussed in detail in Plaintiffs' Opposition to Opendoor Defendants' Motion to Dismiss, a district court in the Ninth Circuit has already upheld the falsity of similar statements in *Jaeger v. Zillow Group, Inc.*, 2022 WL 17486297 (W.D. Wash. Dec. 7, 2022). There, the court found that statements about Zillow's pricing algorithm were false and misleading because they led investors to believe that Zillow's pricing decisions were based on the company's algorithm when, in reality, the defendants had "concealed the broader, more complicated, human-driven process." *Id.* at *6.

### 2. Defendants' Challenge to the CW Allegations Fails

Recognizing that the allegations attributed to CW 2, CW 5, and CW 6 are sufficient to state a claim, Defendants spill much ink seeking to attack the credibility of their accounts. *See* Sec. 11 MTD at 5-8. These arguments should be rejected.[6]

The Complaint establishes the CWs' reliability and personal knowledge by detailing "each former employee's job title and group at [Opendoor], responsibilities, period of

---

[6] Importantly, Defendants attempt to impose a higher standard on the CWs than is required for Plaintiffs' Section 11 claim. Defendants rely on Section 10(b) cases to argue that "[a] complaint relying on statements from confidential witnesses' accounts must 'allege with particularity facts supporting its assumptions that the [CWs] were in a position to be personally knowledgeable of the information alleged.'" Sec. 11 MTD at 5 (citing *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009)). However, such particularity is not required under Rule 8(a)'s notice pleading standard. In any event, as explained in this brief, the CWs are described with sufficient particularity to support the assumption that they had knowledge of the information attributed to them.

employment, and experience." *Jaeger*, 2022 WL 17486297, at \*2 n.5. In addition, the Complaint establishes that the CWs had access to the relevant information attributed to them. For example, the Complaint alleges that CW 2 was a pricing analyst who was responsible for pricing final offers for homes in the western U.S., including major markets like Phoenix, Los Angeles, San Francisco, and Las Vegas, and thus was personally involved in pricing Opendoor's offers. ¶394. CW 5 was also personally involved in Opendoor's pricing operation, as she was an acquisition associate who described her job duties as pricing initial offers that could not be priced using the Company's algorithm. ¶¶397, 417. Similarly, CW 6 was a data scientist on the pricing team and thus would possess information related to how Opendoor employees on the pricing team manually adjust the algorithm's initial offers. ¶¶398, 418.

These allegations "support the probability that a person in the position occupied by the source would possess the information alleged." *Forescout*, 63 F.4th at 767; *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017); *Daou*, 411 F.3d at 1016 (crediting FE allegations where "[p]laintiffs number each witness and describe his or her job description and responsibilities"); *Robb v. Fitbit Inc.*, 216 F. Supp. 3d 1017, 1032 (N.D. Cal. 2016) (crediting allegations of CWs who "held positions that exposed them directly to data"). Moreover, the CWs independently corroborate one another and collectively tell a plausible and coherent narrative. *See Forescout*, 63 F.4th at 772 (crediting CW allegations where there was "consistency between the [CW's] statements" and where CWs told "a reasonably plausible story about [the company's] state of affairs.").

Defendants' other attempts to discredit the CW allegations fail. For example, Defendants argue that these CWs allegations are consistent with the February 2021 Offering Documents' description of Opendoor's final offer process. Sec. 11 MTD at 5-8. But Defendants' self-serving reading of the February 2021 Offering Documents should be rejected, as it merely states humans "conduct[ed] a free assessment ***to confirm*** all of the home details and identify any repairs that may need to be performed." *See* Gray Decl., Ex. 6 (S-1) at 66-67. This clearly did not inform investors that Opendoor employees manually lowered the algorithm's price because the algorithm was never accurate, which thereby rendered its

business highly susceptible to market fluctuations. Nor did it inform investors that Opendoor had a policy of charging for unnecessary repairs in order to make extra profit and increase margins.

Moreover, Defendants claim that the CW allegations should be disregarded because they were not in a position to "access [] or review [] companywide data." Sec. 11 MTD at 7. This argument was recently rejected by the Ninth Circuit. *See Forescout*, 63 F.4th at 771 (the adequacy of the complaint "does not depend on each CW possessing inside knowledge about corporate-level trends; Plaintiffs need only provide a basis for each CW's knowledge about the specific statements he made"). Finally, contrary to Defendants' argument, the FTC Complaint corroborates the CW allegations and contradicts the statements in the Offering Documents. *See* Sec. 11 MTD at 8. The activity in the FTC complaint—namely that Opendoor had a policy of manually lowering the algorithm-generated offer and charged for unnecessary repairs—continued throughout the Class Period. *See* ¶¶416-27, 439-48.

### 3.    Statements Regarding Pricing Accuracy and Automation

The Offering Documents also contained false statements that the Company's "***proprietary, machine learning-based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation***." ¶¶405, 412. This statement was false and misleading because it led investors to believe that the Company's pricing algorithm was key to its profitability, when in reality, the algorithm was inaccurate, and the Company's profitability was driven by deceptive practices and a hot housing market. ¶¶416-448. Notwithstanding these facts, Defendants argue that the statement is not actionable because it is a vague optimistic statement, i.e., puffery. Sec. 11 MTD at 8; MTD at 14-16. Defendants are wrong. In the Ninth Circuit, "the court must analyze the context in which the statements were made." *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013). Here, this statement was made in the Offering Documents which also contained false and misleading statements about the Company's business model and the purported accuracy and importance of the Company's pricing algorithm. Moreover, the Company's pricing algorithm was the most critical aspect

14

of the Company's business and thus was not immaterial puffery. *See Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) ("general statements of optimism, when taken in context, may form a basis for a securities fraud claim").

Moreover, unlike the cases cited by Defendants (Sec. 11 MTD at 10), the challenged statements here involved the most critical aspect of Opendoor's business that induced reliance, and therefore, are not immaterial puffery. *See, e.g., Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, 2017 WL 2378369, at *13 (C.D. Cal. May 31, 2017) ("Given the alleged importance of the [product] to Defendants' business, it is plausible that a reasonable investor would view Daimler AG's failure to live up to this environmentally friendly claim as significantly altering the 'total mix' of information available.").

Finally, Defendants attempt to discredit and downplay the Complaint's CW allegations to avoid liability. Sec. 11 MTD at 10-11. Specifically, Defendants argue that CW 3's and CW 4's allegations are isolated instances that do not show a policy or practice of charging for unnecessary repairs that Opendoor would retain as extra profit. *Id.* Defendants also quibble with the time periods these CWs worked at Opendoor. *Id.* However, Defendants ignore that these allegations are specifically corroborated by the FTC investigation, which revealed that Opendoor had been charging for unnecessary repairs and "retain[ing] the excess as profit" since before the December 2020 Offering. ¶¶434-35. Furthermore, the CW allegations corroborate that this practice continued well into the Relevant Period.[7]

### 4.    Statements Regarding How the Company Generated Revenue

Finally, the Complaint alleges that the Offering Documents further misled investors about the Company's business model by claiming that its "***business model is designed to generate margins from our service charge to sellers and ancillary products and services associated with a transaction, and not from the spread between acquisition price and resale price***." ¶¶407, 414. Defendants argue that this statement was not false or misleading because the Offering Documents made clear that Opendoor sought to obtain the largest spread between acquisition and resale prices. Sec. 11 MTD at 12. However, Defendants' disclosure that its

---

[7] The Relevant Period is December 21, 2020 through November 3, 2022. ¶396.

"resale models, in conjunction with our pricing team, aim to maximize resale margin" does nothing to negate the statement that the Company's "business model is *designed* to generate margins . . . *not* from the spread between acquisition price and resale price."

Rather, the challenged statement was false and misleading because—in conjunction with the other false and misleading statements in the Offering Documents—it led investors to believe that Opendoor's business model was disrupting the real estate market, when in reality, Opendoor's purportedly tech-based business was nothing more than a traditional real estate company that bought low and sold high. To be clear, the question before the Court is not whether each misstatement read in isolation presents a plausible theory of liability. *Lorenz v. Safeway, Inc.*, 241 F. Supp. 3d 1005, 1023 (N.D. Cal. 2017) ("complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible"). The question is whether, when read as a whole and "when construed in the light most favorable to [Plaintiff]," the Complaint "plausibly suggest[s]" the Offering Documents contained material omissions and misrepresentations that would have misled a reasonable investor. *Id.*; *see also Rubke*, 551 F.3d at 1161.

### C.    Defendants Have not Proven Negative Causation

Loss causation is not an element of a Securities Act claim as Plaintiffs "need only show a material misstatement or omission to establish [a] *prima facie* case." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013).[8] Here, Defendants' attempts to raise the affirmative defense of negative causation fail. *See* Sec. 11 MTD at 12; MTD at 29-30.

The "affirmative defense of negative causation prevents recovery for losses that the defendant proves are not attributable to the alleged misrepresentation or omission in the registration statement." *Hildes*, 743 F.3d at 860. However, the Ninth Circuit has made clear that a defendant bears a "heavy burden" to establish this affirmative defense. *Id.* To meet this heavy burden, "[a] defendant must show 'that the depreciation in value' of a plaintiff's stock 'resulted from factors other than the alleged material misstatement.'" *Id.* (citation omitted).

---

[8] Indeed, the Securities Act establishes a presumption that investors suffered a loss and can allege damages through a statutory formula. *See* 15 U.S.C. §§77k(e), 77l(b).

Accordingly, "[b]ecause an analysis of causation is often fact-intensive, negative causation is generally established by a defendant on a motion for summary judgment or at trial," and not at the pleadings stage. *In re Countrywide.*, 588 F. Supp. 2d at 1171; *In re Talis Biomedical Sec. Litig.*, 2023 WL 3167844, at \*1 ("the Court finds that defendants' arguments about negative causation . . . are premature and not suitable for resolution on the pleadings.").

Ignoring their heavy burden and without any discovery or expert testimony, Defendants state in a conclusory fashion that the "disclosures do not reasonably evidence the alleged misstatements." *See* MTD at 29-30. However, Defendants cite no alternative factors to even suggest that the losses are not attributable to the alleged misstatements. At this stage such a showing cannot possibly meet the heavy burden of establishing the affirmative defense of negative causation.  On the other hand, Plaintiffs do establish that following the two offerings, Opendoor disclosed declining profitability as its business model could not "dynamically adjust" to the "real-time macro- and micro-economic conditions" in 2022— which the Offering Documents claimed it could. ¶¶470-73. This is sufficient as the "'disclosure[s] reveal[ed] adverse information . . . that the misrepresentation[s] had concealed, and this cause[d] a drop in stock price.'" *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1123 (E.D. Cal. 2017).  Therefore, the Court should reject Defendants' negative causation defense.

**IV.    CONCLUSION**

For the foregoing reasons, the Court should deny the Defendants' motions to dismiss Plaintiffs' Sections 11 and 15 claims in their entirety.[9]

Dated: August 29, 2023                          **CLARK HILL PLC**

By: */s/Daniel P. Thiel*
Daniel P. Thiel, SBN #035831
14850 North Scottsdale Road, Suite 500
Scottsdale, Arizona 85254

---

[9] If the court grants the Defendants' motions in any part, Plaintiffs respectfully request leave to replead. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.,* 416 F.3d 940, 946 (9th Cir. 2005).

Telephone: 480-684-1100
Fax: 480-684-1199
dthiel@clarkhill.com

*Local Counsel for Plaintiffs*

**LABATON SUCHAROW LLP**
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

*Counsel for Plaintiffs*


**VANOVERBEKE MICHAUD & TIMMONY P.C.**

Aaron L. Castle (admitted *pro hac vice*)
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com


**GLANCY PRONGAY & MURRAY LLP**

Casey E. Sadler (*pro hac vice* motion forthcoming)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
clinehan@glancylaw.com

*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 29, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and transmittal of a Notice of Service of Electronic Filing to the individuals registered with CM/ECF.

By: */s/Daniel P. Thiel*
Daniel P. Thiel, SBN #035831

19