**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
John C. Gray (Bar No. 028454)
201 East Washington Street, Suite 1200
Phoenix, AZ  85004
Telephone:    (602) 262-5311
Facsimile:    (602) 262-5747
Email:          jgray@lewisroca.com

**SHEARMAN & STERLING LLP**
Adam S. Hakki (*pro hac vice*)
599 Lexington Ave
New York, NY 10022
Telephone:  (212) 848-4000
Email:          ahakki@shearman.com

Lyle Roberts (*pro hac vice*)
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone:  (202) 508-8000
Email:          lyle.roberts@shearman.com

*Counsel for Defendants Opendoor*
*Technologies Inc., Eric Wu, Carrie Wheeler,*
*Chamath Palihapitiya, Steven Trieu, Ian*
*Osborne, Adam Bain, David Spillane,*
*Cipora Herman, Pueo Keffer, Glenn*
*Solomon, Jason Kilar, and Jonathan Jaffe*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re Opendoor Technologies Inc. Securities Litigation | Case No. 2:22-cv-01717-MTL |
| | **DECLARATION OF GEORGE ANHANG IN SUPPORT OF THE OPENDOOR DEFENDANTS' MOTION FOR AN ORDER DIRECTING THE SUBMISSION OF COUNSEL AND CONFIDENTIAL WITNESS AFFIDAVITS** |

Pursuant to 28 U.S.C. § 1746, George Anhang declares as follows:

1. My name is George Anhang, and I am a Counsel with the law firm of Shearman & Sterling LLP, which represents Opendoor Technologies Inc. ("Opendoor" or the "Company"), Eric Wu, Carrie Wheeler, Adam Bain, Cipora Herman, Chamath Palihapitiya, Steven Trieu, Ian Osborne, David Spillane, Pueo Keffer, Glenn Solomon, Jason Kilar, and Jonathan Jaffe (collectively, the "Opendoor Defendants") in the above-captioned action. I work in the firm's Washington, DC office.

2. I am a member in good standing of the Bar of the District of Columbia and the Bar of the State of New York.

3. Attached hereto as Exhibit 1 is a true and correct copy of an order issued in *In re Lumber Liquidators Holdings, Inc. Securities Litigation*, 4:13-cv-00157, ECF No. 91 (E.D. Va. Jul. 14, 2015), which is cited in the Opendoor Defendants' accompanying motion.

4. Attached hereto as Exhibit 2 is a true and correct copy of an order issued in *In re Millennial Media, Inc. Securities Litigation*, 1:14-cv-07923, ECF No. 68 (S.D.N.Y. Apr. 21, 2015), which is cited in the Opendoor Defendants' accompanying motion.

5. I submit this Declaration in connection with the Opendoor Defendants' motion for an order directing the submission of counsel and confidential witness ("CW") affidavits.

6. I had phone calls with five individuals who were former employees of the Company, and who matched the descriptions set forth in the Consolidated Amended Complaint

-1-

(the "Complaint" or "CAC") of five of the CWs referenced in the Complaint—CWs 1, 2, 5, 6, and 8. The descriptions provided information about the positions these individuals held at the Company, *i.e.*, their titles, responsibilities, and dates of employment at the Company, that enabled the Company to identify them. Gabrielle Leeman, an Associate with Shearman & Sterling, participated in these telephone calls with me. I discuss below certain statements that these individuals made to me and Ms. Leeman regarding certain of the allegations concerning CWs 2, 5, 6, and 8 made in the CAC.

███████████

7. On August 25, 2023, I had a telephone call with ████████████ Gabrielle Leeman, a Shearman & Sterling associate who works in the firm's Washington, DC office, was also on the call.

8. ████████████ matched the description of CW 1 set forth in the Complaint, though ██ did not confirm on our call that ██ was CW 1. Rather, ████████████ simply informed me and Ms. Leeman that ██ had retained counsel in connection with the above-captioned lawsuit and referred me and Ms. Leeman to her counsel.

CW 2: ████████████

9. On August 23, 2023, I had a telephone call with ████████████ Ms. Leeman was also on the call.

10. ████████████ matched the description of CW 2 set forth in the Complaint.

11. Based on my conversation with ████████████ it was clear to me that ██ was the individual referred to as CW 2 in the Complaint.

12. On the call, ▮ indicated that ▮ had spoken to an individual who apparently had contacted ▮ on behalf of someone who was, or would be, involved in the filing of this case (hereinafter, "plaintiff's representative").

13. At the start of the call, ▮ confirmed that ▮ was previously a Pricing Analyst with Opendoor based in Phoenix, Arizona, as described in the CAC. CAC ¶ 44.

14. In the course of the call, I asked ▮ about certain statements attributed to ▮ in the CAC. ▮ indicated to me and Ms. Leeman that certain of the statements do not accurately capture what ▮ told a plaintiff's representative. Specifically:

   a. ▮ indicated that ▮ would not have said, "[t]he automated system was never accurate." CAC ¶¶ 63, 420.

      i. To confirm this, I squarely asked ▮ "you wouldn't have said it was 'never' accurate?" and ▮ immediately replied: "that's correct."

   b. ▮ also indicated that ▮ would not have said to a plaintiff's representative that ▮ "manager told the team, 'don't look at what the system is coming in at'" because, in fact, the manager expressly asked them to "look at" what the pricing system said, but only said that they should not "anchor to it." CAC ¶¶ 64, 421.

      i. To confirm this, I squarely asked ▮ "You would not have said that your manager told the team 'don't look at what the system is

-3-

coming in at' in the first instance . . . ?" and ▮▮▮▮ immediately replied: "that's correct. [Rather] look at it but don't anchor to it."

    c. I asked ▮▮▮▮ about the following statement attributed to ▮ in the CAC: "According to CW 2, what ▮ and other pricing analysts were doing to price homes was ***no different*** than what any real estate agent would do to price a home for the market." CAC ¶¶ 70, 403, 427. (Emphasis added.)

        i. ▮▮▮▮ indicated that ▮ would not have told a plaintiff's representative that what ▮ did at Opendoor was completely the same as what a real estate agent would do.

            1. ▮ stated to me and Ms. Leeman, "It was not 100% identical to each other, but there were a lot of similarities to how we priced out homes as to what realtors would do."

            2. ▮▮▮▮ also said, "I believe I told them the same thing I'm telling you—like we're kind of like realtors in how we price homes, but we're not appraisers. So it's similar to what realtors do but not 100% the same."

CW 5: ▮▮▮▮

15. On August 25, 2023, I had a telephone call with ▮▮▮▮ Ms. Leeman was also on the call.

16. ▮▮▮▮ matched the description of CW 5 set forth in the Complaint.

17. At the start of the call, ▮▮▮▮ confirmed that ▮ had spoken with a plaintiff's representative and knew that ▮ would be described as a CW in the Complaint.

-4-

18. ████████ confirmed that ██ was the person alleged in the CAC to be an "Acquisition Associate" who had described ██ job duties as "pricing offers on properties that came in to Opendoor which could not be 'taken on,' or priced automatically, by the Company's underwriting and appraisal software or algorithm." CAC ¶ 47.

19. ████████ informed me and Ms. Leeman that ██ was not given an opportunity by a plaintiff's representative to review statements attributed to ██ in the CAC for accuracy until after the CAC was filed or possibly "right when [the plaintiffs] were filing."

20. In the call, ████████ asserted the following about certain statements attributed to ██ in the CAC:

   a. ████████ stated that the following statement attributed to ██ in the CAC was not based on ██ personal knowledge: "approximately 50% of the properties [priced by Opendoor] had to be sent to human beings for review." CAC ¶¶ 71, 403, 417.

      i. ████████ stated that this was "not a number based on personal experience, but based on what someone told" ██.

   b. ████████ indicated that the "50%" number would only have been applicable to the Nashville market.

      i. Specifically, ████████ told me and Ms. Leeman that, as to the "50%" figure, "it would be just Nashville. In every market, the

-5-

automated offers would be different depending on a number of things that are above my pay grade."

    ii. When I asked ▓▓▓▓▓▓ whether ▓ told a plaintiff's representative that the estimate of "approximately 50%" was applicable only to Nashville, ▓▓▓▓▓▓ replied, "I don't believe I told them either way."

21. At the end of the call, I asked ▓▓▓▓▓▓ about whether ▓ agreed with the allegations in the CAC. ▓▓▓▓▓▓ replied, "Not really . . . I don't think [Defendants] were out there telling the stockowners that every offer was automatic or whatever they [plaintiffs] were alleging . . . I definitely don't think my former employer committed any fraud."

CW 6: ▓▓▓▓▓▓▓

22. On June 16, 2023, I had a telephone call with ▓▓▓▓▓▓. Ms. Leeman was also on the call.

23. ▓▓▓▓ matched the description of CW 6 set forth in the Complaint.

24. At the start of the call, ▓▓▓▓▓▓ confirmed that ▓ had spoken with a plaintiff's representative and acknowledged that ▓ was "employed at Opendoor from approximately 2018 through November 2022," most recently as a "Data Scientist." CAC ¶ 48.

25. On the telephone call, ▓▓▓▓▓▓ told me and Ms. Leeman that the plaintiff's representative had read a few of ▓ purported statements back to ▓ before the filing of the Complaint. Those statements are largely contained within a single

paragraph of the Complaint (and repeated later in the Complaint). CAC ¶¶ 72, 418. In the call with me and Ms. Leeman, ▮▮▮▮ did not state that the Complaint wrongly attributed any of those statements to ▮▮.

26. The Complaint states, "[a]ccording to CW 6, a Data Scientist for the Pricing team at Opendoor, the algorithm's initial offer price was reviewed by the human pricing analysts and portfolio managers. CW 6 added that the analysts and portfolio managers could use certain data to adjust the initial offer price based on specific details of the home in question and other market variables." CAC ¶ 72; *see also* CAC ¶ 418.

a. Regarding the foregoing material in the Complaint, I asked ▮▮▮▮ "When you said [to the plaintiff's representative] that 'analysts and managers *could* use certain data to adjust the *initial* offer price,' was that in fact *always* done, [or done a] *majority* of times?" (Emphasis added.)

b. Acknowledging that ▮ had made the statement at issue, ▮▮▮▮ replied to my specific question by stating that ▮ did not "mention to them [the plaintiff's representative]" that "it was roughly somewhere in the range of 60/40 either way of what would be reviewed or not, but the majority of offers would be automated."

c. ▮ elaborated: "I think you'd have to ask somebody on the team later than me because I joined the pricing team later. The earlier on, I would guess that the amount of manual review was higher, and then as we got more mature,

the manual review reduced.  It's sort of a ballpark estimate from what I can remember 60% from the automated offer, 30 – 40% from the manually."

    d.   After ▮ said the foregoing, I asked ▮▮▮▮ for clarification, whether ▮ was referring only to adjustments made to the "initial offer or final offer," and in response to that question, ▮ said, "initial offer."

CW 8: ▮▮▮▮.

27. On June 16, 2023, I had a telephone call with ▮▮▮▮ Ms. Leeman was also on the call.

28. ▮▮▮▮ matched the description of CW 8 set forth in the Complaint.

29. At the outset of the call, ▮▮▮▮ confirmed that ▮ had spoken with a plaintiff's representative.  ▮ also indicated that ▮ was the person identified in the CAC as CW 8 and was "employed by Opendoor from mid-2021 through the end of the Class Period as a staff research scientist."  CAC ¶ 50.

30. ▮▮▮▮ told me and Ms. Leeman that ▮ did not review the statements attributed to ▮ in the CAC until after it was filed.

    a.   I asked ▮, "Did the plaintiffs here, after you spoke with them, send you what it was that they were going to put in the complaint?"

    b.   ▮▮▮▮ replied, "I think they tried to, but I was out of town when they sent it, so there wasn't time to review before they filed the lawsuit."  ▮ further said that a plaintiff's representative "sent me a copy" of the CAC "after" filing.

    c.  ████████ said that the plaintiff's representative "did not verify these comments before filing."

31. ████████ indicated to me and Ms. Leeman that statements attributed to ██ in the CAC did not accurately capture what ██ told the plaintiff's representative. Specifically, ██ indicated that the following statements attributed to ██ in the CAC overstated what ██ in fact told the plaintiff's representative:

    a.  According to the Complaint, "CW 8 stated that Defendant Wheeler, along with President Andrew Low Ah Kee and Chief Investment Officer Daniel Murillo, accessed the Company's internal dashboard every day, and that the dashboard provided current information on tons of metrics. CW 8 added that ██ knew that Defendant Wheeler and Low Ah Kee accessed this information because Murillo had this access, and CW 8 knew this because ██ recalled Murillo often asking CW 8 for advice on what certain information from the dashboard meant." CAC ¶ 277.

        i.  I asked ████████ "What does knowing that Mr. Murillo had access to the dashboard have to do with knowing that Defendant Wheeler and Low Ah Kee accessed the dashboard? Did the plaintiffs accurately transcribe this?"

        ii. ██ replied, "I would not say it's accurate verbatim. I did not work day-to-day with these people but was in meetings with them on a month-to-month basis. [I know] they were at least aware of high-level metrics. I know Murillo was looking at several metrics on the

-9-

dashboard—I received questions from him.  I can say confidently that Murillo was looking at these dashboards on a regular basis.  For the other two, I would not say we had a personal relationship.  I know what was shared with them in meetings, but I cannot say with certainty what they knew or didn't know with regard to the dashboard."

iii. I later asked ████████ "What I'm hearing is that you didn't actually state to the [plaintiff's representative] that Wheeler and Low Ah Kee actually accessed the dashboard every day?"

iv. ████████ replied, "I don't recall actually saying that.  There would be no way for me to verify that was true."

v. I also asked ████████ "If you had seen that statement before the complaint was filed, I gather you would have corrected that or modified it to reflect what you said to me, that you knew what was available to them during the meetings, but you could not know what they looked at?"

vi. ████████ replied: "Right.  I can try to piece together from comments that any of them [Wheeler and Low Ah Kee] had made from their knowledge about the data, but it's not like I was checking their access to the dashboard every night."

b. According to the Complaint, "CW 8 added that the key executives needed that information in order to set the strategic direction of the Company.  CW 8's understanding was that the 'executive team was plugged in from the

AI perspective,' and that the executive team looked at key metrics on the dashboard 'every day,' and that ▮ was aware that they were also constantly tracking non-Opendoor data on a daily basis, such as mortgage rates along with appreciation and depreciation rates." CAC ¶ 278.

    i.  I asked ▮▮▮ whether ▮ would have told them [the plaintiff's representative] that the team was doing something ***every day*** and "constantly tracking this or that on a ***daily*** basis." (Emphasis added.)

    ii.  In response, ▮▮▮ said that the "every day" quote was something ▮ had said to the plaintiff's representative "***with regards to Murillo***." (Emphasis added.) ▮▮▮ further clarified, with respect to Murillo, "I know on a near-regular basis. I don't know if it was literally seven days a week."

32. At the end of the call, ▮▮▮ stated, "I guess in general, and I told this to the people who filed the complaint . . . there was no malicious intent involved . . . it was just a business mistake . . . and this is what I told the prosecutors as well, and obviously, this did not make it into the report or filing."

    a.  I asked ▮▮▮ if ▮ wished that whoever was responsible for preparing the Complaint "would have captured that in what they quoted" ▮ in the Complaint as saying.

    b.  ▮▮▮ said "I definitely would have preferred that. I mean obviously, it wasn't their job, but if they were trying to capture the real intent of what I was saying, that would have been it."

-11-

**33.** I declare under penalty of perjury that the foregoing is true and correct.

Executed:    October 13, 2023

Washington, D.C.

George Anhang

# EXHIBIT 1

# EXHIBIT 1



UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

IN RE LUMBER LIQUIDATORS
HOLDINGS, INC. SECURITIES
LITIGATION

Civil Action No. 4:13cv157

## ORDER

This matter is before the Court on an ex parte motion brought by Defendants Lumber Liquidators

Holdings, Inc. ("Lumber Liquidators"), Robert M. Lynch, Daniel E. Terrell, William K Schlegel and

Thomas D. Sullivan (collectively, "Defendants"). Defendants raise issues regarding statements

attributed to confidential witnesses in the Consolidated Amended Complaint on record.

## I.    BACKGROUND

On April 22, 2015, Plaintiffs filed a Consolidated Amended Complaint ("CAC"). The CAC

attributes information to six different confidential witnesses. Consol. Am. Compl. ¶ 60, ECF No. 80.

On April 24, 2015, the Parties filed a Joint Motion for Approval of Stipulated Briefing Schedule

and Stipulation to Extend Page Limits. The Court granted the motion, providing an extended briefing

schedule for Defendants to file a single joint motion to dismiss by June 2, 2015, Plaintiffs to respond by

July 14, 2015, and Defendants to reply by August 11, 2015. ECF No. 80.

On May 14, 2015, Defendants, by email, submitted an ex parte motion requesting the Court to

order Plaintiffs to furnish affidavits from all confidential witnesses confirming the accuracy of their

statements and the circumstances surrounding their inclusion in the CAC. Defendants also request to

further extend the briefing schedule to accommodate this request.

Defendants explained that, after conducting an investigation, they were able to contact one of the

six confidential witnesses identified in the CAC as CW6. CW6 is cited in the CAC to support Plaintiffs'

allegations of fraud and scienter. *See* Consol. Am. Compl., ECF No. 80 ¶ 60(f). Defendants assert that

1

CW6 disputes ever making the statements attributed to CW6 in the CAC. Defendants contend that this discovery raises significant concerns regarding the accuracy of CW6's statements as well as the statements attributed to the remaining confidential witnesses.

In addition to the requested affidavits, Defendants request the Court to approve the filing of a new complaint, striking any reference to allegations based on statements by CW6. On May 29, 2015, two days before the motion to dismiss was due to be filed, Defendants filed, by email, supplemental authority supporting their position.

## II. DISCUSSION

In a securities action, any claims for fraud will be held to a stricter pleading standard under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67, 109 Stat. 737, *codified at* 15 U.S.C § 78u–4. The PSLRA, with its requirement of specific evidentiary detail in cases such as this, has put a significant burden on plaintiffs' counsel to undertake pre-litigation discovery in order to proffer allegations sufficient to survive a PSLRA motion to dismiss. *Hatamian v. Advanced Micro Devices, Inc.*, No. 14-CV-00226-YGR, 2015 WL 511175, at *3 (N.D. Cal. Feb. 6, 2015). As such, it has become common practice to undertake pre-pleading investigations designed to obtain information from corporate employees. As in many other cases, the CAC here relies heavily, although not exclusively, on information attributed to confidential witnesses.

When such practices are shown to put the integrity of the adversarial process, and the confidential witnesses themselves, in question, courts have chosen to either confirm the reliability of the statements attributed to confidential witnesses, or deeply discount the statement when resolving motions to dismiss. *See Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 216 n.4 (2d Cir. 2010) (concluding that the deposition of confidential witnesses was proper, as an aid to the district court in determining a motion to dismiss shareholders' securities fraud action against a corporation, where testimony was used for the limited purpose of determining whether confidential witnesses acknowledged statements attributed to them in the complaint); *In re Neustar Sec.*, No. 1:14CV885 JCC/TRJ, 2015 WL 364578, at

2

*11 (E.D. Va. Jan. 27, 2015) (granting a motion to dismiss because the Court found no way to "assess the credibility of anonymous sources quoted in the article, whether the sources have personal knowledge of the events described, and whether the sources were in a position to learn of such events personally").

The Court agrees that Defendants' assertions raise significant reliability and accuracy concerns relating to the individuals identified in the CAC as confidential witnesses. Accordingly, the Court **ORDERS** the following:

To assure that no impropriety has occurred, and if one has occurred, to enable the Court to determine the appropriate response, the Court directs that, by Tuesday, July 21, 2015, the following documents be submitted to the Court by plaintiffs' counsel: (1) a sworn affidavit from a personally knowledgeable attorney explaining, with specificity and attaching all relevant correspondence and/or other relevant documentation, the circumstances under which references to CW6 and all other confidential witnesses came to be in the CAC and all communications—before and after its filing—with the witnesses relating to this subject; and (2) a sworn affidavit from CW6 and all other confidential witnesses recounting, with specificity, his or her version of these events. For avoidance of doubt, these submissions may be filed, in the first instance, *ex parte*. After reviewing the submissions, the Court will determine whether it is appropriate for these materials to be disclosed to the defense, and if so, whether redactions (apart from references tending to identify any confidential witness) are to be made.

It is further **ORDERED** that the briefing schedule set forth by the Court in ECF No. 81 is **MODIFIED** as follows: Lead Plaintiffs' opposition to Defendants' pending motion to dismiss shall be filed no later than July 21, 2015.[1] Lead Plaintiffs shall be granted a total of thirty-five (35) pages for their opposition to the motion to dismiss. Defendants' reply brief in support of their motion to dismiss

---

[1] If Lead Plaintiffs have filed a response prior to the issuance of this Order, Lead Plaintiffs are granted leave to file supplemental briefing no later than July 21, 2014. Lead Plaintiffs shall be granted a total of ten (10) pages for any supplemental briefings submitted in opposition to the motion to dismiss. Should Lead Plaintiffs file supplemental briefing, Defendants will be granted an additional five (5) pages for their reply brief in support of their motion to dismiss.

3

shall be filed no later than August 18, 2015. Defendants shall be granted a total of twenty-five (25) pages for their reply brief in support of their joint motion to dismiss.

It is further **ORDERED** that the ex parte submissions made by Defendants on May 14, 2014 and May 29, 2015 are to be filed, under seal, on the docket of this case. The Court also **DIRECTS** counsel to file publicly redacted versions of the ex parte submissions on the docket. The Court authorizes counsel to make all redactions necessary to protect the identities of all confidential witnesses. Further, if counsel believe that additional redactions are justified, *e.g.*, to protect attorney work product, their public filings may also reflect such redactions. In such an event, counsel are **DIRECTED** to submit, the same day, a letter memorandum explaining, and providing the legal basis for, such redactions. The Court will determine whether these redactions are merited.

The Clerk is **REQUESTED** to forward a copy of this Order to all parties.

**IT IS SO ORDERED.**

_____
Arenda L. Wright Allen
United States District Judge

July ___14___, 2015
Norfolk, Virginia

4

# EXHIBIT 2

# EXHIBIT 2

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/21/2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X
                                    :

IN RE MILLENNIAL MEDIA, INC. SECURITIES   :
LITIGATION                                 :

                                      :

----------------------------------------------------------------------X

14 Civ. 7923 (PAE)

ORDER

PAUL A. ENGELMAYER, District Judge:

This order is prompted by issues that have arisen regarding statements attributed to confidential witnesses in the amended complaint. The Court first reviews the relevant background and then addresses next steps.

I.     **Background**

On March 21, 2015, plaintiffs filed their First Amended Complaint ("FAC"), which attributed information to 11 different confidential witnesses ("CWs"). Dkt. 61.

On April 13, 2015, four days before defendants' anticipated motion to dismiss was due, plaintiffs submitted a letter, seeking permission to file what plaintiffs termed a "Supplemental Amended Complaint," which would delete all references in the FAC to "Confidential Witness 4" (hereinafter, "CW-4"). Dkt. 64. Plaintiffs explained that, after the filing of the FAC, CW-4 had asked not to be cited. *See id.* However, plaintiffs did not disclose whether, and if so the circumstances under which, CW-4 had originally agreed to be referred to in the FAC. Plaintiffs took the position that defendants should not be given additional time to file their motion to dismiss.

The same day, defendants submitted a letter, arguing that plaintiffs' proposed revised complaint should be deemed a new amended complaint (under Federal Rule of Civil Procedure 15(a)) rather than a supplemental complaint (under Rule 15(d)), which would justify giving defendants more time to respond to the revised complaint. Dkt. 65.

On April 14, 2015, the Court issued an order granting plaintiffs leave to file a newly amended complaint, while extending, by two weeks, the deadline by which defendants were to move to dismiss. Dkt. 66.

In the same order, the Court expressed concern "about the circumstances related to the inclusion, perhaps without the witness's knowledge or consent, of references in the [FAC], to Confidential Witness 4." *Id.* The Court added:

> To assure that no impropriety has occurred, and if one has occurred, to enable the Court to determine the appropriate response, the Court directs that, by Friday, April 17, 2015, the following two documents be submitted to the Court by plaintiffs' counsel: (1) a sworn affidavit from a personally knowledgeable attorney explaining, with specificity and attaching all relevant correspondence and/or other relevant documentation, the circumstances under which references to Confidential Witness 4 came to be in the [FAC] and all communications—before and after its filing—with the witness relating to this subject; and (2) a sworn affidavit from Confidential Witness 4 recounting, with specificity, his version of these events. For avoidance of doubt, these submissions may be filed, in the first instance, *ex parte*. After reviewing the submissions, the Court will determine whether it is appropriate for these materials to be disclosed to the defense, and if so, whether redactions (apart from references tending to identify Confidential Witness 4) are to be made.

*Id.*

The following day, plaintiffs filed a newly amended complaint, the Second Amended Complaint ("SAC"), which excised all references to CW-4. Dkt. 67.

## II.    The April 17, 2015 Submissions

On April 17, 2015, *both* sides submitted a series of documents—both by email, both on an *ex parte* basis.

Plaintiffs submitted four affidavits: one from CW-4 and three from personnel affiliated with one of plaintiffs' law firms (a partner, a former investigator, and the current director of investigations). Plaintiffs also submitted a cover letter, and various supporting documents, including emails, an investigative report, and an investigator's memorandum. Salient here, it

2

appears to the Court from these materials that CW-4 was not told, in advance, that he would be quoted in any way in the complaint, and that he learned that he had been quoted as a confidential witness only when plaintiffs' counsel sent him the FAC after it had been publicly filed. It also appears that CW-4 disputes the accuracy of several statements that the FAC attributes to him.

For their part, defendants submitted, unsolicited, a report on their own investigation into the confidential witnesses cited in the FAC. Specifically, defendants submitted a cover letter, and two declarations of attorneys at defendants' law firm recounting conversations with multiple persons whom defendants believe to correspond to confidential witnesses quoted in the FAC. Like CW-4, these witnesses represented to defense counsel that they had not been aware of, and did not consent to, being quoted, even pseudonymously, in the complaint. These witnesses also disputed the accuracy of multiple statements attributed to them in the FAC.

## III. Next Steps

### A. Additional Information Relating to Confidential Witnesses

The parties' April 17 submissions, in combination, raise several sets of concerns relating to the persons identified in the FAC as confidential witnesses: (1) To what extent does the FAC (and now the SAC) inaccurately attribute statements to such confidential witnesses?; (2) to what extent were the 11 persons identified in the FAC as confidential witnesses notified beforehand that they might be quoted as such in the complaint as publicly filed, and were these persons notified that being quoted as a confidential witness created a risk that their identities would be ordered disclosed, including during discovery, *see, e.g.*, *Plumbers and Pipefitters Local Union No. 630 Pension Annuity Trust Fund v. Arbitron, Inc.*, 278 F.R.D. 335 (S.D.N.Y. 2011)?; and (3) to what extent do other persons identified as confidential witnesses, like CW-4, now ask to have the attributions to them removed?

3

To obtain answers to these questions, and to determine appropriate next steps, the Court hereby directs plaintiffs' counsel, by **Tuesday, May 5, 2015**, to submit to the Court the following two materials as to each of the remaining 10 confidential witnesses (*i.e.*, those other than CW-4): (1) a sworn affidavit from a personally knowledgeable attorney explaining (a) the circumstances under which references to that confidential witness came to be in the FAC (now the SAC); (b) how the witness came to be identified as a "confidential witness" (*i.e.*, as opposed to being referred to by name); (c) whether the witness was informed in advance that he or she would be quoted in the complaint, and that a reference in the complaint to a "confidential witness" created a risk that the witness's identity would be ordered disclosed, *see Arbitron*, and whether the witness consented to being so quoted in the complaint; and (d) whether the witness, having reviewed the FAC (or SAC), confirms that the statements attributed to him or her are accurately attributed; and (2) a sworn affidavit from each confidential witness setting out, with specificity, his or her version of these events. These submissions, as with the materials relating to CW-4, may be filed, in the first instance, *ex parte*. As discussed below, the Court will determine shortly, with the input of counsel, to what extent redactions to these materials (and those submitted by both parties on April 17, 2015) are merited.

IV.     **Third Amended Complaint and Revised Due Dates for a Motion to Dismiss**

The Court expects that in the course of plaintiffs' counsels' discussions with the persons identified as confidential witnesses, counsel will confirm with each witness whether the statements attributed to that witness in the FAC (now the SAC) are accurately attributed. In the event that plaintiffs' counsels' discussions with other CWs identify inaccurate attributions to these CWs or leads any other CWs (like CW-4) to ask that attributions to him or her be removed, plaintiffs are authorized to file a Third Amended Complaint, on the same day (**May 5, 2015**) that

4

the submissions above are due.  For avoidance of doubt, the purpose of such a Third Amended

Complaint is to assure that attributions to confidential witnesses are accurate, not to invite other

modifications to the SAC.  In recognition of the possibility of such a filing, the Court extends the

due date for defendants' motion to dismiss to **May 26, 2015**.  Plaintiffs' opposition to such a

motion will be due **June 15, 2015**.  Defendants' reply will be due **June 26, 2015**.

## V.     Public Filings of *Ex Parte* Submissions

The Court directs that, on **Friday, May 8, 2015**, the *ex parte* submissions made by both

plaintiffs and defendants on April 17, 2015, and the submissions that plaintiffs are to make on

Tuesday, May 5, 2015, are to be publicly filed on the docket of this case.  The Court, of course,

authorizes counsel to make all redactions necessary to protect the identities of all confidential

witnesses.  Further, if counsel believe that additional redactions are justified, *e.g.*, to protect

attorney work-product, their public filings may also reflect such redactions.  In such an event,

counsel are directed to submit, the same day, a letter memorandum explaining, and providing the

legal basis for, such redactions.  The Court will promptly determine whether these redactions are

merited.


SO ORDERED.

*Paul A. Engelmayer*

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: April 21, 2015
       New York, New York

5