**LEWIS ROCA ROTHGERBER CHRISTIE LLP**
John C. Gray (Bar No. 028454)
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone: (602) 262-5311
Facsimile: (602) 262-5747
Email: jgray@lewisroca.com

**SHEARMAN & STERLING LLP**
Adam S. Hakki (*pro hac vice*)
599 Lexington Ave.
New York, NY 10022
Telephone: (212) 848-4000
Email: ahakki@shearman.com

Lyle Roberts (*pro hac vice*)
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Email: lyle.roberts@shearman.com

*Counsel for Defendants Opendoor Technologies Inc.,
Eric Wu, Carrie Wheeler, Chamath Palihapitiya,
Steven Trieu, Ian Osborne, Adam Bain, David Spillane,
Cipora Herman, Pueo Keffer, Glenn Solomon, Jason Kilar,
and Jonathan Jaffe*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re Opendoor Technologies Inc. Securities Litigation | Case No. 2:22-CV-01717-MTL |
| | **OPENDOOR DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT** |
| | **(Oral Argument Requested)** |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

ARGUMENT ................................................................................................................... 2

I. Plaintiffs fail to identify any actionable false or misleading statements ....... 2

    A. Opendoor told investors about human involvement in pricing decisions and the potential for ineffective pricing strategies. ........... 3

    B. Opendoor repeatedly told investors that it was vulnerable to interest rate increases and market volatility. ..................................... 6

    C. Plaintiffs do not identify any aspect of the statements about Opendoor's pricing algorithms or business model that was inaccurate or actionable. ................................................................. 9

    D. Plaintiffs continue to rely on a materially altered statement from Opendoor's August 4, 2022 earnings call to support their claims. ... 11

    E. The allegations underlying the FTC settlement do not support Plaintiffs' claims. ..................................................................... 11

II. Plaintiffs fail to adequately allege a "strong inference" of scienter. ........... 13

    A. Mr. Wu's stock sales do not support any inference of scienter. ...... 13

        i. Plaintiffs assert that only one Defendant sold any stock during the Class Period. ......................................................... 13

        ii. Mr. Wu's stock sales cannot support any inference of scienter. ................................................................. 14

        iii. Plaintiffs mischaracterize the nature and timing of Mr. Wu's sales. ................................................................. 15

    B. Plaintiffs provide no other basis for a strong inference of scienter. ..................................................................... 16

    C. The more compelling inference is that Defendants did not act with scienter. ..................................................................... 18

III. The Opposition confirms Plaintiffs' failure to adequately plead loss causation and does not refute the existence of negative causation. ............ 18

CONCLUSION ............................................................................................................. 20

**TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page(s)**

*In re. Align Tech. Inc., Sec. Litig.*,
    2021 WL 1176642 (N.D. Cal. Mar. 29, 2021)................................................................. 10

*In re Alteryx Sec. Litig.*,
    2021 WL 4551201 (C.D. Cal. June 17, 2021) ............................................................. 15

*In re AnaptysBio, Inc.*,
    2021 WL 4267413 (S.D. Cal. Sept. 20, 2021)............................................................. 14

*In re Apollo Group, Inc. Sec. Litig.*,
    2011 WL 5101787 (D. Ariz. Oct. 27, 2011)................................................................. 18

*Applestein v. Medivation, Inc.*,
    861 F. Supp. 2d 1030 (N.D. Cal. 2012) ...................................................................... 14

*Bajjuri v. Raytheon Techs. Corp.*,
    2023 WL 3650554 (D. Ariz. May 25, 2023) ......................................................... 5, 12

*Berg v. Velocity Fin., Inc.*,
    2021 WL 268250 (C.D. Cal. Jan. 25, 2021) ............................................................... 10

*In re BofI Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) ...................................................................................... 20

*Brodsky v. Yahoo! Inc.*,
    630 F. Supp. 2d 1104 (N.D. Cal. 2009) ........................................................................ 5

*Brody v. Transitional Hospitals Corp.*,
    280 F. 3d 997 (9th Cir. 2009) ....................................................................................... 4

*City of Pontiac Gen. Emps.' Ret. Sys. v. First Solar, Inc.*,
    2023 WL 155861 (D. Ariz. Jan. 10, 2023) ........................................................*passim*

*Dalberth v. Xerox Corp.*,
    766 F.3d 172 (2d Cir. 2014) .......................................................................................... 5

*In re Daou Systems, Inc.*,
    411 F.3d 1006 (9th Cir. 2005) ..................................................................................... 19

*Ferraro Family Found., Inc. v. Corcept Therapeutics Inc.*,
    501 F. Supp. 3d 735 (N.D. Cal. 2020)................................................................... 19, 20

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F. 4th 747 (9th Cir. 2023) ...................................................................................... 10

*Jaeger v. Zillow Grp., Inc.*,
644 F. Supp. 3d 857 (W.D. Wash. 2022)...................................................................... 6

*Karam v. Corinthian Colleges, Inc.*,
2012 WL 8499135 (C.D. Cal. Aug. 20, 2012)............................................................. 5

*Lamartina v. VMware, Inc.*,
2023 WL 2763541 (N.D. Cal. Mar. 31, 2023)............................................................ 14

*Lomingkit v. Apollo Educ. Grp. Inc.*,
2017 WL 633148 (D. Ariz. Feb. 16, 2017).................................................................. 11

*Loos v. Immersion Corp.*,
762 F.3d 880 (9th Cir. 2014) ...................................................................................... 19

*Lowthorp v. Mesa Air*,
2021 WL 3089118 (D. Ariz. July 22, 2021)............................................................... 11

*Metzler Inv. GMBH v. Corintian Colls., Inc.*,
540 F. 3d 1049 (9th Cir. 2008) ................................................................................... 19

*In re Netflix, Inc. Sec. Litig.*,
647 F. App'x 813 (9th Cir. 2016) ................................................................................. 8

*In re Netflix, Inc., Sec. Litig.*,
964 F. Supp. 2d 1188 (N.D. Cal. 2013) ....................................................................... 8

*In re Nokia Corp. Sec. Litig.*,
2021 WL 1199030 (S.D.N.Y. Mar. 29, 2021)............................................................. 9

*Palm Harbor Special Fire Control & Rescue Dist.*
*Firefighters Pension Plan v. First Solar Inc.*,
2023 WL 4161355 (D. Ariz. June 23, 2023) .................................................. 17, 18, 19

*In re Pivotal Sec. Litg.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020).............................................................. 8

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .................................................................................... 10

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) .................................................................................... 13

*S.E.C. v. Mozilo*,
2010 WL 3656068 (C.D. Cal. Sept. 16, 2010) ........................................................... 10

*In re SeeBeyond Tech. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ...................................................................... 15

iii

*Shupe v. Rocket Cos., Inc.*,
    2023 WL 2411002 (E.D. Mich. Mar. 8, 2023) ............................................................... 15

*In re Silicon Graphics Inc. Sec. Litig.*,
    183 F.3d 970 (9th Cir. 1999) ..................................................................................... 14

*In re Talis Biomedical Corp. Sec. Litig.*,
    2022 WL 17551984 (N.D. Cal. Dec. 9, 2022) ............................................................... 7

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
    2011 WL 1253250 (D. Ariz. Mar. 31, 2011) ................................................................. 3

*Vancouver Alumni Asset Holdings, Inc. v. DaimlerAG*,
    2017 WL 2378369 (C.D. Cal. May 31, 2017) ............................................................... 10

*Xu v. Chinacache Int'l Holdings Ltd.*,
    2016 WL 4370030 (C.D. Cal. Aug. 15, 2016) ............................................................... 7

**Regulations**

17 CFR § 230.144 ............................................................................................................... 16

17 C.F.R. § 240.10b5-1(c)(1)(D)(3) ................................................................................... 16

**Other**

87 Fed. Reg. 80,403 ............................................................................................................ 16

## INTRODUCTION[1]

In their Consolidated Amended Complaint (Complaint or "CAC"), Plaintiffs attempt to convert the unprecedented and rapid downturn in the U.S. housing market in 2022, caused by the sharpest increase in mortgage rates in 40 years, into a securities fraud action by alleging that Opendoor falsely guaranteed to investors that its pricing system for homes would be effective in any type of housing market. As shown in the Motion, Opendoor never made this guarantee and instead repeatedly warned investors about the exact risks to its business that came to fruition in 2022 and negatively impacted its financial results. Apparently recognizing that the basis for their claims has no merit, Plaintiffs suddenly pivot to a new theory in their Opposition.

Plaintiffs now say the "central thrust" of their case is that Opendoor "falsely attributed the Company's *success*" to its pricing algorithms while concealing that it was instead "a human-driven process that actually *drove the Company's pricing decisions* and significantly contributed to the Company's profitability." (Opp. at 10 (emphasis added).) Plaintiffs' new theory is just as deficient as its old theory.

First, it is nonsensical to argue, as Plaintiffs now do, that human involvement drove Opendoor's success, but that it was the failure of the pricing algorithms that led to the Company's poor financial results in 2022. If humans really were doing all of the pricing, then presumably the pricing algorithms played no role in what happened in 2022. Plaintiffs do not address this internal, and fatal, contradiction in their Opposition.

Second, while Opendoor told investors that its pricing algorithms were an important part of its business, the Company always has been transparent that human judgment plays a central role in its pricing decisions. In fact, Opendoor's stated objective was to "marry the best of [its] algorithmic insights with human judgment." (Mot. at 5.) As Ms. Wheeler forthrightly told investors: "I think there's a sense that it's just all about the model…. But we've also done a really good job of integrating systematic modeling with like the human

---

[1] All abbreviations and capitalized or defined terms not defined herein have the same meaning provided in the Opendoor Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof ("Motion" or Mot.").

insight and the human overlay." (*Id.*) Plaintiffs make no attempt to reconcile these clear and accurate disclosures with their unsupported assertions that Opendoor concealed the existence of human involvement.

Given the weakness of their allegations, it is unsurprising that Plaintiffs also are unable to identify facts supporting the "strong inference of scienter" they are statutorily required to plead. They focus on stock sales by Mr. Wu that are not suspicious in either timing or amount, while failing to allege a single fact indicating that Mr. Wu or any other defendant knew of the alleged falsity of the statements at issue or that Opendoor's pricing systems would be unable to keep pace with the unprecedented housing market downturn in the second quarter of 2022.

Nor does the Opposition establish that Plaintiffs have adequately pled loss causation. Plaintiffs rely on a convoluted theory that the alleged falsity of Opendoor's statements was somehow revealed through the Company's financial results, but (a) those financial results did not provide investors with any new information about supposed issues with Opendoor's pricing system, and (b) Opendoor provided investors with financial forecasts for upcoming quarters, and the alleged corrective disclosures merely confirmed those earlier forecasts. Binding Ninth Circuit precedent makes it clear that corrective disclosures that provide no "new news" to the market cannot support an allegation of loss causation.

The Court should dismiss Plaintiffs' claims with prejudice.

## ARGUMENT[2]

### I. Plaintiffs fail to identify any actionable false or misleading statements.

The Opposition fails to address the relevant Opendoor disclosures identified in the Motion that defeat their claims, and it materially distorts the statements that Plaintiffs claim are false and misleading.[3]

---

[2] The Opposition does not address that SCH no longer exists as a separate entity, yet Plaintiffs have asserted claims against SCH as though it does. (*See* Mot. at 4 n.2.) As a non-existent entity, SCH should be dismissed from the case.

[3] Defendants' arguments in this section apply to both the Section 10(b) and Section 11 claims in the Complaint.

**A.    Opendoor told investors about human involvement in pricing decisions and the potential for ineffective pricing strategies.**

Plaintiffs now claim that the "central thrust" of the CAC is that, during Opendoor's run of favorable financial results before the unprecedented market downturn in 2022, the Company "falsely attributed [its] success to the algorithm, while concealing that it was ... a human-driven process that actually drove the Company's pricing decisions and significantly contributed to the Company's profitability." (Opp. at 10.) According to Plaintiffs, the market allegedly did not become aware of the truth until after the downturn when Opendoor suffered losses on home sales. (Opp. at 2.)

This theory is both meritless and in conflict with Plaintiffs' other allegations that Opendoor suffered losses in 2022 because its pricing algorithms did not work. If humans actually drove Opendoor's pricing decisions, then they were responsible for the 2022 financial results and there can be no cognizable claims related to ineffective pricing algorithms. (Mot. at 12 n.9 (citing *Gammel v. Hewlett-Packard, Co.*, 905 F. Supp. 2d 1052, 1074 (C.D. Cal. 2012)); *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 2011 WL 1253250, at *20 (D. Ariz. Mar. 31, 2011) (dismissing claims where allegation of "understatement of net income" "ma[de] no sense" and was "'incompatible' with the plaintiff's fraud theory as the SAC defines it.").

Even accepting this new theory on its face, however, Opendoor's actual public statements make it clear that investors understood that the pricing system was specifically designed to incorporate human judgment. Notably, the Company informed investors: "We appraise and price homes we buy and sell using data science, proprietary algorithms, and *analysis from specially trained employees*." (Mot. at 13.) And Opendoor repeatedly outlined for investors how algorithms and human judgment worked together at every step of the pricing process:

- Final offers are "reviewed and finalized by members of our pricing team, allowing us to marry the best of our algorithmic insights with human judgment."

- Resale prices are determined by "[o]ur resale models, in conjunction with our pricing team."

3

- Even initial offers can involve at least a minimal level of "human intervention." (Mot. at 5, 13-14 n.11; Ex. 1 at 200; Ex. 2 at 6.) Ms. Wheeler confirmed the important role human judgment played in pricing when she told investors: "I think there's a sense that it's just all about the model…. But we've also done a really good job of integrating systematic modeling with like the human insight and the human overlay." (Mot. at 5 (citing Ex. 3).)

The Opposition does not dispute that Opendoor made these statements, but it asserts the disclosures were insufficient because they did not say that Opendoor allegedly was "forced to rely on humans to price its offers because its algorithm could not accurately price homes." (Opp. at 10.) This argument fails for several reasons.

*First*, Opendoor made no "specific claim" that its algorithms were the sole basis for pricing decisions or that they would lead to accurate pricing in all circumstances. (Mot. at 12 (citing *In re Cloudera, Inc.*, 2021 WL 2115303, at *14 (N.D. Cal. May 25, 2021)).) None of the statements challenged by Plaintiffs about Opendoor's pricing algorithms come close to making such representations. *See* Mot. 14-17. In fact, Opendoor told investors the exact opposite, warning that its "pricing or portfolio management strategy" may be "ineffective," it may incur losses due to its "failure to appropriately price and manage the home inventory we acquire," and "actual sales" could be "materially less than our forecasts."[4] (Mot. at 12.) These disclosures negate Plaintiffs' claim. (*See id.* at 13 (citing *In re Netflix, Inc. Sec. Litig.*, 647 F. App'x 813, 816 (9th Cir. 2016)).)

*Second*, Opendoor's disclosures conveyed that its algorithms and human judgment worked together to enhance pricing outcomes. Contrary to Plaintiffs' assertions, Opendoor was not required to provide any additional information about the interaction of these two elements of its home pricing. *See Brody v. Transitional Hospitals Corp.*, 280 F. 3d 997, 1007 (9th Cir. 2009) (press release was not misleading because "the information [the Company] did provide—and the reasonable inferences one could draw from that

[4] Opendoor also cautioned, among other things, "[o]ur ability to acquire and resell homes profitably may be negatively impacted if our models lack robust historical data on home sales, material home features, or other market nuances, especially those outside of features and nuances we have previously encountered and modeled." (Ex. 2 at 15.) The historic, once-in-40-year increase in interest rates in 2022 was a scenario that Opendoor had not previously encountered or modeled. (*See* Mot. at 8-9.)

4

information—were entirely consistent" with what plaintiffs alleged should have been disclosed); *Dalberth v. Xerox Corp.*, 766 F.3d 172, 186-87 (2d Cir. 2014) ("'Corporations are not required to phrase disclosures in pejorative terms.'").

*Third*, Plaintiffs rely on statements from two CWs that are entirely consistent with Opendoor's disclosures.[5] (*See* Mot. at 13-14 n.11.) The first CW (CW5) allegedly claimed that approximately 50 percent of *initial* offers involved human review, which is consistent with Opendoor's disclosures regarding human involvement in the initial offer process.[6] (*See* Mot. at 13-14 n.11 (comparing CW5's statements on initial offers against Opendoor's disclosures).) The second CW (CW2) allegedly stated that pricing analysts would review and adjust *final* offers, which aligns with Opendoor's disclosure that all final offers are "reviewed and finalized by members of our pricing team." (*See id.* (comparing CW2's statements about final offers against Opendoor's disclosures).)

Plaintiffs also rely on an alleged statement from CW2, a low-level pricing analyst with exposure to a limited geographic area, that he believed the algorithms were not accurate. (Opp. at 4, 9, 15.) CW2 provides no facts to support his opinion. An "anecdotal account[]" from a single CW, without more, is not enough to adequately plead a "widespread" issue forming the basis of a securities fraud claim. *Karam v. Corinthian Colleges, Inc.*, 2012 WL 8499135, at *11 (C.D. Cal. Aug. 20, 2012); *see also Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) (reliance on single CW's statement that platform was "severely overloaded" without "compelling objective indicators" supporting the assertion was insufficient); *Bajjuri v. Raytheon Techs. Corp.*, 2023 WL 3650554, at *6 (D. Ariz. May 25, 2023) (dismissing claims based on an

---

[5] The Opendoor Defendants have filed a separate Motion for an Order Directing the Submission of Counsel and Confidential Witness Affidavits because a significant number of the alleged statements attributed to CWs by Lead Plaintiffs (including those of CW2 and CW5) mischaracterize or do not accurately reflect what the CWs actually said.

[6] As noted in the Motion, Opendoor updated its disclosures over time to reflect increasing reliance on pricing algorithms at the preliminary offer stage, but humans have always been involved at least minimally (Mot. at 5 n.4.) Further, CW5's alleged statements do not support Plaintiffs' claims because Plaintiffs admit he stopped working at Opendoor in March 2020—*nine months before Opendoor filed the Registration Statements and the start of the class period. See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (discounting CWs "not employed … during the time period in question").

"uncorroborated and unreliable confidential witness statement" from a single "low-level employee").[7]

*Finally*, Plaintiffs' reliance on the *Zillow* case only serves to highlight why Zillow's exit from the iBuying business in November 2021 shed no light on Opendoor's prospects. The allegations in *Zillow* were about a supposedly undisclosed initiative (referred to internally as "Project Ketchup") to build market share by deliberately overpaying for homes. *Jaeger v. Zillow Grp., Inc.*, 644 F. Supp. 3d 857, 865-66 (W.D. Wash. 2022). According to the plaintiffs, Zillow was "behind some of its competitors, like Opendoor," and wanted to "catch up." *Id.* The plaintiffs alleged that, "[u]nder Project Ketchup, Zillow 'applied systematic "overlays" to drive up offers well above the pricing indicated by its algorithm and pricing analysts.'" *Id.* at 866. Zillow's actions purportedly led to the implosion of its iBuying business because the company incurred significant losses on home sales (while its competitors did not). *Id.* The case had nothing to do with the accuracy of Zillow's algorithms, the general use of human judgment in the pricing process, or the overall viability of the iBuying business model. In sum, *Zillow* was based on an alleged theory that the company failed to disclose that it deliberately was pricing houses well above their "current value," *id.* at 866, which is nothing like the allegations here that Opendoor simply was not able to accurately predict the resale value of the homes it purchased on the eve of an unprecedented dislocation in the residential housing market.

**B.    Opendoor repeatedly told investors that it was vulnerable to interest rate increases and market volatility.**

Throughout the Opposition, Plaintiffs suggest that Opendoor "unequivocally" claimed its algorithms and business model "kept Opendoor profitable in any housing market." (Opp. at 3, 5, 8, 12.) That is demonstrably false. Opendoor repeatedly told investors, among other things:

---

[7] Plaintiffs assert that the FTC's allegations "corroborate" CW2's purported statements, (Opp. at 9), but the FTC action had nothing to do with the accuracy of Opendoor's pricing algorithms. The FTC took issue with marketing messages and Opendoor allegedly offering consumers less than what it assessed as market value, not whether Opendoor correctly assessed market value.

- Opendoor's "success depend[ed], directly and indirectly, on general economic conditions, [and] the health of the U.S. residential real estate industry."

- Interest rate increases "could result in a decline in the demand for our homes" and "adversely affect our business and financial results."

- Opendoor could "incur significant losses in the future" due to its "failure to appropriately price and manage" its inventory.

- Opendoor "may be unable to liquidate [its] inventory at prices that allow [it] to meet [its] margin targets or recover [its] costs."

- "[C]hanging market conditions are reflected in our pricing for new acquisitions, largely leaving previously-acquired inventory at risk to potential market volatility."

Mot. at 6, 12-13. These disclosures describe exactly what happened during the uniquely challenging housing market correction in 2022 and are dispositive of Plaintiffs' claims. (*See* Mot. at 12-13 (citing *Netflix*, 647 F. App'x at 816)); *In re Talis Biomedical Corp. Sec. Litig.,* 2022 WL 17551984, at *15 (N.D. Cal. Dec. 9, 2022) (statement about manufacturing "at scale" not misleading given "disclosures about the manufacturing risks"); *Xu v. Chinacache Int'l Holdings Ltd.*, 2016 WL 4370030, 7-9 (C.D. Cal. Aug. 15, 2016) (statements regarding functionality of new technology not false where contemporaneous disclosures said that company could not "assure you that their implementation will benefit us with the cost and expense reduction as expected").

Plaintiffs' only supposed support for their assertion that Opendoor promised investors it always would be profitable (an absurd assertion on its face) is in two statements Opendoor executives made about how the Company could try to maintain its target contribution margins in a down market.

*First*, Plaintiffs ignore the context Ms. Wheeler provided when she stated "our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets." (Opp. at 12 (citing CAC ¶ 181).) Plaintiffs make no attempt to address Ms. Wheeler's subsequent statement: "If [Home Price Appreciation] were to go down, we would look to fluctuate our spreads to manage to that target margin range." (Mot. at 5.) In context, she explained that even in a down market Opendoor could increase spreads in response to market volatility and try to achieve target contribution margins, but provided

7

no guarantee or promise that Opendoor would successfully "manage to that target margin range" or execute on its plan. This is analogous to the *Netflix* decision in which the statement that "purchasing content for streaming was 'not going to ever manifest itself as margin risk'" was not actionable because in context, Netflix was explaining it would not acquire the content "if [it] were ever more expensive than Netflix thought." *In re Netflix, Inc., Sec. Litig.*, 964 F. Supp. 2d 1188, 1196 (N.D. Cal. 2013), *aff'd*, 647 F. App'x 813 (9th Cir. 2016).[8]

*Second*, Plaintiffs claim that Mr. Wu "doubled down" and "claim[ed] that the Company purportedly had empirical evidence to support Wheeler's statement that the algorithm worked in all housing markets." (Opp. at 13.) But this is a gross mischaracterization of what Mr. Wu said. His statement made no reference to Ms. Wheeler's statement, the Company's algorithms, or "all housing markets." Instead, in response to a question about the viability of Opendoor's business model in a slow market, Mr. Wu spoke about an analysis of how Opendoor's business model would have fared during the subprime mortgage crisis ("great financial crisis" or "GFC"). (*See* CAC ¶¶ 189-92; Mot. at 17, 19.) Plaintiffs do not (1) claim Opendoor did not do this analysis or that the results were not reported accurately by Mr. Wu, (2) explain why that analysis was applicable to the type, speed, and magnitude of downturn that occurred in 2022 on the heels of a historic increase in interest rates, or (3) address the fact that Mr. Wu also expressly cautioned: "[O]utside of … inducing a recession, I can't give you more confidence outside of that."[9] (Mot. at 19.)

---

[8] The PSLRA safe harbor also renders this forward-looking statement non-actionable because Plaintiffs have failed to adequately plead either that Ms. Wheeler knew the statement was false or that her statement was not accompanied by meaningful cautionary language. (*See* Mot. at 19 n.18.)  In response, Plaintiffs offer nothing more than a conclusory assertion that "Wheeler knew of facts that rendered this statement false and misleading," but fail to say what those purported facts were. (Opp. at 12 n.3.) Plaintiffs also refer to Opendoor's risk disclosures as "generic" and "not meaningful" (*id.*), but make no attempt to explain how the disclosures do not address "the very subject Plaintiffs challenge." *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *16 (N.D. Cal. July 21, 2020).

[9] Plaintiffs pick fragments of sentences from a Wedbush analyst report and a Seeking Alpha article and assert that these show the statements from Defendants Wu and Wheeler "led investors to believe that Opendoor's pricing algorithm worked in all housing markets."

## C.   Plaintiffs do not identify any aspect of the statements about Opendoor's pricing algorithms or business model that was inaccurate or actionable.

With respect to Opendoor's statements about its pricing algorithms and business model, the Opposition does not address the statements individually (despite the fact that the PSLRA requires particularized pleading as to each alleged false statement). But even as a general matter, Plaintiffs fail to identify any "specific 'contemporaneous facts that would establish a contradiction between the allegedly materially misleading statements and reality.'" (Mot. at 14-15 (describing pricing algorithm statements and quoting *Cloudera*, 2021 WL 2115303, at *16); *id.* at 17-20 (describing business model statements).) In particular, Plaintiffs do not contend that the pricing algorithms did not actually have the features described or that they were not "key" to Opendoor's profitability. Nor do Plaintiffs point to anything that would undermine the accuracy of the statements about Opendoor's business model.[10] Instead, they argue that the pricing algorithms did not work and did not adjust quickly enough to changing market conditions, and, thereafter, Opendoor suffered losses. (Opp. at 15-16.) But the statements at issue make no affirmative or specific claim regarding the future performance of the pricing algorithms or profitability. (*See supra* p.4.)

The Opposition also fails to explain how any of the statements are not vague, general statements that would not be relied upon by investors (*i.e.*, nonactionable "puffery"). (Mot. at 15.) Plaintiffs baldly assert that statements related to "matters of central importance" to the Company cannot be puffery. (Opp. at 17.) But Plaintiffs cite no cases supporting this purported exception to the normal analysis and, indeed, "[c]aselaw shows that even

(Opp. at 14-15.) Not only do these reports not say that, but they also were both *published months before the statements at issue were made*. (*See* CAC ¶¶ 97, 99.) And whatever Plaintiffs try to paint the reports to say, "'analysts' conclusions do not change the fact that [Opendoor] made robust disclosures related to" its vulnerability to market swings. *See In re Nokia Corp. Sec. Litig.*, 2021 WL 1199030, at *17 (S.D.N.Y. Mar. 29, 2021).

[10] Plaintiffs continue to assert that Opendoor misled investors by claiming its business model was "designed to generate margins from our service charge to sellers and adjacent products and services associated with a transaction, and not from the spread between acquisition price and resale price." (Opp. at 16-17.) But the Opposition fails to identify any alleged facts suggesting Opendoor's business model was *designed* to do anything different at the time the statement was made and, in any event, Opendoor told investors that it also generated margins from "resale gains and pricing improvements." (Mot. at 18.)

statements about a corporation's core business may be nonactionable puffery." *Berg v. Velocity Fin., Inc.*, 2021 WL 268250, at *4 (C.D. Cal. Jan. 25, 2021) (citing cases).[11]

Plaintiffs also assert that none of the alleged misstatements qualify as puffery because "they were made in direct response to analyst questions." (Opp. at 17.) As a preliminary matter, that is not accurate. Most of the alleged misstatements (including all the misstatements underlying Plaintiffs' Securities Act claims) come from Opendoor's Registration Statements. But more importantly, the distinction makes no difference.[12] Courts regularly find responses to analyst questions constitute nonactionable puffery. *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (statements during analysts calls not actionable because they constituted "mere corporate puffery"). The fact that the puffery is later repeated or re-published by the analysts is irrelevant. *See In re. Align Tech. Inc., Sec. Litig.*, 2021 WL 1176642, at *4 (N.D. Cal. Mar. 29, 2021) ("An analyst's interpretation of a defendant's statement … 'cannot transform corporate optimism into a securities violation.'") (quoting *Intuitive Surgical*, 759 F. 3d at 1058).

Finally, company officers are "not required to take a gloomy view of the future" and "can be expected to be confident about the prospects of their company." (*See* Mot. at 18 (citing *Villare v. Abiomed, Inc.*, 2021 WL 4311749, at *13 (S.D.N.Y. Sept. 21, 2021)); Opp. at 20.) Plaintiffs argue that the business model statements are nevertheless actionable because they were "concrete," "specific," and "induced reliance," but apart from offering

---

[11] Plaintiffs cite two cases that supposedly support their argument, but both are inapposite. In *Vancouver Alumni*, the court specifically found that "Defendants made objective and material misrepresentations regarding compliance with emissions regulations." *Vancouver Alumni Asset Holdings, Inc. v. DaimlerAG*, 2017 WL 2378369, at *12 (C.D. Cal. May 31, 2017). In *Mozilo*, the court did not say the statements at issue were not non-actionable puffery because they concerned "matters of central importance." Rather, it found the "company's essential operations were so at odds with the company's public statements that [the statements] … are rendered cognizable to the securities laws." *S.E.C. v. Mozilo*, 2010 WL 3656068, at *11 (C.D. Cal. Sept. 16, 2010) (internal citations omitted).  Plaintiffs have come nowhere close to meeting that standard here.

[12] Plaintiffs cite *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F. 4th 747, 769-70 (9th Cir. 2023), but in *Glazer*, the court held that the statements at issue entailed "a concrete description" of the sales pipeline. The court's determination did not hinge on the statements having been made in response to an analyst question.

these conclusory assertions, the Opposition fails to identify any statement, or even a portion of any statement, that fits this description. (Opp. at 18.) Instead, the business model statements use the same type of vague, optimistic language that courts regularly find is nonactionable. (*See* Mot at 18 & n.16 (citing cases).)

**D.      Plaintiffs continue to rely on a materially altered statement from Opendoor's August 4, 2022 earnings call to support their claims.**

The Opposition glosses over Plaintiffs' use of a materially altered statement to claim Ms. Wheeler misled investors on Opendoor's August 4, 2022 earnings call, apparently hoping that Plaintiffs' creative editing will go unnoticed by the Court. (*See* Mot. at 16-17; Opp. at 15-16.) The portion that Plaintiffs refuse to quote or even acknowledge— "*[o]utside of that*"—is in direct reference to Ms. Wheeler's preceding remarks that the Company was facing "a very different macro forecast than what we have been embedding in our expectations," including "very large and very fast moving rates in a single quarter" and "a 1 in 40-year type scenario." (Ex. 19 at 6.) Ms. Wheeler then said, *"[o]utside of that*," she believed Opendoor's systems were doing "what they're designed to do." (*Id.*)

When read in full, and in context, there is nothing false or misleading about Ms. Wheeler's statement. *Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *15 (D. Ariz. Feb. 16, 2017) ("The use of selective quotes to deprive statements of their context does not make such statements actionable under Section 10(b) and Rule 10b-5."). In fact, the full statement undermines Plaintiffs' entire case because it shows that Opendoor timely informed investors of pricing issues after they arose and of expected losses before they occurred. *See Lowthorp v. Mesa Air*, 2021 WL 3089118, at *9 (D. Ariz. July 22, 2021) (dismissing claims where "[Plaintiff] selected only the portion of the August 2019 earnings call that supported its claim while omitting the portions that weakened it.").

**E.      The allegations underlying the FTC settlement do not support Plaintiffs' claims.**

As reflected on the face of the FTC complaint, and as described in Opendoor's disclosures, the FTC took issue with pre-2020 marketing messages to consumers about the

11

Company's home offers "reflecting or being based on market prices," "the amount of its offers," and "the repair costs charged to home sellers." (Mot. at 6-7, 20; Ex. 7.) The Opposition does not even attempt to address the fact that the FTC complaint dealt only with pre-class period activity. *See* Mot. at 20. Nor does it identify a single, allegedly problematic marketing message or advertising claim that continued into the class period. (Opp. at 16-17.) Accordingly, any claims based on Opendoor's press release about the FTC settlement, or allegations in the FTC's complaint, should be dismissed.

At several points in the Opposition, Plaintiffs also suggest that Opendoor continued to engage in the "deceptive practices" alleged by the FTC because it "manually adjust[ed] offers below market value" and "charg[ed] for unnecessary repairs."[13] (Opp. at 10, 16-17.) The FTC did not allege, however, that adjustments to pricing or repair credits were deceptive practices. After all, Opendoor's home purchases are arm's-length transactions and Opendoor takes on all the risk of required repairs and resale. The FTC's focus was on how the value of a final offer was *presented* to consumers *in the pre-2020 time period*, including pricing adjustments and repair credits. These processes were fully disclosed to consumers and investors during the class period and Plaintiffs do not claim otherwise. (*See* Mot. at 20-21 & n.19.)[14] And even setting all that aside, Plaintiffs have not pled any facts showing that any allegedly undisclosed, deceptive consumer practice during the class period had a material impact on the Company's business or caused any investor loss. (*See* Mot. at 15 n.13, 21 n.19, 28 n.25); *see also Raytheon*, 2023 WL 3650554, at *8 ("CW1 … alleged many instances of wrongdoing on a large contract, but never quantified the effect

---

[13] Plaintiffs also allege that the FTC complaint revealed that Opendoor benefitted from resale gains (buying homes for less than they sold), but do not dispute that investors were well aware of that fact and its contribution to Opendoor's financial results. (*Supra* n.10.)

[14] (*See also* Ex. 2 at 7 ("To create our home offers, we algorithmically produce both an estimated offer price and an assessment of our confidence level in that estimate, and we then further validate that estimate with in-depth underwriting and risk assessment, including additional review from our in-house pricing associates, to finalize the offer. We dynamically adjust our offers to account for the level of certainty in pricing each home. This degree of certainty can be impacted by factors such as macro conditions, the condition or attributes of a home, or depth of home comparables."); *id.* at 6 ("We ask for a repair credit that relates to our assessment of home condition … We bear the subsequent risk of conducting repairs … The scope of our repair work before resale is focused on ensuring the home is in market-ready condition.").)

or alleged facts suggesting the wrongdoing was material to that contract or Raytheon's overall business.").

**II.     Plaintiffs fail to adequately allege a "strong inference" of scienter.**

The Opposition confirms that Plaintiffs fall well short of satisfying the PSRLA's "high burden" to plead a "strong inference" of scienter. (Mot. at 10-11, 21 (discussing pleading burden imposed by the PSLRA).)

**A.     Mr. Wu's stock sales do not support any inference of scienter.**

**i.     Plaintiffs assert that only one Defendant sold any stock during the Class Period.**

Plaintiffs have only alleged that one of the twelve Individual Defendants sold stock during the class period. "[E]ven unusual sales by one insider do not give rise to a strong inference of scienter when other defendants do not sell some or all of their shares during the Class Period." (Mot. at 22 (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002)).) The only response Plaintiffs offer is that "motive is not required to plead scienter." (Opp. at 19 n.8.)[15] But that misses the point. It is Plaintiffs' burden to establish a "strong inference" of scienter that is "at least as compelling as any plausible opposing inferences one could draw from the facts alleged." *City of Pontiac Gen. Emps.' Ret. Sys. v. First Solar, Inc.*, 2023 WL 155861, at *6 (D. Ariz. Jan. 10, 2023) (Liburdi, J.) (citations omitted). Plaintiffs' failure to offer any compelling reason for the vast majority of the Individual Defendants, and in particular Ms. Wheeler (the other named Defendant on the Exchange Act claims), to have defrauded investors negates an inference of scienter. (*See* Mot. at 22 n.20 (citing cases).)

---

[15] Plaintiffs cite *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144-46 (9th Cir. 2017) to assert that "one Defendant's suspicious sales are sufficient to find scienter" (Opp. at 19 n.8), but fail to note that the extraordinary circumstance presented by that case where "a showing of scienter specific to [the CEO was] reinforced by his sale of 87 percent" of his holdings a short time before the alleged fraud was revealed. Defendant Wu's stock sales come nowhere close to approaching *87 percent* of his holdings and the sales at issue occurred a year before the end of the alleged class period.

**ii.      Mr. Wu's stock sales cannot support any inference of scienter.**

Nor do Mr. Wu's stock sales support any inference of scienter. Mr. Wu's Opendoor stock holdings *increased* during the class period (Mot. at 22-23; Opp. at 22), which "strongly negates an inference of scienter" because it indicates that he sold a modest amount of stock compared to his overall holdings and was more negatively impacted by the release of bad news at the end of the class period than he would have been at the beginning. (Mot. at 22 (quoting *First Solar*, 2023 WL 155861, at *22).) Plaintiffs' only response is to argue that because Mr. Wu obtained the additional holdings through stock-based compensation, this overall increase is irrelevant. (Opp. at 22.) Plaintiffs are wrong. The Ninth Circuit has rejected Plaintiffs' position that stock earned through compensation-based awards should not be considered as part of a court's scienter analysis. *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (vested stock option awards should be considered on a motion to dismiss to determine whether stock sales are suspicious); *see also Applestein v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1043 (N.D. Cal. 2012) ("[T]his argument would require the Court to ignore the vested options, which contradicts Ninth Circuit authority requiring that vested options be considered in determining whether there are suspicious insider trades."), *aff'd*, 561 F. App'x 598 (9th Cir. 2014); *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *9 (S.D. Cal. Sept. 20, 2021) (considering vesting of compensation-based stock awards in scienter analysis).[16]

In any event, Plaintiffs' theory of allegedly suspicious stock sales is based entirely on Mr. Wu's sales between November 16 and 18, 2021, but those sales represented a mere *7 percent* of his total holdings at the time. (Mot. at 23; Opp. at 22.) Courts in the Ninth Circuit uniformly have held that the sale of such a small percentage of an individual's total holdings does not support an inference of scienter. (*See* Mot. at 23 (citing cases).) To get around this case law, Plaintiffs focus solely on the total dollar value of the sales, which

---

[16] In the sole decision cited by Plaintiffs – *Lamartina v. VMware, Inc.*, 2023 WL 2763541, at *15 (N.D. Cal. Mar. 31, 2023) – the court said only that it would not change its prior ruling regarding the import of insider stock sales, noting that it did not believe a stock award necessarily demonstrates "good faith." But it did not hold that the increase in holdings failed to undercut an inference of scienter as Plaintiffs contend.

amounted to $57.6 million, and cite a single decision from 20 years ago where sales of a lesser dollar amount were found to be "significant." (Opp. at 22 (citing *In re SeeBeyond Tech. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003)).) But in *SeeBeyond*, the court considered the stock sales "taken together" with other factors, such as the allegation that "defendants … *admittedly lied* to analysts and investors." *SeeBeyond*, 266 F. Supp. 2d at 1169 (emphasis added). Here, there are no such allegations. And courts routinely have found that sales involving percentage and dollar amounts similar to those of Mr. Wu are not suspicious in amount. *See, e.g., In re Alteryx Sec. Litig.*, 2021 WL 4551201, at *4 (C.D. Cal. June 17, 2021) (defendant's sale of 6% of holdings for $71 million during the class period did not give rise to scienter).[17]

### iii. Plaintiffs mischaracterize the nature and timing of Mr. Wu's sales.

Mr. Wu's stock sales also were not suspicious in their nature or timing. Roughly half of the total amount of Mr. Wu's stock sales (~$112 million) were pre-determined sales intended to cover tax liabilities. Mot. at 22-23. Selling stock to cover tax liabilities provides a "credible and wholly innocent explanation[] for the stock sales" that is "sufficient to defeat any inference of bad faith." (Mot. at 22 (quoting *Provenz v. Miller*, 102 F. 3d 1478, 1491 (9th Cir. 1996)).) Nevertheless, Plaintiffs try to mischaracterize the nature of those sales to create the impression that Mr. Wu's sales between November 16 and 18, 2021 were somehow suspicious.

*First*, Plaintiffs wrongly claim that all of Mr. Wu's stock sales during the class period, other than the sales between November 16 and 18, 2021, were conducted under a traditional "10b5-1 trading plan" that included a schedule to sell shares at a certain time and price. (Opp. at 19-22.) That is not what the Form 4s relied upon by Plaintiffs actually say. The Form 4s reference a "10b5-1 instruction letter" that merely served to permit Opendoor to "sell only such securities as are necessary to satisfy tax withholding

---

[17] Plaintiffs also cite *Shupe v. Rocket Cos., Inc.*, 2023 WL 2411002, at *23 (E.D. Mich. Mar. 8, 2023), in which the defendant sold "half a billion dollars … in a single day"—a clearly "astronomical" figure far more than Defendant Wu's sales in November 2021.

obligations arising exclusively from the vesting of a compensatory award." 17 C.F.R. § 240.10b5-1(c)(1)(D)(3).[18] This is entirely distinct from a traditional 10b5-1 plan. Plaintiffs have no basis to claim that any of these sales occurred under a 10b5-1 plan or that a 10b5-1 plan even existed, and consequently have no basis to claim the sales between November 16 and 18 occurred outside of an existing 10b5-1 plan.

*Second*, Plaintiffs claim that Mr. Wu's sales between November 16 and 18 were suspicious because the sales followed Zillow's exit from the iBuying industry, and, according to CW4, Opendoor was "experiencing longer selling times and lower sales prices in multiple states during the second half of 2021." (Opp. at 20.) Neither of these arguments is persuasive. Zillow supposedly exited the iBuying industry because it was deliberately overpricing homes and incurring significant losses to gain market share, which has nothing to do with Opendoor's alleged issues. (*See supra* p.6.) As for CW4, she worked in Opendoor's Home Loans department and her alleged statement is based on hearsay. (CAC ¶¶ 46, 119.) Moreover, CW4 states that this slowdown impacted only certain markets and there are no allegations in the CAC regarding Mr. Wu's knowledge of this information.

*Third*, Plaintiffs do not dispute that the one-year lockup period under Rule 144 had only recently expired in November 2021, allowing Mr. Wu to sell shares for his own account for the first time following the de-SPAC transaction. This undermines their assertion that the sales between November 16 and 18, 2021 were suspiciously timed. (*See* Mot. at 24 (citing cases).)

**B.      Plaintiffs provide no other basis for a strong inference of scienter.**

The Opposition does not even attempt to identify allegations from the CAC that suggest any Defendant knew of the alleged falsity of the challenged statements. Indeed, both the Opposition and CAC are devoid of any allegation that an Opendoor executive

---

[18] Unlike stock sales under a traditional Rule 10b5-1 plan where the seller keeps the proceeds and there are no restrictions on their use, eligible "sell-to-cover" transactions pursuant to a 10b5-1 instruction letter permit only sales to cover tax obligations and prohibit sales for any other purpose, reason, or use (e.g., to obtain liquidity) and for that reason receive special treatment under SEC rules. *See, e.g.*, 87 Fed. Reg. 80,403 (certain limitations on Rule 10b5-1 trading arrangements do "not apply to sell-to-cover transactions, which will preserve the flexibility for insiders to meet tax withholding obligations related to the vesting of equity compensation").

received a report or information suggesting that there was anything about Opendoor's pricing algorithms or business model that was inconsistent with Opendoor's public disclosures. Instead, Plaintiffs continue to rely on several alternative theories of circumstantial knowledge that courts routinely reject as inadequate.

*First*, Plaintiffs assert a form of the "core operations" doctrine, arguing that it would be "absurd" to suggest that management did not know about the algorithm's true capabilities. (Opp. at 23.) But absent "specific admissions or witness accounts," which Plaintiffs do not offer, that assertion by itself cannot trigger the "core operations" doctrine. (Mot. at 24-25); *see also Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, 2023 WL 4161355, at *5 (D. Ariz. June 23, 2023) (Liburdi, J.) ("Although Plaintiffs argue that 'it would be absurd to suggest that Defendants were not aware of the problems with the Series 6 module[,]' the law requires more in the form of specific admissions or witness accounts.").

*Second*, Plaintiffs suggest that Zillow's exit from the iBuying space somehow supports an inference of scienter. (Opp. at 23-24.) But the Opposition fails to explain how a competitor's failure translates into a legitimate scienter theory. Zillow's exit from the same business as Opendoor, a number of months before the Q2 2022 housing market shock, clearly did not reveal anything about alleged deficiencies in Opendoor's pricing algorithms or business model. Even after Zillow's exit, Opendoor would go on to meet its financial forecasts and report favorable financial results for the next three quarters.

*Third*, Plaintiffs allege the FTC investigation supports an inference of scienter. As noted above, the investigation covered pre-2020 marketing practices. (*See supra* pp. 11-12.) It had nothing to do with purported deficiencies in Opendoor's pricing algorithms and business model during the class period. (Mot. at 25.) Plaintiffs have failed to allege any facts relating to the FTC investigation that show Opendoor executives were aware of information inconsistent with the Company's public disclosures.

*Finally*, Plaintiffs assert that Defendants' "statements support an inference that Defendants knew that the algorithm was not working" and reference statements about

17

testing of Opendoor's models. (Opp. at 24.) This theory fails because the CAC "lacks particularized allegations that any Individual Defendant had access to contradictory information" based on the results of this testing. *First Solar*, 2023 WL 4161355, at *8.[19]

**C.      The more compelling inference is that Defendants did not act with scienter.**

Plaintiffs offer no counter to the clear inference that Opendoor and its executives had every reason to believe in its pricing system and business model and simply did not anticipate the full impact of the dramatic increase in interest rates or resulting housing market slowdown in the second half of 2022. (Mot. at 26-27 (citing cases).) Instead, the Opposition merely repeats its unsupported assertions that "Defendants claimed their AI-powered algorithm insulated the Company from changing market conditions—like a rise in interest rates" and hid "a human-driven process that made Opendoor susceptible to those changes." (Opp. at 25.) Based on all of the facts properly before the Court, it is clear that Opendoor repeatedly warned investors of the exact risks that came to fruition in 2022 (*supra* p.7), and the "most compelling inference" is that none of the Defendants acted with fraudulent intent.

**III.     The Opposition confirms Plaintiffs' failure to adequately plead loss causation and does not refute the existence of negative causation.**

Plaintiffs say their "theory of loss causation here is simple," but have to use a substantial amount of space in the Opposition to explain it. (Opp. at 25-30.) Ultimately, Plaintiffs appear to argue that they can satisfy their loss causation burden by identifying "an adverse financial event" and a corresponding stock drop, even if the supposed fraud was not revealed. Opp. at 25-26. Plaintiffs are wrong. "Plaintiffs must show that the market learned of and reacted to the fraudulent practices, not just that the alleged fraudulent practices were manifesting themselves in the reports of Defendants' poor financial health." *In re Apollo Group, Inc. Sec. Litig.*, 2011 WL 5101787, at *17 (D. Ariz. Oct. 27, 2011)

---

[19] Plaintiffs also try to point to Defendant Wheeler's statement from the Q2 2022 earnings call that they have materially altered as support for their scienter theory. (*Supra* p.11.) When read in full without alteration, that statement undermines any inference of scienter.

(citing *Metzler Inv. GMBH v. Corintian Colls., Inc.*, 540 F. 3d 1049, 1063 (9th Cir. 2008)). "[D]isappointing financial results" by themselves do not suffice. *Loos v. Immersion Corp.*, 762 F.3d 880, 887-88 (9th Cir. 2014) ("As the district court correctly recognized, our precedent requires a securities fraud plaintiff to allege that the market 'learned of and reacted to th[e] fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally.'"). As in *Metzler* and *Loos*, there is nothing in the alleged corrective disclosures here that reveals anything about the alleged falsity of the statements Plaintiffs have identified.[20]

The alleged February 24, 2022, corrective disclosure provided no new information about Opendoor's pricing system. Instead, Opendoor simply disclosed a 4% contribution margin, which met its previously stated target contribution margin of 4% to 6%. (Opp. at 26-27.) Plaintiffs do not, because they cannot, provide any support for their bald assertion that the revelation of a 4% contribution margin was "well below market expectations" and caused a stock price decline. (Opp. at 27); *see First Solar*, 2023 WL 4163155, at *7 (no loss causation because company already disclosed "it was expecting to exit the year missing its CpW target, and the February 2020 call merely confirmed as much").

The alleged corrective disclosure in the *Bloomberg* article published on September 19, 2022 fails for the same reason. The article discussed Opendoor's losses in Q3 2022, but the Company already had told the market to expect those losses. (Mot. at 28-29.) While Plaintiffs contend that the *Bloomberg* article provided more specific data about Opendoor's financial performance, the allegedly more specific data already was publicly available through YipitData. (Opp. at 28-29.) Plaintiffs try to brush this aside by saying "Yipit … does not publish its data for consumption by the general public" (Opp. at 28), but the standard is "publicly available" not "published." *Ferraro Family Found., Inc. v. Corcept*

---

[20] Plaintiffs' reliance on *Daou* and *First Solar* is misplaced. In *Daou*, the "Plaintiffs adequately pled loss causation … because their complaint alleged that the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally." *Metzler*, 540 F. 3d at 1063 (citing *In re Daou Systems, Inc.*, 411 F.3d 1006, 1025-26 (9th Cir. 2005)). Likewise, under *First Solar*, a plaintiff must connect their loss to "the very facts about which the defendant lied." *First Solar*, 2023 WL 4161355, at *7 (quoting *Mineworkers' Pension Scheme v. First Solar, Inc.*, 881 F. 3d 750, 753 (9th Cir. 2018)).

*Therapeutics Inc.*, 501 F. Supp. 3d 735, 772 (N.D. Cal. 2020). Any investor could have gone to Yipit and obtained the same information that *Bloomberg* did. That is sufficient to conclude that the information already was incorporated into Opendoor's stock price and could not act as a corrective disclosure. *See id.* (report summarizing publicly available data obtained through FOIA requests, Open Payments data, and Medicare Part D data did not qualify as corrective disclosure).[21]

Finally, the November 3, 2022 corrective disclosure relating to Opendoor's contribution margin fails because Opendoor already had told the market it expected to fall well short of its target contribution margin in Q3 2022. (Opp. at 29-30.) Plaintiffs argue the contribution margin came in even lower than predicted, but they do not explain how the specific number corrected any prior false or misleading statement. Plaintiffs also concede that this lawsuit was filed before the November 3 disclosure, which means that the market had already learned of the alleged fraud. (Mot. at 29); *First Solar*, 2023 WL 155861, at *5 (a corrective disclosure cannot be "confirmatory").

The defense of negative causation requires dismissal of Plaintiffs' Securities Act claims for the same reasons. Based on the allegations in the CAC and materials that are the proper subject of judicial notice, it is clear the corrective disclosures on which Plaintiffs rely did not provide new information not already known to the market. Plaintiffs offer no response except to note that some courts have reserved decisions on negative causation for summary judgment or trial. But under these circumstances, where it is established that no new information was revealed to the market, courts regularly dismiss claims on negative causation grounds. (Mot. at 29-30 (citing cases).)

**CONCLUSION**

For all these reasons, the CAC should be dismissed in its entirety with prejudice.[22]

---

[21] Plaintiffs note that "in certain circumstances," a disclosure of publicly available information can "constitute a corrective disclosure," Opp. at 29 (quoting *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 795 (9th Cir. 2020)), but it is still their burden to allege "particular facts plausibly suggesting that other market participants had not done the same analysis." *BofI*, 977 F.3d at 794. They have not done so here.

[22] Plaintiffs do not dispute that failure to plead a viable primary claim requires dismissal of their control person claims. (Mot. at 30; Opp. at 30.)

20

Dated: October 13, 2023                    **LEWIS ROCA ROTHGERBER CHRISTIE LLP**


_/s/ John C. Gray_

John C. Gray (Arizona Bar. No. 028454)
201 East Washington Street, Suite 1200
Phoenix, AZ 85004
Telephone: (602) 262-5311
Facsimile: (602) 262-5747
Email: jgray@lewisroca.com

**SHEARMAN & STERLING LLP**
Adam S. Hakki (*pro hac vice*)
599 Lexington Ave.
New York, NY 10022
Telephone: (212) 848-4000
Email: ahakki@shearman.com

Lyle Roberts (*pro hac vice*)
401 9th Street, NW, Suite 800
Washington, DC 20004
Telephone: (202) 508-8000
Email: lyle.roberts@shearman.com

*Counsel for Defendants Opendoor Technologies Inc., Eric Wu, Carrie Wheeler, Chamath Palihapitiya, Steven Trieu, Ian Osborne, Adam Bain, David Spillane, Cipora Herman, Pueo Keffer, Glenn Solomon, Jason Kilar, and Jonathan Jaffe*

21