UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **Sam Alich, et al.,** | ) | |
| | ) | No. 2:22-cv-01717-MTL |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Phoenix, Arizona |
| **Opendoor Technologies,** | ) | January 17, 2024 |
| **Incorporated, et al.,** | ) | 2:00 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

BEFORE:   THE HONORABLE MICHAEL T. LIBURDI, JUDGE

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**HEARING ON PENDING MOTIONS**

Official Court Reporter:
Cathy J. Taylor, RMR, CRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff Indiana Public Retirement System; Oakland County Employees Retirement System; Oakland County Voluntary Employees Beneficiary Association; Stuart Graham Hereford:
    CLARK HILL, PLC
    By:  **Mr. Daniel P. Thiel, Esq.**
    14850 North Scottsdale Road, Suite 500
    Scottsdale, Arizona  85254
    - and -
    LABATON KELLER SUCHAROW, LLP
    By:  **Mr. James T. Christie, Esq.**
        **Mr. Michael P. Canty, Esq.**
        **Mr. Nicholas Manningham, Esq.**
    140 Broadway
    New York, New York  10005

For the Defendant Opendoor Technologies, Incorporated:
    LEWIS ROCA, LLC
    By:  **Mr. Robert Matthew Kort, Esq.**
    201 East Washington Street, Suite 1200
    Phoenix, Arizona  85004
    - and -
    Sherman & Sterling, LLP
    **By:  Mr. Lyle Roberts, Esq.**
    401 9th Street NW, Suite 800
    Washington, DC  20004-2128

For the Defendant Underwriters:
    BEYERS FARRELL, PLLC
    **By:  Mr. Michael J. Farrell, Esq.**
    99 East Virginia Avenue, Suite 220
    Phoenix, Arizona  85004-1195
    - and -
    O'MELVENY & MYERS, LLP
    **By:  Ms. Amy S. Park, Esq.**
    2765 Sand Hill Road
    Menlo Park, California  94025

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings commence at 2:00 p.m.)

THE COURTROOM DEPUTY:  Civil Case 22-1717, Sam Alich, and others, vs. Opendoor Technologies, Incorporated, and others.  This is the time set for hearing on pending motions.

Please announce your presence for the record starting with the plaintiffs.

MR. THIEL:  Good afternoon, Your Honor.  Daniel Thiel for Clark Hill, LLP, local counsel on behalf of Plaintiffs Indiana Public Retirement System, Oakland County Employees Retirement System, Oakland County Voluntary Employers Beneficiary Association, and Stuart Hereford.

And with me today is lead counsel from Labaton Keller Sucharow, James Christie, Michael Canty, and Nicholas Manningham.

MR. CANTY:  Good afternoon, Your Honor.

MR. CHRISTIE:  Good afternoon, Your Honor.  How are you?

THE COURT:  All right.  Good afternoon, everybody.

You may have a seat.

MR. KORT:  Good afternoon, Your Honor.  Rob Kort of Lewis Roca for Defendant Opendoor and the individual defendants.  I entered a notice of appearance yesterday as Mr. Gray is out of town.

With me is Lyle Robert of Sherman & Sterling admitted pro hac, and he will be the lead on our motions.

THE COURT:  Okay.  And who else is with you there?

MR. KORT:  This is co-counsel for the other defendants.

THE COURT:  Okay.

MR. FARRELL:  Good afternoon, Your Honor.  Mike Farrell of the firm Beyers Farrell.  We are local counsel for the underwriter defendants.  With me is Ms. Amy Park of the California office of O'Melveny & Myers.

THE COURT:  Okay.

MR. FARRELL:  She's been admitted pro hoc vice.  And with the permission of the Court, she will present argument on behalf of the underwriter defendants.

THE COURT:  Okay.  Very good.  Thank you very much.

We have a little less than 90 minutes.  I have another hearing at 3:30.  So perhaps -- have you all discussed how to -- how to approach this hearing maybe?  Or I could just figure that out now.

MR. ROBERTS:  Yeah, Your Honor.  I did raise that issue with the plaintiffs.  I think they said they would defer to the Court.  As it is our motions, I'm happy to present a proposal to Your Honor as to how --

THE COURT:  Please.

MR. ROBERTS:  -- we would handle it.

THE COURT:  Let me hear it.

MR. ROBERTS:  I think we would like to argue the motion to dismiss both for the Opendoor defendants and the underwriter defendants first and then turn to the motion concerning confidential witness statements.

THE COURT:  Okay.  I think that's -- that sounds appropriate.

Counsel for plaintiffs, do either of you have any -- any of you, I should say, have any objection to that?

MR. THIEL:  Your Honor, that's fine with us.  And, just for the record, Mr. Christie's going to be handling the argument on the motions to dismiss on behalf of the plaintiffs, and Mr. Canty will be handling the argument on defendants' motion for an order directing submission of counsel and confidential witness statements.

THE COURT:  Okay.  Sounds good.

Mr. Roberts, come on up.  You could spend about 15 minutes.  Are you going to be arguing both motions to dismiss?  Are there -- are there two motions to dismiss?

MR. ROBERTS:  So, yes, Your Honor.  There's a motion to dismiss by the Opendoor defendants.  I will be arguing that, and then counsel for the underwriter defendants will --

THE COURT:  Okay.

MR. ROBERTS:  -- much more briefly be arguing a few points as to their motion to dismiss.

THE COURT:  All right.  So I think 15 minutes is appropriate, and then you'll have time for rebuttal as well.

MR. ROBERTS:  Thank you, Your Honor.  I appreciate it.

THE COURT:  Go for it.

MR. ROBERTS:  Again, Lyle Roberts of Sherman & Sterling for the Opendoor defendants.

Your Honor, Opendoor is a digital platform for residential real estate that acquires and sells residential properties online.  It uses a combination of proprietary pricing algorithm and then also human analysis to price its properties.

Opendoor became a public company in a de-SPAC transaction that took place in late 2020.  About a year and a half later, in mid-2022, the U.S. real estate market experienced a shock when the Federal Reserve started to raise interest rates at an unprecedented pace.  The interest rate increase caused homes to stay on the market longer than anticipated and exerted significant downward pressure on housing prices.

The houses that Opendoor had acquired earlier in 2022 prior to this shock were now harder to sell and they were worth less, and this had a negative impact on Opendoor's financial results and on its stock price.  However, I want to emphasize that Opendoor was able to eventually sell those houses.  Its stock prices rebounded, and it continues as really the leading

company in this iBuying space for homes.  And from this really quite normal series of business events, the plaintiffs are attempting to reverse engineer a securities class action. Their strategy is to work backward from the 2022 stock price declines and argue that every statement the company made over a two-year -- nearly two-year period about its business model was misleading for two reasons:

One, because the company failed to tell investors that its pricing system included human analysis; and, two, because it failed to tell investors that its pricing system might not be effective in an unprecedented real estate market environment.  And the problem with plaintiffs' theory of liability here is really simple.  Opendoor repeatedly told investors both things.

I want to turn first to the involvement of humans in Opendoor's pricing system.  The company made disclosures both in its registration statement at the time of the de-SPAC transaction and its SEC filings making it absolutely clear that it relied on a combination of its pricing algorithms and human analysis when it made its pricing decision around buying and selling homes.  Those disclosures are laid out in our filings, but I just want to highlight a few key examples for you here today.

So as to initial price officers -- I'm sorry -- initial price offers made to homeowners, Opendoor stated that

they involved at least a minimal level of human intervention. As to final price offers to homeowners, Opendoor stated they were reviewed and finalized by members of our pricing team, allowing us to marry the best of our algorithm insights with human judgment.  As to the resell price for homes, Opendoor stated these were determined by its resale models in conjunction with our pricing team.  And if that were not enough, Opendoor's CFO specifically told investors in early 2022, before the real estate market downturn that the company's pricing system integrated systematic modeling with, quote, human insight and human overlay, unquote.

Given these disclosures, plaintiffs' assertion that Opendoor failed to tell investors that human judgment was part of its pricing system is specious.  And I would say, Your Honor, notably missing from the complaint are any factual allegations, and, in particular, any confidential witness statements asserting that there was some known issue with either the pricing algorithm or human judgment components of this pricing system that led to the 2022 losses.  Instead, what did the CWs actually say?  They say that there was human judgment involved in every step of the pricing process.  Well, that's what Opendoor told its investors was going on.

So having failed to show that human involvement in the pricing system wasn't disclosed to investors, what plaintiffs then turn to is an assertion that Opendoor guaranteed to its

investors that a business model would be profitable in any housing market.

Your Honor, I would like to suggest today that that assertion is ridiculous on its face. Opendoor obviously did not guarantee to its investors that it would always be profitable, and no reasonable investor would ever believe such a thing. It's always the case, of course, the public companies can sustain losses. What Opendoor did do was express optimism about its pricing system. It told its investors, for example, that it believed that its pricing model was effective and that it had engaged in analyses around that pricing model, for example, showing that the pricing model would have worked during the earlier subprime mortgage crisis. With those expressions of optimism, however, Opendoor also carefully warned its investors that the pricing system could fail.

And, again, those disclosures are set out in some depth in our briefing, Your Honor, but, again, just a few key examples.

Opendoor stated that, "Interest rate increases could result in the decline in the demand for our homes and adversely affect our business and financial results."

Opendoor stated it could incur significant losses in the future due to its failure to appropriately price and manage its envelope. Finally, Opendoor stated it might be unable to liquidate its inventory of prices that would allow it to meet

its margin targets or to cover its costs.

In other words, Your Honor, Opendoor warned investors of the exact risks that came to fruition in the middle of 2022 when there was a sharp rise in the interest rates and the company had an inability to sell homes at prices above what it had paid for them.  That's what the company had a responsibility to tell investors, and it told it to them.

And I would suggest, Your Honor, if the Court needs any more proof that the plaintiffs' claims here about the supposed guarantee of its pricing system don't have any merit, it need look no further than the allegation that Opendoor's CFO falsely told investors in August of 2022, now right in the middle of this market downturn, Your Honor, that the company's pricing system was, quote, doing what they were designed to do, unquote.

The CFO did say that but only after discussing at length the current situation facing the company, including the very different macro forecast that it had expected and the, quote, very large and very fast moving rates in a single quarter, unquote.

The CFO then said outside of that, the company's pricing system was working properly.

The plaintiffs carefully cut the key phrase, Your Honor, out of their complaint, "outside of that."  And as Your Honor recognized in your decision in *Mesa Air*, once security

plaintiffs have to start engaging in selective editing to plead their case, the gig's up and dismissal is appropriate.

Having discussed falsity, Your Honor, I just want to turn briefly to the two other elements that are not adequately pled here, scienter and loss causation.

On scienter, the plaintiffs fail to adequately plead that any of the Opendoor defendants acted with a strong inference of fraudulent intent.  Most importantly, the complaint is devoid of factual allegations suggesting that any of the Opendoor defendants knew or were severely reckless in not knowing that any of the alleged misstatements were falsely made.  Indeed, plaintiffs failed to identify a single instance in which any Opendoor defendant received information or a report suggesting that the company's pricing system either involved a different level of human input than it had already disclosed to investors or that it was ineffective at any time prior to mid-2022 when we had this unprecedented event in the real estate market.

And I would suggest, Your Honor, that if you read their opposition, the plaintiffs effectively conceded they do not and cannot make any such allegation.  What they do focus on are some alternative theories of circumstantial knowledge, but those alternative theories are the kind that the courts regularly reject.

First, they talk about the fact that the pricing

system is important to Opendoor's business.  It's often called the core operations theory.  But it's black letter law that plaintiffs cannot create any inference of scienter on that basis alone, which is something that Your Honor held in the -- in your First Solar decision.

The second thing they point to is they point to the exit of Zillow from the iBuying business.  Zillow was a former competitor of Opendoor in this space.  But when you look at the *Zillow* case that they cite, the allegations there are that Zillow supposedly had an undisclosed initiative to build up its market share by deliberately overpaying for homes.  Zillow then ended up incurring a bunch of losses on those homes and decided to exit the business, and then it closed that down in November 2021.

Simply put, there's nothing about what Zillow did, the scheme to overpay for homes that's, first of all, anything like what's alleged here.  And, second of all, could have possibly put the Opendoor defendants on notice that somehow its pricing system wouldn't be effective in a sharp interest rate increase real estate market shock that was going to take place several months later.

Finally, Your Honor, the plaintiffs point to an FTC investigation of the related Opendoor, and they suggest that this investigation, which was into marketing practices, somehow establishes that the Opendoor defendants knew about issues

related to its pricing system.

That's clearly incorrect.  First of all, Your Honor, there's a dispositive timing issue here.  The FTC investigation only involved pre-2020 marketing activities to consumers.  It didn't have anything to do with pricing system, and it certainly doesn't have anything to do with activities that took place during the class period here, which were all post the late 2020 de-SPAC transaction.

And, second, the FTC investigation didn't find that Opendoor was doing anything inherently deceptive.  What it found was that it needed to do better consumer disclosures.  It needed to be better at telling consumers about how the buying and selling process worked.  It didn't take issue with Opendoor's use of adjustments to its pricing or credit -- or credit for repairs or anything else that was involved in its home buying process.

And, finally, on this issue of scienter, Your Honor, I want to turn briefly to stock sales.  As a motive to commit fraud, the plaintiffs assert that one -- one of the 12 individual defendants, the former CEO, Mr. Wu, sold stock during the class period.  I think, though, Your Honor, it's quite obvious from the facts before the Court that these sales can't create any inference as to Mr. Wu's state of mind because they are neither suspicious in timing or suspicious in amount.

First, Mr. Wu's overall holdings of Opendoor stock

actually increased during the class period.  So despite these sales, he ended up at the end of the class period with more stock than he had at the beginning of the class period.

Second, over half of Mr. Wu's sales during the class period were predetermined sales to cover tax liabilities. That's exactly the sort of thing the courts routinely find does not create any kind of suspicion of insider trading.

And, finally, the sales that were not done to cover tax liabilities were made in November 2021.  That's significant because that is when the one-year lockup from the time of the de-SPAC transaction expired.  So it's the first time that Mr. Wu was, in fact, able to sell his -- any of his holdings. And what was his decision?  He sold a total of 7 percent of his current holdings.  That is a very low percentage.  Courts in this circuit and around the country find that that kind of percentage does not create any inference of scienter.

So, Your Honor, ultimately with scienter, of course, the Court is required to view all of the allegations holistically and decide whether -- what's the most compelling inference of innocent conduct or not innocent conduct.  The plaintiffs here really offer no counter to the clear inference that Opendoor had every reason to believe its pricing system was working and simply didn't anticipate the full impact of the dramatic increase in interest rates and the real estate shock that took place in mid-2022.  That's not securities fraud, Your

Honor.  That's a business setback, which Opendoor's managed to successfully weather.

Finally, Your Honor, the issue of loss causation. Plaintiffs here identify three corrective disclosures that they say revealed Opendoor's supposed fraud and led to their losses. In the Ninth Circuit, however, it's black letter law that to be corrective, the disclosure must provide new news about the company that reveals its fraudulent practices and not merely that the company's having some financial issues.  All of the supposed corrective disclosures identified by plaintiffs merely confirmed existing financial information about Opendoor, and they can't satisfy this requirement.  I'll just go through them very briefly, Your Honor.

The plaintiffs allege that Opendoor's earning release for Quarter 4 2021, which took place in February 2022, was a corrective disclosure because it revealed a contribution margin of 4 percent.  A contribution margin, by the way, Your Honor, is a measure of revenue that Opendoor makes on a home minus certain costs that it directly attributes to making that revenue.  It is an important financial metric for the company, for sure.

But what happened here is Opendoor previously disclosed that it expected to achieve a contribution margin between 4 percent and 6 percent for that quarter.  And, in fact, that was its normal range.  Not only did this disclosure

UNITED STATES DISTRICT COURT

not reveal any supposed fraudulent practices related to Opendoor's pricing system, frankly, it didn't even reveal anything about the company's financial health.

Second, plaintiffs allege that a Bloomberg article published in September 2022 was a corrective disclosure because it discussed Opendoor home sale losses in August 2022, so the month before, but Opendoor had already disclosed it expected to have losses in that quarter.  And the Bloomberg article was based on publicly available information about Opendoor's home sales that any investor could have obtained and reviewed. Again, this clearly doesn't constitute new news about the company, and it certainly didn't reveal anything about fraudulent practices.

And then, finally, and in my view, Your Honor, most incredibly, plaintiffs allege that Opendoor's earnings release for Quarter 3, 2022, in November 2022 was a corrective disclosure because the company reported a contribution margin of .7 percent for that quarter.  But, again, Opendoor had already told the market that it expected to fall well short of its target contribution for the quarter.  And, as Your Honor recognized in *First Solar*, there's no recognizable corrective disclosure under that kind of situation.  And perhaps even more importantly, Your Honor, investors had already filed the original complaint in this action nearly a month earlier.  If investors had sufficient information to bring a securities

fraught claim in October, then the November earnings release could hardly have suddenly revealed alleged fraudulent practices.

In sum, Your Honor, on this issue it's really rare to see a case where the absence of loss causation is this apparent on the face of the complaint. In circumstances like this, Courts haven't hesitated to hold that not only have plaintiffs failed to plead loss causation as to their Exchange Act claims, but also the affirmative defense of negative causation for any Security Act claims has also been established. We cited a number of cases to that effect in our pleadings, and we would urge the Court to follow that precedent here on the issue of loss causation.

So with that, Your Honor, I think that I'll turn it over to underwriters' defense counsel to add a few additional remarks on this.

THE COURT: Thank you, Mr. Roberts.

MR. ROBERTS: Thank you.

THE COURT: One moment, please.

(The Court and the courtroom deputy confer.)

THE COURT: Okay. So, Mr. Christie -- which one are you? I'm sorry.

MR. CHRISTIE: It's me. Right. That would be me, Your Honor.

THE COURT: Okay. So are you arguing the response?

MR. CHRISTIE:  I am, Your Honor.  And it's up to you completely.  I would -- I'm -- I'm going to address both the Section 11 and the -- and the 10b allegation --

THE COURT:  Okay.

MR. CHRISTIE:  -- so it's up to you if you want me to go now and then go again after the underwriter defendants.

THE COURT:  I was going to --

MR. CHRISTIE:  That's completely fine with me.

THE COURT:  I think the better way is to let the other defendants go --

MR. CHRISTIE:  I agree.

THE COURT:  -- and then that way you don't have to get up and down twice.

MR. CHRISTIE:  I agree.  Thank you, Your Honor.

THE COURT:  All right.

Ms. Park.

MS. PARK:  Thank you.  Good afternoon, Your Honor.

THE COURT:  Good afternoon.  By the way, the both microphones work.  You could just choose one or the other.  You don't have to speak into both.

MS. PARK:  Great.  Is that good?

THE COURT:  Yes.

MS. PARK:  Wow.

So -- so thank you, Your Honor.  Amy Park for the underwriter defendants, and I am here to address the

plaintiffs' claim against the underwriters, which is asserted solely under Section 11 of the Securities Act.

And that claim, Your Honor, as we pointed out in our papers, challenges four statements, four statements in Opendoor's February 2021 secondary public offering materials. Those four statements are indisputably the very same statements that plaintiff challenges in its Section 10b claim against the other defendants. And Your Honor heard briefly from counsel for Opendoor defendants as to why none of the challenged statements set forth in the complaint are materially false or misleading. They weren't materially false or misleading at the time they were made. Counsel addressed that. We addressed that in detail as well in our papers. So in the interest of time, I'm not going to repeat those arguments here.

I will say only, Your Honor, and refer the Court respectfully to our papers that the falsity arguments advanced by our co-defendants' counsel today apply to the Section 11 claims against the underwriter defendants because plaintiffs allege that the statements they challenge in their Section 11 claim are false or misleading for the same reasons that they were allegedly so with respect to the Section 10b claim. So while I won't repeat the falsity arguments here, I will address the standard to which the plaintiffs are held in pleading their Section 11 claim.

There's no dispute among the parties that when

attempting to plead a Section 10b claim plaintiffs must meet the pleading burdens of Rule 9(b).  There's, likewise, no dispute among the parties here that Rule 9(b)'s pleading standards apply to a Section 11 claim if that claim is grounded in fraud.  So the dispute here on the Section 11 claim is whether the Section 11 claim that the plaintiffs have attempted to plead, in fact, is grounded in fraud.

The Ninth Circuit in the *Rigel* case from 2012, the most recent statement from the Ninth Circuit on the matter, articulates the standard for when a Section 11 claim is grounded in fraud.  And *Rigel*, Your Honor, is very similar to our case here.  *Rigel* involved Section 11 claims being alleged alongside Section 10b claims.  And *Rigel* said that a Section 11 claim is grounded in fraud even though it does not adopt all of the allegations contained in the rest of the complaint if the Section 11 claim relies on the same alleged misrepresentations that are central to plaintiffs' Section 10b claim.

There can be no reasonable dispute, Your Honor, that plaintiffs' Section 11 claim here relies on the same alleged misrepresentations that are central to their Section 10b claim. It's outlined in their complaint.  We addressed it at length in our papers.  We heard some of that here today by counsel for the Opendoor defendants.  There's no dispute on that point.

Plaintiffs, nonetheless, argue that *Rigel* doesn't apply here because they disclaimed fraud expressly with their

Section 11 claim in the complaint.  And they set out the Section 11 claim in a different section of their complaint, and they don't allege the exact same claims against the exact same defendants.

But, Your Honor, that is exactly what the plaintiffs in *Rigel* did, and it was rejected by the district court and it was rejected by the Ninth Circuit when it affirmed the district court's ruling.  The Ninth Circuit in *Rigel* dismissed plaintiffs' disavowal of their fraud assertion and dismissed plaintiffs' assertion that they didn't incorporate any of the Section 10b conduct allegations in their Section 10b claim, calling that nominal efforts to disclaim allegations of fraud with respect to the Section 11 claim in *Rigel* held that the gravamen of the complaint was fraud because the Section 11 claim was based on the same misrepresentations that were central to the Section 10b claim.

And in reaching that conclusion, Your Honor, the Ninth Circuit also rejected the very same and final argument that plaintiffs have made in their papers in attempting to avoid the application of Rule 9(b), and that's the claim that holding plaintiffs to a 9(b) pleading standard with respect to their Section 11 claim would leave plaintiffs unable to plead alternative theories of liability, Section 11 and Section 10 together.

Ninth Circuit in *Rigel* said absolutely not the case.

No way.  Requiring plaintiffs to meet the pleading burden of Rule 9(b) doesn't mean that plaintiffs can't plead alternative theories of liability.  It merely means that with both the Section 10b claim and the Section 11 claim, plaintiff must meet the pleading requirements of Rule 9(b).

Here, as we've showed in our papers, as you've gotten a glimpse from argument of our co-defense counsel, plaintiffs' claims against the underwriters depend on the same unified course of allegedly fraudulent conduct, Opendoor's alleged misrepresentation of its business model and its pricing algorithm to investors that are core to, that undergird their Exchange Act claims.  The Ninth Circuit law articulated most recently in *Rigel* is clear that that means plaintiffs' Section 11 claims sounds in fraud, and they have to meet the Rule 9(b) pleading requirements.

I'll just conclude with noting that for the avoidance of doubt, even if the plaintiffs were held only to the Rule 8(a) pleading standard, which we dispute for the reasons I've addressed and set forth in our papers, they have still failed to plead falsity, because, as Opendoor's counsel just addressed and we also showed in our papers, they haven't made even plausible allegations of falsity.

With that, I'll step aside and let other counsel speak and be prepared to address any questions the Court has if you'd like me to go one by one through the four statements alleged

against the underwriter defendants and why we believe wholeheartedly that plaintiffs have failed to meet their pleading burden as to falsity on them.

THE COURT:  Okay.  Well, thank you, Ms. Park.

MS. PARK:  Thank you.

MR. CHRISTIE:  Thank you, Your Honor.  James Christie on behalf of the plaintiffs from the firm of Labaton Sucharow & Keller -- Labaton Keller Sucharow.  It's the first time I've had to say it since we changed our name, Your Honor.

THE COURT:  Okay.  Well, you did just fine.

MR. CHRISTIE:  Thanks.

So, anyway, Your Honor, I'd like to start by, first, you know, addressing some of the -- the statements that my colleague from the Opendoor defendants have made about what plaintiffs' case is about.  And -- and what defense counsel said here is that the case is about human intervention, and he used the words a combination of -- of human overlay and the algorithm.

And, Your Honor, respectfully, I just don't think that that's what plaintiffs' case is about.  I think that fundamentally misses the point of what our allegations are about.  Our allegations are about the very thing that supposedly made Opendoor a good environment for investors and the market as a whole, and that was the secret sauce that the company had that was supposably this proprietary

first-of-its-kind AI.  Your Honor, you know we heard a lot about AI.  It was AI driven.  It was supposed to be this special algorithm that gave Opendoor a competitive advantage over its competitors.  And I'd like to just point to a few of the allegations in the complaint that demonstrate that that's how investors thought about Opendoor.

Paragraph 97 of the complaint is a wed- -- a wedbush analyst saying, "Opendoor's pricing capabilities let it optimize, acquisition, and resale across all market conditions.  Opendoor's pricing capabilities have been best in class, and we believe its vast data is a significant asset."

The next paragraph, paragraph 98, "Investor Place in an article that's titled Opendoor is a Real" -- "Real Estate Disruptor.  One of the main reasons for Opendoor's success is its robust pricing algorithm because its competitors, Zillow and Offerpad, do not possess such pricing engines."

And then, Your Honor, Seeking Alpha on September 28th, and this is in paragraph 99 of the complaint, says -- The Mythology of Disruption is the title of the article, and it says, "Opendoor's pricing algorithm" -- or AVM -- "is the secret sauce or performance soul of iBuying.  Opendoor's algorithm is the best in the business, a first of its kind machine-lending platform that actively ingested historical pricing information alongside hundreds of data points per homes customized within each market to arrive at a fair price."

And, Your Honor, the reason I bring that up is that's why investors invested in Opendoor. You know, we're going to be talking about Section 11 or we're going to be talking about 10b. And, as Your Honor knows, those are different causes of action, but, Your Honor, this is the first time that Opendoor was publicly available to purchase for investors. And they were under the impression that they were buying a very special and unique company that had an algorithm that was capable of things that other iBuying companies were not capable of.

And we know, Your Honor, from some of the statements that defendants made, and my colleague here had mentioned a number of times some of the supposed disclosures that they've made about humans being involved, but in a minute, Your Honor, I'll talk to you about the fact that when you look at the entire case of what was going on at the time of that initial SPAC offering, the only thing that they knew was that a majority of the time it was actually the algorithm that was making the -- the offering price.

And I'll get to that in just one second, Your Honor. But I think when you look at that from a Section 11 standpoint at the time of the offering, based on what the -- the false statements were, which were touting the algorithm's capability, combined with the supposed disclosures that defendants made about who were making the pricing decisions, no reasonable investor could have understood at that point in time that it

was humans making that decision.  And as I'll get to again, also in a second, Your Honor, the CWs make it clear that that wasn't the case, that it was actually humans making a majority of the decisions.

So just to preview that for Your Honor.  I'll get to that in one second.

So, Your Honor, I -- I want to go to the *Brody* case, which we cited in our brief.  And I know defendants have cited a similar, you know, the standard for when a statement is false in their brief, and that is when it creates an impression of the state of affairs that it differs in a material way from the one that actually exists.

And, Your Honor, that's exactly what we have here. The -- they say that their algorithm was driving all their pricing decisions and that's how they were reaching the contribution margin of 4 to 6 percent, but in reality it was humans a majority of the time.  And I think their statements -- and clearly investors were under the impression that that's what was happening.

And just some -- some choice parts of the complaint from the CWs that establish this, Your Honor, and this is paragraph 420, CW2 stated that the pricing algorithm was never accurate and, as a result, about 90 percent of the final offer submitted for the homes priced were below the number generated by the system.  Again, so evidencing that the algorithm really

wasn't doing anything other than 10 percent of the time.

CW2 goes on to say that the only time the company turned on the algorithm and let it generate finals offers was without any human -- was when the queue of homes needed a final offer that was overloaded and the system was overloaded.

So, Your Honor, from an investor standpoint, if you're standing in your shoes and you're thinking about investing in Opendoor and you think they have this great algorithm and it turns out its only being used when the queue is overloaded and 90 percent of the time it's humans making the decision, don't you think that that would have changed what your understanding of what your investing was at the time?

And I'll go to CW -- CW5 and 6 who further corroborate this. 5 says approximately 50 percent of initial offers had to be sent to humans for review. So, again, Your Honor, that's half. And I think that that is a little bit different than what the defendants had disclosed, which was that a majority of the time it was the algorithm making the offer.

I'll also point to CW6 who said that the algorithm's initial offer price was reviewed by humans, pricing analysts, and portfolio managers and that analysts and portfolio managers used data to adjust the initial pricing offers. So, again, not the algorithm making the pricing decision.

And then, also, I'll just point to the FTC complaint, Your Honor. And I know my colleague here kind of glazed over

this and said there's no allegations of any reports related to this that the defendants got, but that's just not true.  The FTC complaint specifically says that there were internal analyses that showed that these manually adjusted offers were several percentage points below Opendoor's assessment of market value and that beginning no later than 2019, Opendoor instituted a policy to reduce its manually adjusted offers to below what Opendoor assessed as market value.

So -- yes, Your Honor?

THE COURT:  I'm just thinking of my court reporter.

MR. CHRISTIE:  Oh.

THE COURT:  You -- It's hard to --

MR. CHRISTIE:  A little quick.

THE COURT:  It's hard to tell when you're standing up there.  I understand.  But you could -- you could just slow it down just a little bit, Mr. Christie.

MR. CHRISTIE:  I'll be happy to, Your Honor.

THE COURT:  Okay.  Thanks.

MR. CHRISTIE:  So, Your Honor, I just wanted to also address one point that my colleague made also, which was that there's -- there's no evidence that this continued into the class period.  And, Your Honor, that's -- that's also not true.  The CW allegations do corroborate the fact that what's stated in the FTC complaint did continue into the class period.  So there's a factual dispute as to that.  I mean, I think the FTC

complaint specifically says that they were underpricing homes, and that's the same as what the CWs were saying.  So the contention that it ended in 20- -- 2019 isn't belied.  It's belied by the facts that are pled in particularity in the complaint.

So, Your Honor, I just want to go and touch on to the warnings.  And, again, I had mentioned that and previewed -- previewed this for Your Honor.  The disclosures that defendants made in their -- in their offering documents, and that's in the registration statement, and this is Exhibit 1 of -- of -- from defendants' motion, it says, "The majority of our initial offers are algorithmically generated and do not require any human intervention."

And, Your Honor, that's the disclosure that defendants say absolves them and that's what let investors know that there was human, you know, involvement in making these offers.  But, Your Honor, I don't know how reading "the majority of our initial offers are algorithmically generated and do not require any human intervention," I don't know how that could give the impression to an investor that it was humans making the pricing decisions.  And when you marry that with the statements that were made in the offering documents, and I'll get to those in just one second, Your Honor, I think it's quite clear there was a misleading impression that was created as a result of -- when you look at all of these statements in context and together.

So, Your Honor, turning to the statements, I'm going to go to the statement that's listed in paragraph 405 of the complaint. And that says, "Pricing Accuracy and Automation: We have invested significant engineering data, science, and operations resources in our pricing infrastructure. Our proprietary machine-learning base pricing models are key to our ability to acquire and resale thousands of homes per month accurately, profitably, and with increasing levels of automation."

And, Your Honor, the way that the defendants say this, "they're key to our ability to acquire and resale thousands of homes accurately and profitably and increasing" -- "with increasing levels of automation," Your Honor, that's the secret sauce I mentioned in the beginning that was the bill of sale investors were buying into. They thought this company had this very special algorithm that was capable of adapting to any market conditions, and we'll get to that in a second, but also that was going to be able to give them a competitive advantage over their competitors. And, as I just mentioned from the CW allegations, that just wasn't happening a majority of the time. And, Your Honor, our contention would be that that rendered those statements false and misleading in the offering documents.

Your Honor, I'd be remiss if I just didn't mention the *Zillow* case in response to the Defendants' point on that as

UNITED STATES DISTRICT COURT

well.  The *Zillow* case is exactly on point with this case.  And in the *Zillow* case, I'll mention the statement that was at issue there, one of them.  One of them is, "The step-up in space in home buying demonstrates our confidence in our ability to scale resulting from the progress we have made in strengthening our pricing models and automating the top of the funnel."

And, Your Honor, that's strikingly similar to the statement here where defendants say, "Our proprietary machine-learning based algorithm" -- "based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitability" -- "profitably, and with increased levels of automation."

They're essentially one and the same, Your Honor.  And the Court held that those statements were misleading because Zillow was not, in fact, basing their pricing and inventory decisions on the algorithm's price.  That's the same here.  They were not basing their decisions on the algorithm's price.  They were basing it on human involvement.  And they -- the Court also says, "As noted, it was false because defendants concealed the broader, more complicated human-driven process implemented by project catch-up."

Again, that's the same here, Your Honor.  It was a human-driven process that was making these pricing decisions, not the algorithm that investors thought they were buying.

And, Your Honor, I will address the difference here, there's one difference, and that is in *Zillow*, the -- the company was purposefully increasing the price of the housing that they were buying, and here they were purposely lowering it because the algorithm was spitting out too high of a number.

Your Honor, I think that's a distinction without a difference.  What mattered to investors was whether or not the company was seeing the benefits of the supposedly superior algorithm that they thought that they were buying.  And, Your Honor, in both cases that wasn't the case.  It was humans.  It was humans who were susceptible, like all other real estate -- you know, real estate businesses, to market fluctuations, which is different than buying a company that you think, you know, you believe their algorithm is -- is insulating them from that risk.

Your Honor, really quickly I'd like to turn to Section 11 and just address some of Ms. Park's arguments.  Your Honor, I do think you're well aware from your *Mesa Air* decision that the only thing we need to prove in a Section 11 case is a false and misleading statement.  I think what I just went over has established that, Your Honor.  And so that -- just turning to the Rule 8 standard versus the Rule 9(b) standard, Your Honor, this is one of those cases where we've done everything we can to allege this as a separate violation.  And I think we're running into a place in the law here where I don't know

that there's much else we can do.  I -- we've done everything.

We've disclaimed reliance on the fraud theory.  We've also

contained separate sections segregating the two claims.

They're organized differently.  They contain unique standalone

sections.  And we've eliminated any mention of fraud

whatsoever.  We also have the fact that the different

defendants appear in the different sections of the complaints.

So, Your Honor, it's one of those things where the

case law is separate on it.  I know Your Honor -- Your Honor

and -- has looked into this issue, but there's plenty of case

law to suggest that where the -- the level of effort we've

taken to segregate these two causes of action, Your Honor, is

sufficient to find that the Rule 8 standard applies.

And, quite frankly, Your Honor, even if 9(b) does

apply here, I believe we've satisfied that standard.  The

allegations that we demonstrate falsity with are the CW

allegations, which are pled with the requisite particularity.

There's -- there's detailed descriptions of the CW allegations,

and there's pages and pages of CW allegations supporting why

the statements were false.  So even if the 9(b) standard would

apply, Your Honor, and we do not think that it should, we think

we still meet that -- that standard.

I'll also mention the FTC allegations, Your Honor.

There's pages and pages of FTC allegations describing why what

the FTC claimed was happening and what we -- we argue continued

into the class period was also pled with particularity and would meet the 9(b) standard.

Just very briefly, Your Honor, I want to touch on puffery. I know that the defendant didn't address this issue, but I think it's an important thing to mention because it's forefront in their brief. One of the things I just wanted to mention was there's the two kind of different types of statements here. We have the statements that are made in the SEC filings, and those are the ones that are in the offering documents. And, Your Honor, I think there's probably some tension with whether or not puffery could even be included in offering documents under -- under a Section 11 type violation. I mean, the whole point of registration statements is to provide investors with information so they can make a reasoned investment decision in a company that's never, you know, offered shares for sale before. And here, Your Honor, the statements themselves are specifically dealing with the matters of central importance to the company, which is how their algorithm worked.

And, Your Honor, I'll just point to some of the other -- the SPACs that are included in the statement here where they specifically talk about what it is about their algorithm that makes it special. And, Your Honor, just going back to what we mentioned earlier, that's the very reason that investors were buying into Opendoor at the time. They mention,

"Advancements in model sophistication that have accelerated their feedback loops such that our systems can dynamically adjust to leading market indicators and react to real-time macro and micro-economic conditions.  Our algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions.  This responsiveness is critical to pricing accurately and maintaining margins" -- again, money, Your Honor -- "especially in periods of volatility."

And if that's not the kind of thing that an investor would rely on in deciding to invest in this company and its algorithm, I don't know what else an investor would care about. And given the context of the fact that it appeared in SEC filings and our registration statement I think only bolsters the fact that it's not puffery, Your Honor.

And I'll point you to the *Vancouver Alumni* case vs. *Daimler*, which makes that point and the SEC *Mozilo* case, which are both in our brief, Your Honor.

I'd also just briefly mention that a lot of the -- the statements and the facts in the statements that, you know, defendants claim are puffery are parroted by analysts in their -- in their analyst reports, which demonstrates that it's something that analysts care about.  And that's also buttressed by the fact that during analyst calls, those analysts ask specific questions about the capabilities of the algorithm,

which also demonstrates that defendants' statements, saying that they would work in up markets and could work in down markets and bad markets, you know, supports the fact that it was something investors really cared about.  Anything that defendants said after that was something that investors were listening to because they specifically asked the question about that.  And, Your Honor, I would just posit that, you know, for those reasons that none of the statements were puffery here.  And I think the *Zillow* case makes it clear why that's the case, so I'll point you to that case.

Turning to the CWs, Your Honor.  I know we're going to be addressing this in the other motion, but I did want to say just briefly that the underwriter defendants do mention in their brief that the CWs were not reliable, and they only do that as to CWs 2, 5, and 6.  However, Your Honor, under -- under requisite case law in the Ninth Circuit, and I'll point to you the *Quality Systems* case, all that's required is the complaint mention each former employee's job title and group, their responsibilities, and the period of employment and experience.  And, Your Honor, we've done that for every single one of the CWs.  Most notably the three that they attack under the *Zucco* prong 1 standard is CWs 2, 5 and 6, but each of them were in the pricing aspect of Opendoor.

CW2 was a pricing analyst who was responsible for pricing final offers for homes and was -- we say that she was

there and employed from July '21 to July 2022.  And we also specifically mention the -- the locations that she was responsible for and who she reported to.

Likewise, CW5 we say was personally involved in Opendoor's pricing operation as she was an acquisition associate from November 2018 through March 2020 and described her duties as pricing initial offers that couldn't be priced by the company's algorithm.

And then, finally, Your Honor, on briefly, CW6 was a data scientist on the pricing team.  And we also mention her, that she was employed from 2018 through November 2020 and that she reported to the staff research scientist.

So, Your Honor, these allegations demonstrate that they are reliable CWs.  They were in a position to know about the information that they convey related to the fact that they -- that the company wasn't using the algorithm.  And they should be credited for that, Your Honor, under the *Zucco* standard.

Briefly, Your Honor, I'll just get into scienter in response to defendants' arguments on that.  I'd like to start with just the insider sales.  There's the three items that courts look at when assessing whether or not insider sales support a strong inference of scienter.  And, Your Honor, that's from the *Quality Systems* case here, and that is the amount and percentage of shares sold, the timing of the sales,

and the consistency with prior trading.

And, Your Honor, I would posit that we've met all of those -- those three requirements.  The amount was substantial.  It was 6 million shares, and it -- and it resulted in $112 million of proceeds.  I know that's only 7 percent, as -- as the defendants have noted, but $112 million by any measure is a lot of money.  And they kind of mention in their brief that, well, he had a lot more money than that.  But, Your Honor, I assure you the investors who lost 95 percent of their investment over the course of -- of the relevant class period here certainly would feel differently about whether or not that is a substantial amount of money.

I'll also note that the circumstances were particularly suspicious.  I mean, they kind of glaze over this Zillow issue, but, Your Honor, Opendoor's shares fell 14.5 percent in response to the Zillow announcement that it was exiting the market.  And it was only after Defendant Wheeler made positive statements reassuring the market about that, that Opendoor wasn't susceptible to the same kind of issues that Zillow was, that the -- the stock rebounded 15 percent.  And just days later Defendant Wu sold, you know, 57 -- made $57 million of proceeds right -- right after that, knowing full well, unlike investors, that it wasn't the algorithm driving, you know, the -- the pricing decisions within his company and that it was actually humans and that he was just as susceptible

to the issues that Zillow was susceptible to, as we would later find out when their contribution margins fell.

I would also mention that it was outside of his trading plan, Your Honor. I mean, we hear a lot about in these cases about 10b5 trading plans, and defendants usually use that as a basis to say that it was -- you know, it was something they had planned for a long time. But here, Your Honor, this was a responsive move. It wasn't done pursuant to any 10b5-1 plading tran -- plade -- trading plan. Sorry about that. So, Your Honor, we also think that that would meet the third prong there about whether it was consistent with prior trading. Indeed, you know, prior to Opendoor going public through the SPAC, there was no prior trading. So this was the first time after the lock-up that he had an opportunity to sell. Lo and behold, he did after seeing his stock rebound after a false statement was made.

THE COURT: Isn't that common, though, that an executive, they'd sell some stock when the trading window opens or when the prohibition ends --

MR. CHRISTIE: Sure.

THE COURT: -- however you want to describe it?

MR. CHRISTIE: Sure, Your Honor.

THE COURT: I'm just saying, isn't that common? They -- part of their compensation has to do with stock and --

MR. CHRISTIE: Yes. And, in fact, in this case Mr. Wu

was compensated by -- by stock.  And there's case law, and the *Fourscout* decision mentions this, Your Honor, that, you know, compensation is different than out of pocket paying for shares.  So, you know, defendants mentioning that he had more shares than he did at the beginning of the class period, it's not exactly not probative of scienter, because he didn't actually pay for his shares.  He took his compensation in that way.

But, Your Honor, nonetheless, I think the timing just in and of itself after -- you know, after you hear that Zillow is exiting the market.  And knowing that, Your Honor, that -- that the defendant was in possession of nonpublic information about the capabilities of his algorithm and the company's algorithm I think kind of changes the calculus of whether or not it was a suspicious trade or not.

THE COURT:  Okay.  So we're -- so we're running out of time for the motions to dismiss, Mr. Christie, so why don't I hear a few minutes from the defendants in rebuttal.

MR. CHRISTIE:  Sure.  Thank you, Your Honor.

THE COURT:  And then I'll want to deal with the other motion.

MR. CHRISTIE:  Okay.  Great.  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Christie.

All right.  Mr. Roberts.

So here's kind of how I think about this case.  I'll just -- I'll share my thinking with you, is -- I'll just tell

you I read bad blood, and I'm sure a lot of you have.  And I don't think this is anywhere like Theranos -- that makes a great -- a great little comparison -- where they're supposed to be running blood tests on these machines, but they're doing it, like, by -- like with humans.

So I thought I'd just anecdotally say that.  But I do think they're saying that -- that by virtue of this algorithm the company stock was marketed in a way that would give buyers of the stock or users of Opendoor an advantage over people who would be traditionally -- who would -- who would just go to Sotheby's Real Estate, or whatever, use -- use an appraisal service.

So I don't know if I'm articulating this as clear as I can, but it seems like there was something about Opendoor and this algorithm in their proprietary technology that was supposed to give the company a -- a market advantage.  And -- and I understand you're saying that there are the disclaimers and whatnot.  Maybe that's -- maybe that's how you prevail at the end of day.  I don't know yet.  But why don't you kind of focus in on plaintiffs' -- the thrust of plaintiffs' argument here.

Maybe I've completely mischaracterized it, in which case I would take responsibility for that.

MR. ROBERTS:  No, no.  Your Honor, I think -- I think that's perfectly fine.  And I -- I'm happy to address that, and

I'd like to address it in two ways.  First, I'd like to talk just a little bit to make some clarifying about what's -- what is really the company's business model here; right?

So the company's business model here is very similar to other iBuying type of ventures, like, for example, CarMax. So what's going on here is that sellers are coming to the company.  They're saying that they're interested in selling their car or their home.  They're getting an algorithmically generated initial offer for that, just like CarMax would do if you brought your car to them and you went on the Internet and you showed them.  You said:  I have a Mazda from 2021.  I'd like to know how much I could get for it.

They give you an initial offer.  That's generated by algorithms.  Then you bring in the car.  Or in this case for Opendoor, they come look at your house, and they make an assessment.  Okay.  Does that initial offer work anymore? Maybe we have to adjust it.  The house isn't quite the way we thought it was.  There's going to be more repairs that we need. And make adjustments and come to a final price.  That involves much more human intervention.

And so when Mr. Christie got up here and started talking about the CWs and the statements, going very quickly, what he's doing is he's -- he's wiping out these distinctions. When the company said that the majority of the time there was minimal human intervention, it was talking very specifically

about its initial price offers, what it offers once it gets somebody interested in selling the house over the Internet.  It wasn't talking about its final price officers -- offers, which have a much bigger human component, just like CarMax, just like any of these iBuying entities do.  And so we can't just collapse, as Mr. Christie attempted to do here, all these CW statements and say, well, the CW said there was a lot of humans involved.  See, it wasn't really the algorithms.

Well, you have to actually separate out the buying process steps here.  And, again, there are two steps on the buying side:  One, the initial offer; second, the final offer.  And then there's a third step, of course, which is the resale side of it, which, again, also the company's very specifically said in its registration statement, we used our resale models in conjunction with our pricing team.

So the company's consistently disclosing there are different steps and different levels of human involvement in each of those different steps.  And when you look at the confidential witness statements in this case, they're confirming the same thing as well.  Yep, there was humans involved.  And sometimes they're talking about the initial system and how that works, and sometimes they're talking about the final offers and how that worked.  And those are all different things.

The plaintiffs here are just trying to collapse them

UNITED STATES DISTRICT COURT

all together very quickly, speaking very quickly, to try to create the impression there's something funny going on here, but there isn't.  This is a standard model for iBuying and applies, again, to CarMax, what we do with cars.  It applies to houses, when Opendoor does it with houses.

Yes, it did doubt its pricing system, and this is the second part I'd like to get to.  He did say he thought its pricing algorithms worked well.  And they did.  The company was very successful.  It hit its contribution margins.  It continues now post-2022 to hit its -- to hit its contribution margins, so it's not that the technology doesn't work.

And, in fact, I appreciate Your Honor bringing up the Theranos example, because that's -- this is the exact opposite.  There when they opened up the technology, it didn't work.  That's not what's going on here.  Technology didn't work in one particular circumstance, which was this unprecedented rise of interest rates in 2022.  And no one disagrees with that.  The complaint is rife talking all about how things changed dramatically in 2022, including confidential witness statements to that effect.

So, Your Honor, this -- I think that's really has to be understood what's going on here, that there is different pieces.  There's human involvement in every piece, and the company told the market that.

All right.  I would go back, Your Honor, to

Mr. Christie's initial remarks when he got up.  He gave you a bunch of statements, if you'll recall.  He talked about pricing capabilities and iBuying competitors and the pricing algorithm.  All of those statements were from third parties.  Those weren't the company's statements.  He's citing third-party statements about the company.

At issue in a securities fraud case is what the company said.  And when we look here what the company said, it was very clear that it was not relying 100 percent on pricing algorithms to make its initial offers or its final offers and ultimately decide what the resale price would be for the homes that it purchased.

THE COURT:  Okay.  Thank you.

Ms. Park?

MS. PARK:  Thank you, Your Honor.

What did we hear from Mr. Christie with respect to the Section 11 claim?  We heard, "We've done everything we can to plead it.  I don't think there's much else we can do.  We've organized our Section 11 and Section claim" -- "10 claims in different sections, and we've got different defendants in the different sections of the brief, so we're good."

He said, "There's plenty of case law to suggest that what we've done is just enough."

With all due respect, that's incorrect, and I would invite Your Honor to look at the *Rigel* case, which makes it

very clear what plaintiffs must do.  They -- they must do more than the nominal efforts that Mr. Christie has described the plaintiffs have done here.  When the same misstatements undergird both, there is a 9(b) pleading requirement that is imposed on the Section 11 claims.

Now, Mr. Christie spoke all about the CWs without going point by point by point to address every one of the CWs.  I would invite Your Honor to take a look again at the underwriter defendants' briefing in which we address the overarching problems with the CW allegations to the extent that they are relied on to support a Section 11 falsity claim.  And that is that either the CWs weren't employed at the relevant time, they weren't employed at the time the SPO documents were issued, or they weren't employed in positions and facts pleaded sufficiently to explain that they would be in a position to know at the time the assertions that they're making.

Mindful of time, I will resist the very strong temptation to talk specifically about what's false in the four statements alleged by the underwriter defendants, and I will close with the point that plaintiffs have requested in their papers leave to amend with respect to the underwriters and the Section 11 claims.  We submit, Your Honor, that that would be futile.  We heard from Mr. Christie himself.  There's nothing more they can do.

With that, I'll conclude.  Thank you.

THE COURT:  Thank you, Ms. Park.

I'm going to take the motions to dismiss under advisement.

I'd like to now discuss the motion to strike.  Or maybe I formulated that incorrectly.  The motion referring the confidential witnesses.

Mr. Roberts, are you handling that as well?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Please come forward.  Maybe we can focus, you know, ten minutes or less.

MR. ROBERTS:  I promise it'll be ten minutes or less, Your Honor --

THE COURT:  Okay.

MR. ROBERTS:  -- because -- and you'll know why, because of how I'm going to start my argument, which is that the Court does not need to reach this motion.  The motion to dismiss shows that the complaint fails to state a claim and should be dismissed even if the Court were to consider and credit the confidential witness allegations in the complaint. And, now, although the Court doesn't need to reach this motion to grant the motion to dismiss in our view, we -- we filed this confidential witness motion for two reasons that I really want to emphasize here.

First, Your Honor, defendants felt compelled to draw the Court's attention to the facts and circumstances

surrounding the confidential witness allegations in this case because, first, they are unusual and concerning; and, two, we believed it served the Court's interest in monitoring/policing the integrity of the pleadings before it.

The second reason, Your Honor, is that defendants believed it appropriate in light of the Ninth Circuit's seminal decision in *Zucco*.  In *Zucco*, the Ninth Circuit instructed Courts to consider the reliability of confidential witness allegations in securities fraud cases.

The defendants' motions intended to alert the Court to precisely the sort of issues that should be factored under the Court's reliability determination.  Specifically, the attorney declarations that we submitted with our motion create a compelling record of significant reliability concerns with regard to at least four of the CWs; numbers 2, 5, 6, and 8. And I would note that Mr. Christie cited some of them today in his argument.

The attorney declarations amply raise reliability concerns on their own, but they also warrant the relief sought here, which is not, I should add, Your Honor, very carefully, to strike anything.  All we are seeking here in this motion is an order requiring affidavits from the confidential witnesses themselves so that the Court could make the required reliability assessment under *Zucco*.

THE COURT:  Yeah, I realize I had misspoken.  I was

thinking about something else.

MR. ROBERTS:  No.  Quite --

THE COURT:  I appreciate you clarifying the record, Mr. Roberts.

Go on.

MR. ROBERTS:  Quite all right, Your Honor.  Thank you.

So plaintiffs, of course, filed an opposition to this motion.  It doesn't address at all the reliability concerns that we've raised.  I mean, and I would say significantly they don't really even attempt to dispute any of the three key showings that we make in our motion.

First, they don't dispute that the sworn declarations that we submitted in support of the motion show that the four confidential witnesses stated that they did not make certain statements the plaintiffs attribute to them in the complaint.  Plaintiffs also don't dispute the Ninth Circuit's decision in *Zucco*, which affirmatively requires Courts to make reliability determinations in addressing CW allegations.

THE COURT:  Remind me.  Was *Zucco* at the pleading stage, or was it at summary judgment?

MR. ROBERTS:  It is at the pleading stage, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  Finally, plaintiffs did not dispute that if this Court ordered the confidential witnesses to submit affidavits, those affidavits which shed further light on the

reliability of the confidential witness allegations that are in the complaint.

So, in sum, I don't think plaintiffs really disputed any of the key underpinnings of our motion. And on that basis alone, the motion could be granted. What they really do in their opposition, Your Honor, is throw out two, in our view, insubstantial roadblocks to the Court and both which are legal roadblocks.

First, they argue that 12(b)(6) and 12(d), the two Federal Rules of Civil Procedure, preclude the Court from obtaining and using confidential witness affidavits. But we believe that that argument really is flatly inconsistent with the relevant precedent. First of all, again, in *Zucco* the Court must consider the reliability. And in light of that, Courts have refused to consider confidential witness allegations if they determine they're unreliable.

They -- it is clear that the Court can take judicial notice of affidavits. That's referenced in the fact that in *Tellabs*, a leading securities case from the Supreme Court, the Court noted -- said things for -- can take judicial notice of can be used at the motion to dismiss stage. And, of course, affidavits can be taken judicial notice of. And, finally, I think most importantly, the plaintiffs failed to acknowledge the Court's inherent powers, including the power to investigate and police confidential witness issues insofar as they may

affect the integrity of proceedings before it.

The second thing that the plaintiffs argue is they say the PSLRA discovery stay precludes this Court from obtaining and considering confidential witness affidavits.  Plaintiffs offer no rationale or supporting case law for the proposition that ordering and making limited use of confidential witness affidavits to assess the reliability of confidential witness allegations is somehow the Court engaging in discovery. Instead, the Court's consideration of these affidavits would involve the Court's exercise of its inherent powers to protect the integrity of the proceedings.  And, quite frankly, Your Honor, I think it defies reason to suggest that Congress meant to somehow prevent the Court from exercising that inherent power, you know, when it comes to confidential witnesses.  And plaintiffs overly argue that it did -- that it does.

What they really do focus on is they say, well, there's no exception to this discovery stay.  Even assuming this were discovery -- and, again, we reject the notion that it is -- there's an exception that applies.  There's an express exception to the stay to prevent undo prejudice to a party.  We think that exception applies here for all the reasons that was contained in our briefing.  But, again, we don't think the Court needs to apply this exception or really, in fact, to consider the PSLRA discovery stay given that this isn't discovery.

So, in sum, Your Honor, we don't believe that the Court needs to resolve this motion or define the motion to dismiss should be granted in this case.  But if the Court believes that it needs to engage in a full inquiry as to the reliability of the confidential witnesses to reach its decision, then we'd request that the motion be granted, the Court obtain the necessary affidavits and have the opportunity to review them in making that reliability determination.

THE COURT:  Thank you, sir.  You'll get a -- some minutes for rebuttal.

And I understand the underwriter defendants have joined in on that motion, but I don't think it's necessary for counsel to argue in addition to Mr. Roberts.

Do you agree?

MS. PARK:  I agree.  Thank you, Your Honor.

THE COURT:  Okay.  Very good.  All right.

Come on up.

MR. CANTY:  Good afternoon again, Your Honor.  Michael Canty on behalf of the plaintiffs.

Insubstantial roadblocks I think is an understatement. We're talking about the rules of -- Federal Rules of Civil Procedure and controlling case law.  And I would respectfully submit to the Court that this is an easy call that the motion should be denied and defendants' motion is procedurally improper.  It violates Rule 12(b)(6) because Courts cannot

consider matters outside of the pleadings.  Essentially they're asking for these affidavits, which is discovery, and asking the Court to consider those with respect to the reliability of the witnesses that are pled in the complaint.  This is improper.  Improper under the Federal Rules of Civil Procedure, and it's also improper under the controlling case law in the Ninth Circuit.

In *Kho-* --

THE COURT:  Why did your opposition not -- not address the *Zucco* case?

MR. CANTY:  Your Honor, I believe that the *Zucco* issue was raised in their response.  And I can address *Zucco* now.  It's very clear.  *Zucco* -- *Zucco* asks for the reliability to be determined with respect to the information that's contained in the complaint.  The Court needs to make a determination as to the reliability of the witnesses as they're described in the complaint.  It's improper, and the Courts -- certain courts in this circuit, as well as the Ninth Circuit, has -- have said that to consider extraneous evidence is improper.  In fact -- and I'd like to get the *Zucco* language specifically.  In *Zucco*, the Court says that the -- the -- the Court is to determine the reliability of the witness within the complaint.  In *Khoja*, the Court specifically said that district courts may not consider material outside of the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6).  There are two

exceptions:  Incorporation by reference, which is not applicable here; and judicial notice under the Federal Rules of Evidence Rule 201.  That's also not applicable here.  This is not information that's not subject to reasonable dispute or generally known or can be accurately readily determined from sources whose accuracy cannot be questioned.  Whatever the declaration would say or the affidavit would say would be subject to reasonable dispute because the defendants have alleged in their declarations that information is inconsistent.

In short, what this comes down to is a credibility question.  And courts in this district have repeatedly said that those issues are better settled during the discovery process.

With respect to *Tellabs*, the Court specifically said, and this is at 551 U.S. 322, "Faced with a Rule 12(b)(6) motion to dismiss a 10b action, courts must, as with any motion to dismiss for failure to plead a claim on which relief could be granted, accept all factual allegations as true."

Essentially what the defendants are asking for is the Court to consider extraneous material that they have derived through their own independent investigation that they've alleged shows that there's some certain inconsistencies with respect to the allegations that are pled in the complaint. That is improper.

Secondly, the request violates the PSLRA discovery

stay.  The stay applies unless the Court finds upon a motion of any party that particularized discovery is necessary to preserve evidence or to prevent undo prejudice to that party.

Now, with respect to *Zucco*, the defendants attempt to extend *Zucco*, and that is unsupported by any authority.  They have pointed to no authority that would allow a Court to look at extraneous evidence to determine whether or not the first prong of *Zucco* is met.  No case has extended *Zucco* to allow for the use of extrinsic evidence.  Moreover, the Court in *Khoja* strictly cautions against it.

In *Zucco*, quote, "Whether a complaint has provided sufficient detail about a CW's position, this is" -- quoting the *Zucco* language.  Let me repeat that again.

"Whether a complaint has provided sufficient detail about a CW's position within the company to provide a basis for attributing the facts reported by the witness to the witness's personal knowledge."

*Zucco* does not allow for extraneous extrinsic evidence to be considered.  The attempt here is to essentially allow -- if the Court were to allow this, they're asking for the Court to take a novel reading of *Zucco*, expand *Zucco* to include extrinsic evidence.  They've provide no support for that proposition, and it should be roundly rejected.  It is procedurally improper, and they have no authority for that position.

UNITED STATES DISTRICT COURT

I would point the Court to the *AMD* case decided by Judge Gonzalez Rogers. In that case, the defendant presented a full recantation and asked for the motion to be -- the plaintiffs' motion to be dismissed and that -- the Court to consider the full recantation.

Judge Rogers denied that, and she said it's better suited for summary judgment where a full record can be determined. And it's im- -- and specifically said that extrinsic evidence at the pleading stage is improper for the Court to consider.

Judge Chhabria --

THE COURT: That's the *Hatamian vs. AMD* case?

MR. CANTY: Yes, Your Honor. And I have that cite for you.

THE COURT: I have it. I'm looking at your table of authorities.

MR. CANTY: And SanDisk at 227 F. Supp. 3d 1098, the defendants there submitted a recanting declaration. Defendants acknowledged actually in that case that they -- that it could not be used in support of dismissal because there defendants acknowledge that it's inappropriate for the Court to consider extrinsic evidence at the pleading stage. However, they wanted to use it for the purpose of allowing the case to be dismissed with prejudice. The Court cautioned there and said that, quote, "The defendants are introducing extrinsic material in an

effort to sow doubt at a stage when the plaintiffs' factual allegations are presumed true."

That is not appropriate. That's at 227 F. Supp. 3d 1100.

I would respectfully submit that that is not appropriate here as well. It is inconsistent with Ninth Circuit case law and the two cases that I've cited.

Moreover, Judge Chhabria said that those credibility questions are appropriately tested through discovery, through evidentiary hearings, or both, but not at the pleading stage. "At bottom, the defendants" -- this is a quote. "At bottom, the defendants are introducing extrinsic material in an effort to sew at a stage when plaintiffs' factual allegations are presumed true."

Again, not appropriate.

"While a district court is considering a motion to dismiss, there is a strong argument that defendants should never be submitting recanting declarations, and courts should be striking any such declarations sight unseen."

That's at 227 F. Supp. 3d at 1101.

Your Honor -- Your Honor, controlling case law and the federal rules prohibit the Court from considering the declaration without -- if the Court were to consider it, without converting the motion -- the motion to dismiss into a motion for summary judgment. Something the defendants have not

asked for here.  If they are asking for that, we would ask for the opportunity to take full discovery on those issues so we may present those to the Court.  It's also substantively improper.

The cases that I cited full recanting declarations, witnesses claim that they never made such statements.  And those situations, both in *SanDisk* and in *AMD*, the Courts denied the applications of the defendants.

Here we don't have such a problem.  There were eight CWs referenced in the amended complaint.  Defendants do not proffer that the CWs recanted their statements.  They don't proffer that any of the CWs were unaware or denied that they spoke with defense counsel or their investigators.  And, in fact, when we look carefully at the allegations of the four CWs that they take issue with, two of them don't ever claim that there's anything inconsistent with the information.

In fact, defendants go through great pains saying that arguments made by counsel misconstrue the intent of what they said.  But, in fact, those witnesses don't disclaim any of their statements.  The two witnesses, CW2 and CW8, were talking about distinctions with respect to CW2 without a difference.  And I would point to the affidavit that was provided by defense counsel.  I think Judge Rogers and Judge Chhabria got it right saying this was appropriate for discovery and depositions, not at the pleading stage.  Essentially there was a

cross-examination of these witnesses, questions like:

"You wouldn't have said it was never.  Accurate?

"ANSWER:  That's correct."

This was a cross-examination without the opportunity for a lawyer to be present or plaintiffs to be present to question those -- those issues.  Those are credibility issues. They don't go to the integrity of the process.  These witnesses never denied speaking to plaintiffs' counsel.  In fact, a process and procedure was followed here where they were identified, the purpose of the call was identified, who we represent was identified, with respect to every witness save CW8.  And I'll address CW8.

THE COURT:  You know, Mr. Canty, I think I understand your argument.

MR. CANTY:  Okay.

THE COURT:  I think -- I think I'm good.

MR. CANTY:  Very well.  Thank you, Judge.

THE COURT:  I'll ask Mr. Roberts to say a few words.

I do have a question in rebuttal, and then I think we can close this one up.

MR. CANTY:  Thank you, Your Honor.

THE COURT:  Thank you, Mr. Canty.

So my first question is -- it has to do with *Zucco*. And I pulled the case up here, and I scanned it a little bit. And what I think that case is saying is that the reliability of

the confidential witness needs to be established in the complaint. And the basis for discounting the confidential witness statements comes from the lack of -- of underlying authority in the complaint.

So here are you attacking the plaintiffs' characterization of the confidential witness statements as they appear in the complaint and as supported or unsupported by other allegations, or is it simply that you and your colleagues were able to determine who these people are and go and interview them and get them to say something different?

MR. ROBERTS: Well, Your Honor, let me take that in two steps. We certainly address the reliability of the confidential witness allegations as they are pled in the complaint. And so as part of our motion to dismiss, we address those as to the underwriter defendants talking about the fact that, for example, CW5, which is cited a number of times, didn't actually work at Opendoor during the time period of the -- of the class period; so, therefore, of course, he -- whatever he has to say is not reliable because he's not talking about the time period at issue here.

THE COURT: I could consider that in the context of the motion to dismiss.

MR. ROBERTS: Absolutely. It is clear on the face of the motion -- well, it's clear on the face of the complaint that that's true. That is what the plaintiffs themselves plead

about his time, his employment period at the company.  So we do do that.  And, again, as I've argued here today, I think based on that and all of the other arguments, of course, we made in the motion to dismiss, the motion to dismiss can be granted on that basis alone.

But there's a separate here.  What I -- Mr. Canty's very vehement, and I appreciate that.  But what I didn't hear him say is that the CW statements are accurate.  And that's a problem, Your Honor.  It's a problem for the Court in terms of the Court policing the integrity of the proceedings here.  And I would refer the Court to the *Millennial Media* decision, the *Lumbar Liquidators* decision, neither of which Mr. Canty addressed quite conveniently, because there the courts granted the relief that we're seeing here under the exact same circumstances because the issue is not credibility.

I heard Mr. Canty say credibility over and over again.  He's using that word very deliberately, because, of course, when you look at the case law, you say, yes, credibility is something you do in discovery.  You figure it out after you have depositions, et cetera.

That's not the issue here.  The issue here is reliability, and that's an appropriate thing at the pleading stage.  And when we cite *Zucco*, Your Honor, we're not -- we're not suggesting that in *Zucco* they endorsed getting these affidavits.  We're saying what the Ninth Circuit endorsed was

it's the Court's responsibility to do this reliability determination, something that you really can't do very effectively if there are CW statements that they are -- that the CWs themselves are saying are inaccurate.

And that's -- and, by the way, we're not seeking to do that on our statements alone. I think, again, Mr. Canty suggested, you know, on the basis of our affidavits the Court should take some action. We're not saying that. We're saying the Court should have the confidential witnesses themselves speak. Not us. Themselves. And that's not discovery. That's really the Court, again, exercising its inherent powers to make sure that the proceedings before it are being -- are -- are proceeding appropriately.

So I think here that there's a -- I just -- in my view, there's a lot of misdirection here about what's going on. And I'll just summarize it again very quickly. It's about reliability, and it's about the confidential witnesses themselves providing affidavits to the Court to help the Court in that -- in that exercise.

THE COURT: Okay. Thank you.

All right. Well, I think I could give you a decision on that.

I'm going to deny the motion, because I do feel like it's precluded by Rule 12(b). I think that the -- that the plaintiffs have sufficiently alleged the confidential witness

information and provided the information they need to to support that. And I do feel constrained by the well-established rules surrounding Rule 12(b)(6) and that if I were to consider material outside of the face of the complaint, I would need to convert it to a motion for summary judgment. And at this stage I would prefer not to do that.

And this doesn't mean that if the case proceeds to discovery that defendants can make all the use of their labors down the road to take depositions of these confidential witnesses and obtain other discovery and then undermine their statements at the summary judgment stage, but I don't feel like it's appropriate to provide the relief that you're seeking at this stage.

So I'm going to deny that motion, and then we'll just -- we could just move on from there.

Okay. Well, like I said, I'm taking the motions to dismiss under advisement. I'm hoping to get this done by no later than mid-February, but, you know, we'll see. We'll see how long it takes.

Is there anything else that you'd like to address with me while everybody's here?

MR. CANTY: No, thank you, Your Honor.

MR. ROBERTS: No, Your Honor. Thank you.

MR. FARRELL: No, thank you.

THE COURT: Okay. Well, for those of you who've

traveled far to be here today, thank you.  And I know the weather is not great in New York.

And where are you from, Mr. Roberts?  I've forgotten.

MR. ROBERTS:  D.C., Your Honor.  I believe it's the coldest day we've experienced in quite a while, so I'm perfectly happy to be in Phoenix instead.

THE COURT:  Okay.  I read there's a measles outbreak at Reagan Airport and at Dulles.  So if you -- or a measles exposure.  So if you're flying into either one of those airports, be careful.

But thank you all for coming.  And I thought you all did a wonderful job with your advocacy today and also with the written work product that you've provided.  It is -- it is very good, and you all are very good at what you do.  Your clients should be satisfied.

Court is adjourned.

MR. ROBERTS:  Thank you, Your Honor.

MR. CANTY:  Thank you, Your Honor.

MR. KORT:  Thank you, Your Honor.

(Proceedings conclude at 3:21 p.m.)

---oOo---

# C E R T I F I C A T E

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 25th day of January, 2024.

/s/ Cathy J. Taylor
Cathy J. Taylor, RMR, CRR, CRC

UNITED STATES DISTRICT COURT