**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sam Alich, | No. CV-22-01717-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| Opendoor Technologies Incorporated, et al., | |
| Defendants. | |

Opendoor is a publicly traded company that uses advanced technology to buy and resell homes. Plaintiffs are purchasers of Opendoor stock. They are suing Opendoor, Opendoor personnel, and the Underwriters of Opendoor's secondary public offering for securities fraud.

This matter is before the Court on the Opendoor and Underwriter Defendants' Motions to Dismiss the Consolidated Amended Complaint.[1] (Doc. 48 and 51.) Additionally, the Opendoor Defendants request that the Court consider documents referenced in the Consolidated Amended Complaint in its analysis of the Motions. (Docs. 49, 50.) The Motions are fully briefed. (Docs. 48, 51, 55, 56, 60, 62.) The Court held oral argument on January 17, 2024. For the following reasons, the Court considers

---

[1]    The Opendoor Defendants are Opendoor Technologies, Inc., Eric Wu, Carrie Wheeler, Adam Bain, Cipora Herman, Chamath Palihapitiya, Steven Trieu, Ian Osborne, David Spillane, Pueo Keffer, Glenn Solomon, Jason Kilar, and Jonathan Jaffe.

The Underwriter Defendants are Citigroup Global Markets Inc.; Goldman Sachs & Co. LLC; Barclays Capital Inc.; Deutsche Bank Securities Inc.; Oppenheimer & Co. Inc.; BTIG, LLC; KeyBanc Capital Markets Inc.; Wedbush Securities Inc.; TD Securities (USA) LLC; Zelman Partners LLC; Academy Securities, Inc.; Loop Capital Markets LLC; Samuel A. Ramirez & Company, Inc.; and Siebert Williams Shank & Co., LLC.

1  the referenced documents under the doctrine of incorporation by reference and dismisses

2  the Consolidated Amended Complaint with leave to amend.

3  **I.    FACTS**

4       In the past decade, rapid technological development has shaped and reshaped

5  commerce. Artificial intelligence is now disrupting industries throughout the world

6  economy. The ways that people shop, consume entertainment, move about, and vacation

7  have fundamentally changed. So, too, has the way that people conduct major transactions

8  such as home selling and buying.

9       iBuying, short for instant buying, is a relatively recent phenomenon intended to

10  simplify major transactions. (Doc. 39 ¶¶ 51, 52.) Powered by advanced technology,

11  iBuyers, or businesses engaged in iBuying, use automated valuation models to price homes.

12  (*Id.* ¶ 51.) Based on those valuations, iBuyers attempt to quickly purchase and resell

13  homes. (*Id.*)

14       Founded in 2014, Opendoor is an iBuying company operating in the residential real

15  estate market. (*Id.* ¶¶ 51-52.) Its process follows the typical structure of an iBuying

16  business. Individuals looking to sell their homes can go to Opendoor's website or mobile

17  app, input some relevant data points, and receive an "instant" cash offer generated by

18  Opendoor's proprietary algorithm. (*Id.* ¶ 53.) After making the initial offer, Opendoor

19  personnel conduct a virtual assessment and adjust the offer based on the home's condition.

20  (*Id.*) Then, Opendoor makes a final offer, which is reduced by a 5% service charge. (*Id.*) If

21  the homeowner accepts, Opendoor pays the seller, takes ownership of the home, makes

22  repairs if necessary, and lists it for resale. (*Id.* ¶¶ 55, 75-76.)

23       Opendoor's algorithm is central to the success of its iBuying business. (*Id.* ¶¶ 56,

24  59.) To consistently sell homes at a profit, Opendoor's algorithm must produce generally

25  accurate initial offers. (*Id.* ¶ 4.) While those initial offers will often be adjusted after the

26  homes' unique defects are revealed through an inspection, they must provide Opendoor

27  with a viable starting point. (*Id.* ¶¶ 4, 53.) Accordingly, the algorithm must account for the

28  value of the homes at the time of the initial offer and accurately forecast their future value.

(*Id.* ¶¶ 4, 7, 60.) The algorithm purports to do this by relying on frequently expanding, comprehensive sets of hyperlocal data. (*Id.* ¶ 58.) It uses that data, according to Opendoor, to anticipate market changes and thereby generate offers reflective of a home's true value—not just today, but in the future. (*Id.* ¶¶ 7-9.)

Opendoor has worked toward this objective since its inception. (*Id.* ¶¶ 3, 52, 56.) It began as a private company, but in 2020, went public via a reverse merger with Defendant Social Capital Hedosophia Holdings Corp. II, a Special Purpose Acquisition Company ("SPAC").[2] (*Id.* ¶ 324.) After the de-SPAC merger, the surviving entity changed its name to Opendoor Technologies Inc. (*Id.* ¶ 325.) Then, in December of that year, Opendoor published offering documents which registered the first issuance of shares of Opendoor common stock. (*Id.*) On December 21, 2020, the newly issued Opendoor shares began publicly trading on the NASDAQ stock exchange. (*Id.*) In February 2021, Opendoor published new offering documents registering the issuance of additional stock. (*Id.* ¶ 327.) On February 9, 2021, those shares began publicly trading. (*Id.*)

As Opendoor informed stockholders, its iBuying business is its main revenue driver. (*Id.* ¶ 55.) In evaluating the financial health of that business, Opendoor told its investors that "[t]he ultimate measure [they] should hold [Opendoor] accountable for is how [it is] doing on contribution margin delivery." (*Id.* ¶ 8.) Contribution margin refers to a metric used "to understand how a specific product contributes to [a] company's profit." Amy Gallo, *Contribution Margin: What It Is, How to Calculate It, and Why You Need It*, Harvard Business Review (Oct. 13, 2017), https://hbr.org/2017/10/contribution-margin-what-it-is-how-to-calculate-it-and-why-you-need-it. In this case, the "product" is Opendoor's iBuying operation.

Opendoor's contribution margin was strong immediately following its public

---

[2] A SPAC is an entity that "goes public as a shell company using an IPO for the purpose of merging with or acquiring a yet-to-be-identified private operating company. Generally within two years, the SPAC combines with the private company via a de-SPAC merger, with the resulting company becoming public and receiving a combination of the SPAC's IPO proceeds and additional capital from a private financing." *What are the differences in an IPO, a SPAC, and a direct listing?*, U.S. Securities and Exchange Commission (last visited Feb. 25, 2024), https://www.sec.gov/education/capitalraising/building-blocks/registered-offerings.

offering. For example, its contribution margin for the fourth quarter of 2020 was 12.6%. (*Id.* ¶ 348.) But one year later, amidst a housing slowdown, its contribution margin decreased to 4%. (*Id.*) Then, in August 2022, Opendoor lost money on 42% of its transactions. (*Id.* ¶ 349.) That year, its third quarter contribution margin was negative 0.7%. (*Id.* ¶ 350.) Opendoor's stock value reflected this turn of events. From December 21, 2020 to November 7, 2022 (the "Class Period"), its price dropped by 94.43%. (*Id.* ¶ 351.)

Lead Plaintiffs are retirement service providers that purchased Opendoor stock on behalf of their members and beneficiaries during the Class Period.[3] (*Id.* ¶¶ 356-57.) Stuart Graham Hereford, another Plaintiff, purchased stock in Social Capital Hedosophia Holdings Corp. II and, after the de-SPAC merger, from Opendoor on several occasions throughout the Class Period. (Doc. 39-3.) Together, Plaintiffs allege that Defendants made several materially misleading statements during the Class Period, that those statements artificially inflated Opendoor's stock price, that they relied on those statements, and that they suffered damages when the stock price dropped after the truth was revealed. (*See generally* Doc. 39.)

Against the Opendoor Defendants, Plaintiffs assert claims under Section 10(b), 15 U.S.C. § 78j(b) and Section 20(a), 15 U.S.C. § 78t(a) of the Exchange Act of 1934, and Section 11, 15 U.S.C. § 77k and Section 15, 15 U.S.C. § 77o, of the Securities Act of 1933. (*Id.* ¶¶ 305-19, 480-99.) Against the Underwriter Defendants, they assert one claim under Section 11. (*Id.* ¶¶ 480-92.) Defendants responded by filing their Motions to Dismiss. (Docs. 48, 51.)

## II.   LEGAL STANDARD

To survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it contains

---

[3] Lead Plaintiffs are Indiana Public Retirement System, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association. (Doc. 20.)

"factual content that allows the court to draw the reasonable inference" that the moving party is liable. *Id.* At the pleading stage, the Court's duty is to accept all well-pleaded complaint allegations as true. *Id.* Facts should be viewed "in the light most favorable to the non-moving party." *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013). "[D]ismissal . . . is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal marks omitted).

Securities fraud suits face heightened pleading standards. "At the pleading stage, a complaint stating claims under [S]ection 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

> Because allegations of fraud inescapably carry a degree of moral turpitude, Rule 9(b) imparts a heightened note of seriousness, requiring a greater degree of pre-discovery investigation by the plaintiff, followed by the plaintiff's required particular allegations, thereby protecting a defendant's reputation from frivolous and unfounded allegations and permitting a particularized basis for a defendant to respond to the particularized allegations.

*Irving Firemen's Relief & Ret. Fund v. Uber Techs., Inc.*, 998 F.3d 397, 404 (9th Cir. 2021) (citation omitted).

Similarly, the PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). The PSLRA "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (emphasis in original).

1    **III.    DISCUSSION**

2        **A.    Section 10(b)**

3        "Section 10(b) of the Exchange Act prohibits manipulative or deceptive practices in

4    connection with the purchase or sale of a security." *In re Facebook, Inc. Sec. Litig.*, 87

5    F.4th 934, 947 (9th Cir. 2023) (internal marks omitted). Rule 10b-5 of the Exchange Act's

6    implementing regulations, which is coextensive with Section 10(b), "prohibits making 'any

7    untrue statement of a material fact' or omitting material facts 'necessary in order to make

8    the statements made, in the light of the circumstances under which they were made, not

9    misleading.'" *Id.* (quoting *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747,

10    764 (9th Cir. 2023) (quoting 17 C.F.R. § 240.10b-5(b))).

11        To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must sufficiently

12    allege: "(1) a material misrepresentation or omission; (2) made with scienter; (3) in

13    connection with the purchase or sale of a security; (4) reliance on the misrepresentation or

14    omission; (5) economic loss; and (6) loss causation." *In re BofI Holding Sec. Litig.*, 977

15    F.3d 781, 786 (9th Cir. 2020). Each of these elements must be independently satisfied. *See

16    Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014) (reasoning

17    that failure to adequately plead an element constitutes "an independent basis" on which to

18    affirm dismissal of a securities fraud complaint). As explored below, Plaintiffs successfully

19    pleads six misrepresentations attributable to the Opendoor Defendants. Nonetheless, they

20    fail to meet their pleading standards as to scienter and loss causation.

21            **1.    Actionable False or Misleading Statements**

22        The Opendoor Defendants first argue that Plaintiffs' Section 10(b) claim fails

23    because Plaintiffs have not alleged that they made any actionable false or misleading

24    statements. (Doc. 48 at 18-28; Doc. 60 at 7-18.) In response, Plaintiffs point to several

25    categories of statements made by the Opendoor Defendants alleged in the Consolidated

26    Amended Complaint to have been false or misleading. (Doc. 56 at 15-21.)

27        "A plaintiff can allege falsity by 'point[ing] to [the] defendant's statements that

28    directly contradict what the defendant knew at the time." *Jaeger v. Zillow Grp., Inc.*, 644

F. Supp. 3d 857, 870 (W.D. Wash. 2022) (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018)). "[A] statement is misleading if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (quoting *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002)). "To be misleading, a statement must be 'capable of objective verification.'" *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017) (quoting *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 606).

### i.    Statements Regarding the Pricing Algorithm

Plaintiffs allege that the Opendoor Defendants, through their challenged statements, "created the impression that [Opendoor's] success was the result of its AI-powered algorithm, which they claimed drove pricing decisions and kept Opendoor profitable in any housing market by reacting to changing economic conditions." (Doc. 55 at 15.) Plaintiffs challenge the following statements regarding the accuracy and operability of Opendoor's pricing algorithm:

- The algorithm uses "machine learning to drive pricing decisions." (Doc. 39 ¶ 169.)
- Opendoor's "proprietary, machine learning-based pricing models are key to [Opendoor's] ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation." (*Id.* ¶ 173.)
- The algorithm can "dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions." (*Id.* ¶¶ 169, 177.)
- The algorithm's ability to "dynamically price homes in response to both micro and macro factors [] allows [Opendoor] to manage . . . within [a] 4% to 6%, annual [contribution] margin range, [] regardless of the home cycle [Opendoor is] operating in." (*Id.* ¶ 186.)

(Doc. 55 at 15.)

Plaintiffs allege that these statements were misleading because "the algorithm could not accurately price homes (even in a hot market) and as such [Opendoor's] pricing

decisions were based on a human-driven process that led to [Opendoor's] success." (*Id.* at 9.) This fact has been confirmed, say Plaintiffs, by several former employees. (Doc. 39 ¶¶ 62-73.) For example, "[a]ccording to CW 5, who was brought in to price initial offers, approximately 50% of the properties were sent to human pricing analysts for review." (Doc. 55 at 16 (citing Doc. 39 ¶ 71).) Additionally, "CW 2 stated that her managers continuously told pricing analysts to not even use the algorithm to generate final offers because the algorithm was never accurate and would corrupt the pricing analysts' assessment of market value." (*Id.* (citing Doc. 39 ¶¶ 63-64).) Plaintiffs also point to findings made by the Federal Trade Commission ("FTC") in 2019 as further evidence that people did the work publicly attributed to Opendoor's algorithm. (*Id.*)

The Opendoor Defendants counter that Plaintiffs' allegations conflate their business practices in the initial and final offer stages. (Doc. 48 at 20-21 n.11.) They argue that Opendoor never claimed that all its pricing decisions were driven by its algorithm. (*Id.* at 20-21.) Instead, Opendoor's initial offers were driven primarily (though not entirely) by its algorithm, but creating final offers required the aid of substantial human involvement. This makes sense. While the pricing algorithm took the lead in generating an initial offer based on available data, that initial offer had to be adjusted by the unique characteristics that each individual property possessed—such as damaged or aged aspects that may have necessitated repairs. This latter task naturally required personal intervention.

The Opendoor Defendants say that they disclosed the existence of this human involvement in the following statements:[4]

- "The majority of our initial offers are algorithmically generated and do not require any human intervention." (Doc. 49-1 at 45.)

---

[4] The Opendoor Defendants filed several exhibits containing their prior statements. (Doc. 49.) They request that the Court take judicial notice of the exhibits or consider them under the doctrine of incorporation by reference. (Doc. 50.) Plaintiffs take no position on the request, "except to the extent Defendants offer these exhibits for the truth of the matter asserted therein . . . . Similarly, Plaintiffs object to the documents Defendants seek judicial notice of, such as Ex[hibits] 16-18, because they are offered to establish a counter-factual narrative that is improper a[t] the motion to dismiss stage." (Doc. 55 at 16 n.5.) The Court finds that it may consider the exhibits, to the extent it does so in this Order, under the doctrine of incorporation by reference.

- "After all the data has been collected and incorporated, each offer is reviewed and finalized by members of our pricing team, allowing us to marry the best of algorithmic insights with human judgment." (Doc. 49-2 at 10.)
- "We appraise and price homes we buy and sell using data science, proprietary algorithms, and analysis from specially trained employees." (*Id.* at 19.)
- "I think there's a sense that it's just about the model . . . . But we've also done a really good job of integrating systematic modeling with [] the human insight and the human overlay." (Doc. 49-3 at 10.)

(Doc. 48 at 20-21.)

The Opendoor Defendants also argue that Plaintiffs' confidential witnesses corroborate the disclosures. (Doc. 60 at 10.) For example, CW 2's statement that about 90% of *final offers* were generated by pricing analysts is consistent with Opendoor's disclosure that its final offers come after human adjustments. CW 5's estimate that about 50% of *initial offers* were reviewed by humans is generally consistent with Opendoor's disclosure that most, though not all, of its initial offers do not involve human intervention.

Plaintiffs, however, contend that the Opendoor Defendants' disclosures fall short because they do not "disclose[] that Opendoor was forced to rely on humans to price its offers because its algorithm could not accurately price homes . . . [or] that [Opendoor] was engaged in deceptive practices . . . that contributed to [Opendoor's] profitability." (Doc. 55 at 17.) Additionally, Plaintiffs argue that the "[t]he instant case is strikingly analogous to the securities fraud lawsuit against Zillow [in *Jaeger*, 644 F. Supp. 3d 857], which investors brought after Zillow left the iBuying business in November 2021." (*Id.*) In both cases, say Plaintiffs, the companies relied on extensive human involvement in their pricing scheme while misleading investors into believing that their algorithms drove their success. (*Id.* at 18.)

Plaintiffs' arguments are unavailing. First, *Jaeger* is distinguishable. There, Zillow sought to rapidly scale up its iBuying operation in an attempt to catch up to its competitors. *Jaeger*, 644 F. Supp. 3d at 865-66. To do so, Zillow devised a plan that it called "Project

Ketchup." *Id.* In Project Ketchup, Zillow "applied systematic overlays to drive up offers well above the pricing indicated by its algorithm and pricing analysts." *Id.* at 866 (internal marks omitted). Put another way, Zillow purposefully raised its offer prices well beyond those generated by its algorithm. *See id.* Publicly, Zillow presented a different picture to investors and led them to believe that it was actively relying on its algorithm. *Id.* Instead, under Project Ketchup, Zillow was raising the offers generated by its algorithm in an attempt to purchase more homes more quickly, thereby increasing its market share. *Id.* Thus, Zillow's statements were misleading. *Id.*

Plaintiffs' attempt to frame Opendoor's conduct in a similar light is unconvincing. They allege that, like Zillow, Opendoor concealed its practices of adjusting initial offers in the final offer stage and failing to refund deductions made for anticipated repairs that became unnecessary. (Doc. 39 ¶¶ 170-74; Doc. 55 at 18.) But unlike Project Ketchup, those practices were sufficiently disclosed to investors and consistent with the Opendoor Defendants' public statements. (Doc. 49-1 at 10, 45; Doc. 49-2 at 10, 11, 19; Doc. 49-3 at 10.)

The Court also finds that, even taking the facts in the light most favorable to Plaintiffs, the four challenged statements are not false and would not have misled a reasonable investor. The Opendoor Defendants' statement that the algorithm used "machine learning to drive pricing decisions" is a simple statement about Opendoor's use of AI in its pricing scheme and does not suggest that Opendoor personnel lack any significant role in that process. Nor does the Opendoor Defendants' representation that Opendoor's algorithm is "key" to the success of its business model. The other two challenged statements—about the algorithm's ability to dynamically adjust and keep Opendoor within a 4% to 6% annual contribution margin—likewise would not lead reasonable investors to conclude that Opendoor's entire process, from initial offer to final offer, was driven by its algorithm. This is especially true in light of the Opendoor Defendants' disclosures. As discussed below, however, Plaintiffs successfully pleaded these two latter statements as misleading insofar as they suggest that Opendoor's algorithm

1    was accurately estimating and forecasting home values.

2                  **ii.    Statements Regarding Profitability**

3           Plaintiffs next argue that the Opendoor Defendants misled investors by guaranteeing

4    Opendoor's "ability to remain profitable in any housing market." (Doc. 55 at 19.) Plaintiffs

5    challenge the following statements:

6    - The algorithm can "dynamically adjust to leading market indicators and react to

7        real-time macro- and micro-economic conditions." (Doc. 39 ¶¶ 169, 177.)

8    - "[O]ur model really works in upmarkets, it's going to work in flat markets, it's going

9        to work in downmarkets." (*Id.* ¶ 181 (spelling in original).)

10   - The algorithm's ability to "dynamically price homes in response to both micro and

11       macro factors [] allows [Opendoor] to manage . . . within [a] 4% to 6%, annual

12       [contribution] margin range, [] regardless of the home cycle [Opendoor is] operating

13       in." (*Id.* ¶ 186.)

14   - "[I]f you run the business model through the worst recession in U.S. history, we

15       would still have positive contribution margin." (*Id.* ¶ 189.)

16   - Opendoor "ha[s] good evidence that [it] can operate in [a] declining market."

17       (*Id.* ¶ 192.)

18   - Opendoor's "systems are doing exactly what they're designed to do, which is

19       responding very quickly, adjusting prices to market." (*Id.* ¶ 199.)

20   (Doc. 55 at 15, 19-20, 23.)

21          According to Plaintiffs, "the algorithm never worked as Defendants claimed." (Doc.

22   55 at 20.) And, according to Plaintiffs, many of the same confidential witness statements

23   cited above support this contention. (*Supra* at 8; *see also* Doc. 39 ¶¶ 62-73; Doc. 55 at 22.)

24          The Opendoor Defendants argue that the challenged statements are not misleading

25   because their many disclaimers notified reasonable investors that the algorithm could not

26   guarantee profitability. (Doc. 48 at 19-20.) They cite the following statements from the

27   Opendoor Defendants as disclosing the risk that Opendoor could incur losses:

28   - "Our business is dependent upon our ability to accurately price and portfolio

manage inventory and an ineffective pricing or portfolio management strategy may have a material adverse effect on our business." (Doc. 49-1 at 10-11.)

- Opendoor could "incur significant losses in the future" due to its "failure to appropriately price and manage the home inventory [it] acquire[d]." (Doc. 49-2 at 17.)

- Opendoor "may be unable to liquidate . . . inventory at prices that allow [it] to meet [its] margin targets or recover [its] costs." (Doc. 49-1 at 11.)

- Opendoor's "success depends, directly and indirectly, on general economic conditions, [and] the health of the U.S. residential real estate industry, particularly the single family home resale market." (*Id.* at 7-8.)

- "Home prices can be volatile and the values of [Opendoor's] inventory may fluctuate significantly." (*Id.* at 14.)

- "Mortgage rates are currently low as compared to most historical periods," and rate increases "could result in a decline in the demand for [Opendoor's] homes" and "adversely affect [Opendoor's] business or financial results." (*Id.* at 15-16.)

- "[C]hanging market conditions are reflected in [Opendoor's] pricing for new acquisitions, largely leaving previously acquired inventory at risk to potential market volatility." (Doc. 49-2 at 12.)

(Doc. 48 at 13, 19-20.)

Plaintiffs argue that the Opendoor Defendants' disclosures were insufficient because (1) they did not correct the impression that the algorithm "worked in all housing markets;" and (2) they did not disclose that the algorithm already failed to accurately estimate home value. (Doc. 55 at 21-22.) The first argument can be quickly dismissed. It stands to reason that no reasonable investor would ever believe that a particular business model, even one premised on impressive technology, is guaranteed to be profitable in all circumstances.

Plaintiffs also rely on statements from financial analysts writing for Wedbush, InvestorPlace, and Seeking Alpha to argue that reasonable investors believed Opendoor's

algorithm to guarantee profitability. (Doc. 39 ¶¶ 96-99.) Based on the Opendoor Defendants' allegedly misleading statements and financial success, those writers reported favorably on Opendoor's algorithm. (*Id.*) But none of the statements, as recited in the Consolidated Amended Complaint, evidence a belief that Opendoor's algorithm was guaranteed to accurately price and forecast home values in every housing market; instead, they indicate general enthusiasm that Opendoor's algorithm was "best in class" and the "best in the business." (*Id.*) The Court cannot equate such statements with an endorsement that a particular technology is perfect or unfailing.

The statements do, however, reflect an impression that Opendoor's algorithm was, at the very least, generating roughly accurate initial offers at the time the statements were made. If the algorithm was in fact already failing to accurately estimate home values, the analysts cited in the Consolidated Amended Complaint were incorrect in their impressions. Plaintiffs adequately allege that the analysts' erroneous conclusions were due to the Opendoor Defendants' purportedly misleading statements regarding the efficacy of their algorithm. (*Id.* ¶¶ 96-99, 112.) Because "[t]he perceptions of analysts are an acceptable measure of what reasonable investors would have understood," *Jaeger*, 644 F. Supp. 3d. at 872, the Court finds that, taking Plaintiffs' allegations as true, a reasonable investor would have been misled by the Opendoor Defendants' statements into believing that Opendoor's algorithm was accurately estimating and forecasting home values at the time the statements were made.

The Opendoor Defendants argue that their misleading statements are nonetheless non-actionable puffery. (Doc. 48 at 24-27.) "In the Ninth Circuit, vague, generalized assertions of corporate optimism or statements of mere puffing are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019) (internal quotations and citations omitted). "When valuing corporations, . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel good monikers." *In re Cutera Sec. Litig.*, 610 F.3d 1103,

1111 (9th Cir. 2010); *see also In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1481 (N.D. Cal. 1992) ("Professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company."). Far from being a guarantee of unshakable financial success, the statements, according to the Opendoor Defendants, expressed justified corporate optimism of the type that courts routinely deem non-actionable puffery. (Doc. 48 at 26-27.)

The Court finds that the Opendoor Defendants' statements are too concrete and verifiable to constitute non-actionable puffery. *See e.g., Jaeger*, 644 F. Supp. 3d at 872-73. Each of the challenged statements are premised on a concrete, verifiable supposition—Opendoor's algorithm, at a bare minimum, can accurately estimate and forecast home values. Opendoor's algorithm either does this in up, flat, and down markets or it does not. In the face of rapid economic downturn, it either responds very quickly and adjusts prices to market or it does not. It is either capable of keeping Opendoor within a 4% to 6% contribution margin range or it is not. These elements of concreteness and verifiability were not present in the cases relied upon by the Opendoor Defendants. *See Plevy v. Haggerty*, 38 F. Supp. 2d 816, 827-28 (C.D. Cal. 1998); *Hutton v. McDaniel*, 264 F. Supp. 3d 997, 1021 (D. Ariz. 2017); *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022).

Thus, the Court finds that these six challenged statements are actionably misleading because they would have led a reasonable investor to conclude that Opendoor's algorithm was accurately pricing homes and adjusting to changes within the market when the statements were made.

### iii.   Statements Regarding Opendoor's Business Model and the 2019 FTC Complaint

Plaintiffs next argue that the Opendoor Defendants misled investors by mischaracterizing its business model. (Doc. 55 at 23-24.) The Opendoor Defendants claimed that Opendoor's "business model is designed to generate margins from [Opendoor's] service charge to sellers and ancillary products and services associated with

a transaction, and not from the spread between acquisition price and resale price." (Doc. 39 ¶ 175.) Plaintiffs argue that Opendoor's business model more heavily relied upon gains from reselling houses. They point to a 2019 FTC complaint against Opendoor charging that "gains from selling homes for more than its offer price are a key contributor to [Opendoor's] revenue." (*Id.* ¶ 150 (quoting Doc. 49-7) (alteration in original).)

The Opendoor Defendants reply that investors were fully aware that Opendoor generated revenue from reselling homes. (Doc. 48 at 25; Doc. 60 at 17 nn.10, 13-14.) Specifically, Opendoor told investors that it "aim[ed] to maximize resale margin." (Doc. 49-1 at 45; *see also* Doc. 49-25 at 54, 62.) Because Opendoor adequately disclosed that it sought to resell homes at a profit, the Court finds that, even taking Plaintiffs' allegations as true, a reasonable investor would not have been misled by the challenged statement.

Plaintiffs next allege that the Opendoor Defendants misled investors by reassuring them that "the allegations raised by the FTC are related to activity that occurred between 2017 and 2019." (Doc. 39 ¶ 196.) In fact, say Plaintiffs, the activity continued throughout the Class Period. But Plaintiffs do not allege that the conduct giving rise to the FTC complaint—allegedly misleading advertising practices—continued. (*See generally* Doc. 39; *see also* Doc. 49-7.) Instead, they allege, based on the detailed statements of confidential witnesses, that Opendoor personnel continued to manually adjust the algorithm's offers and charge sellers for repairs that they did not make. (*Id.* ¶¶ 62-84, 143-49.) But Opendoor repeatedly disclosed that people had a role in pricing and that repair credits were estimates for which Opendoor bore the risk or reward of staying within budget. (*See e.g.,* Doc. 49-2 at 10, 11.) Therefore, the Court finds that a reasonable investor would not have been misled by this challenged statement.

## 2.     Scienter

To state a claim under Section 10(b), Plaintiffs must make a showing of scienter, i.e., an intent to defraud. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) (explaining that scienter refers to the mental state embracing an "intent to deceive, manipulate, or defraud"). "Mere negligence—even head-scratching mistakes—does not

amount to fraud." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1103 (9th Cir. 2021).

Rule 9(b), moreover, requires a plaintiff to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In enacting the PSLRA, Congress extended Rule 9(b)'s particularity requirement to allegations of scienter. Therefore, to adequately plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To support a strong inference of scienter, a complaint must allege that a defendant made false or misleading statements with an "intent to deceive, manipulate, or defraud," or with deliberate recklessness. *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 619 (9th Cir. 2017). "Deliberate recklessness is not *mere* recklessness." *Prodanova*, 993 F.3d at 1106 (internal marks and citation omitted) (emphasis in original). Rather, it is "an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is [] known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (emphasis in original).

These standards "present no small hurdle for the securities fraud plaintiff." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016) (citation omitted); *see also Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) ("The PSLRA's strong inference requirement has teeth. It is an exacting pleading obligation.") (cleaned up). The Court must "engage in a comparative evaluation [and] . . . consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 314 (2007). A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The Opendoor Defendants argue that Plaintiffs have failed to adequately plead scienter. (Doc. 48 at 28-34; Doc. 60 at 18-23.) Plaintiffs disagree. (Doc. 55 at 25-32.) They

respond that the Consolidated Amended Complaint adequately pleads scienter through five different avenues. (*Id.*) But as explained below, the Court finds to the contrary.

### i.   Defendant Wu's Stock Sales

Defendant Wu is a co-founder of Opendoor, the former Chairman of Opendoor's Board of Directors, and Opendoor's former Chief Executive Officer. (Doc. 39 ¶ 39.) Plaintiffs argue that his sale of a portion of his Opendoor stock is "highly indicative of scienter." (Doc. 55 at 26; Doc. 39 ¶¶ 239-47.) Setting aside the question of whether a single defendant's trading can establish a strong inference of scienter for a group of co-defendants, the Court finds that Defendant Wu's sales do not even establish a strong inference of scienter as to him.

"'To evaluate suspiciousness of stock stales, [the Court] consider[s], *inter alia*, three factors: (1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history.'" *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) (quoting *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004)).

First, the amount and percentage of shares sold by Defendant Wu do not indicate scienter. Plaintiffs allege that, between November 16 and 18, 2021, Defendant Wu sold 7% of his Opendoor stock. (Doc. 39 ¶ 239; *see also* Doc. 55 at 29.) They concede that this is a relatively small percentage but argue that "even sales of a relatively small percentage of an insider's holdings can support an inference of scienter if the absolute dollar value of the transactions is high." (Doc. 55 at 29.) For example, Plaintiffs rely upon *In re SeeBeyond Technologies Corp. Securities Litigation*, 266 F. Supp. 2d 1150 (C.D. Cal. 2003) (hereinafter "*In re SeeBeyond*"). But *In re SeeBeyond* is readily distinguishable, as the court's decision relied on the fact that the "defendants . . . admittedly lied to analysts and investors." 266 F. Supp. 2d at 1169. Not so here. Additionally, the Court finds that courts within the Ninth Circuit routinely find that sales of similarly small percentages of defendants' stock holdings do not give rise to a strong inference of scienter. *See e.g., In re Alteryx, Inc. Sec. Litig.*, No. 8:20-cv-01540 DOC (JDEx), 2021 WL 4551201, at *4 (C.D.

Cal. June 17, 2021); *Zamir v. Bridgepoint Educ., Inc.*, No. 15-CV-408 JLS (DHB), 2016 WL 3971400, at *10 (S.D. Cal. July 25, 2016); *In re Juniper Networks, Inc.*, 158 F. App'x 899, 901 (9th Cir. 2005).

Nor does the timing of Defendant Wu's sales indicate scienter. The parties characterize those sales somewhat differently. As told by Plaintiffs, Defendant Wu's sales were suspiciously timed because they were made outside the parameters of his 10b5-1 plan and came just three days after he provided allegedly false reassurances to investors following Zillow's exit from the iBuying marketplace.[5] (Doc. 55 at 26-27.) But according to the Opendoor Defendants, Defendant Wu had no traditional 10b5-1 plan at all. (Doc. 60 at 20-21.) Instead, his sales were pre-determined and exclusively intended to cover tax liability. (*Id.*) Zillow's exit is irrelevant because that was not due to the failure of its algorithm, but its plan to overprice homes in order to gain market share. (*Id.* at 21.) Finally, Defendant Wu's one-year lockup period under SEC Rule 144 had just expired, leaving him free to unload stock; thus, such rapid sales are not unusual.[6] (*Id.*)

Plaintiffs' allegations fail to meet the exacting pleading standards imposed by Rule 9(b) and the PSLRA. A reasonable person would not deem the inference of scienter "cogent and at least as compelling as [the] opposing inference" that Defendant Wu's sales were due to the expiration of his lockup period. *See Tellabs*, 551 U.S. at 314. Moreover, Defendant Wu's Opendoor stock holdings actually increased during the Class Period. (Doc. 48 at 29; Doc. 60 at 19.) Plaintiff discounts this fact as irrelevant because Defendant Wu's stock acquisitions "were part of his compensation and thus do not undercut an inference of scienter." (Doc. 55 at 29.) But this Court has previously found that "net gain[s] of shares during the class period cuts against" a plaintiff's theory that stock sales support an inference of scienter. *City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*, No.

---

[5] A Rule 10b5-1 plan "allows for stock sales over a predetermined period without concern for the market." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1226 n.2 (9th Cir. 2017).

[6] "Rule 144 allows public resale of restricted and control securities if a number of conditions are met." *Rule 144: Selling Restricted and Control Securities*, U.S. Securities and Exchange Commission (last visited Feb. 7, 2024), https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144. The rule imposes a holding period during which an individual cannot sell restricted securities in the marketplace. *Id.*

CV-22-00036-PHX-MTL, 2023 WL 155861, at *8 (D. Ariz. Jan. 10, 2023).

Neither party addresses the third factor—whether Defendant Wu's sales were consistent with his prior trading history. (*See* Doc. 48 at 28-31; Doc. 55 at 26-29; Doc. 60 at 18-21.) The Consolidated Amended Complaint alleges only that the sales "were by far Defendant Wu's largest sales of Opendoor stock historically." (Doc. 39 ¶ 244.) But it does not provide any "meaningful trading history for purposes of comparison to the stock sales within the Class Period." *Zucco*, 552 F.3d at 1005 (cleaned up).

Accordingly, the Court finds that Plaintiffs' allegations concerning Defendant Wu's stock sales fail to support a strong inference of scienter.

## ii.    Core Operations Doctrine

Plaintiffs next attempt to plead scienter through the "core operations" doctrine. (Doc. 39 ¶¶ 248-53.) This theory "relies on the principle that corporate officers have knowledge of the critical core operation of their companies." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014) (internal marks omitted). Core operations may support a strong inference of scienter under three circumstances:

> First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is cogent and compelling, thus strong in light of other explanations . . . . Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . . Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter.

*S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (internal marks omitted). "Proof under this theory is not easy." *Intuitive Surgical, Inc.*, 759 F.3d at 1062. To successfully allege scienter under the core operations doctrine, "[a] plaintiff must produce either specific admissions by one or more corporate executives of detailed

involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.*

Plaintiffs' arguments regarding the core operations doctrine are brief and ambiguous. (*See* Doc. 39 ¶¶ 248-53.) For example, Plaintiffs state that "it is implausible to suggest that Defendants did not know about the human-driven process for pricing." (Doc. 55 at 30 (cleaned up).) But they also state, much more broadly, that "'it would be absurd to suggest that management was without knowledge of' the algorithm's true capabilities." (*Id.* (quoting *Reese v. Malone*, 747 F.3d 557, 577 (9th Cir. 2014).) In either case, the Consolidated Amended Complaint lacks the necessary particularized allegations to plead scienter through the core operations doctrine.

While the Consolidated Amended Complaint adequately alleges that the algorithm was the core of Opendoor's operations, Plaintiffs have not "produce[d] either specific admissions by one or more corporate executives of detailed involvement in the minutia of [Opendoor's pricing] operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Intuitive Surgical, Inc.*, 759 F.3d at 1062. In the Consolidated Amended Complaint, Plaintiffs generally assert that because the algorithm was so crucial to the success of the business, the Opendoor Defendants must have been aware of the algorithm's efficacy. (*See* Doc. 39 ¶¶ 248-53.) In their response brief, Plaintiffs additionally argue that the 2019 FTC investigation into Opendoor must have made the Opendoor Defendants aware of the algorithm's present inability to estimate and forecast home values accurately. (Doc. 55 at 30.)

The Court finds that Plaintiffs' allegations are insufficient to establish a strong inference of scienter through the core operations doctrine. First, their vague allegations based on the algorithm's general importance are insufficient. *See Palm Harbor Special Fire Control & Rescue Dist. Firefighters Pension Plan v. First Solar Inc.*, No. CV-22-00036-PHX-MTL, 2023 WL 4161355, at *5 (D. Ariz. June 23, 2023) ("Although Plaintiffs argue that it 'would be absurd to suggest that Defendants were not aware of the problems with the Series 6 module[,]' the law requires more in the form of specific admissions or

witness accounts."). Similarly, Plaintiffs' reliance on the FTC investigation is misplaced. The FTC investigation had nothing to do with the accuracy of Opendoor's algorithm. (*See generally* Doc. 49-7.) Thus, the core operations doctrine is no help to Plaintiffs.

### iii.    Zillow's Exit from the iBuying Marketplace

Plaintiffs also argue that Zillow's exit from the iBuying marketplace supports an inference of scienter. (Doc. 39 ¶¶ 273-75; Doc. 55 at 30-31.) They say that because Zillow was a major competitor, presumably with expansive resources, but nonetheless exited the iBuying space "because of its failure to accurately price homes" (Doc. 39 ¶ 273), the Opendoor Defendants "knew, or were reckless in not knowing, that their algorithm was not able to accurately price homes in any environment" (*id.* ¶ 274).

The Court is unpersuaded. Plaintiffs merely insinuate that, following Zillow's exit, the Opendoor Defendants either did or should have concluded that if Zillow cannot succeed, they cannot either. But Plaintiffs' allegations fail to specify with the level of particularity demanded by the PSLRA why the Court should assume that Zillow's failure justifies an inference that the Opendoor Defendants were aware of their own algorithm's alleged shortcomings or were reckless in failing to discover those shortcomings. (*See* Doc. 39 ¶¶ 273-75.) Nor do Plaintiffs refer the Court to any case where a similar inference was made. (*See id.*; Doc. 55 at 30-31.)

### iv.    FTC Investigation

Next, Plaintiffs allege that the FTC investigation into Opendoor's operations supports an inference of scienter. (Doc. 39 ¶¶ 264-72; Doc. 55 at 31.) According to Plaintiffs, because the FTC investigated "the very conduct that the [Consolidated Amended] Complaint alleges was withheld from investors" and because "Opendoor had conducted internal analyses showing its employees manually adjusted offers and charged for unnecessary repairs," the Opendoor Defendants must have been aware of the undisclosed practices. (Doc. 55 at 31.) While the FTC investigation dealt with alleged activities before the Class Period, Plaintiffs allege that those activities continued through the Class Period. (*See e.g.,* Doc. 39 ¶¶ 62-84, 143-49.)

As the Court finds in this Order, the Opendoor Defendants' statements concerning the role of people in its pricing scheme and the nature of its repair estimates were not false or misleading. (*Supra* at 7-11.) As to the statements the Court does find misleading—dealing with the algorithm's efficacy—the FTC investigation is irrelevant. It sheds no light on whether Opendoor's algorithm was accurately estimating and forecasting home values at the time the misleading statements were made. (*See generally* Doc. 49-7.) As a result, the FTC investigation is not evidence that the Opendoor Defendants were aware that their statements were false or misleading. Thus, it fails to establish a strong inference of scienter as to those statements.

### v.    The Opendoor Defendants' Statements

Plaintiffs finally argue that the Opendoor Defendants' statements regarding the algorithm's capabilities, references to internal testing of the algorithm, and timing of their statements support an inference of scienter. (Doc. 39 ¶¶ 108, 181, 254-63; Doc. 55 at 31.) But again, the Consolidated Amended Complaint lacks particularized allegations that the Opendoor Defendants possessed contradictory information about the efficacy of the algorithm. (*See generally* Doc. 39 ¶¶ 254-63.) For example, Plaintiffs do not specifically allege that Opendoor's internal testing revealed that the algorithm was not accurately estimating or forecasting home values. (*See generally id.*) Nor do they allege that such troubling test results, if indeed they existed, were conveyed to the Opendoor Defendants. (*See generally id.*) Thus, Plaintiffs cannot establish a strong inference of scienter on this theory either.

Accordingly, the Court finds that Plaintiffs' allegations do not meet the demanding requirements imposed by Rule 9(b) and the PSLRA. They are insufficient to establish a strong inference of scienter. As a result, Plaintiffs' claims against the Opendoor Defendants brought pursuant to Section 10(b) fail.

### 3.    Loss Causation

Even if Plaintiffs had adequately pleaded a strong inference of scienter, their Section 10(b) claims against the Opendoor Defendants would still fail due to their failure to plead

loss causation.

Section 10(b) requires that plaintiffs asserting securities fraud "must plead and ultimately prove that the defendant's wrongful conduct caused the plaintiff's injury." *In re BofI Holding*, 977 F.3d at 789. In enacting the PSLRA, Congress codified the requirement that plaintiffs "shall have the burden of proving that the act or omission of the defendant alleged to violate [the law] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

"Typically, to establish loss causation, a plaintiff must show that the defendants' alleged misstatements artificially inflated the price of stock and that, once the market learned of the deception, the value of the stock declined." *Irving Firemen's Relief & Ret. Fund*, 998 F.3d at 407 (citing *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119-20 (9th Cir. 2013)). This is known as the "fraud-on-the-market" theory. *Nuveen*, 730 F.3d at 1120. To advance this theory, "the plaintiff must show that after purchasing her shares and before selling, the following occurred: (1) the truth became known, and (2) the revelation caused the fraud-induced inflation in the stock's price to be reduced or eliminated." *In re BofI Holding*, 977 F.3d at 789 (internal marks omitted). "The most common way for plaintiffs to prove that 'the truth became known' is to identify one or more corrective disclosures." *Id.* at 790 (citing *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018) (per curiam)). Corrective disclosures occur "when 'information correcting the misstatement or omission that is the basis for the action is disseminated to the market.'" *Id.* (quoting 15 U.S.C. § 78u-4(e)(1)).

While determining what constitutes a corrective disclosure "has proved more challenging than might have been expected, a few basic ground rules can be sketched out." *Id.* at 790. Corrective disclosures do not require "an admission of fraud by the defendant or a formal finding of fraud by a government agency." *Id.* (citing *Metzler*, 540 F.3d at 1064). Rather, a corrective disclosure can "come from any source, including knowledgeable third parties such as whistleblowers, analysts, or investigative reporters."

1   *Id.* (citation omitted). Also, corrective disclosures "need not reveal the full scope of the
2   defendant's fraud in one fell swoop; the true facts concealed by the defendant's
3   misstatements may be revealed over time through a series of partial disclosures." *Id.*
4   (citation omitted). While corrective disclosures "need not precisely mirror the earlier
5   misrepresentation, [they] must at least relate back to the misrepresentation and not to some
6   other negative information about the company." *Grigsby v. BofI Holding, Inc.*, 979 F.3d
7   1198, 1207-08 (9th Cir. 2020) (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210
8   (9th Cir. 2016)).

9        Plaintiffs allege that three corrective disclosures occurred and that significant losses
10   ensued for shareholders. (Doc. 39 ¶¶ 210-236.)

11               **i.**    **Decreasing Contribution Margin**

12        On February 24, 2022, Opendoor announced its fourth quarter and full year 2021
13   financial results. (*Id.* ¶ 220.) Opendoor revealed that its fourth quarter 2021 contribution
14   margin was 4%, representing a significant decrease from its 12.6% contribution margin in
15   the fourth quarter of 2020. (*Id.* ¶ 221.) On February 25, 2022, Opendoor's stock price
16   closed at $8.44, representing a $2.54 loss from the previous trading day. (*Id.* ¶ 222.)
17   Plaintiffs allege that Opendoor's announcement "started to reveal that Defendants had
18   overstated the purported benefits and competitive advantages of the algorithm and that
19   [Opendoor] was equally susceptible to the same market fluctuations as every other iBuying
20   and real estate [c]ompany in the world." (*Id.* ¶ 220.)

21        The Court finds that the February announcement of Opendoor's contribution margin
22   did not constitute a corrective disclosure. First, Plaintiffs do not clearly or specifically
23   allege how this announcement corrected any specific previous misrepresentation or false
24   statement made by the Opendoor Defendants. (*See generally id.* ¶¶ 220-24.) At most, it
25   may have corrected the notion that Opendoor's algorithm was infallible; but even that
26   conclusion assumes that the algorithm was responsible for the decrease in contribution
27   margin. Regardless, as the Court has previously noted, the Opendoor Defendants'
28   statements would not have misled a reasonable investor into believing that its algorithm

could not fail. (*Supra* at 12-13.) Instead, the statements that the Court finds actionably misleading were so because, accepting Plaintiffs' allegations as true, they assured investors that the algorithm was accurately estimating and forecasting home values at the time the statements were made when it was not. (*Supra* at *id.*) The February announcement did nothing to correct those statements or impressions.

### ii.     Bloomberg Article

On September 19, 2022, Bloomberg published an article revealing "that Opendoor lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties)." (Doc. 39 ¶ 226.) Over the next two trading sessions, Opendoor's stock price fell by $0.50, closing at $3.56 on September 20, 2022. (*Id.* ¶ 229.) Again, Plaintiffs allege that the Opendoor Defendants' misrepresentations regarding the efficacy of its algorithm were partially revealed. (*Id.* ¶ 228.) But the Bloomberg article revealed little other than that Opendoor's algorithm may be struggling with the sudden housing slowdown. (*See id.* ¶ 226.) This possibility had been forecasted by Opendoor's February announcement. Further, as Plaintiffs concede, all the data relied upon by Bloomberg was publicly available to investors. (Doc. 55 at 36.) Thus, the Court finds that the Bloomberg article does not constitute a corrective disclosure.

### iii.     Negative Contribution Margin

Finally, on November 3, 2022, Opendoor announced its financial results for the third quarter of 2022. (Doc. 39 ¶ 232.) Opendoor revealed a contribution margin of negative 0.7%. (*Id.*) On November 4, the price of Opendoor stock fell $0.32 and closed at $2.02. (*Id.* ¶ 235.) The next trading day, it fell by an additional $0.29 and closed at $1.74. (*Id.* ¶ 235.) Plaintiffs allege that the November announcement revealed that "Opendoor's pricing algorithm could not adjust to changing housing markets or economic conditions and could not deliver 4% to 6% contribution margins in any market." (*Id.* ¶ 234.)

Though it presents a closer question, the Court likewise finds that the November announcement was not a corrective disclosure. First, Opendoor had revealed months prior that its contribution margin was likely to fall significantly short of 4% for the third quarter.

- 25 -

(Doc. 48 at 36 (citing Doc. 49-19 at 6).) Thus, the November announcement merely confirmed a previous disclosure. *See City of Pontiac Gen. Emps. Ret. Sys. v. First Solar Inc.*, No. CV-22-00036-PHX-MTL, 2023 WL 155861, at *5 (D. Ariz. Jan. 10, 2023). Second, Plaintiffs had already filed their lawsuit by November 2022. (*See* Doc. 1.) If investors were ready to bring a securities fraud action in October 2022, Opendoor cannot have corrected any misimpressions about the algorithm's unfailing capabilities in November 2022.

Thus, for the additional and independent reason that Plaintiffs fail to plead loss causation, the Court finds that Plaintiffs' Section 10(b) claims against the Opendoor Defendants fail.

**B.    Section 11**

Section 11 of the Securities Act regulates the content of registration statements. *See* 15 U.S.C. § 77k(a). It promotes compliance with the Securities Act "by giving purchasers a right of action against an issuer or designated individuals (directors, partners, underwriters, and so forth) for material misstatements or omissions in registration statements." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015). The text of the statute provides in relevant part:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading,      any      person      acquiring      such security . . . may . . . sue.

15 U.S.C. § 77k(a). Section 11 therefore "creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc.*, 575 U.S. at 179.

To prevail on a Section 11 claim, a plaintiff must demonstrate that (1) "the registration statement contained an omission or misrepresentation," and (2) "the omission or misrepresentation was material, that is, it would have misled a reasonable investor about

the nature of his or her investment." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005) (quoting *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403-04 (9th Cir. 1996)). Scienter is not required for liability under Section 11. *Id.* A defendant is "liable for innocent or negligent material misstatements or omissions." *Id.*

### 1.      Applicability of Rule 9(b)'s Heightened Pleading Standard

Importantly, "the heightened pleading requirements of the PSLRA do not apply to Section 11 claims." *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009). Nonetheless, "plaintiffs are required to allege their claims with increased particularity under Rule 9(b) if their complaint sounds in fraud." *Id.* (cleaned up). The Ninth Circuit has advised that where "a complaint employs the exact same factual allegations to allege violations of [S]ection 11 as it used to allege fraudulent conduct under [S]ection 10(b) of the Exchange Act, [the Court] can assume that it sounds in fraud." *Id.* Otherwise, the Court must consider "whether the complaint 'allege[s] a unified course of fraudulent conduct' and rel[ies] entirely on that course of conduct as the basis of a claim." *Id.* (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103-04 (9th Cir. 2003)) (alterations in original). If it does, the claim sounds in fraud. *Id.*

The parties disagree over whether Rule 9(b) applies to Plaintiffs' Section 11 claims. The Opendoor Defendants argue that it does because the claims sound in fraud. They argue that "although Plaintiffs expressly disclaim that their Section 11 claim sounds in fraud, this disclaimer is belied by their repeating of the exact same factual allegations used to support their Section 10(b) claim." (Doc. 48 at 18 (cleaned up).) The Underwriter Defendants join in the Opendoor Defendants' arguments. (Doc. 51 at 8-9; Doc. 62 at 7-9.)

Plaintiffs counter that their Section 11 claims do not sound in fraud because "the [Consolidated Amended] Complaint carefully segregates Plaintiffs' negligence-based Securities Act claims from the fraud-based Exchange Act claims," "the Securities Act claims expressly disclaim any allegations of fraud, fraudulent conduct, improper motive or any intentional or reckless misconduct," and "the Securities Act and Exchange Act claims are distinct claims against different defendants." (Doc. 56 at 13-14 (cleaned up).)

The Court finds that Plaintiffs' Section 11 claims sound in fraud because the exact same factual allegations underlie both Plaintiffs' Sections 10(b) and 11 claims. (*Compare* Doc. 39 ¶¶ 62-84, 118-29, 166-82 *with id.* ¶¶ 401-60.) Specifically, Plaintiffs allege the exact same false or misleading statements. (*Compare id.* ¶¶ 169, 173, 175, 177 *with id.* ¶¶ 402, 405, 407, 410, 412, 414.) Because "the [S]ection 11 claim . . . merely relies on the same alleged misrepresentations . . . that are central to Plaintiff[s]' [S]ection 10(b) fraud claim . . . Plaintiff[s]' [S]ection 11 claim is grounded in fraud and must meet Rule 9(b)'s pleading requirements." *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885-86 (9th Cir. 2012) (hereinafter "*In re Rigel*").

Plaintiffs' disclaimer does not, on its own, evade Rule 9(b). *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 684 (9th Cir. 2005) ("[A] disclaimer alone is insufficient to re-characterize a complaint whose gravamen is plainly fraud . . ."); *See also In re Rigel*, 697 F.3d at 885-86. There is no magic pleading technique that transforms a claim otherwise based in fraud into one that is not. *Knollenberg*, 152 F. App'x at 684; *see also In re Rigel*, 697 F.3d at 885-86. Instead, Plaintiffs' reliance on the same false or misleading statements alleged in its Section 10(b) claim controls the outcome. *In re Rigel*, 697 F.3d at 885-86. Finally, and for the same reasons, the fact that the claims are not brought against the exact same Defendants does not change the outcome. *See id.*; *Rubke*, 551 F.3d at 1161.

Plaintiffs' cited authority does not compel an alternative conclusion. *Knollenberg*, 152 F. App'x 674, *In re Countrywide Financial Corp. Securities Litigation*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008) (hereinafter "*In re Countrywide*"), and *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-02204-PHX-FJM, 2009 WL 275405 (D. Ariz. Feb. 4, 2009), each predate the Ninth Circuit's guidance in *Rubke* and *In re Rigel*. While the court in *Boston Retirement System v. Uber Technologies, Inc.*, No. 19-cv-06361-RS, 2020 WL 4569846 (N.D. Cal. Aug. 7, 2020), held the plaintiffs' disclaimer sufficient to evade Rule 9(b), there is no indication that the plaintiffs there relied on the exact same alleged false or misleading statements in its Sections 10(b) and 11 claims. *See id.* Similarly, in *Flynn v.*

1    *Sientra, Inc.*, No. CV 15-07548 SJO (RAOx), 2016 WL 3360676 (C.D. Cal. June 9, 2016),

2    the court expressly found that the plaintiffs' fraud claims were based on "unique,

3    particularized facts." *Id.* at *17. Not so here. Accordingly, the Court applies Rule 9(b) to

4    Plaintiffs' Section 11 claims.

5                    **2.      Actionable False or Misleading Statements**

6          Defendants argue that Plaintiffs' Section 11 claims fail because Plaintiffs again do

7    not allege that Defendants made any actionable false or misleading statements. (Doc. 48 at

8    21-28; Doc. 51 at 9-17; Doc. 60 at 7 n.3; Doc. 62 at 9-16.) In response, Plaintiffs point to

9    several categories of statements made by Defendants in Opendoor's offering documents

10   alleged to be false or misleading. (Doc. 56 at 15-21.) For the foregoing reasons, the Court

11   finds that one of the challenged statements was misleading.

12                    **i.      Statements Regarding the Pricing Algorithm's Efficacy**

13                             **and Role**

14         Plaintiffs object to two statements made in Opendoor's offering documents: first,

15   that Opendoor's "algorithms use machine learning to drive pricing decisions;" second, that

16   the algorithm "can dynamically adjust to leading market indicators and react to real-time

17   macro- and micro-economic conditions." (Doc. 39 ¶¶ 402, 410; Doc. 56 at 15.) They

18   contend that the statements "were false and misleading because they led investors to

19   believe that advancements in [Opendoor's] algorithm drove [Opendoor's] pricing

20   decisions and allowed Opendoor to 'dynamically adjust' to changing housing markets,

21   when in reality, [Opendoor's] algorithm was already inaccurate and [Opendoor's] pricing

22   decisions were driven by an undisclosed human-driven process." (Doc. 56 at 17.)

23         The Court has already addressed whether these statements were false or misleading

24   in the Section 10(b) context. (*Supra* at 7-14.) For the same reasons, the Court finds that

25   the first statement was not false or misleading, while the second statement was. (*See*

26   *supra* at *id.*)

27                    **ii.     Statements Regarding the Pricing Algorithm's Importance**

28         Plaintiffs next challenge the offering documents' statement that Opendoor's

"proprietary, machine learning-based pricing models are key to [its] ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation." (Doc. 39 ¶¶ 405, 412; Doc. 56 at 19.) According to Plaintiffs, that statement "was false and misleading because it led investors to believe that [Opendoor's] pricing algorithm was key to its profitability, when in reality, the algorithm was inaccurate, and [Opendoor's] profitability was driven by deceptive practices and a hot housing market." (Doc. 56 at 19.)

The Court also considered whether this statement was false or misleading in the Section 10(b) context. (*Supra* at 7-11.) Here, and for the same reasons, it finds that the statement was not false or misleading. (*See supra* at *id.*)

### iii.    Statements Regarding Opendoor's Business Model

Plaintiffs finally challenge the offering documents' statement that Opendoor's "business model is designed to generate margins from [its] service charge to sellers and ancillary products and services associated with a transaction, and not from the spread between acquisition price and resale price." (Doc. 39 ¶¶ 407, 414; Doc. 56 at 20-21.) Plaintiffs allege that the statement was false and misleading because, considered alongside "the other false and misleading statements in the offering documents, it led investors to believe that Opendoor's business model was disrupting the real estate market, when in reality, Opendoor's purportedly tech-based business was nothing more than a traditional real estate company that bought low and sold high." (Doc. 56 at 21 (cleaned up).)

For the reasons articulated in the Court's discussion of the same challenged statement in the Section 10(b) discussion, the Court finds that the statement was not false or misleading. (*Supra* at 14-15.)

### 3.    Negative Causation

Plaintiffs' claims under Section 11 do not require proof of loss causation. *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) ("[Plaintiffs] need only show a material misstatement or omission to establish [a] prima facie case."). Defendants may avoid liability by establishing that the alleged losses "are not attributable to the alleged

1    misrepresentations or omission in the registration statement." *Id.* at 860. This affirmative

2    defense is known as "negative causation." *Id.*

3        A defendant raising the negative causation defense bears the burden of proof, and it

4    is a "heavy burden." *Id.* They "must show that the depreciation in value of a plaintiff's

5    stock resulted from factors other than the alleged material misstatement." *Id.* (internal

6    quotations omitted). Additionally, "[b]ecause an analysis of causation is often

7    fact-intensive, negative causation is generally established by a defendant on a motion for

8    summary judgment or at trial." *In re Countrywide*, 588 F. Supp. 2d at 1171.

9        As analyzed above, the Court finds that none of the purported corrective disclosures

10   cited by Plaintiffs in their briefs withstand scrutiny. Courts within the Ninth Circuit and

11   elsewhere have found negative causation established where the defendants have

12   demonstrated that the plaintiffs failed to allege a corrective disclosure or any other

13   indication of loss causation. *See e.g., Brown v. Ambow Educ. Holding Ltd.*, No. CV

14   12-5062 PSG (AJWx), 2014 WL 523166, at *16 (C.D. Cal. Feb. 6, 2014) (collecting cases).

15   And while, in some instances, it may be appropriate to reserve the issue for a later time,

16   the Court concludes that postponing the issue would serve no legitimate purpose. *See id.* at

17   *14 ("While the loss causation analysis is fact intensive and often more appropriate at the

18   summary judgment phases, courts in the Ninth Circuit routinely apply Rule 12(b)(6) when

19   the face of the complaint demonstrates that the plaintiff cannot establish loss causation.").

20   Here, the Court finds that Defendants have established negative causation because they

21   have demonstrated that Plaintiffs do not allege a corrective disclosure or any other

22   indication of loss causation in their Consolidated Amended Complaint.

23       For these reasons, the Court finds that Plaintiffs' claims against Defendants brought

24   pursuant to Section 11 fail.

25       **C.**    **Sections 15 and 20(a)**

26       A claim under Section 15 of the Securities Act is a derivative claim: it "require[s]

27   [an] underlying primary violation[] of the securities laws." *See In re Rigel*, 697 F.3d at 886;

28

*see also* 15 U.S.C. § 77o.

Similarly, Section 20(a) of the Exchange Act "imposes liability on certain controlling individuals . . . for violations of [S]ection 10(b) and its underlying regulations." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1113 (9th Cir. 2021) (internal marks and citation omitted). To state a claim of control person liability under Section 20(a), a plaintiff must demonstrate "a primary violation of federal securities law" and that "the defendant exercised actual power or control over the primary violator." *Zucco*, 552 F.3d at 990.

Because Plaintiffs fail to plead a primary violation of Sections 10(b) or 11, the Sections 15 and 20(a) control person claims necessarily fail.

## IV.     LEAVE TO AMEND

Plaintiffs "request leave to replead." (Doc. 56 at 23 n.9; *see also* Doc. 55 at 38 n.17.) District courts "shall grant leave to amend freely 'when justice so requires.'" *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (en banc) (quoting Fed. R. Civ. P. 15 (a)). Courts in the Ninth Circuit are to apply this policy "with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). The Court, however, "may in its discretion deny leave to amend due to undue delay, bad faith or dilatory motive . . . , repeated failure to cure deficiencies . . . , undue prejudice to the opposing party by virtue of the allowance of the amendment, [and] futility of amendment." *Zucco*, F.3d at 1007. Absent a "strong showing of any of [these] factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (emphasis in original).

It is not clear to the Court that any further amendment to Plaintiffs' Consolidated Amended Complaint would be futile. *See Eminence Capital*, 316 F.3d at 1052 (reasoning that dismissal with prejudice and "without leave to amend is not appropriate unless it is clear on de novo review that the complaint could not be saved by amendment"). Thus, Plaintiffs will be granted leave to file a Second Consolidated Amended Complaint.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.      CONCLUSION

Accordingly,

**IT IS ORDERED** that the Opendoor Defendants' Motion to Dismiss and Memorandum of Points and Authorities in Support Thereof (Doc. 48) is **granted**.

**IT IS FURTHER ORDERED** that the Underwriter Defendants' Motion to Dismiss the Consolidated Amended Complaint and Memorandum of Points and Authorities in Support Thereof (Doc. 51) is **granted**.

**IT IS FINALLY ORDERED** that Plaintiffs' Consolidated Amended Complaint (Doc. 39) is **dismissed with leave to amend**. Plaintiffs may file a Second Consolidated Amended Complaint no later than 30 days from the date of this Order.

Dated this 27th day of February, 2024.

*Michael T. Liburdi*

Michael T. Liburdi
United States District Judge

- 33 -