UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **Sam Alich, et al.,** | ) |
| | ) No. 2:22-cv-01717-MTL |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) Phoenix, Arizona |
| **Opendoor Technologies,** | ) September 4, 2024 |
| **Incorporated, et al.,** | ) 9:32 a.m. |
| | ) |
| Defendants. | ) |
| _____ | ) |

**BEFORE:   THE HONORABLE MICHAEL T. LIBURDI, JUDGE**

**<u>REPORTER'S TRANSCRIPT OF PROCEEDINGS</u>**

**<u>RULE 16 SCHEDULING CONFERENCE AND MOTION HEARING</u>**

Official Court Reporter:
**Cathy J. Taylor, RMR, CRR, CRC**
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 31
Phoenix, Arizona 85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiff Indiana Public Retirement System; Oakland County Employees Retirement System; Oakland County Voluntary Employees Beneficiary Association; Stuart Graham Hereford:
    CLARK HILL, PLC
    By:  **Mr. Daniel P. Thiel, Esq.**
    14850 North Scottsdale Road, Suite 500
    Scottsdale, Arizona  85254
    - and -
    LABATON KELLER SUCHAROW, LLP
    By:  **Mr. James T. Christie, Esq.**
         **Mr. Michael P. Canty, Esq.**
         **Mr. Nicholas D. Manningham, Esq.**
    140 Broadway
    New York, New York  10005

For the Defendant Opendoor Technologies, Incorporated:
    LEWIS ROCA, LLC
    By:  **Mr. Robert Matthew Kort, Esq.**
         **Mr. John C. Gray, Esq.**
    201 East Washington Street, Suite 1200
    Phoenix, Arizona  85004
    - and -
    A&O SHEARMAN, LLP
    **By:  Mr. Lyle Roberts, Esq.**
         **Mr. Billy Marsh, Esq.**
    401 9th Street NW, Suite 800
    Washington, DC  20004-2128

For the Defendant Underwriters:
    BEYERS FARRELL, PLLC
    **By:  Mr. Michael J. Farrell, Esq.**
    99 East Virginia Avenue, Suite 220
    Phoenix, Arizona  85004-1195

**P R O C E E D I N G S**

(Court was called to order by the courtroom deputy.)

(Proceedings commence at 9:32 a.m.)

THE COURTROOM DEPUTY:  Civil Case 22-1717, Sam Alich, and others, vs. Opendoor Technologies, Incorporated, and others.  This is the time set for a scheduling conference and hearing on pending motion.

Please announce your presence for the record starting with the plaintiff.

MR. THIEL:  Good morning, Your Honor.  Daniel Thiel for Clark Hill on behalf of the lead plaintiffs.  And with me today are Michael Canty, Nicholas Manningham, and James Christie, also on behalf of lead plaintiffs.

MR. CANTY:  Good morning, Your Honor.

MR. MANNINGHAM:  Good morning, Your Honor.

MR. CHRISTIE:  Good morning, Your Honor.

MR. ROBERTS:  Good morning, Your Honor.  Lyle Roberts with A&O Shearman on behalf of the Opendoor defendants.  With me is my colleague, Billy Marsh, and our local counsel, John Gray.

THE COURT:  Okay.  Good morning.

MR. FARRELL:  Good morning, Your Honor.

THE COURT:  Well, I'm embarrassed because somebody prepared a file for me, Wednesday, September 4th, 2024, at 9:30 a.m.  So I brought the wrong file in.  So I need to take a

brief recess, and I will be back.

(Recess from 9:34 a.m. to 9:35 a.m.)

THE COURT:  Well, never in five years has that happened to me.  I guess there's a first time for everything.

Okay.  Well, this is a Rule 16 Scheduling Conference -- you could have a seat.

This is a Rule 16 Scheduling Conference, and I wanted to hear the motion for interlocutory appeal.  I was hoping to just do the Rule 16 part first, unless counsel wishes to have it done another way.  I might be interested in hearing -- oh, go ahead.

MR. CHRISTIE:  Sure.  That's fine with us, Your Honor. We're happy to start with the Rule 16 conference.

THE COURT:  Okay.  What do you think?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Okay.  I understand from the Rule 16 -- or the 26(f) filing that there's quite a bit of disagreement on the dates, which we could discuss.  Happy to discuss that with you all.  And then there are some other little nuances that we should cover.  I'm fairly familiar with the background facts here, having adjudicated the motions to dismiss and the motion for reconsideration.  So I don't really feel like we need to go into that, unless counsel wishes to point anything out.

I did get your notice of supplemental authority on the interlocutory appeal issue, so I'll let you know that.

So anything you wish to cover in terms of the facts of the case?

MR. CHRISTIE:  On the facts of the case, Your Honor, I think that's all been well flushed out in this courtroom and in our briefing, so we don't have anything to add from the facts of the case for the Rule 16(f) conference.

With respect to the dates, I will just be candid. It's been a frustrating experience in my career, and I've done this, you know, 15, 20 times.  I've never not come to the Court with an agreed-upon schedule.

THE COURT:  So it's, like I said, a first time for everything.

MR. CHRISTIE:  Yeah.  So I think we're fairly close, as you could see.

THE COURT:  Okay.

MR. CHRISTIE:  We kind of didn't get a counterproposal until the eve of the report being due.  Given the fact that we're close, we're happy to offer a compromise with the defendants here and meet them in the middle.

THE COURT:  Okay.

MR. CHRISTIE:  The only thing I would say is we think it's crucial that we get a substantial completion date on the calendar.  I'm aware that Your Honor didn't enter one in the *Mesa Air* case, which is another securities case that was in front of Your Honor.  However, in our experience, we think it's

very important for the orderly kind of case moving forward and ensuring that we have the documents that we need to proceed with depositions and ensure that we have all the documents to proceed with our case. And having a -- a -- you know, a line in the sand somewhere in the case for -- you know, prior to the close of fact discovery gives us an opportunity to make sure that everything is in line as of that date.

So that's the only thing we feel strongly that we'd like entered in the schedule. But other than that, Your Honor, we're more than happy to compromise in the middle on the dates with -- with the defendants.

THE COURT: Okay.

MR. ROBERTS: Thanks, Your Honor.

I think, as Your Honor's aware, the discovery burden in securities class actions lies almost entirely with the defendants. The defendants, we're required here to produce a huge volume of documents, lots of witnesses, while the plaintiffs will be producing only a small amount of materials, primarily around the trading of their clients.

And so we haven't exchanged document requests in this case yet, but I can tell you, for example, that the plaintiffs have put in 55 non-defendant Opendoor witnesses into their initial disclosures as potentially having information about this case. In turn, we have cited only the four plaintiffs here that have been brought.

So I think the Court -- the defendant -- the plaintiffs here will be in front of the Court very shortly asking for a huge amount of depositions in this case. They've already indicated that in their case management schedule. So in some ways I think we are in the best position to kind of understand what the schedule is necessary for this case. And the schedule that we've put forward tracks very closely what this Court did in *Mesa Air*, which is an extremely similar case, also involves 33 Act claims, also involves additional underwriter defendants. We tried to follow that virtually exactly, except that we compromised in that we put it 30 days earlier to try to address the plaintiffs' concern that they wanted a quicker schedule.

So I think in light of that, Your Honor, it's our view that really our timeline should be adopted in this case. We've done what the Court indicated in *Mesa Air*. We've been even more accommodating about it, giving -- and, again, 30 days earlier on all of the deadlines. And so while I know it's very tempting to accept the plaintiffs' offer to split everything in the middle, our position would be it really would be more appropriate here to adopt our schedule, which we already think is extremely aggressive in light of the discovery demands that it's pretty clear already the plaintiffs are going to be needing.

THE COURT: Okay. Mr. Roberts, what is -- I

understand you oppose the substantial completion of discovery.

Do you want to give me a little bit more information as to why you would prefer not to have that deadline.

MR. ROBERTS:  Absolutely, Your Honor.

I think there's really three reasons.  One, of course, it's not a deadline that's called for in the case, a management report.  It was not included in *Mesa Air*.  Even though both sides submitted competing deadlines for that, Your Honor decided not to include it.  And we're trying to, of course, follow along with what the Court has done in other similar cases.

And, really, I think what -- here the biggest thing is what I've just indicated, which is it's wildly premature to have such a deadline put in place for this case right now.  We haven't received document requests.  We don't know how many depositions are going to be sought.  It's really difficult here to understand the scope of the case and how much discovery's going to go on.  To then try to put in a substantial completion date here without that information I don't think makes any sense.

THE COURT:  Okay.  Have you all exchanged initial disclosure statements?

MR. ROBERTS:  Yes, Your Honor.

MR. CHRISTIE:  Yes, we have, Your Honor.

THE COURT:  Okay.

UNITED STATES DISTRICT COURT

MR. FARRELL:  Your Honor?

THE COURT:  Oh, yes, sir.  Sorry.

MR. FARRELL:  Mike Farrell of the firm Beyers Farrell. We represent the underwriter defendants.

THE COURT:  Okay.  Thank you, Mr. Farrell.

MR. FARRELL:  I join everything that counsel for the Opendoor defendants just said, just to make that clear for the record.

THE COURT:  Okay.

MR. FARRELL:  Thank you.

THE COURT:  And I don't want to forget you, Mr. Farrell.  If I seem to skip asking you for your opinion, you're free to just jump in.  Okay?

MR. FARRELL:  I'm easily forgettable, Your Honor.

THE COURT:  Well, you're seated all the way over there.

Okay.  You know, I -- as I was preparing for this hearing, I was looking at the competing dates, and I seem to -- to tend to agree with Mr. Roberts and Opendoor, and I'll explain to you why.

You know, every case is different.  So when you say I did something in *Lowthorp* or I did something in *Mesa Air*, it's maybe because the parties agreed to that or maybe there was a special circumstance or something else.  But here I do think that counsel's argument about them having the burden

of producing all of this information is one that I should take seriously compared to the plaintiffs' relative burden and what you're going to have to produce on behalf of your clients.

So my inclination is to side with the defendants. And I would note that the dates aren't really that far off. I think a lot of them -- you know, for example, the amending the pleadings date, it's roughly five weeks difference. The initial expert report looks like it's a month difference. So I feel like it's better to err on the side of providing them with additional time, and that's the reason why I'm going to go with their proposed dates.

But I -- I want to thank you all for working as hard as you did to come up with a compromise. I understand that there are some times where you just can't reach agreements, and there's nothing wrong with that.

Mr. Christie, do you want to tell me a little bit more about why you require the substantial completion.

Just kind of -- why don't you take this as an opportunity to --

MR. CHRISTIE:  Yeah.

THE COURT:  -- to rebut what Mr. Roberts said.

MR. CHRISTIE:  Sure.  Yeah, I mean, Your Honor, as you know, and as Mr. Roberts mentioned, there's a lot of documents that are produced in these cases.  What we found in our experience, sometimes if you don't have a substantial

completion date, many documents will be produced right at the end of fact discovery. And that creates a major problem from, you know, the Court's standpoint. We want this to be as efficient as possible for you as well and the Court and the parties as well. And the idea being, Your Honor, is if we have to come back to you and say, we just got a whole bunch of documents dumped on us, you know, two weeks before the end of fact discovery, we need to re-notice the defendants' depositions, we need to ask for more documents because there appears to be things missing, if you have a line in the sand -- and, Your Honor, given that you've adopted their schedule, we're willing to compromise on that as well. We just think it's extremely helpful and efficient. And it's commonplace in -- in large commercial litigation such as this, because it really sets a line in the sand for defendants to have met their discovery obligations and for us to be able to prosecute our case and not have to come back to the Court and ask for more time or depositions, more documents that we -- that we got at the last minute.

THE COURT: And you've suggested February 10th, but the fact discovery cutoff isn't until June 3rd, so --

MR. CHRISTIE: I believe with the defendants -- with -- if you're adopting the defendants' schedule, I believe it's July --

THE COURT: You're right. You're right. I'm looking

at the plaintiffs' proposed dates.

So what I'm going to adopt is July 14 for fact discovery cutoff. But I'm just looking at the time limits you proposed, and I'm just wondering why would there be a substantial completion of document production three months before the completion of fact discovery?

MR. CHRISTIE: I think, you know, given the number of parties in this case and the number of depositions we expect to take -- and that's one of the main reasons why it's important to have all the documents, so we're able to then take the depositions of the -- the -- the relevant parties of the defendants. It -- we think that that's roughly the amount of time that -- that's needed for substantial completion, to be able to accomplish that -- that task.

THE COURT: And can't you accomplish substantial completion just by way of providing them requests for production of documents as quickly as possible?

MR. CHRISTIE: Yes. And we're ready to serve those as soon as today, Your Honor, so that is something we plan on doing. It's just, in our experience, where there hasn't been substantial completion dates, we don't get documents until the very end of discovery, and that creates logistical problems, and it just creates more motion practice and things with the Court that we think can be avoided with a substantial completion deadline that are frequently entered in cases such

as this.

THE COURT:  And the motion practice you're referring to, that -- would that be motions to compel production?

MR. CHRISTIE:  I think, yeah, it would be motions to compel.  I think it would be motions to recall defendants and recall deponents who -- who we didn't have the benefit of having the documents in hand to confront them with at the time because they weren't produced at that time.  And that's -- that's one of the main logistical error -- you know, issues that can come up.

THE COURT:  Did you define substantial completion in the 26(f) report?  I can't recall.

MR. CHRISTIE:  Quite honestly, Your Honor, we didn't.  It's well known in these kinds of cases.  I'm sure Mr. Roberts has -- has, you know, dealt with substantial completion in the past.  I think it's a certification to the Court that says that the defendants believe that they -- and, you know, we would do it as well, that we've, you know, met our discovery obligations and produced, you know, most of the documents in the case absent some odds and ends.

And that -- and it creates a line in the sand that later on if we get a document dump two days before the end of fact discovery, we can say, it appears that they -- they didn't meet their obligations of substantial, you know, completion and we need more time and we need more -- you know, that kind of

thing, which we'd hope to avoid.

THE COURT: Okay. And how many RFPs do you have prepared now and ready to go?

MR. CHRISTIE: I think it's around 30, Your Honor --

THE COURT: Okay.

MR. CHRISTIE: -- but it -- we tried to cover the gamut.

THE COURT: Okay. All right. Well, since I gave the plaintiff -- or the defendants their dates, I'll give the plaintiff a date for substantial completion of document production.

But I want all of you to know that -- that I'm -- I'm -- you know, I'm not going to define substantial completion in my order, and I think it's going to be I'll call it the way I see it. And I understand the burden's on the defendants on producing documents, but I think -- I think the message that I want to send is, is be diligent in producing the documents responsive to the RFPs. If you have objections that you're entitled to raise, of course, raise the objections, but try to resolve them as quickly as you can. And if you do require that I get involved, let me know right away so that I can adjudicate a discovery dispute. And we'll talk a little bit more about that later.

And I do note in your 26(f) report you've consented to me appointing a magistrate judge to resolve discovery disputes,

so I might -- I might just ask you to reconfirm that. Not now but later, and perhaps I'll just do just that.

Okay. So, Mr. Roberts, do you understand what -- where I'm -- the message I'm trying to send on this item?

MR. ROBERTS: Yes, Your Honor, I understand the message. I would take your point, though, that having a substantial completion date that far in advance of the end date doesn't seem reasonable. So I hope Your Honor would pick a date that's a little closer to the end of fact discovery.

THE COURT: Yeah, I think your point is well taken. Because I'm agreeing to the defendants' dates, what about sometime in April? Like early April --

MR. ROBERTS: Yes, Your Honor.

THE COURT: -- 2025?

Okay. And, Mr. Christie?

MR. CHRISTIE: That's okay with us, Your Honor.

THE COURT: All right. I'm going to pick a date in early April 2025. It'll probably be the second Friday for this deadline.

Is there anything else you wish to talk about concerning the discovery deadlines?

Mr. Christie?

MR. CHRISTIE: No, Your Honor. We had included a trial date. We like the idea of having a trial date out there. We think it keeps the parties honest. I know that's not always

your practice.  If you don't want to go that route --

THE COURT:  I wish --

MR. CHRISTIE:  -- I understand, but we try.

THE COURT:  I wish I could accommodate that, but I just -- you know, I'm scheduling all these criminal trials.  I just got a criminal trial -- criminal case back from the Circuit that I have to fit in now, and so it's -- as much as I love civil cases, I have to give priority to criminal, and who knows --

MR. CHRISTIE:  Understood.

THE COURT:  -- how it goes.

Okay.  But if this case goes to trial, I'll tell you, I'll be very interested in presiding over that trial.
But we'll see how it goes, and maybe you could settle the case.

Oh, let me -- let me ask you this, Mr. Christie:  You had proposed a separate deadline for pretrial motions, including *Daubert*, as February 10th, 2026.  What -- were you thinking -- was that your thinking in connection to the trial date?  For example, a motion in limine?

MR. CHRISTIE:  Yes.  Yeah, I think so --

THE COURT:  Okay.

MR. CHRISTIE:  -- Your Honor.

THE COURT:  All right.  If we get that far, then when I set the final pretrial conference, the order setting the final pretrial conference will cover motions in limine.  So

I'll just reserve that.  But the *Daubert* motions I would expect to get with the dispositive motion deadline.  So you'll file summary judgment motions, but then you'd also have separate *Daubert* filings.  Okay?

MR. CHRISTIE:  That's fine with us.

THE COURT:  All right.  Okay.  Mr. Roberts, anything on -- from you on the dates?

MR. ROBERTS:  Not on the dates, Your Honor.  I did have one other item, but --

THE COURT:  Okay.  Well, I'll hear it now, and then I have some other things to go over.  But interested in what you all have to say, of course.

MR. ROBERTS:  Thank you, Your Honor.

This is a -- what I think should be an easy item, but it somehow turned out to be an intractable one.

Opendoor is an entity formerly known as Social Capital Hedosophia Holdings Corp. II --

THE COURT:  Right.

MR. ROBERTS:  -- or SCH.  It changed its name to Opendoor in its state of incorporation of Delaware in 2020.  SCH is not a separate existing entity.  The plaintiff acknowledges that, says that Opendoor is the entity formerly known as SCH.

We asked in our motion to dismiss for SCH to be dismissed because it doesn't exist as a separate entity from

Opendoor.  Plaintiffs did not respond to that in their opposition.

THE COURT:  Did I just miss that maybe?

MR. ROBERTS:  Perfectly understandable, Your Honor. It wasn't -- it wasn't a footnote.

THE COURT:  Okay.

MR. ROBERTS:  And I know how you feel bout footnotes, so I completely understand.  But I do want to hopefully address it today.

THE COURT:  Is this the case I was upset about footnotes?

MR. ROBERTS:  No, no.  But it --

THE COURT:  You heard?

MR. ROBERTS:  But I heard, and I got the message, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  So I -- so I would say that, you know, we think that at this point SCH should be administratively removed from the case as it -- because we have not answered --

THE COURT:  Okay.

MR. ROBERTS:  -- all there that.  They don't exist and just shouldn't be here any longer.

THE COURT:  Any objection, Mr. Christie?

MR. CHRISTIE:  Yeah, I just -- I don't have any objection.  I just want to mention one thing, which is --

THE COURT:  On this point?

MR. CHRISTIE:  Yes, on this point.

THE COURT:  Okay.

MR. CHRISTIE:  Yes, Your Honor.

The factual situation here is a little confusing because at the time of the -- the de-SPAC merger, which is the offering at issue in the case at the beginning of the class period, they were separate entities.  And some of the documents and, you know, all of the things that are kept at a -- one office may be at Social Capital's offices and not at Opendoor's office.

And I'd also just like to mention, you know, there's things, like insurance and other things, where there may be -- we agree that it's the same entity now, that it merged with the other entity.  However, we'd just like to get defendants' commitment on the record that they will be willing to produce documents and any relevant insurance that might be applicable to the case from that entity that may have existed from that relevant time period.

THE COURT:  All right.  I understand his point.

Mr. Roberts, do you have any -- do you see it differently, or -- so, for example, the way I understand what Mr. Christie just said is -- I mean, there's a lot of different layers to this, but just to pick a simple one, if you're seeking document production from SDH, whether you could treat

SDH as a party or, perhaps, will somebody require that he serve a subpoena, a production subpoena, if I were to dismiss S- -- is it SDH?

MR. ROBERTS:  SCH --

THE COURT:  SCH.

MR. ROBERTS:  -- Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  So, again, these are now the same entity, SCH and Opendoor.  So anything that's served on Opendoor, any documents we have and are in control and possession that -- that are relevant and produceable, we will be producing.  So, again, it's not an issue whether there's some separate entity.  These are the same.  Opendoor, it's the same entity.

THE COURT:  Okay.  Yes, sir?

MR. CHRISTIE:  Your Honor, if I could take a -- if we serve a document request that asks for documents from prior to the merger happening, our -- who would answer for those, whether or not those documents exist and whether or not they're going to be produced?  Who has custody and control over those documents?

That's a question that we haven't gotten a clear answer to and -- and why we think just, you know, administratively getting rid of this entity that, you know, is -- is in a separate location, or was in a separate location

at the time, the relevant time period, kind of creates a bit of a confusing situation.

THE COURT:  Okay.  So I'm willing to let SCH out, but I need to do it in a way that protects plaintiffs' ability to obtain discovery from them as if they were a party.  And then there's also the insurance issue, which may -- I'm just going to guess might have significance if there's a judgment against --

MR. CHRISTIE:  Correct.

THE COURT:  -- the defendant.

So can I just let you all work this out and give me a stipulation by the end of next week, some sort of a stipulated order that I can enter?

Because I'll let you know if you can't reach an agreement, what I would be inclined to do is to -- is to come up with my own language letting SCH out but then holding them to party status in that regard.  And I think you'd rather write that language than me just in case I miss something.

MR. ROBERTS:  No, I -- I understand, Your Honor.  I mean, I guess I can only reiterate -- I don't want to press your patience, but only reiterate it is the same entity.

THE COURT:  I get it.

MR. ROBERTS:  It would be covered.

THE COURT:  Okay.

MR. ROBERTS:  If they give a request to Opendoor, it's

covered.

THE COURT:  I understand.  So, you know, lawyers, we're trained -- we're trained in a certain way to foresee risk and to mitigate against risk.  And I think that's what he's doing.  And I would just say, why don't you just agree to something in writing, get it to me, and if it looks good, I'll enter it.

MR. ROBERTS:  Okay, Your Honor.

THE COURT:  Okay.  Can you do that by next Friday?

MR. ROBERTS:  Yes, Your Honor.

THE COURT:  Okay.  Okay.  Any other housekeeping matters that you want to address before I move on to some other items?

MR. CHRISTIE:  Not from plaintiffs, Your Honor.

MR. ROBERTS:  No, Your Honor.

THE COURT:  Okay.  All right.  Well, you'll get the scheduling order maybe tomorrow as soon as you can -- as soon as I can get it out, but it may not be until tomorrow morning.  So when it comes out -- and, counsel, you can sit down --

MR. ROBERTS:  Okay.

THE COURT:  -- unless you like standing.  This isn't the Catholic mass.

So you'll get the order.  Please read it.  Please make sure people who are working on your case with you read it.  There's a few items that I want to go over with you that you

can expect to be written in there.

Oh, Mr. Farrell, I forgot you.  I'm sorry.

MR. FARRELL:  Your Honor, I have nothing to add.
Thank you.

THE COURT:  Okay.  Good.

So I want to go over a few items with you.  So the
first has to do with the -- the deadlines.  I do think that
these are generous deadlines that satisfy the needs of the
defendants, but that doesn't mean that you should not act
diligently.  And I asked plaintiffs' counsel if there's
documents ready to go -- or, pardon me -- discovery ready to
go.  There is.  I would expect you to get on that right away.
And the same with defendants' counsel.  If you have written
discovery that you wish to serve upon plaintiffs, I recommend
that you get at it right away.

This case has been around for about two years, I
think, because of the heavy motion practice at the front end.
This almost certainly means I'm going to have to report this to
Congress next year, or whenever that's -- whenever that
deadline comes up, which isn't something that I'm happy about
doing, but, you know, the needs of the case require it.  So
those of you who have clerked in the federal system will know
what I'm talking about.

And the reason why I say that is because I want to
make it clear to you that if you come to me to readjust these

deadlines, I'm going to hold you all to a very high bar. And let me give you a little about what to expect.

The first is always keep in mind it's a good-cause standard under Rule 16.  And how I interpret good cause is have the parties and the lawyers been acting diligently.  If something happens with a witness, they have COVID for a few weeks or they -- they've had a medical emergency, I understand that sometimes this may happen where you're trying to schedule a witness for a deposition, and you just can't get it done within -- whether it's the fact discovery cutoff or the expert discovery cutoff.

So sometimes you may need to ask me to adjust those dates.  And when you do, the way to do it is to file a joint motion for me to adjust the dates, and you need to tell me with precision what you've done in the case, what you have left to do, and why you couldn't get it done.  So it needs to be more than just telling me, we've been working diligently on discovery and taking depositions and this came up.  I need to know how many depositions you've taken, how many you have left to take, why you couldn't get those depositions done within the deadline.  If it's document discovery related, I need to know how many -- you know, generally how many written discovery requests have been satisfied and why these lingering requests couldn't get resolved.

And then after I read your motion, I'm going to go in

the docket, and I'm going to look at if you've been filing notices of discovery activity.  So, you know, I only know what we do here in the District of Arizona.  I don't know what they do in other federal judicial districts, but in our local rules, we require parties to file notices whenever a disclosure statement is exchanged, a deposition is noticed, requests for production and response are served.  And that's so that I can keep -- you know, I'm sorry to say, but keep track of what you all are doing, but in a good way.  I want to make sure that you're all diligently prosecuting the case and defending the case.

So if I go onto the docket and I don't see any of these notices filed, I'm going to simply assume that you haven't been doing that work.  I admit to you that that might be an unfair assumption.  You all might be burning the midnight oil on this case, but if you're not filing these notices, I have no way of knowing that.  And if you're not filing the notices, the likelihood of you getting a deadline extension is going to plummet like a stock of some sort.  I don't want to use any -- any examples.  But like a dot com stock, how about that, from the early 2000s.  So just keep that in mind, please. And I want you all to leave this hearing today understanding what I expect of all of you as you go forward with discovery.

The next thing I wanted to go over with you is the protocol for resolving discovery disputes.  I expect you all to

be professional with one another.  And I have no reason to doubt based on your all performance over the last time period. I think it's been almost two years.  But I think you're all very good and very professional attorneys, and I would expect you would resolve discovery disputes as best you can.  But my understanding is sometimes you just can't give any more, and you have to bring the dispute to the judge.

The way I approach discovery disputes is designed so that I can resolve them as quickly and in -- and as efficiently as I can.  So I ask for nothing more than a three-page notice -- or, excuse me, I misspoke -- three-page joint motion to resolve the discovery dispute.  The three pages -- it's a little more than three pages because I don't count the caption as a -- as a page.  I don't count the signatures towards the page.  It's three pages of argument that you share, each side, and just tell me what's going on.

And then you should attach the disputed discovery items.  That doesn't count toward the page limit.  And then you should also attach any email or letters that you might have exchanged with one another that could give me a better understanding of the nature of the dispute.

If I could resolve the dispute based on what you filed, I will, and I'll do it quickly.  But sometimes I might require supplemental briefs, so I'll ask you to provide them. And if I need a hearing, I'll set a hearing.  I know a lot of

you are from outside of Arizona.  So on a discovery dispute hearing, I'm generally open to having telephonic appearances. You're welcome to come if you want, but you're also welcome to use a dial-in number that I'd provide to you.

Why don't I revisit now the magistrate judge.  Tell me a little bit more of your thinking on that for discovery disputes, Mr. Christie.

Do you wish to go first?

MR. CHRISTIE:  Yes.  Sure, Your Honor.

It's just practice oftentimes in complex cases where we might expect motion practice that the magistrate would handle discovery disputes, but we're more than happy with Your Honor to handle them as well.  It sounds like you don't mind doing so.  So if it's something you'd like to keep in your province, we're okay with that as well.  We just like to defer to the judge and have no problem with you referring them to magistrate judges if that's better for your efficiency and time.

THE COURT:  Okay.  Mr. Roberts?

MR. ROBERTS:  I agree with everything Mr. Christie said on that subject, Your Honor.

THE COURT:  Okay.  Mr. Farrell, anything to add?

MR. FARRELL:  We agree.

THE COURT:  Okay.  I mean, it sounds like this might be a discovery heavy case since you have 30 RFPs already

prepared.

What are you looking at in terms of other written discovery, like interrogatory exchanges?

MR. CHRISTIE:  Yeah.  I mean, I suspect we will have some down the road once we have time to kind of see some of the documents and things like that.  But I -- you know, I don't expect them to be overly heavy or burdensome.  You know, sometimes that comes later in the discovery process, you know, like contentious interrogatories and things like that.  But I don't expect that to happen, you know, right away.  But we will get some out the door soon, but not a -- not a large number, I would think, Your Honor.

THE COURT:  What are you thinking in terms of 30(b)(6) depositions?

MR. CHRISTIE:  Again, that's something that depends on the case.  I think depending -- we probably -- sometimes take one early in order to kind of get a better had understanding of some of the basics of the company.  I suspect we will ask for a 30(b)(6) sometime along the road to kind of have that checked off.  Usually that's earlier than we're out of the fact depositions.

THE COURT:  And, Mr. Roberts, what are you thinking about the volume of discovery that you're planning to serve on plaintiffs?

MR. ROBERTS:  Well, Your Honor, I think, as I

indicated in my initial remarks, typically in most of the discovery in a case like this as to the plaintiffs revolves around their trading in Opendoor stock, how they made those decisions when the trading was done.  So that's where I would expect the focus of our discovery to be.

THE COURT:  Okay.  Well, here's what I think I would do, is simply hold off on appointing a magistrate judge for a settlement conference.  That doesn't mean I'm opposed to it.  So if I get -- if you give me a discovery dispute that I think I'd rather push to a magistrate judge, I might just do that.  So hold that in reserve.

Any questions about discovery disputes?

MR. CHRISTIE:  Nope.

MR. ROBERTS:  No, Your Honor.

THE COURT:  Okay.  The next item I want to talk about is summary judgment motions.  And I fully expect that a case like this would involve summary judgment briefing, at least from the defense side, and probably from the plaintiffs' side.  So -- oh, and you've also given yourself a little extra time on the briefing schedule, which I think is appropriate given the needs of the case.

I'll set a hearing to hear the summary judgment motions, and that will be an in-person hearing.  So I'll look forward to seeing you all back here.  And if I set that hearing at a time that doesn't work for somebody, like you have a

preplanned vacation or -- or whatever -- now, I'm not inviting you to just gratuitously change it. But I'm saying is if you need to change the hearing when I set it, the best thing for me to do is for you all to propose, like, multiple dates that are alternatives. And it doesn't necessarily need to be after that date. It could be maybe the week before, but please try your best to come up with some alternatives for me in resetting a hearing date.

Because, you know, sometimes somebody will say it doesn't work, and then I'll reset it, and then I'll just get another motion, oh, well, this doesn't work for me now because, and it just kind of gets a little silly. So please give me some alternates if the date doesn't work.

Now, in terms of the briefing, you've all gone through the practice with the dispositive motion -- well, the 12(b) motions. I like to get courtesy copies of -- of summary judgment motions and the record exhibits. That doesn't mean you have to have them hand-delivered. I think that's an unnecessary expense. So you could just have them sent in whatever way is most cost effective for you all. If there's a color exhibit in what you file on ECF, please give me a color exhibit in the courtesy copy as well.

You don't have to do a separate statement of facts. That could just be part of your background facts section. Just cite to the record the same way you would and attach all the

record exhibits to the motion as exhibits.  And you could -- you know, whoever in your office does the ECF filing knows how to do it so much better than me.  But you -- but it all tends to work out just fine.

Any questions about summary judgment?

MR. CHRISTIE:  No, Your Honor.

MR. ROBERTS:  No, Your Honor.

MR. FARRELL:  None, Your Honor.

THE COURT:  So if I don't resolve the case on summary judgment briefs and we have a trial, what I'll do after that is set a separate trial setting conference.  And I like to have lawyers in person for that if at all possible as well.  And you'll need to be here prepared to tell me about how long you think the case will require considering jury selection, opening statements, closing arguments.  I need to know, like, not just your side, but the whole -- the whole expectation.  And then I'll try to set the trial as soon as I can.

Oh, I want to say, make sure you come prepared with your expert witnesses' availability and your client reps' availability.  You may want to look maybe six to eight months down the road so I could get you in.

I feel like I talked a lot, but I hope -- I hope I covered everything that would be helpful to you all.

Before we move on to the motion, is there anything about expectations with discovery, the pretrial schedule,

summary judgment that I can -- I can clarify for you?

MR. CHRISTIE:  No, Your Honor, not from plaintiffs. We appreciate the thorough explanation from Your Honor on it.

THE COURT:  Okay.  Thank you.

Mr. Roberts?

MR. ROBERTS:  No, Your Honor.  Again, thank you.

MR. FARRELL:  Likewise, Your Honor.  Thank you.

THE COURT:  Oh, let me say one thing.  I almost forgot to say this about the schedule.

So I have a deadline that other judges don't.  I kind of came up with this.  And maybe one day over drinks you could all tell me whether this is useful or not.  But in addition to the good-faith settlement talks deadline, I have this joint mediation plan.  And that's my suggestion to the parties, and including their lawyers, to start thinking about third-party neutral based settlement early.  We have wonderful magistrate judges here.  They're very good at what they do.  They don't cost your clients any money on an hourly basis or a retainer basis.  So if you know you want to use a magistrate judge to help you settle the case, it's good for me to know earlier, and I could assign one.

Now, a case like this might be better suited for a private mediator.  And this isn't saying anything about magistrate judges, but sometimes it's nice to have a private mediator where you go to an all-day mediation, it doesn't work

out, but the mediator stays involved and has side conversations, and maybe you could get a second mediation day. Many times a case will settle just with the mediator working the phones after having an in-person mediation. And maybe this case is better suited for that, but I'll leave that up to all of you and your clients.

So I think it would be helpful to have the joint mediation plan a few months before the deadline for the joint settlement talks. And this isn't a -- an exhaustive exercise. Really what this is is just requiring the lawyers to confer with each other and make a tentative decision based on whether you want to use a magistrate judge or hire a private mediator.

So I think I might advance that date to January of 2025, unless any of you have any concern about me doing so.

Go ahead.

MR. CHRISTIE: No concern from us, Your Honor. I think that's a great idea.

THE COURT: Okay.

MR. ROBERTS: Fine with us, Your Honor. Thank you.

MR. FARRELL: Agree.

THE COURT: Okay. Thank you.

Okay. Shall we move on to the motion?

MR. ROBERTS: Yes.

THE COURT: Mr. Roberts.

MR. ROBERTS: May I approach the podium, Your Honor?

THE COURT:  You may.

MR. ROBERTS:  Your Honor, I'll just dive in, as we're well into this hearing, to say I think the key to this motion is that all we are requesting of the Court to decide is that the requirements of 28 U.S.C. 1292 have been met here.  And there are three requirements under the statute.  The first is that the order involved a controlling issue of law; second, that there's substantial ground for difference of opinion about the legal decision; and, finally, that an immediate appeal may materially advance the ultimate termination of litigation.

We think that all three requirements here are quite easily satisfied, but, as the Court likely saw, the plaintiffs have taken opposition mostly as to the second requirement.  I'm happy to address anything the Court would like to hear about ultimate termination or controlling question of law, but I think I could probably do that in 30 seconds, which is to say it's black letter law that initial law is considered controlling if reversal would terminate the action.

If the Ninth Circuit were to hold here that negative causation could be shown by plaintiffs' failure to adequately plead loss occasion, that holding would be dispositive of plaintiffs' remaining claims.

THE COURT:  Remind me, is there any Circuit that's gone the way that you've advocated for?

MR. ROBERTS:  Well, I think, Your Honor, we have cited

the *Amorosa* case from the Second Circuit, which is -- which has certainly suggested in its opinion that loss causation and negative causation are essentially mirror images of each other, and that's how you assess negative causation for a Section 11 claim.  So I think that's the closest Circuit Court decision that we would point to.

THE COURT:  But so the nature of my question is just to confirm my understanding you're seeking to make new law here; is that right?

MR. ROBERTS:  Well, if you're -- if you're asking --

THE COURT:  At the pleading stage.

MR. ROBERTS:  I don't think so in the sense, Your Honor, we've cited a number of district court cases, including cases in this circuit, *Shoretel* case, *ContextLogic*, the *Brown* case, all of which have found that a failure to adequately plead loss causation is sufficient to meet the defendants' burden of proof as a negative causation at the pleading stage.

THE COURT:  But there hasn't been a Circuit decision, at least a published one, that you're aware of?

MR. ROBERTS:  I would say there's not been a Circuit decision that's directly on point, Your Honor.  But, again, I think the *Amorosa* decision in the Second Circuit certainly suggests that the Second Circuit views, again, loss causation and negative causation as mirror images of each other, and they're assessed the same way --

THE COURT: Okay.

MR. ROBERTS: -- at the pleading stage.

THE COURT: Okay. Thank you.

MR. ROBERTS: And I would note on the issue of materially advancing the termination of litigation, the requirement here is satisfied if the order -- if a reversal of the order may result in a dismissal of a subset of claims or defendants.

Here, of course, Your Honor, it would result in the dismissal of all of the remaining claims which have been brought against 27 separate defendants in a case which, as we've just spent a long time discussing, will be very extensive, lengthy, and disruptive.

So I guess I want to turn Your Honor to the requirement about a substantial ground for difference of opinion that goes a little bit to your -- to your question.

The issue for 1292(b) Circuit -- purposes is whether the existing case law is uncertain or unclear. It's not that there has to be, of course, a clear Circuit split to do that. It's certainly sufficient that there be a split amongst the district courts within a circuit, and that's certainly the case here in the Ninth Circuit.

And, really, its hard to see how there isn't some uncertainty here. The procedural status of this case is actually quite similar to the *Mehedi* decision that we submitted

as supplemental authority.  There the Court also granted a motion for reconsideration as to loss causation legal issue and then certified the issue for interlocutory appeal.  And on the legal substance, the Ninth Circuit has repeatedly found that affirmative defenses can be established on the face of the complaint.  But when it comes to affirmative -- the affirmative defense of negative causation, there are two things that the Ninth Circuit has not done:

First, the Ninth Circuit has not found that there's any distinction between the standard for loss causation and negative causation.  Plaintiffs have claimed that the touches upon language that was used in *Hildes v. Arthur Andersen* created, and I'm quoting now, a separate and lower standard than established in loss causation, unquote.

But the touches upon language that's in *Hildes* comes from a negative causation standard announced an earlier case, *Worlds of Wonder* from the Ninth Circuit.  In *Worlds of Wonder*, the Ninth Circuit treated a plaintiffs' loss causation burden and the defendants' negative causation defense as identical to one another.

THE COURT:  Can -- can -- I'm just thinking of my court reporter.  If you could speak a little more slowly.

MR. ROBERTS:  Oh, sure, Your Honor.

THE COURT:  Please, Mr. Roberts.

MR. ROBERTS:  Indeed, the Ninth Circuit went so far as

to refer to negative causation as the, quote, loss causation defense in the *Worlds of Wonder* decision.  And it cited several Exchange Act cases on loss causation in its analysis.  And the specific touches upon language used by *Worlds of Wonder* and *Hildes* came from an even earlier case that Ninth Circuit expressly identified as the Section 10(b) Exchange Act claim case related to loss causation.  Based on this line of cases from the Ninth Circuit, other district courts -- excuse me -- Your Honor, other district courts within the circuit have concluded that these two things are mirror images of each other.

And I would quote the Metro Securities litigation from the Eastern District of Washington where the Court said, "The 10(b) plaintiffs' burden of proving loss causation is the mirror image of the Section 11 defendants' burden of proving negative causation."

The second thing, I think crucially, the Ninth Circuit has not found in this area is that a failure of a plaintiff to adequately plead loss causation is insufficient to establish negative causation.  In the absence of the Ninth Circuit having made a decision like that, and keeping in mind that *Worlds of Wonder* suggested the standards are mirror images of each other, other Courts in this circuit have held that the failure to adequately plead loss causation satisfies the defendants' burden of proof as a negative causation.

Again, cite the same cases over to you again; *Brown*, *Shoretel*, *ContextLogic*.  There's a number of them, Your Honor.  And those holdings are consistent with other Courts, including the recent *Miniso* decision from the Southern District of New York that we cited in our papers.

And however plaintiffs seek to characterize the facts of those cases, there's no way to satisfy the legal standard they apply by those Courts and the legal standard adopted here.  That's fine, of course.  The -- this Court clearly disagreed with those decisions.  In fact, Your Honor cited the *Brown decision* originally.  Did not cite it in your reconsideration decision.  Completely understandable.  Of course, this Court is free to disagree with the other Courts.  But to satisfy the substantial ground for difference of opinion requirement and certify your order, it's just sufficient that reasonable jurists have come to different conclusions, and they have.

If defendants are wrong, and if the Ninth Circuit in *Hildes* and *Worlds of Wonder* did create some separate and lower standard for negative causation, as plaintiffs have argued here, then the Ninth Circuit will decline to accept the interlocutory appeal, and the case will move on.  Really, all we're requesting here, Your Honor, is the opportunity to explore an unclear legal issue with the Ninth Circuit, and I would add an issue that's quite important for these cases.  This is an issue that will rise again and again in securities

cases.  And a Ninth Circuit ruling, especially one that expressly reconciles its decision with a decisions like the *Amorosa* decision from the Second Circuit, will be a benefit to all of the district courts in this circuit that are facing these types of cases.

THE COURT:  And I believe you said in your motion -- did you acknowledge in your motion that discovery would continue while this interlocutory appeal is pending even if the Circuit accepts it?

Am I remembering that right?

MR. ROBERTS:  There's no automatic stay of this case under those circumstances, Your Honor.  Courts in this circuit have dealt with that differently.  Some Courts have -- when granting the interlocutory appeal request have stayed the case immediately at that point.  Other Courts, like the Court in *Slack Technologies*, have waited for the Ninth Circuit to make a decision as to whether it would accept the appeal, and only if the appeal was accepted had they then gone ahead and stayed the cases.

THE COURT:  I see.  Your proposed order doesn't address staying the case, so that's why I asked that.  And I would -- if I grant this, I don't feel like I would want to stay the case for the reasons I mentioned earlier in this hearing, that that -- you know, we're about two years into the case already, and we're just kicking off discovery.

MR. ROBERTS: Your Honor, again, that is a -- a decision that's entirely within the Court's discretion. And, of course, we would follow the Court's ruling on that.

THE COURT: Okay. And I think the Circuit is -- it's been a while since I checked, but I think it's about 12 to 13 months on average from date of case initiation to adjudicating the case to mandate.

Do you have more updated data than I have?

MR. ROBERTS: Your Honor, I think that's right. I would add maybe a little extra data to that --

THE COURT: Please.

MR. ROBERTS: -- which is to say that the Ninth Circuit does generally, however, rule fairly quickly as to whether it will take the appeal. So typically, from what we've looked at, that happens in kind of a two-month time frame after the request is -- is -- if Your Honor were to authorize the appeal --

THE COURT: Right.

MR. ROBERTS: -- and we were put into the request. So we would, in any event, know fairly quickly whether this was going to transpire.

THE COURT: Does a motions panel handle that? Do you know?

MR. ROBERTS: I believe so, Your Honor, but I don't know.

THE COURT:  Okay.  Another question that I have for you is, I've seen some authority in my own research preparing for this hearing that the Circuit doesn't necessarily accept issues but, rather, order -- like the order.  The Circuit -- I would ask the Circuit to take up perhaps my order on reconsideration and perhaps direct them to the issue.

And do you have a different opinion on that?

I'm legitimately asking you this question.  I'm not trying to trap you.

MR. ROBERTS:  Not at all, Your Honor.

THE COURT:  Okay.

MR. ROBERTS:  It's a fair procedural point.

I would say, yes, that's correct.  This Court would have to inform the Ninth Circuit why it did agree to allow this -- for this interlocutory appeal to happen and that the -- why it believed the requirements of 1292(b) were satisfied.

THE COURT:  And I would point to the order on reconsideration and say this is the specific issue that I -- that I'm asking you to resolve?

MR. ROBERTS:  Correct, Your Honor.

THE COURT:  Okay.  Anything else?

MR. ROBERTS:  I think that's it for me, unless you have any additional questions, Your Honor.

THE COURT:  I don't.  You'll get a time for rebuttal.

MR. ROBERTS:  Thank you.

THE COURT:  Who's handling this for the plaintiffs' company?

MR. CANTY:  Your Honor, Michael Canty from Labaton Keller Sucharow.

With the Court's permission, our associate, Nicholas Manningham, will be handling the argument.

THE COURT:  Of course, Mr. Mangum.  Is it Mangum?

MR. MANNINGHAM:  Manningham.

THE COURT:  Manningham.  Come on up and help me remember this.

MR. MANNINGHAM:  Good morning, Your Honor.

THE COURT:  Okay.  Your name again?

MR. MANNINGHAM:  Nick Manningham.

THE COURT:  Manningham.  Okay.

MR. MANNINGHAM:  Yes.

THE COURT:  All right.  Go ahead, sir.

MR. MANNINGHAM:  Sure.

The Court should deny defendants' motion. Interlocutory appear -- appeals are rare.  They're granted only in exceptional circumstances where the law is unclear and the Court needs clarification on a particular issue.  But we don't have that here.  Here the question that defendants are asking you to certify is what's the proper standard for proving negative causation at the motion to dismiss stage.  But the law on the -- the law on the issue of negative causation Section 11

cases is clearly established, and importantly, it's not in dispute. Let me walk you through why that is. So to state a claim under Section 11, a plaintiff has to only allege a material misrepresentation in a registration statement; right? That's it.

At that point damages are presumed, and the defendants have the burden of disproving causation; right? The text of the statute, Section 11(e), provides the defendants an affirmative defense if they can prove the losses were caused by something else. And how do they do this; right? They must point to other factors, evidence showing what caused the stock price to decline.

They have not done that here. They haven't pointed to a single other reason of why the Opendoor stock price declined. For example, they haven't alleged that there was an earthquake that destroyed 50 percent of Opendoor's homes, that caused the company significant losses and caused the share price to decline. They haven't offered any alternative explanation, Your Honor.

THE COURT: And how would they offer that alternative? Would it be the motion to dismiss?

MR. MANNINGHAM: Well, it's a highly factual determination, Your Honor, and that's why most Courts, including Your Honor, found that this is better reserved for summary judgment and trial, because it is such a highly factual

determination; right?  It involves evidence and presenting expert reports, explaining why the stock price declined on particular days; right?  That's why it's better reserved for later stages of the case.  And it's not typically resolved on a motion to dismiss --

THE COURT:  Okay.

MR. MANNINGHAM:  -- except for very unique situations, which I will get into shortly.

But defendants argue now that there's a lack of clarity on the proper standard of negative causation at the motion to dismiss stage, but that's just not the case.  The text of the statute is clear about their burden, and there are three uncontested Ninth Circuit opinions on the issue, and, Your Honor's order granting the motion for reconsider -- consideration applied that statutory and Ninth Circuit case law appropriately here; right?

Defendants have not pointed to a single case, Your Honor, that has disputed the validity of any of those Ninth Circuit cases.  And the one Circuit case that they are relying on now that says that -- it suggests that loss causation and negative causation, saying the *Amorosa* case from the Second Circuit, that's one of those unique factual situations where the plaintiff sold its stock before any alleged corrective disclosure.  The plaintiff did not have standing.  That case we dealt with already on the motion for reconsideration.  Those

facts are not present here.  That case does not support what they are trying to argue here, Your Honor.

They're simply unhappy with how the Court applied the statutory and Ninth Circuit law in the issue of negative causation, but that's not an appropriate reason for an interlocutory appeal.

Now, as Your Honor knows, there are three requirements that they have to meet in order to be entitled to an interlocutory appeal.  They haven't met any of the three requirements.

The first one is that there's a pure question of law; right?  The -- but the law on -- here it's not a pure question of law, because the law on the issue of negative causation is clear and uncontested, and you properly applied that law; right?  Defendants are simply unhappy with how you applied the law to the facts of the case, but defendants cannot get around this first requirement by broadly asserting that negative causation is a controlling issue here.

And, Your Honor, for this requirement, we don't have to go any further than your decision from *Krause v. Yavapai County*.  And the citation for that is 2020 Westlaw 2512761. There you noted that this requirement, the first requirement, should be interpreted narrowly and in such a way to implement a policy of applying Section 1292(b) sparingly and only in exceptional circumstances.

You found there that the defendant could not create a controlling issue of law by broadly asserting in that case that the statute of limitations was a controlling issue. Because in those types of situations, a party could create a controlling issue of law whenever a motion is denied by broadly asserting that the law -- or the issue that they disagreed with and how the Court applied the binding law on that issue, that -- and creating what defendants are trying to do is creating another requirement for the plaintiffs that's not supported by any case law. They cannot get around this requirement by creating a standard that maybe the Ninth Circuit would -- would agree with them on. Which we would submit that they wouldn't, because the Ninth Circuit has never held that the loss causation and negative causation are the same thing. And I want to get into that shortly.

And that leads me to the second requirement, which is that there is substantial grounds for difference of opinion. Defendants have not met -- met this prong. This prong is met if the law's unclear and not fully established. And Courts have issued conflicting opinions. So give you two examples:

If there's a Circuit split and the Ninth Circuit has not addressed the issue, that might be grounds for a difference of opinion. Or if the Ninth Circuit has issued conflicting opinions and Courts do not know which line of Ninth Circuit cases to follow, that would be grounds for -- that could be

grounds for interlocutory appeal.  But none of those situations are present here.  There's clear statutory Ninth Circuit law on the issues that are not in dispute.

So, first, the statutory law, Your Honor, as we've already discussed, it's clear -- the statute is clear they have the burden of proving something else caused the loss.  They haven't done that here.  Then point to any other factors.  And because they haven't done that, it's really unnecessary to go any further.

Defendants will have their chance as we get into discovery to present evidence and expert reports showing why they might be entitled to limit their damages under the text of the statute; right?  But right now they have not met their burden at the pleading stage.

The existing case law on the issue is also -- at the motion to dismiss stage, Your Honor, is also clear and established; right?  The -- there are three Ninth Circuit cases.  The most recent one is *Hildes vs. Arthur Andersen*.  The citation for that is 734 F.3d 854, Ninth Circuit, 2013.  Before that it was *Garbini vs. Protection One*.  The case citation for that is 49 F. App'x 169.  It's Ninth Circuit, 2002.  And the Section 11(e) defense was first recognized by the Ninth Circuit in *In Re Worlds of Wonder Securities Litigation*.  It's 35 F.3d 1407, Ninth Circuit, 1994.

In all of these cases, the Ninth Circuit explained

that defendants have a heavy burden of proving the affirmative defense under Section 11(e) of the Securities Act.  Indeed, in *Garbini*, the Ninth Circuit explained that negative causation is quote, a fact-intensive inquiry, unquote, and that such questions are normally aided by the testimony of expert witnesses are best left to trial or summary judgment and not on a motion to dismiss.

And, Your Honor, the pin cite for that is at 170 to 171.

And in all three of these cases, the Ninth Circuit found that even if the defendants point to other factors that could have caused the stock price to decline, a plaintiff can overcome a negative causation offense by alleging merely that the misrepresentation touches upon the reasons for the alleged losses.

Here the Court applied both the statute and this Ninth Circuit precedent on the issue of negative causation. Defendants did not like the outcome, but that's not enough to justify an interlocutory appeal.  Defendants have not pointed -- again, they haven't pointed to a single case disputing any of these Ninth Circuit decisions.

Instead, what they try to do is create a difference of opinion by pointing to a few district court cases that have found negative causation from the face of the complaint.  But there's nothing extraordinary about the fact that courts apply

the same law to different facts and reach different conclusions. Indeed, in the Ninth Circuit in Couch vs. Telescope, citation is 611 F.3d 629, Ninth Circuit, 2010, there the Ninth Circuit explained that, quote, "That settled law might be applied differently does not establish a substantial grounds for a difference of opinion," unquote.

That is what we have here, Your Honor. The fact that settled law has been applied differently, that does not create a difference of opinion.

Your Honor, we're past the motion for reconsideration. Defendants continued reliance on the same nonbinding fact-specific outliers does not change the fact that the Court properly applied Ninth Circuit and statutory law on the issue. The Court should, therefore, deny their motion.

And the last requirement, Your Honor, if I may just briefly, is that the appeal may materially advance the proceedings. Given the law's clear on this issue, an immediate appeal would lengthen, not shorten the litigation; right? Defendants are going to be given the opportunity to address this at a later stage as we're getting into discovery now; so, therefore, appealing this issue, especially when the Ninth Circuit wouldn't, in all likelihood, affirm the Court's order and would -- based on the fact that it applied Ninth Circuit precedent and statutory law on this issue, we would -- it would significantly -- it would not advance the litigation.

Defendants are going to be given the opportunity. And as we just set the schedule today, we will be in expert discovery in less than a year, Your Honor. So it would actually lengthen the -- the time for litigation. So they have not met the third requirement.

Simply, Your Honor, there's no dispute about what the proper law is on negative causation. You applied that correct standard under the plain text of the statute and binding Ninth Circuit case law. Defendants don't like the outcome. Their displeasure's not an appropriate reason for interlocutory appeal.

I'm happy to take any questions the Court may have.

THE COURT:  Thank you.

MR. MANNINGHAM:  Thank you.

MR. ROBERTS:  Thank you, Your Honor.

I think this has been extensively briefed, and I think the Court is probably well aware of all the arguments. I won't repeat them. I will maybe make just one point, which is to say that the Ninth Circuit has repeatedly said that affirmative defenses can be shown at the pleading stage. Not witnesses. Not anything else. They can be shown at the pleading stage if the complaint and the -- the documents properly before the Court show that the -- that the defense has been established.

In their opposition, the plaintiffs do not address -- nowhere in their opposition does it show -- do they address the

*Brown*, *Shoretel*, and *ContextLogic* decisions.  They don't address them, because in each of those cases the Court decided as a matter of law that the failure to adequately plead loss causation meant that the defendants' burden as to negative causation had been satisfied.  That's the legal issue.  That's what we're asking to go up to the Ninth Circuit with.

Thank you, Your Honor.

THE COURT:  Okay.  Thank you.

I'm going to take this motion under advisement, and I will issue a decision promptly.

Oh, Mr. Manningham, do you wish to submit a written response to the defendants' notice of supplemental authority?

MR. MANNINGHAM:  Your Honor, I'm happy to address it now, if that's okay with the Court, or we can submit a written response.  Whatever the Court prefers.

THE COURT:  I'll give you the opportunity to file a written response, if you wish.  Can you do it by next Friday?

MR. MANNINGHAM:  Of course, Your Honor.

THE COURT:  Okay.

MR. MANNINGHAM:  Thank you.

THE COURT:  And no reply.

And then I would note that the defendants' description is a page of their written text, so no greater than a page.

MR. MANNINGHAM:  Okay.

THE COURT:  Okay.

MR. MANNINGHAM:  Thank you, Your Honor.

THE COURT:  Does anybody have anything else you want to cover before we adjourn?

MR. THIEL:  No, thank you, Your Honor.

MR. ROBERTS:  No, Your Honor.  Thank you.

MR. FARRELL:  No, Your Honor.  Thank you.

THE COURT:  Well, thank you all very much.  It's nice to see you.  Have a nice day.

Court is adjourned.

(Proceedings conclude at 10:40 a.m.)

---oOo---

**C E R T I F I C A T E**

I, CATHY J. TAYLOR, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 5th day of September, 2024.

*/s/Cathy J. Taylor*
Cathy J. Taylor, RMR, CRR, CRC

UNITED STATES DISTRICT COURT