# EXHIBIT 1

**LABATON SUCHAROW LLP**
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

*Counsel for Plaintiffs*

[Additional Counsel on signature page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE OPENDOOR TECHNOLOGIES INC. SECURITIES LITIGATION | Case No. 2:22-CV-01717-MTL<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL<br><br><u>CLASS ACTION</u> |

# **TABLE OF CONTENTS**

I.  VIOLATIONS OF SECTIONS 10(b) and 20(a) OF THE EXCHANGE ACT ..........2

II.  NATURE OF THE EXCHANGE ACT CLAIMS......................................................2

    A.  Company Background ......................................................................................3

    B.  Defendants Mislead Investors About the Purported Benefits of Opendoor's Pricing Algorithm ..........................................................................................4

    C.  Opendoor's Biggest Competitor Fails and Defendants Continue Misleading Investors About the Purported Benefits of its Algorithm ...............................6

    D.  Because the Algorithm Did Not Work as Intended, Defendants Employed Deceptive Practices to Try to Maximize Contribution Margin.......................8

    E.  The Truth is Gradually Revealed as Defendants Continue Misleading Investors .........................................................................................................9

III.  JURISDICTION AND VENUE ...........................................................................11

IV.  PARTIES ...............................................................................................................12

    A.  Plaintiffs ........................................................................................................12

    B.  Defendants .....................................................................................................13

        1.  Corporate Defendant .........................................................................13

        2.  Individual Defendants .......................................................................13

    C.  Relevant Third Parties...................................................................................14

V.  FACTUAL ALLEGATIONS – EXCHANGE ACT CLAIMS ...............................16

    A.  Background on Opendoor ..............................................................................16

    B.  Opendoor's Pricing Algorithm Was Critical to the Company's Success........17

    C.  Former Opendoor Employees Reveal that the Algorithm Was Inaccurate and Humans, not the Algorithm, Drove Pricing Decisions ...........................19

    D.  Former Opendoor Employees Reveal Opendoor Drove Contribution Margin Through Deceptive Consumer Practices ...........................................22

    E.  Opendoor Goes Public Through a Reverse Merger with a SPAC ..................24

F.     Defendants Issue Several False and Misleading Statements on the First Day Opendoor's Shares Trade Publicly ...................................................... 25

G.     Defendants Mislead Investors About the Company's Competitive Advantages ...................................................... 27

H.     Defendants Continue Misleading Investors About Opendoor's Pricing Algorithm After Zillow Announces its Failed iBuying Venture ................... 29

I.     Defendant Wu Sells $57.6 Million in Stock Directly After Defendants Falsely Reassured Investors that Opendoor was Different Than Zillow ........ 33

J.     Former Employees Reveal that Opendoor's Algorithm Could Not Adjust to the Changing Housing Environment in 2022 ................................................ 34

K.     The Truth Begins to Emerge as Defendants Continue Misleading Investors About Opendoor's Pricing Algorithm ........................................................ 38

L.     The FTC Announces Settlement with Opendoor Over Deceptive Consumer Practices ...................................................... 40

M.     Defendants Continue Misleading Investors as Housing Market Continues Declining ...................................................... 44

N.     The Truth Emerges as Investors Learn that Opendoor's Algorithm Did Not Work in any Market ...................................................... 45

VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................................... 47

A.     The December 21, 2020 Registration Statement .......................................... 48

B.     March 4, 2021 – 2020 Annual Report .......................................................... 51

C.     November 10, 2021 – Earnings Call ............................................................. 52

VII.   THE TRUTH GRADUALLY EMERGES AS DEFENDANTS CONTINUE MAKING MATERIALLY FALSE AND MISLEADING STATEMENTS ............ 54

A.     February 24, 2022 – First Partial Corrective Disclosure/Materialization of the Risk ...................................................... 54

B.     March 4, 2022 – False and Misleading Statements During the Wedbush Real Estate Technology Conference ............................................................. 55

C.     March 8, 2022 – False and Misleading Statements During the Morgan Stanley Technology, Media and Telecom Conference ................................... 57

|   |   |   |   |
|---|---|---|---|
| | D. | August 1, 2022 – False and Misleading Press Release | 60 |
| | E. | August 4, 2022 – False and Misleading Statements During the Company's Earnings Call | 61 |
| | F. | September 19, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk | 62 |
| VIII. | | THE FULL TRUTH IS REVEALED AS DEFENDANTS DISCLOSE NEGATIVE CONTRIBUTION MARGIN | 63 |
| IX. | | LOSS CAUSATION/ECONOMIC LOSS | 65 |
| | A. | February 24, 2022 – First Partial Corrective Disclosure/Materialization of the Risk | 67 |
| | B. | September 19, 2022 – Second Corrective Disclosure/Materialization of the Risk | 68 |
| | C. | November 3, 2022 – Third Corrective Disclosure/Materialization of the Risk | 70 |
| X. | | ADDITIONAL ALLEGATIONS OF SCIENTER | 72 |
| | A. | Defendant Wu's Class Period Sales and Insider Trading Are Indicative of Scienter | 72 |
| | B. | Core Operations: iBuying is Opendoor's Entire Business, and its Pricing Algorithm was Core to the Company's Success | 75 |
| | C. | Defendants' Statements Themselves Support Scienter | 76 |
| | D. | The FTC Investigation and Findings Are Indicative of Scienter | 79 |
| | E. | Zillow's Failure Supports Scienter | 81 |
| | F. | Defendants' Access to Data Such as Home Appreciation and Interest Rate Trends Supports an Inference of Scienter | 82 |
| | G. | The Scienter of the Exchange Act Individual Defendants Is Imputed to Opendoor | 84 |
| XI. | | CONTROL PERSON ALLEGATIONS | 84 |
| XII. | | CLASS ACTION ALLEGATIONS | 85 |
| XIII. | | APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE | 87 |

XIV.    NO SAFE HARBOR ........................................................................................... 89

XV.     CAUSES OF ACTION ....................................................................................... 90

        COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
        AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST THE
        EXCHANGE ACT DEFENDANTS ................................................................... 90

        COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
        AGAINST THE EXCHANGE ACT INDIVIDUAL DEFENDANTS ..................... 93

XVI.    PRAYER FOR RELIEF ..................................................................................... 94

XVII.   VIOLATIONS OF SECTIONS 11 and 15 of the SECURITIES ACT ....................... 96

XVIII.  BACKGROUND FOR THE SECURITIES ACT CLAIMS ................................... 96

        A.    Opendoor Goes Public Through a SPAC Called SCH ................................. 98

        B.    Summary of the December 2020 Offering .................................................. 100

        C.    Summary of the February 2021 Secondary Public Offering ....................... 104

        D.    Opendoor's Stock Plummets as it is Gradually Revealed that Opendoor's
              Algorithm Could Not Maintain Contribution Margins in any Market .......... 105

XIX.    JURISDICTION ............................................................................................... 106

XX.     THE SECURITIES ACT PARTIES ................................................................... 106

        A.    Plaintiffs .................................................................................................. 106

        B.    Defendants ............................................................................................... 107

              1.    Corporate Defendants ...................................................................... 107

              2.    Individual Defendants ..................................................................... 108

              3.    Underwriter Defendants ................................................................... 110

        C.    Relevant Third Parties .............................................................................. 112

XXI.    THE MATERIALLY FALSE STATEMENTS IN THE OFFERING
        MATERIALS ................................................................................................... 114

        A.    Materially False Statements Contained in the December 2020 Offering
              Documents ............................................................................................... 114

B.     Materially False Statements Contained in the February 2021 SPO Documents ........................................................................................ 117

C.     Statements in the Offering Documents Were Materially False ................... 119

    1.     Former Opendoor Employees Reveal that the Pricing Algorithm Was Largely Inaccurate and Humans Drove Pricing Decisions ........ 119

    2.     The FTC Investigation Reveals Human Involvement and Deceptive Practices Designed to Drive Contribution Margin ........................... 121

    3.     Former Employees Reveal that Opendoor Charged Sellers for Unnecessary Repairs and Pocketed the Extra Money as Profit ......... 124

    4.     Former Employees Reveal that the Algorithm Could Not Adapt to the Changing Housing Market in 2022 ............................................. 127

D.     The Underwriter Defendants Failed to Perform Adequate Due Diligence ... 130

E.     News About Declining Contribution Margins and Profitability Cause Opendoor's Stock to Crash ........................................................................ 133

XXII. CLASS ALLEGATIONS ................................................................................. 134

XXIII. CAUSES OF ACTION .................................................................................... 136

COUNT III FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST OPENDOOR, SCH, THE SECURITIES ACT INDIVIDUAL DEFENDANTS, AND THE UNDERWRITER DEFENDANTS .......................... 136

COUNT IV FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST THE SECURITIES ACT INDIVIDUAL DEFENDANTS ................... 139

XXIV. PRAYER FOR RELIEF .................................................................................. 140

XXV. JURY TRIAL DEMANDED ............................................................................ 141

Lead Plaintiffs Indiana Public Retirement System, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association ("Lead Plaintiffs") and Additional Plaintiff Stuart Graham Hereford ("Additional Plaintiff" and together with Lead Plaintiffs, "Plaintiffs"), by and through their undersigned counsel, bring this action under Section 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act Claims") and separately under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act Claims") against Opendoor Technologies Inc. ("Opendoor" or the "Company"), Social Capital Hedosophia Holdings Corp. II ("SCH"), several of the officers and directors of Opendoor and/or SCH, and the underwriters of Opendoor's public offering in December 2020 and secondary public offering in February 2021.

As it pertains to the Exchange Act Claims, Plaintiffs bring the Class Action Complaint against Defendants: Opendoor, former Chief Executive Officer ("CEO") Eric Wu ("Wu"), and former Chief Financial Officer ("CFO") and current-CEO Carrie Wheeler ("Wheeler").

As it pertains to the Securities Act Claims, Plaintiffs bring this Class Action Complaint against Defendants: Opendoor and SCH (the "Corporate Defendants"), Wu, Wheeler, Chamath Palihapitiya, Steven Trieu, Ian Osborne, David Spillane, Adam Bain, Cipora Herman, Pueo Keffer, Glenn Solomon, Jason Kilar, Jonathan Jaffe (the "Securities Act Individual Defendants"); and Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Oppenheimer & Co. Inc., BTIG, LLC, KeyBanc Capital Markets Inc., Wedbush Securities Inc., TD Securities (USA) LLC, Zelman Partners LLC, Academy Securities, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Co., LLC, and Siebert Williams Shank & Co., LLC (the "Underwriter Defendants" and together with the Corporate Defendants and Securities Act Individual Defendants, the "Securities Act Defendants"). The Securities Act Claims solely allege strict liability and negligence causes of action, and do not sound in fraud. Accordingly, for the purpose of these Securities Act Claims, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud, intentional misconduct, or deliberate reckless misconduct.

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, interviews with numerous individuals, including former employees of Opendoor, a review of Opendoor's public documents, transcripts of conference calls and presentations concerning Opendoor, Opendoor's filings with the United States Securities and Exchange Commission ("SEC"), wire and press releases published by Opendoor, analyst reports and advisories about the Company, media reports concerning Opendoor, documents received from a Freedom of Information Act request to the Federal Trade Commission, and other publicly available information. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after Plaintiffs have had a reasonable opportunity to conduct discovery.

## I. VIOLATIONS OF SECTIONS 10(b) AND 20(a) OF THE EXCHANGE ACT

The Exchange Act Claims set forth below in Counts I and II allege violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934. Plaintiffs bring the Exchange Act Claims individually and on behalf of all persons and entities who or which, during the period from December 21, 2020 through November 3, 2022, inclusive (the "Class Period"), purchased the publicly traded common stock of Opendoor on the NASDAQ or any U.S.-based trading platform during the Class Period and were damaged thereby (the "Exchange Act Class").[1]

## II. NATURE OF THE EXCHANGE ACT CLAIMS

1. The Exchange Act Claims arise out of the Exchange Act Defendants' fraudulent misrepresentations and material omissions regarding the supposed benefits and competitive

---

[1] The following are excluded from the Exchange Act Class: (i) Exchange Act Defendants; (ii) Securities Act Defendants; (iii) members of the immediate family of any Defendant who is an individual; (iv) any person who was an officer, director, and/or control person of Opendoor during the Class Period; (v) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (vi) Opendoor's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such.

2

advantages of Opendoor's purportedly superior, artificial intelligence ("AI")-driven business model. Specifically, Defendants[2] knowingly overstated the purported benefits of the Company's proprietary pricing algorithm—the key differentiator that Defendants claimed set Opendoor apart from its competitors—in order to take Opendoor public via a reverse merger with a special purpose acquisition company ("SPAC") and, in doing so, enrich Opendoor's founders, including Defendant Eric Wu, at the expense of the shareholders that relied on Defendants' material misrepresentations.

2. Shortly before the start of the Class Period, Opendoor went public via a reverse merger with a SPAC, Social Capital Hedosophia Holdings Corp. II (the "de-SPAC Merger"). The de-SPAC Merger valued Opendoor at approximately $4.85 billion. Within the first year and a half, Defendant Wu personally made over $112 million from selling his Opendoor stock at artificially inflated prices before the fraud he knew about was revealed to the market. Unsurprisingly, now that the fraud has been revealed, the Company's stock price has plummeted—from a closing price of $31.25 per share on the first day of the Class Period, to a closing price of $2.02 per share the day after the fraud was fully revealed, a ***94 percent decline in value***. As a result, while Defendant Wu made a fortune, shareholders were left to lose billions of dollars in value.

### A. Company Background

3. Founded in 2014, Opendoor has touted itself as an AI-driven company that buys and sells residential real estate in the United States through an online process referred to as "iBuying." iBuying, which is short for instant buying, is a relatively new concept in home buying and selling. Companies that compete in the iBuying market use algorithms and technology to buy and resell homes quickly. These companies use algorithms to make instant cash offers to buy homes, often within 24 hours, based on the values indicated by their pricing algorithms. These companies then sometimes make repairs and quickly relist the homes for sale.

---

[2] Within Sections I through XVI of this complaint, Plaintiffs refer to the Exchange Act Defendants as "Defendants."

3

4. Critical to the success of iBuyers such as Opendoor is their pricing algorithm and its ability to accurately predict house prices—not just today, but in the future. Therefore, investors paid close attention to Opendoor's pricing algorithm and what advantages, if any, it had over competitors.

**B. Defendants Mislead Investors About the Purported Benefits of Opendoor's Pricing Algorithm**

5. Throughout the Class Period, Defendants touted the Company's algorithm and led investors to believe that it was the main driver of the Company's success. Defendants told investors that Opendoor had built "world-class data . . . to improve and automate pricing decisions" and explained that its AI-powered algorithm was superior because it "use[s] machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management." Defendants further claimed that the algorithm's offers "do not require any human intervention."

6. These representations were highly material to investors because Opendoor convinced investors that it was the leading disruptor to the residential real estate market because of its purportedly AI-powered pricing algorithm. This, according to Opendoor, created a lower cost platform and eliminated human error in trying to predict home price trends, economic forecasts, and other similar factors—thus purportedly shielding Opendoor, and investors, from the perils of fluctuating housing markets and changing economic conditions.

7. Indeed, Defendants consistently told investors that the Company's algorithm worked in all housing markets because it could predict changing economic conditions and quickly adapt to such changes. For example, the Company's 2020 Annual Report misleadingly stated that "*our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions*" and claimed that Opendoor's "*pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions*."

4

8. According to Defendants, this adaptability allowed the Company to remain profitable in any housing market. Specifically, Defendants explained that the Company's proprietary algorithm allowed Opendoor to consistently deliver positive contribution margins,[3] a key profitability metric for the Company. Indeed, Defendants directly told investors that "[t]he **ultimate measure you should hold us accountable for is how we're doing on contribution margin delivery**." Thus, investors tracked contribution margin closely because it was a key measure of the Company's success.

9. Defendants repeatedly touted the Company's contribution margin and claimed that its AI-powered pricing algorithm drove its contribution margin success. For example, during the Class Period, Defendant Wheeler attributed Opendoor's successful contribution margin numbers to the algorithm and its forecasting capabilities, stating: "*forecasting accuracy was what allows [Opendoor] to . . . deliver margins within that 4% to 6% contribution margin range that we've guided to.*" Similarly, Defendant Wheeler assured investors that Opendoor's "business model is really designed to ensure that we can meet our annual margin target at 4% to 6% contribution margin, *regardless of the home price environment we're operating in, and the way we do that is just how we price our homes.*"

10. Based on these representations, the investing public believed that the accuracy of Opendoor's algorithm drove its success and was a key competitive advantage over other iBuyers like Zillow (the second largest iBuyer in terms of revenue in 2021). For example, on August 2, 2021, InvestorPlace published an article stating that "One of the main reasons for Opendoor's success is its robust pricing algorithm" and that "[Opendoor's] competitors — Zillow [] and Offerpad — do not possess such pricing engines." Similarly, on August 12,

---

[3] Contribution margin is generally defined as a cost-accounting calculation that measures the profitability of a specific product or the revenue that is left after covering costs for that product. Here, the relevant product is the home that Opendoor buys and sells. Contribution margin shows you the aggregate amount of revenue available after variable costs to cover fixed expenses and provide profit to the company. Companies look to their contribution margin to understand how a specific product—here, the home that Opendoor buys and sells—contributes to the Company's profit (as opposed to profit margin, which measures the total amount by which revenue from sales exceeds costs).

2021, Wedbush issued an analyst report noting that "Opendoor's pricing capabilities have been best in class, and we believe its vast data is a significant asset . . . ."

**C.      Opendoor's Biggest Competitor Fails and Defendants Continue Misleading Investors About the Purported Benefits of its Algorithm**

11.     However, shortly after these analyst reports were published, the entire iBuying business came under scrutiny when, on November 2, 2021, Opendoor's biggest competitor, Zillow, announced that it was shutting down its iBuying business because Zillow's algorithm could not accurately forecast home prices. Zillow's CEO explained that "fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in."

12.     Given this news, the market started to question whether iBuying could work as a business model. Indeed, the price of Opendoor's stock fell by more than 14.5% on the day of the Zillow announcement, as investors pulled back from iBuying stocks and eagerly awaited Opendoor's next earnings announcement to assess whether Opendoor was facing similar issues.

13.     On November 10, 2021, Opendoor announced its third quarter 2021 earnings. During the earnings call on the same day, Defendant Wheeler directly addressed any concerns over the future of Opendoor and the iBuying business model, reassuring investors that—unlike Zillow—Opendoor's AI-driven algorithm was "highly responsive" to changing economic conditions. Specifically, Defendant Wheeler reassured investors that Opendoor's business model worked in any housing market, and unequivocally stated: "***Important is that our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets.***"

14.     Based on these representations—which investors did not know were false and misleading at the time—Opendoor's common stock rebounded, increasing by **more than 15.5%** the very next day.

15.     Then, merely three trading days later, on November 16, 2021, Defendant Wu took advantage of the Company's artificially inflated stock and sold 1,613,498 shares of his

6

Opendoor stock, reaping proceeds of more than **$35 million on a single transaction**. Over the next two trading days, Defendant Wu continued to unload Opendoor shares and made two additional open market sales: on November 17, 2021, Wu sold an additional 628,348 shares, reaping proceeds of more than $13 million; and on November 18, 2021, he sold an additional 443,182 shares, reaping proceeds of over $9 million. In total, Defendant Wu sold over 2.6 million shares of Opendoor stock just days after Defendant Wheeler's false statements, **reaping proceeds of over $57.6 million dollars in a span of three days**.

16. Unfortunately for investors, they did not possess the same inside information as Defendant Wu. Although Defendants led investors to believe that the Company's success was the result of its algorithm and its ability to quickly adapt to changing market conditions, in reality, within the Company the algorithm was known to be largely inaccurate and unable to account for changes in the housing market. Moreover, although Defendants led investors to believe that the Company's algorithm was fully automated and drove the Company's pricing decisions, they withheld that the Company's pricing decisions were in fact being made by humans, and therefore, Opendoor was equally susceptible to the same market fluctuations as every other iBuying and conventional real estate company.

17. Indeed, during the course of Lead Counsel's investigation, multiple former Opendoor employees have confirmed that Opendoor's algorithm was largely inaccurate and that, as a result, the Company relied heavily on humans to price Opendoor's offers to buy. For example, according to CW 2, who worked as a Pricing Analyst at Opendoor during the Class Period, she adjusted the prices downward because the system was consistently overpricing the homes. Indeed, CW 2 said that about 90 percent of the final offers she submitted for approximately 4,000 homes she priced were below the number generated by the system. Thus, contrary to Defendants' repeated representations that Opendoor was unique and different than Zillow because of its proprietary algorithm—which they claimed was "highly responsive" to changing economic conditions—in reality, Opendoor's business model was human-driven just like any other conventional, non-tech-based real estate company and thus just as susceptible to changing housing markets.

7

**D.**     **Because the Algorithm Did Not Work as Intended, Defendants Employed Deceptive Practices to Try to Maximize Contribution Margin**

18.     Once the algorithm was shown internally to be flawed and unable to produce the promised contribution margin, Defendants deployed additional deceptive consumer practices to maximize contribution margin.  At that time, Defendants continued to lead investors to believe that Opendoor's contribution margin success was the result of the Company's AI-powered pricing algorithm, while hiding from investors that Opendoor engaged in deceptive consumer practices—such as charging sellers for repairs that Opendoor never made—that largely contributed to the Company's contribution margin.  According to multiple former Opendoor employees, during the Class Period, Opendoor regularly charged sellers for repairs in order to lower the final offer.  Then, Opendoor would not perform those repairs and would keep the extra money as additional profit.  These former employees' statements are corroborated by the findings of the Federal Trade Commission ("FTC"), who had been investigating Opendoor since 2019 for misleading potential sellers about its iBuying service.  According to the FTC complaint, which was made public during the Class Period on August 1, 2022, the FTC found that Opendoor "frequently demanded cosmetic changes such as repainting and replacement of items that could be repaired at far lower cost" and "[i]f the repairs cost less than the amount deducted, Opendoor retains the excess as profit."

19.     As the housing market changed in 2022, and Opendoor's algorithm was unable to adapt to the new market, Defendants doubled down and expanded their deceptive consumer practices in an attempt to remain profitable.  For example, CW 3 explained that when she first started at the Company, in March 2021, an average repair charge for a transaction was about $5,000, but by the end of her employment, in November 2022, the amount Opendoor was charging sellers had increased dramatically, to "$15,000, $25,000, $30,000, big numbers." By increasing the repair charges to boost profits, Opendoor was able to temporarily conceal from investors the negative impact the declining housing market was having on the Company and make it seem like its pricing algorithm was still driving strong contribution margins.

8

20.     The FTC complaint also confirmed that humans drove the Company's pricing decisions.  The FTC complaint found that although Opendoor claimed its algorithm generated "market based" offers, "[i]n many instances, Opendoor's employees have manually adjusted these values before presenting them to consumers as offers."  Indeed, the FTC complaint found—based on documents produced by Opendoor during the FTC's investigation—that "Opendoor's internal analyses showed that these manually adjusted offers were several percentage points below Opendoor's assessment of market value" and explained that "[b]eginning no later than 2019, Opendoor instituted a policy to reduce its manually adjusted offers to [redacted] below what Opendoor assessed as market value."

21.     Therefore, Defendants concealed the broader, human-driven process that drove the Company's pricing decisions, and instead created the misleading impression that Opendoor was advancing its automation efforts for pricing and generating strong contribution numbers because of the algorithm, which Defendants had repeatedly touted as the key to Opendoor's success.  However, investors did not know that humans played a crucial role in the Company's pricing, or that Opendoor's success was driven simply by a hot housing market and deceptive consumer practices that boosted the Company's profitability.  As a result, Opendoor misled investors about the fact that Opendoor was just as susceptible to changing housing markets as any other iBuying business or real estate company.

**E.     The Truth is Gradually Revealed as Defendants Continue Misleading Investors**

22.     These risks started to emerge as the housing market cooled off in 2022, and investors started learning the truth on February 24, 2022, when Opendoor announced that its fourth quarter 2021 contribution margin was just 4%, a steep decline from a 12.6% contribution margin in the fourth quarter of 2020.  On this news, the Company's stock price plummeted, dropping more than 23% the very next day to close at $8.44 per share on February 25, 2022.  However, the extent of Opendoor's inability to generate strong contribution margin in a down housing market based on its algorithm was not revealed until months later.

9

23. Over the next several months, Defendants continued misleading investors about the Company's algorithm and its ability to succeed despite a down housing market. Specifically, starting in early 2022, the housing market had started changing as interest rates increased and home prices started flattening across the country. Given this changing housing market, investors asked Defendants direct questions about whether the Company's business model would work in a flat or declining housing market. For example, in response to such a question at a conference on March 8, 2022, Defendant Wu assured investors that Opendoor's business model would work in any market—including the "worst recession in U.S. history"—and falsely claimed that even in the worst recession in history, Opendoor "would still have positive contribution margin," despite knowing that the Company's pricing was based on human judgment and fraudulent conduct, not the AI-powered algorithm, and was therefore highly susceptible to a down real estate market.

24. In fact, during this time, Defendants knew that the signs of a down housing market had already begun impacting the Company's business strategy. Specifically, Opendoor was dealing with very high levels of inventory and houses remaining unsold for months due to the Company's failure to account for the declining housing market. According to former Opendoor employees, Opendoor's algorithm failed to adapt to this housing market change, leading to excess inventory levels in 2022. By the middle of that year—with the algorithm's vulnerabilities exposed internally—Opendoor had so much inventory that the Company was forced to give credits and incentives to sellers and pay outside brokers steep commissions to help sell its houses, all of which cut into the Company's profitability.

25. Despite this, Defendants continued misleading investors. For example, on August 4, 2022, Defendant Wheeler reassured investors that the Company's algorithm would work in the current, extremely volatile housing market, stating that, "***our systems are doing exactly what they're designed to do, which is responding very, very quickly, adjusting prices to market*** . . . ." In reality, Opendoor's systems were not doing what they were designed to do, as unsold inventory was growing and Opendoor was forced to resort to giving significant concessions and paying outside brokers to sell off the inventory.

26.     The fact that Opendoor was unable to generate strong contribution margins in a declining real estate market was further revealed on September 19, 2022, when Bloomberg published an article revealing that Opendoor had lost money on 42 percent of its real-estate transactions in August 2022.  Bloomberg further reported that Opendoor's performance was even worse in key markets such as Los Angeles, where the Company lost money on 55% of sales, and Phoenix, where the Company lost money on 76% of sales.  On this news, Opendoor's stock price fell 12.32% over the following two trading sessions.

27.     Then, although Defendants repeatedly assured investors that the Company's pricing accuracy allowed it to maintain a 4% to 6% contribution margin, on November 3, 2022, Defendants revealed that Opendoor's contribution margin for the third quarter 2022 was **negative 0.7%**—well below the 4% to 6% contribution margin range and well below the Company's contribution margin of 7.5% from the third quarter of 2021.

28.     On this news, Opendoor's stock fell more than 25% over the next two trading days, closing at $1.74 per share on November 7, 2022.

29.     This information revealed to investors for the first time that, contrary to Defendants' repeated representations, Opendoor's pricing algorithm could not react quickly to changing market conditions and could not deliver 4% to 6% contribution margins in any market.  For example, as *Seeking Alpha* wrote in a November 23, 2022 article, "the fact that these macroeconomic changes can wreak such havoc on the profitability of this business model illustrates the inflexibility of these businesses to respond to changing circumstances and reveals concerning underlying problems that perhaps go deeper than interest rates."

## III.     JURISDICTION AND VENUE

30.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

32. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Opendoor's Principal Executive Offices are located in this Judicial District, Defendants (as defined herein) conduct business in this Judicial District, and a significant portion of Defendants' (as defined herein) actions took place within this Judicial District.

33. In connection with the acts, transactions, and conduct alleged in this Complaint, Defendants (as defined herein), directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Plaintiffs

34. Plaintiff, Indiana Public Retirement System ("Indiana"), purchased Opendoor common stock during the Class Period, as set forth in the attached certification, at artificially inflated prices, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Plaintiff Indiana provides retirement, disability, survivor, and other benefits and is headquartered in the state of Indiana. As of April 15, 2023, Indiana manages approximately $45 billion in total net assets on behalf of more than 500,000 members and their beneficiaries. By order dated February 1, 2023 (*see* ECF No. 20), this Court appointed Indiana as a Lead Plaintiff in this action.

35. Plaintiffs Oakland County Employees' Retirement System ("Oakland County ERS") and Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA") (together, "Oakland County Funds"), purchased Opendoor common stock during the Class Period, as set forth in the attached certification, at artificially inflated prices, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein. Plaintiffs Oakland County Funds provide retirement services and are headquartered in Michigan. The Oakland County Funds managed approximately $2.4 billion in net assets on behalf of thousands of members

12

and their beneficiaries. By order dated February 1, 2023 (*see* ECF No. 20), this Court appointed Oakland County Funds as Lead Plaintiffs in this action.

36. Plaintiffs Indiana, Oakland County ERS, and Oakland County VEBA are referred together as "Lead Plaintiffs."

37. Additional Plaintiff Stuart Graham Hereford purchased Opendoor common stock during the Class Period, as set forth in the attached certification, at artificially inflated prices, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

**B. Defendants**

**1. Corporate Defendant**

38. Defendant Opendoor Technologies Inc. is a Delaware corporation with its principal executive offices located at 410 N. Scottsdale Road, Suite 1600, Tempe, Arizona 85281. Since December 21, 2021, the Company's common stock and warrants have traded in an efficient market on the NASDAQ under the ticker symbols "OPEN" and "OPENW," respectively.

**2. Individual Defendants**

39. Defendant Wu co-founded Opendoor and served as Chairman of Opendoor's Board of Directors and CEO during the Class Period following the consummation of the Merger. After the Class Period, in December 2022, Defendant Wu resigned as CEO of Opendoor. During the Class Period, in his role as CEO of Opendoor, Wu participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact. Defendant Wu also signed Opendoor's public filings with the SEC, which contained materially false and misleading statements and omissions of material fact throughout the Class Period.

40. Defendant Wheeler served as Opendoor's CFO during the Class Period following the consummation of the Merger. After the Class Period, Opendoor appointed Defendant Wheeler as CEO of Opendoor following Defendant Wu's resignation, effective as of December 1, 2022. On that day, Defendant Wheeler was also appointed to the Board of

13

Directors of the Company. During the Class Period, in her role as CFO of Opendoor, Wheeler participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact. Defendant Wheeler also signed Opendoor's public filings with the SEC which contained materially false and misleading statements and omissions of material fact throughout the Class Period.

41. Defendants Wu and Wheeler are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

42. The Exchange Act Individual Defendants possessed the power and authority to control the contents of Opendoor's SEC filings, press releases, and other market communications. The Exchange Act Individual Defendants were provided with copies of Opendoor's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Opendoor, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

**C.    Relevant Third Parties**

43. Confidential Witness ("CW") 1[4] was employed by Opendoor as Head of Brokerage – Homebase from April 2022 until November 2022. According to CW 1, her responsibilities included brokering Opendoor properties to Real Estate Investment Trust ("REIT") buyers, adding that she was a "Head of Open Exchange," and that she lived and worked for Opendoor in the San Francisco Bay area. In 2022, Opendoor's National Director of Brokerage, Chelsea Goyer, was speaking to CW 1 about inventory that was not selling, and asked CW 1 about the San Francisco Area. At that point CW 1 volunteered to take a look at

---

[4] All CWs are described using feminine pronouns to protect their identity.

14

the current inventory of Opendoor properties in San Francisco and Southern California to see if she could provide insight into why it was not selling.

44. CW 2 was a Pricing Analyst at Opendoor from July 2021 to July 2022. CW 2 was based in Phoenix and priced homes in several cities in the Western United States, including Phoenix, Tucson, Prescott, Los Angeles, San Bernadino County, San Diego, San Francisco, Sacramento, Portland, Boise, Albuquerque, Las Vegas, and Reno. CW 2 reported to the Pricing Escalation Manager for the Western United States. As a Pricing Analyst, CW 2 played a vital role in setting Opendoor's final offer price for homes.

45. CW 3 was a customer experience partner at Opendoor from March 2021 to November 2022. CW 3 initially worked with sellers throughout the nation, but later in her tenure she was regionalized to mostly working with sellers on the east coast. As a customer experience partner, CW 3 worked with customers through the process of obtaining an offer from Opendoor, and if accepted, selling their home to the company. CW 3 explained that she was the first and primary representative of the Company that customers interacted with during the process of selling their home.

46. CW 4 was an associate at Opendoor Home Loans during the Class Period. According to CW 4, her responsibilities included working with the finance department. CW 4's geographic areas of responsibility included the southeast and parts of the east coast.

47. CW 5 was an Acquisition Associate at Opendoor from approximately November 2018 through March 2020. CW 5 described her job duties as pricing offers on properties that came in to Opendoor which could not be "taken on," or priced automatically, by the Company's underwriting and appraisal software or algorithm.

48. CW 6 was employed at Opendoor from approximately 2018 through November 2022. CW 6's most recent position was a Data Scientist. In that role, CW 6 reported to a Staff Research Scientist at Opendoor, who in turn reported to the Vice President of Investment Operations, Portfolio Management, and Strategy. CW 6 started at Opendoor working in Business Operations. CW 6 then moved into Data Science operations, initially for the

15

Consumer team, then ultimately on the Pricing team. CW 6 explained the basic role of the Pricing Team was to analyze how much the company could list for homes to sell.

49. CW 7 was employed by Opendoor from November 2021 to September 2022 as a Senior Loan Officer, and she held the same title at RedDoor from April 2021 to November 2021, when she then transitioned over to Opendoor when Opendoor acquired RedDoor. CW 7's job responsibilities included originating home loans. In her final reporting structure, CW 7 reported someone she described as like a Head of Loans Operations, who reported to Head of Finance, who CW 7 believes reported to Defendant Wu.

50. CW 8 was employed by Opendoor from mid-2021 through the end of the Class Period as a staff research scientist. CW 8 was three levels removed from CEO Eric Wu. As a staff research scientist, CW 8 worked with Opendoor's algorithm on the sales side, including working closely with the Company's executives and senior level executives on adjusting the various algorithms that made up Opendoor's "valuation model" for pricing the sales of Opendoor properties, based on those executives' decisions and feedback.

## V. FACTUAL ALLEGATIONS – EXCHANGE ACT CLAIMS

### A. Background on Opendoor

51. Opendoor operates a digital platform for buying and selling residential real estate in the United States, using a featured technology called iBuying. iBuying, which is short for instant buying, is a fairly new concept in home buying and selling. Companies that compete in the iBuying market use algorithms and technology to buy and resell homes quickly. These companies use algorithms (sometimes referred to as an automated valuation model, or "AVN") to make instant cash offers to buy homes, often within 24 hours, based on the values indicated by their pricing algorithms.

52. Since its founding in 2014, Opendoor's self-professed goal has been to "redefine residential real estate." According to Opendoor, the current residential real estate market is mostly offline and can be expensive, time consuming, and stressful for both sellers and buyers. Opendoor aims to disrupt this market by "streamlin[ing] the process of buying and selling a home into a seamless digital experience, eliminating uncertainty for sellers."

16

53. Home sellers can go to Opendoor's website or mobile app and receive an instant, purportedly "market-based," cash offer. After the initial offer is made, Opendoor conducts virtual assessment of the house to determine any "necessary" repairs. Opendoor then calculates the costs of the "necessary" repairs and deducts that amount from the final offer. Opendoor's website described the repair process as designed "to make sure the house is safe and functional" and not designed "to uncover every deficiency in your home to lower the offer." Opendoor further claimed that sellers may even save money on repairs if they sell to it because "we do our best to pass wholesale savings on to you from our partnerships with local vendors." In addition to the costs of repairs, Opendoor collects a flat 5% service charge that covers the costs of buying, maintaining, marketing, and selling the home.

54. According to Opendoor, selling to it is cheaper and compares favorably to the traditional listing process, which typically includes an average broker fee of 5% to 6%, as well as a number of additional costs—such as staging and home preparation costs, seller concessions, repair costs (determined based on inspection), home ownership and overlap costs, and closing costs—many of which may be unforeseen by the homeowner at the outset.

55. Opendoor's main revenue driver was its iBuying business. According to the Company's 2021 Annual Report, "[t]he vast majority of our revenue and margins today are generated by acquiring homes directly from individual sellers and reselling those homes to buyers."

**B. Opendoor's Pricing Algorithm Was Critical to the Company's Success**

56. As an iBuyer, Opendoor's pricing algorithm was critical to its success. Indeed, since before the start of the Class Period, Defendants repeatedly told investors that Opendoor's pricing algorithm was core to its business model. As Defendant Wheeler explained during the Class Period, "pricing is absolutely core to what we do. It is something that Opendoor[] has been investing in religiously from day one as a core capability in eight years of investment and that's not going to abate."

57. Defendants told investors that its AI-powered pricing model—i.e., its algorithm—was among one of the Company's key competitive advantages. As the 2020

17

Annual Report stated, Opendoor's "proprietary, machine learning-based pricing models [is] among [one of] our core advantages and differentiators for our business."

58. Similarly, Defendants led investors to believe that their AI-powered algorithm provided many advantages over traditional real estate companies. For example, the 2020 Annual Report explained that "[w]hile the real estate industry lends itself to the use of a plethora of publicly sourceable data, much of this data lacks the quality and specificity essential to accurately price homes." However, unlike traditional real estate companies, Opendoor claimed to "have built world-class data science capabilities and systematized tooling to gather, aggregate and synthesize an expanding catalog of proprietary, hyperlocal data in order to improve and automate pricing decisions."

59. Defendants also told investors that Opendoor's pricing algorithm was critical to the Company's profitability—specifically the Company's contribution margin, which is a key profitability metric for Opendoor. In the Company's 2020 Annual Report, Opendoor explained that the Company views contribution margin "as an important measure of business performance as it captures the unit level performance isolated to homes sold in a given period and provides comparability across reporting periods. Contribution Profit helps management assess inflows and outflows directly associated with a specific resale cohort." The 2020 Annual Report also explained that the Company's "long-term financial performance depends, in part, on continuing to expand unit margins through" initiatives such as "[p]ricing engine optimization and enhancements" and "[l]owering platform costs through refinement, greater automation and self-service . . . ."

60. Defendants claimed that the accuracy of the Company's pricing algorithm, and its ability to quickly adapt to changing markets, allowed the Company to maintain positive contribution margins between 4% and 6%. For example, during the Class Period, Defendant Wheeler claimed that Opendoor's "business model is really designed to ensure that we can meet our annual margin target at 4% to 6% contribution margin, *regardless of the home price environment we're operating in, and the way we do that is just how we price our homes.*" Similarly, Defendant Wheeler claimed that Opendoor's "*forecasting accuracy was what*

*allows us to . . . deliver margins within that 4% to 6% contribution margin range that we've guided to.*"

61. Therefore, investors focused on contribution margin as a measure of the Company's success and profitability. Indeed, as Defendant Wheeler told investors during an earnings call on February 24, 2022, "[t]he ultimate measure you should hold us accountable for is how we're doing on contribution margin delivery and how those resale cohorts are showing up on our P&L quarter-to-quarter."

### C. Former Opendoor Employees Reveal that the Algorithm Was Inaccurate and Humans, not the Algorithm, Drove Pricing Decisions

62. Although Defendants led investors to believe that Opendoor priced its offers using a fully automated algorithm that used AI to accurately price homes in any market, former employees reveal that humans played a central role in pricing Opendoor's offers. Indeed, these former employees reveal that Opendoor's algorithm often generated offers nowhere near a house's true market value and that the Company's pricing process relied heavily on humans to more accurately price Opendoor's offers.

63. For example, CW 2, who worked as a Pricing Analyst at Opendoor during the Class Period, said the algorithm often priced homes incorrectly. "The automated system was never accurate," CW 2 said. "It had a lot of flaws. A lot."

64. Indeed, CW 2 explained that Pricing Analysts and their managers did not trust the pricing algorithm to generate an accurate final offer. CW 2 stated that both her managers—who were the Pricing Escalation Managers for the Western U.S.—continuously told her and other pricing analysts not to depend on the automatically generated number from the algorithm. When CW 2 first started at Opendoor, her manager told the team, "Don't look at what the system is coming in at." According to CW 2, the managers thought if analysts looked at the automatically generated number, the analyst's opinion would be biased about what the actual price should be. CW 2 recalled that her managers instructed her team: "What the automated system gave out, don't anchor to it because it's not going to be correct." CW

19

2's manager instructed pricing analysts to use their own best judgment to determine the correct final offer.

65. CW 2 explained that when pricing analysts got an automatically generated final offer price from the pricing algorithm, they could adjust it to better reflect what they thought the price should be or in response to guidance from their managers.

66. For example, in the spring and early summer of 2022, CW 2 said pricing analysts were instructed to go into the pricing system and adjust the pricings being generated by the algorithm in the Las Vegas market. According to CW 2, the Company's algorithm was dramatically overpricing homes in Las Vegas. CW 2 said "[t]he automated system offers were just insane offers that any seller would say yes, I'll take it right away."

67. CW 2 said that most of the final offers CW 2 submitted were lower than the algorithm-generated price. CW 2 said she adjusted the prices downward because the system was consistently overpricing the homes. Indeed, CW 2 said that about 90 percent of the final offers she submitted for approximately 4,000 homes she priced were below the number generated by the system.

68. CW 2 also explained that some markets had pricing caps, which meant if the algorithm generated a final offer higher than the cap, the pricing analyst had to adjust the price below the cap.

69. CW 2 said that Opendoor did not typically use its fully automated pricing algorithm to generate final offer prices for homes. Mostly, the Company used pricing analysts to participate in the process and inject subjective, human judgment into determining the final offer price. CW 2 said the only time the Company "turned on" the algorithm and let it generate final offers without any human input was when the queue of homes needing a final offer was overloaded. For example, if the queue was backed up with more than 1,000 homes, the Company would turn on the system and let the algorithm run independently and generate final offers for homes until the queue cleared out, CW 2 said. CW 2 said the fully automated system was only turned on three to four times a month and was on "just to help us clear out" the queue. According to CW 2, "The vast majority (of final offers) were human-made offers."

20

70. Ultimately, according to CW 2, what she and other pricing analysts were doing to price homes was no different than what any real estate agent would do to price a home for the market.

71. Other CWs confirm that Opendoor had a human-driven process for pricing homes accurately, including for initial offers. For example, CW 5 was brought in to price the initial offers sent to customers. CW 5 described her job duties as pricing any property that could not be priced automatically by the Company's underwriting and appraisal software or algorithm. CW 5 stated that management flagged certain properties that could not be processed through the algorithm to generate an offer. According to CW 5, approximately 50% of the properties had to be sent to human beings for review.

72. According to CW 6, a Data Scientist for the Pricing team at Opendoor, the algorithm's initial offer price was reviewed by the human pricing analysts and portfolio managers. CW 6 added that the analysts and portfolio managers could use certain data to adjust the initial offer price based on specific details of the home in question and other market variables.

73. Moreover, other former employees reveal that the algorithm could not accurately price homes for resale, specifically in new markets like San Francisco. For example, according to CW 1, Opendoor "did not know" the San Francisco market and was overpricing its homes there, which caused Opendoor to hold onto those properties longer than they should have otherwise been. According to CW 1, the reason the houses were being priced too high was due to Opendoor's algorithm, which was not accounting for changes in the real estate market that were happening at that time in 2022. Opendoor also did not do any research on any market they went into, so also did not know that in San Francisco they needed to have all disclosures linked into the MLS in order for offers to be made. After CW 1 let them know this they started that process.

21

**D.** **Former Opendoor Employees Reveal Opendoor Drove Contribution Margin Through Deceptive Consumer Practices**

74. In addition to hiding Opendoor's human-driven process for pricing homes, Defendants also hid from investors deceptive consumer practices that also largely contributed to the Company's success. For example, Opendoor regularly charged sellers for repairs in order to lower the final offer and then failed to perform those repairs—keeping the extra money as additional profit.

75. CW 4 recalled that in 2019, it was Opendoor's policy or practice to get the property repairs done as soon as possible either before or right after the Company took possession of the property, and before it was put up for sale. However, according to CW 4, at some point in 2020, the Company changed the policy or practice of doing the repairs upfront, or just doing minimal repairs, and then waiting until the house was put up for sale and for a list of repairs by the outside appraiser or buyer to be provided. CW 4 recalled that this change was made because homes were typically on the market for 30 – 90 days, and that the decision was made to hold onto the funds for as long as possible.

76. Similarly, CW 3—who worked directly with customers after an offer was made, including discussing the repairs that Opendoor assessed were needed—stated, "We didn't do every single repair we accounted for." CW 3 learned from the home team, the team that assessed repairs and subsequently managed the repair work, that it was common for Opendoor not to do all of the repairs.

77. CW 3 explained that after a potential seller requested an offer from the company via its online platform, CW 3 would reach out to set up a Zoom interview with the seller at their home. During the Zoom interview, CW 3 asked questions about "their situation," such as why they were selling, their financial needs, and what they expected to get out of the house. CW 3 then had the owners give her a video tour through the entire house, which was recorded and sent on to another department, the home team, that assessed the home's condition prior to Opendoor making a final purchase price offer to the sellers. According to CW 3, the home team also conducted an in-person visit to assess the exterior of the house and the

22

neighborhood, and Opendoor's pricing team also got involved during this time period as well. CW 3 did not know how the pricing team made their decisions, but she understood they more closely looked at the home's attributes and problems, such as being located next to a school or large power transformers. CW 3 explained that Opendoor then made a final offer from which the repair costs were subtracted. After a final offer was made, CW 3 discussed it with the customer, including the list of repairs that Opendoor assessed were needed.

78. CW 3 stated that the Company instructed her and people in her position not to send sellers the itemized repair list that also included itemized costs. Instead of sending the actual itemized list, which showed the amount the seller was charged for each repair, the Company told customer experience partners (like CW 3) to summarize the repairs verbally for the seller and not to itemize any costs for repair. So, instead of telling the seller they were being charged $200 for paint, $5,000 for new floors, $100 for new bath fixtures, CW 3 talked the seller through the full list of repairs needed, then at the end she told them how much Opendoor would take off the purchase price to cover the costs of all the repairs. CW 3 said she was instructed by her manager not to send the list, but CW 3 is confident the instruction came from her manager's supervisors.

79. CW 3 received a call from a seller who was upset by what she had learned from a friend who had toured the seller's former home once it was placed back on the market. During the tour, the friend saw that the repairs Opendoor charged the seller for had not been done, CW 3 recalled. CW 3 then went to the manager of the "home team," which was the group that assessed the property via the Zoom video recording and created the list of repairs needed for which the seller would be charged. CW 3 was told that Opendoor assesses repairs based on what they expect buyers will ask for, but if the sellers don't ask for and/or the company doesn't do the repairs, Opendoor "pockets the money" the seller was charged for those repairs.

80. CW 3 explained that if the home's AC unit is approaching the end of its expected lifespan, Opendoor would tell the owner the home needs a new AC unit, for which the seller would be charged $7,000. (An amount subtracted from the purchase price.) But if

23

the next buyer does not request a new AC unit before purchasing the home, Opendoor would not replace the unit, CW 3 said. "They would pocket that $7,000 if the buyer didn't ask for it," CW 3 said, noting, "That's definitely another source of income" for Opendoor. From what CW 3 learned from the home team that assessed repairs and subsequently managed the repair work, it was common for Opendoor not to do all of the repairs.

81. As the housing market turned in 2022, Opendoor started charging more for repairs, presumably to try to make up for the fact that its algorithm had failed to adapt to changing market conditions.

82. For example, CW 3 explained that when she first started at the Company, in March 2021, an average repair charge for a transaction was about $5,000, but by the end of her employment, in November 2022, the amount Opendoor was charging sellers had increased dramatically, to "$15,000, $25,000, $30,000, big numbers."

83. CW 3 recalled the co-workers shared their shock and exclaimed something along the lines of: "Oh my gosh! These repair charges! There had not been a single one under 20 grand! What is going on?" CW 3 recalled that toward the end of her tenure the home team seemed to be determining that almost every home needed painting, even homes that CW 3 knew did not need it. According to CW 3, "I think there was logic behind it. (Paint) is something that is going to be on any home—let's just pump it up a threshold, and it still rings true." So, for instance, according to CW 3, $25 paint charges would get bumped up to a $100.

84. CW 3 recalled a specific example of a seller who had freshly painted their home in anticipation of selling it, but when the final offer came back, Opendoor said the house needed to be painted. CW 3 knew that repair was not needed, so she went to the home team and challenged them. CW 3 said that she would regularly feel the need to go back to the home team to challenge repair charges she did not agree with. CW 3 explained that she went back to the home team "probably once or twice a day."

**E.     Opendoor Goes Public Through a Reverse Merger with a SPAC**

85. Social Capital Hedosophia Holdings Corp. II (SCH), a Special Purpose Acquisition Company ("SPAC"), was incorporated on October 18, 2019. SPACs, also known

24

as "blank check" companies, are publicly traded shells created for the purpose of merging with privately held businesses. Once a SPAC identifies a target and agrees to terms, the parties effect a business combination through a reverse merger (also referred to as a de-SPAC merger). This transaction structure allows the target, a privately held company, to become publicly traded by merging with the SPAC (or a subsidiary of the SPAC). This allows the target to bypass the traditional IPO process while allowing their equity to become publicly traded in an expedited manner without the traditional regulatory scrutiny. For these reasons, SPACs are now a major route to taking companies public.

86. Pursuant to the de-SPAC Merger, on December 21, 2020, the Company's common stock and warrants began trading on NASDAQ under the new ticker symbol "OPEN" for the common stock and "OPENW" for the warrants.[5] Prior to the Domestication[6] and transfer to the NASDAQ, SCH's Class A ordinary shares and warrants to purchase Class A ordinary shares traded under ticker symbols "IPOB" and "IPOB.WS," respectively, on the New York Stock Exchange.

**F. Defendants Issue Several False and Misleading Statements on the First Day Opendoor's Shares Trade Publicly**

87. Before the market opened on December 21, 2021, the first day Opendoor shares traded publicly on the NASDAQ, the Company filed a registration statement on Form S-1 with the SEC (the "December 21, 2020 Registration Statement"). The December 21, 2020 Registration Statement contained several false and misleading statements about the Company's business and the purported benefits of Opendoor's AI-powered algorithm. For example, the December 21, 2020 Registration Statement claimed that Opendoor's "*algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management*." The December 21, 2021

---

[5] OPENW were a separate set of securities that were issued in connection with the de-SPAC Merger. Pursuant to the de-SPAC Merger, all the issued and outstanding redeemable warrant of SCH converted automatically into a redeemable warrant to acquire one share of Opendoor Technologies common stock.

[6] Pursuant to the de-SPAC Merger, among other things, SCH deregistered as a Cayman Islands corporation and domesticated as a Delaware corporation (the "Domestication").

Registration Statement also misled investors by claiming that the Company's "*pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions*."

88.    However, Defendants' statements about the algorithm and the Company's pricing decisions were false and misleading because Opendoor was not, in fact, basing its pricing decisions on the algorithm.  As explained above, Opendoor's process for pricing homes relied heavily on human intervention.  As detailed by multiple former employees, Opendoor's process for pricing homes relied heavily on human judgment and deceptive, fraudulent conduct, *see* Section V(C)-(D), *infra*, which meant that—like other real estate companies that relied on human judgment to price homes—Opendoor was just as susceptible to the risk of changing market conditions as traditional home flippers and other iBuying companies.

89.    Simply put, the December 2020 Offering Documents concealed the broader, more complicated human-driven process that drove the Company's pricing decisions, and instead created the misleading impression that Opendoor was still primarily relying on its automation efforts for pricing, which Defendants had repeatedly touted as the Company's largest competitive advantage.

90.    The December 21, 2020 Registration Statement also misled investors about the source of the Company's financial success—attributing it to the AI-powered algorithm and failing to disclose the human-driven process that drove the Company's contribution margin success.  Specifically, the December 21, 2020 Registration Statement claimed that: "*Our proprietary, machine learning-based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation*."

91.    This statement was false and misleading because the Company's profitability was not driven by the algorithm, but rather, deceptive consumer practices such as lowering the algorithm's offer before submitting it to the seller and charging the seller for repairs that Opendoor did not make.  *See* Section V(C)-(D), *supra*.  Thus, Defendants had overstated the

26

purported benefits and competitive advantages of the algorithm and failed to disclose the known risk that the Company was susceptible to changing housing markets and economic conditions just like other iBuying businesses and traditional home flippers.

### G. Defendants Mislead Investors About the Company's Competitive Advantages

92. During most of the Class Period, Opendoor's main iBuying competitors in the United States were Zillow, Offerpad, and Redfin. By early 2021, Zillow was the Company's largest competitor, as it was the second largest iBuyer in terms of revenue after Opendoor. But unlike Opendoor, Zillow's core business was not iBuying. Rather, Zillow is best known for operating the real estate website Zillow.com (as well as other websites such as StreetEasy). As such, Zillow generated a large portion of its revenue from advertising on its websites and earning referral fees when matching prospective buyers and sellers with traditional real estate agents and brokers.

93. As explained above, the most important aspect of each iBuyer's business was its ability to accurately predict home values using their respective algorithms. Thus, investors cared deeply about each company's algorithm and repeatedly asked questions to determine which company had the best and most accurate algorithm. As Wedbush explained in a November 1, 2021 analyst report, "One of the most common questions we get from investors is what advantage Opendoor may have in pricing relative to its competitors and what data inputs it uses."

94. As such, Opendoor and Defendants routinely publicly discussed the Company's algorithm and its ability to accurately predict home values. For example, in the Company's 2020 Annual Report, which was filed on March 4, 2021, Defendants touted the Company's algorithm, stating that Opendoor had "built world-class data science capabilities and systematized tooling to gather, aggregate and synthesize an expanding catalog of proprietary, hyperlocal data in order to improve and automate pricing decisions." Specifically, the 2020 Annual Report claimed that Opendoor's "*systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions. Our pricing*

27

*algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions*."

95. In other words, Defendants told investors that their pricing algorithm was highly responsive and would work in any market condition or economic cycle. During the early part of the Class Period, the housing market was hot—as home prices skyrocketed and interest rates were low—and Opendoor banked easy profits. However, Defendants unequivocally told investors that their algorithm worked in all market conditions. For example, during the Company's earnings call on August 11, 2021, Defendant Wheeler acknowledged that home prices were elevated but told investors that their strong results were not driven by the hot housing market, but rather "the key macro driver behind our results is the massive secular shift in consumer demand for integrated digital-first solution to buy and sell home[s]."

96. Based on these and similar representations, the investing public was led to believe that Opendoor's algorithm worked in all market conditions and that it was what set Opendoor apart from competitors like Zillow in the iBuying business.

97. For example, on August 12, 2021, Wedbush issued an analyst report adding Opendoor to the "Wedbush Best Ideas List after another strong quarter." In the report, Wedbush noted that Opendoor's "pricing capabilities let it optimize acquisition and resale across all market conditions. Opendoor's pricing capabilities have been best in class, and we believe its vast data is a significant asset."

98. Similarly, on August 2, 2021, InvestorPlace published an article titled "Opendoor Is a Real Estate Disruptor," which explained that they believed Opendoor's algorithm was what drove the Company's success. Specifically, the article stated:

> One of the main reasons for Opendoor's success is its robust pricing algorithm. It's not looking to buy at very low prices and sell at very high prices, but instead seeks to identify the highest price that it can pay for a home and still generate a profit. Because its competitors — Zillow (NASDAQ:Z) and Offerpad — do not possess such pricing engines, they have been forced to charge more than Opendoor for their homes to make the same profit on them.

28

99. A month later, on September 8, 2021, *Seeking Alpha* published an article titled "Opendoor: The Mythology of Disruption," which explained that "Opendoor's pricing algorithm, or AVM, is the secret sauce; the performant soul of iBuying." The article went on to posit that "Opendoor's [algorithm] is the best in the business – a first of its kind machine-learning platform that actively ingests historical pricing information alongside hundreds of datapoints per home, customized within each market to arrive at a fair price."

**H. Defendants Continue Misleading Investors About Opendoor's Pricing Algorithm After Zillow Announces its Failed iBuying Venture**

100. On October 17, 2021, Bloomberg reported that Zillow would pause its Zillow Offers business, through at least year-end, due to capacity constraints. The article quoted a Zillow spokesperson as saying: "We are beyond operational capacity in our Zillow Offers business and are not taking on additional contracts to purchase homes at this time . . . . We continue to process the purchase of homes from sellers who are already under contract, as quickly as possible." The following day, on October 18, 2021, Zillow confirmed the reports in a press release, disclosing that: "[d]ue to a backlog in renovations and operational capacity constraints," Zillow Offers "will not sign any new, additional contracts to buy homes through the end of the year."

101. Then, just two weeks later, on November 1, 2021, media outlets reported that most of the homes in the Zillow Offers inventory were now worth less than the Company paid for them. A day later, on November 2, 2021, Zillow announced that it was shutting down Zillow Offers because Zillow's algorithm had not been able to accurately forecast home prices. For example, during the earnings call, Zillow's CEO, Rich Barton, acknowledged that Zillow's ability to execute in the iBuying business was "underpinned by the need to forecast the price of homes accurately 3 to 6 months into the future," but admitted that Zillow "ha[d] been unable to accurately forecast future home prices." Ultimately, Barton explained that the Company's inability to accurately forecast home prices created too much risk to continue: "fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in." In other words, "[w]hat it boils down to is our

inability to have confidence in pricing in the future, enough confidence to put our own capital at risk that we don't have to."

102. Given this news, the market started to question whether iBuying could work as a scalable business—since Zillow was the second largest iBuyer and had significant competitive advantages (including the fact that its websites drove traffic to Zillow's iBuying business). Given this uncertainty, Opendoor investors reacted swiftly. On this news, the price of Opendoor's stock fell by more than 14.5% on November 2, 2021.

103. Over the next few days, many articles were published questioning the iBuying business and whether Opendoor's algorithm was better than its competitors. For example, on November 9, 2021, *The Washington Post* published an article titled, "Zillow sent its algorithm to take on the housing market. The housing market won." In the article, author Megan McArdle stated:

> Zillow, and its fellow competitors in the "iBuying" business — including Opendoor, Offerpad and Redfin — brought speed and efficiency to a slow and capricious housing market. That market is now one competitor down, **with lingering questions about whether anyone will ever rationalize it**.

104. Given the uncertainty about the iBuying business model, investors were eager to hear what Opendoor had to say at their next earnings call on November 10, 2021. On that day, after the market closed, the Company issued a press release announcing strong third quarter 2021 earnings and providing fourth quarter guidance ahead of analysts' expectations. Specifically, Opendoor announced its contribution margin for the third quarter 2021 was 7.5% (versus 10.8% in the second quarter 2021), which was ahead of industry expectations.

105. Then, during the Company's earnings call on November 10, 2021, Defendants restored confidence in their business by overstating the purported benefits and competitive advantages of the algorithm and misleading investors about the algorithm's ability to work in any market.

106. During Defendant Wheeler's opening remarks, she touted the Company's contribution margin—explaining that Opendoor had experienced 20 consecutive quarters of

30

positive contribution margins and that the Company expected that it would move to 7% to 9% over the long term. Defendant Wheeler then addressed the Zillow news by reassuring investors that Opendoor was focused on pricing accuracy and would remain disciplined in its growth strategy. Specifically, Defendant Wheeler stated:

> One additional note on unit margins given the news of the last few weeks. We understand the importance of one, forecasting and two, managing seasonal and macro market changes. We have prioritized our investments and our pricing capabilities across acquisition valuation, forecasting and resell systems since our inception. These investments pair with a strong risk management DNA that's embedded in our pricing or operations, and our finance teams.
>
> Our philosophy for growth has always been and will continue to be anchored in disciplined unit economics. I'd note that Q4 of 2021 will mark our 20th consecutive quarter of positive contribution margins.

107. After Defendant Wheeler's opening remarks, the very first question was about Opendoor's pricing algorithm and whether it could withstand volatility in home prices—i.e., whether it could work in any housing market. Specifically, the analyst asked:

> Great. Thanks for taking the questions. I guess, maybe two. One, can you touch on housing pricing volatility and how you feel your model is kind of positioned to withstand that, and kind of detected given some of the turnover. And then if let's say, prices you could press a little bit, how much contribution margin compression can we expect and how much can the kind of model withstand given some of the other kind of headlines and outline over the last two weeks? Thanks.

108. Defendant Wheeler responded by touting Opendoor's algorithm and reassuring investors that, unlike Zillow, Opendoor's algorithm quickly adapts to changing market conditions and works in any housing market, which allowed the Company to maintain a contribution margin range of 4% to 6%. Specifically, Defendant Wheeler responded:

> Embedding your question is how do we price for homes and how do we think about forecasting. *A couple of comments; one, we're very good at this. This is core to what we do.* We have built over the last seven years, very robust pricing systems. We have seven years of investment in the data, in the modeling and in our team that allows us continuously improve how we model and approach home price valuations. We operate our business with a tight discipline.

31

As Eric said, we are rigorously back testing our models every day. ***They're highly responsive. They have fast feedback loops and we can react to changing market conditions. Our forecasting accuracy was what allows us to manage the business within a reasonable range of outcomes and deliver margins within that 4% to 6% contribution margin range that we've guided to.*** Ultimately, the proof of our ability to do that is in our results. I just want to mention again, Q4 will mark our 20th consecutive quarter of positive CM.

So that's housing and – so the housing and forecasting question in total. And [] part two of your question was around contribution margins, and how they may fluctuate with changes in HPA. ***Important is that our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets.*** We've talked about this before. But we are a market maker. Like define that, that means we provided putting in the customers, we're pricing a certainty and we're taking a spread. We're getting paid for that. ***And we're managing [] our business to that 4[-]6% range I just indicated if HPA were to go down, we would look to fluctuate increase our spreads to manage to that target margin range.*** So, I would not marry HPA trend and contribution margin trends together. We're driving for consistency within that range of outcomes.

109.    However, this was false and misleading because the algorithm could not react to changing market conditions or maintain contribution margins between 4% to 6% in all markets.  Moreover, Defendant Wheeler's statements were false and misleading because they led investors to believe that the accuracy of Opendoor's algorithm allowed the Company to maintain positive contribution margins in any environment—thus shielding the Company from the risk of changing market conditions and economic cycles—while concealing the broader, human-driven process that drove the Company's pricing decisions and put Opendoor at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations.  These misrepresentations were highly material to investors, especially considering that Zillow had just exited the iBuying business for its failure to accurately price homes, which sparked investor concern over whether other iBuyers, like Opendoor, had a viable business model.

110.    Similarly, later during the November 10, 2021 earnings call, Defendant Wu responded to a question about the Company's pricing models by claiming that pricing was

32

"something that we treat [a]s proprietary and a large competitive mode that compounds as we get to scale overtime. And so I would just say that since we started Opendoor, this has been core and foundational to the business."

111. Based on Defendants' statements, investors were reassured and believed that Opendoor's algorithm was superior to other iBuyers and allowed the Company to deliver 4% to 6% contribution margin in any market. Therefore, the very next day, November 11, 2021, Opendoor's common stock increased by **more than 15.5%**—demonstrating investors relied on Defendants' false reassurances about the Company's pricing capabilities.

112. Following Defendants' false and misleading statements on November 10, 2021, analysts issued reports praising Opendoor for its supposedly superior pricing algorithm. For example, on November 11, 2021, Oppenheimer concluded that Opendoor was the clear leader in the iBuying space and raised its price "target to $28 from $25 after OPEN reported better 3Q21 results/Q4 outlook and is clearly positioned to be the vertical leader in the transition of home transacting online."

I. **Defendant Wu Sells $57.6 Million in Stock Directly After Defendants Falsely Reassured Investors that Opendoor was Different Than Zillow**

113. Knowing all along that Opendoor's pricing decisions were based on a human-driven process and that the Company's success was driven by a hot housing market and deceptive consumer practices, Defendant Wu enriched himself at the expense of Opendoor investors.

114. Just three trading days after Defendants falsely reassured investors that Opendoor's pricing algorithm was superior and worked in all markets—thus shielding the Company from a fate similar to Zillow—Defendant Wu took advantage of the Company's artificially inflated stock price. On November 16, 2021, Defendant Wu sold 1,613,498 shares of his Opendoor stock, reaping proceeds of more than $35 million on a single transaction. Then, over the next two trading days, Defendant Wu made two additional open market sales. On November 17, 2021, Wu sold an additional 628,348 shares, reaping proceeds of more than $13 million; and on November 18, 2021, he sold an additional 443,182 shares, reaping

33

proceeds of over $9 million. In total, Defendant Wu sold over 2.6 million shares of Opendoor stock just days after the November 10, 2021 misstatements, **reaping proceeds of over $57.6 million dollars in a span of three days**.

115. Notably, these transactions were by far Defendant Wu's largest sales of Opendoor stock historically, and were not executed pursuant to any Rule 10b5-1 trading plan, as indicated on Defendant Wu's SEC Form 4 dated November 18, 2021.

116. Unfortunately for investors, they did not possess the same inside information as Defendant Wu. Although Defendants claimed Opendoor's success was the result of its superior pricing algorithm—which they claimed worked in any housing market—in reality, humans drove the Company's pricing decisions and the Company's success was driven by a hot housing market and deceptive consumer practices that boosted the Company's profitability. As a result, Opendoor failed to disclose the known risk that it was susceptible to changing housing markets and economic conditions just like other iBuying businesses, including Zillow.

117. Based on Defendants' false and misleading representations, investors (wrongly) believed that Opendoor was not susceptible to the changing housing market in 2022. As the housing market started changing in 2022, investors continued to rely on Defendants' false and misleading representations about Opendoor's ability to quickly adapt to those changing market conditions and maintain 4% to 6% contribution margins using its AI-powered algorithm. But unbeknownst to investors, the algorithm could not adjust to the changing housing environment in 2022.

**J.      Former Employees Reveal that Opendoor's Algorithm Could Not Adjust to the Changing Housing Environment in 2022**

118. Former employees have explained that Opendoor's algorithm failed to adapt to changing market conditions in 2022, leading to excess inventory as the housing market cooled off. These former employees also demonstrate that Defendants Wu and Wheeler closely monitored this issue, which caused Opendoor to issue incentives and credits to buyers and use

34

a third-party brokerage to move excess inventory, all of which contributed to the Company's declining contribution margins.

119. CW 4 stated that sometime in the second half of 2021, there was discussion on an MBR (Monthly Business Review) call that Opendoor's homes were staying on the market longer in some "problematic" states and that their selling prices were going down. CW 4 recalled that one of the problematic states was one of her regions—Arizona. CW 4 advised that MBR calls were monthly calls to update the Home Loans department of Opendoor and were led by Product Managers and Program Managers. CW 4 recalled that by the end of 2022, homes in all of her markets that she handled were staying on the market longer and that this was occurring because of the dramatic increase in interest rates, which she advised nobody was expecting.

120. In 2022, CW 1 was asked by the National Head of Brokerage, Chelsea Goyer, to review the Opendoor properties in the San Francisco and Southern California markets to determine why the Company was having a difficult time selling its homes there. CW 1 was asked to do so because of her experience in California markets, specifically in the San Francisco area. CW 1 started her review in July 2022, and after reviewing over one hundred properties in the San Francisco Bay area and Southern California markets, CW 1 concluded that Opendoor "did not know" the market and was overpricing its homes, which caused Opendoor to hold onto those properties longer than they should have otherwise been. Opendoor also did not even do basic real estate marketing, which is saying that you did repairs or upgrades to explain the higher price, from when they purchased the property which CW 1 pointed out to them. Opendoor also put pictures in the marketing that were not ideal, such as backyard pictures with piles of weeds. Opendoor's marketing remarks did not match the house they were trying to sell either.

121. According to CW 1, the reason the houses were being priced too high was due to Opendoor's algorithm, which was not accounting for changes in the real estate market that were happening at that time. CW 1 told an Opendoor General Manager of Reselling that the algorithm was not accounting for the changing housing market conditions and was therefore

inaccurate, and that Opendoor needed to put the houses up for sale at prices that were lower, more realistic, and more aligned with the current market values as of July 2022. However, the GM of Reselling told CW 1 that "this is how Opendoor does it," and did not indicate that changes were going to be made. Opendoor priced high and would just do price reductions every week to two weeks, CW 1 told them this was not good, because buyers would just sit and watch and wait for the price to get lower and lower and this was not good marketing strategy. CW 1 told this to the general manager, and was told this was how they did their pricing and they didn't care if this was not the best way to do it or that it was not the typical real estate way to do it.

122. Defendants knew that Opendoor's homes were staying on the market too long. For example, Defendants Wu and Wheeler participated in company-wide conferences where they expressed concern over the levels of inventory and directed Opendoor employees to give concessions—which would eat into the Company's contribution margins—in order to get rid of the property.

123. CW 7 explained that the Company regularly held company-wide video conferences, either on Zoom or Google, that were led by Defendants Wu and Wheeler. CW 7 recalled these video conferences as being like internal earnings calls and that they were held monthly. According to CW 7, Wu and Wheeler's demeanor changed on these calls from positive attitudes to "long faces" sometime in mid-2022. CW 7 recalled that during a video call around July 2022, Wu and Wheeler stated that the Company needed to "quickly unload" properties because they were spending too much on inventory. Indeed, according to CW 7, Wheeler stated, "We'll take anything right now," which CW 7 explained meant that any offer would be taken.

124. CW 8 recalled that in July or August 2022, during an all-hands conference call, Defendant Wheeler announced that the new priority for the Company was "to lower the DIP," which CW 8 stated was an acronym for "Days In Possession." CW 8 recalled that after the announcement, Defendant Wheeler and Andrew Low Ah Kee worked closely with Daniel Murillo to adjust models in order to sell properties more quickly.

125. Similarly, CW 3 recalled a meeting in mid-2022 during which leadership talked about its extensive inventory. CW 3 noted, "The longer we held the inventory, the more money we lost, and less profit we made when we could turn around and sell those homes again." CW 3 recalled that Defendant Wheeler, Vice President of Sales & Support Shannon Hodges, President Andrew Low Ah Kee, and Sales Director Michelle Meyers led and spoke at this meeting. CW 3 explained that these four regularly hosted the Sales & Support meetings.

126. CW 7 also recalled that during an August 2022 video call, Wheeler gave the directive to provide credits and incentives to "outside assets," which she described as real estate agents and home mortgage companies, to help move the Company's inventory of properties. According to CW 7 it was also in July 2022, when she and her RedDoor legacy colleagues[7] began writing loans for Opendoor, that CW 7 witnessed many credits and incentives identified in the loan paperwork to close a deal. CW 7 recalled some examples as being an additional 1% being given to outside real estate brokers who presented home buyers that led to a sale, as well as a $2,000 lender credit and free appraisals. CW 7 advised that the amount of these credits and incentives were "uncommon" and that the properties whose portfolios she handled were depreciated assets with no repairs being done.

127. CW 7 went on to recall that when she was given loans to work on for the first time by Opendoor in July 2022, that she first worked on loans from California, and that she was then also working on loans from Texas and Arizona. According to CW 7, she witnessed Opendoor properties selling for less than what they were purchased for, with incentives and credits being given to unload the property, and without repairs being done, in all three states.

128. In addition to providing these credits and incentives, Opendoor had to pay outside brokers to help move their properties since the algorithm could not accurately price the homes, which also cut into the Company's contribution margins. For example, according to CW 1, for the properties in the San Francisco Bay area that she reviewed that had been

---

[7] Opendoor acquired RedDoor for $15 million on November 3, 2021. Opendoor described RedDoor as "a digital-first mortgage brokerage" and acquired RedDoor to integrate with Opendoor Home Loans.

unsold for a long period of time, Opendoor paid outside brokers to sell and list them properly, with accurate descriptions and better pictures. CW 1 explained that Opendoor would have had to pay a fee of around 2% to list the house with an outside broker.

129. These issues continued throughout the summer of 2022, as Opendoor employees told Wu and Wheeler during a company-wide meeting that the Company was not accurately pricing its offers. For example, in September 2022, CW 7 recalled that there was a video call that she attended where Wheeler said that she's "seeing depreciated assets" and a lot of inventory on the books, and to "move the properties." CW 7 recalled complaints from some of the attendees on that call that the Company was overpaying for houses and no repairs were being done.

### K. The Truth Begins to Emerge as Defendants Continue Misleading Investors About Opendoor's Pricing Algorithm

130. Investors began to learn the relevant truth concealed by Defendants' false and misleading statements starting on February 24, 2022. On that day, Opendoor announced massive losses, which started to reveal to investors that the Company's algorithm failed to live up to the representations Defendants made throughout the Class Period. After the market closed that day, Opendoor issued a press release and a shareholder letter announcing its financial results for the fourth quarter and year ended December 31, 2021. The press release revealed that the Company's fourth quarter 2021 contribution margin—a key profitability metric—was 4.0%, which was a significant decline from the Company's fourth quarter 2020 contribution margin of 12.6%.

131. On this news, the price of Opendoor common stock plummeted by more than 23% the next day, closing at $8.44 per share on February 25, 2022 on unusually heavy volume, as investors started understanding that the Company's algorithm could not maintain the contribution margins it had seen during the hot housing market of the previous year.

132. According to an article published by *The Real Deal* on February 25, 2022, this "selloff was widely attributed to a drop in Opendoor's contribution margin, a key profitability metric that factors in the costs of carrying and selling home inventory. It declined to 4 percent

38

in the fourth quarter from 13 percent a year ago." Therefore, the stock price drop was attributable to the Company's failure to price homes at profitable levels.

133. However, Defendants continued misleading investors about the Company's algorithm and its ability to maintain the Company's contribution margin within the 4% to 6% range in any housing market and economic condition.

134. On March 4, 2022, Defendant Wheeler attended the Wedbush Real Estate Technology Conference, where she answered questions about the Company's pricing algorithm and contribution margins. Specifically, the conference's moderator, an analyst from Wedbush, asked about the Company's ability to maintain its contribution margins in a flat or declining home price appreciation ("HPA") environment. Defendant Wheeler responded by claiming that Opendoor's "***ability to dynamically price homes in response to both micro and macro factors [] allows us to manage . . . within that 4% to 6%, annual margin range, and regardless of the home cycle we're operating in that's really important part of our business model***."

135. However, this statement was false and misleading because Defendants knew that Opendoor's algorithm could not price homes in response to changing macro- and micro-economic conditions and could not maintain contribution margins of 4% to 6% regardless of the home price environment. As explained above, because it relied primarily on human judgment, the algorithm failed to adjust to the changing housing market in 2022, leading to a significant amount of unsold inventory causing Opendoor to resort to giving significant concessions and paying outside brokers to sell off the inventory.

136. Defendant Wheeler's statement in ¶ 134 was false and misleading for the additional reason that Defendant Wheeler led investors to believe that the Company's success—i.e., its strong contribution margins—was the result of the algorithm and its ability to accurately adapt to changing market conditions, without disclosing that much of the Company's success was driven by deceptive consumer practices that contributed to the Company's profitability, such as charging sellers for repairs that Opendoor never made and pocketed as profit.

39

137.    Then on March 8, 2022, Defendant Wheeler attended the Morgan Stanley Technology, Media and Telecom Conference.  During that conference, one participant asked about the Company's strategy for maintaining margins as the housing market started slowing down.  In response, Defendant Wu claimed that the Company could maintain its margins in a down market, no matter how bad the economy was doing.  Specifically, Defendant Wu claimed that "***if you run the business model through the worst recession in U.S. history, we would still have positive contribution margin***."

138.    However, Defendant Wu's statement was false and misleading because it led investors to believe that the Company's model worked in any housing market, including the worst possible markets, when in reality, there was nothing about Opendoor's algorithm that made it any less susceptible to changes in the real estate market because, like its competitors, its pricing models were primarily human-driven.

**L.    The FTC Announces Settlement with Opendoor Over Deceptive Consumer Practices**

139.    On August 1, 2022, the Federal Trade Commission ("FTC") issued a press release announcing a $62 million settlement with Opendoor relating to claims that Opendoor engaged in deceptive consumer practices and required the Company to change its business practices moving forward.

140.    The FTC's related blog post stated that Opendoor advertised its iBuying business to consumers with the pitch that "Opendoor's cutting-edge technology would save sellers money by providing 'market value' offers and reducing transaction costs."  However, according to the FTC, "[i]n fact, the vast majority of consumers who sold to Opendoor lost thousands compared to what they would have realized in net proceeds from selling on the market because Opendoor's offers have been below market value on average and its costs have been significantly higher than what consumers typically pay."

141.    The FTC's blog post stated:

> The complaint alleges that Opendoor engaged in practices that both increased the costs to customers and reduced offers to below market value. Opendoor's approach to home repairs is one example. The

40

company told prospective customers that after an in-person assessment of the property, it may require them to make or pay for certain repairs. However, Opendoor also said that it 'ask[s] for the repairs we anticipate the next buyer of the home will ask for' – fixes that customers would have to address before a traditional sale, too. Opendoor further claimed that consumers may even save money on repairs if they sell to Opendoor because 'we do our best to pass wholesale savings on to you from our partnerships with local vendors.' But according to the FTC, Opendoor's required repairs often cost thousands more than what people would have to pay before a traditional sale.

142. In connection with the settlement announcement, the FTC released their complaint against Opendoor. The Complaint—which was based on an over two-year long investigation—offered significant details about the FTC's allegation that Opendoor cheated home sellers by tricking them into thinking that they could make more money selling their home to Opendoor than on the open market using the traditional sales process.

143. The FTC complaint corroborated the CW allegations in Section V(C) that humans, not the algorithm, drove pricing decisions since before the Class Period.

144. For example, the FTC complaint alleged that although Opendoor claimed that its algorithm generated "market based" offers, "[i]n many instances, **Opendoor's employees have manually adjusted these values** before presenting them to consumers as offers." Indeed, the FTC complaint found—based on documents produced by Opendoor during the FTC's investigation—that "**Opendoor's internal analyses** showed that these manually adjusted offers were **several percentage points below Opendoor's assessment of market value**" and explained that "[b]eginning no later than 2019, **Opendoor instituted a policy** to reduce its manually adjusted offers to [redacted] below what Opendoor assessed as market value." Similarly, the FTC reviewed an "internal communication [which] stated bluntly, 'We don't offer a fair market value to our customers.'"

145. The FTC complaint also corroborated the CW allegations in Section V(D) that Opendoor made money by charging sellers for repairs that they did not end up making.

41

146. For example, the FTC complaint alleged that "Opendoor has sent customers a list of required repairs with the cost it would charge consumers if they agree to deduct the costs from their sales proceeds. The list of repairs has been typically well beyond what consumers would be responsible for in a market sale." According to the FTC, many of these repairs were unnecessary: "Opendoor has routinely requested upgrades to, or replacement of, functional heating and cooling systems, flooring, and roofs. It has also frequently demanded cosmetic changes such as repainting and replacement of items that could be repaired at far lower cost."

147. The FTC complaint alleged that since Opendoor takes up to 18 days after their initial offer to provide the seller with a list of repairs, sellers could not walk away because they had already placed deposits on new homes. Notably, the FTC alleged that "Opendoor's **internal communications** have described the lag between the initial offer and the later, significantly lower offer as a 'bait-and-switch' operation."

148. Finally, the FTC complaint confirmed the CW allegations in Section V(D) that Opendoor often pocketed the repairs costs as extra profit. Specifically, the FTC complaint alleged that:

> If the consumer decides to authorize Opendoor to complete the repairs and deduct the estimated costs from the sale proceeds, Opendoor completes the repairs after it acquires the property. **If the repairs cost less than the amount deducted, Opendoor retains the excess as profit**, including the undisclosed Estimated Repair Credit that Opendoor deducted from its original offer.

149. Notably, the FTC investigation confirmed that the Exchange Act Defendants knew or were reckless in not knowing about this deceptive consumer practice. According to the FTC, "[o]ne **internal study** found that for [redacted] of Opendoor's purchases, its deductions for repair costs were greater than Opendoor's actual costs, thereby 'taking away [redacted] of seller equity' in each of those sales."

150. The FTC complaint also found that Opendoor made money by buying low and selling high. The FTC complaint stated:

42

Opendoor claimed that it did not make money from 'buying low and selling high,' but from 'charging a fee for [its] service.' **But gains from selling homes for more than its offer price are a key contributor to its revenue**. A 2019 financial analysis broke down revenue from Opendoor's fee and from 'net resale gain' and reported over [redacted] in resale gains in 2018 and [redacted] in project resale gains in 2019. Presentations to investors touted 'resale gain' as a significant contributor to Opendoor's revenue per home.

* * *

**Data from Opendoor's real estate transactions confirm that Opendoor makes money not just from its fees, but also from buying homes low and selling them high.** After purchasing homes, it lists them on the open market for resale. From 2016 through February 2020, Opendoor sold [redacted] percent of its homes for more than what it offered consumers. The average gain on these homes was [redacted], or [redacted] percent of the homes' average offer price of [redacted].

151. In connection with the settlement agreement, Opendoor agreed to pay $62 million and stop the deceptive consumer practices. The Director of the FTC's Bureau of Consumer Protection, Samuel Levine, stated in the FTC's press release announcing the settlement that, "Opendoor promised to revolutionize the real estate market but built its business using old-fashioned deception about how much consumers could earn from selling their homes on the platform. There is nothing innovative about cheating consumers."

152. Following the FTC's announcement, which was released during trading hours on August 1, 2022, the Company's stock price fell by 2.44% by the close of trading on that day.

153. Despite the settlement and the FTC's findings, Defendants continued to mislead investors. For example, after the market closed on August 1, 2022, Opendoor issued a press release "strongly disagree[ing]" with the FTC's findings. Specifically, the August 1, 2022 press release stated:

While we strongly disagree with the FTC's allegations, our decision to settle with the Commission will allow us to resolve the matter and

43

> focus on helping consumers buy, sell and move with simplicity, certainty and speed.
>
> Importantly, ***the allegations raised by the FTC are related to activity that occurred between 2017 and 2019 and target marketing messages the company modified years ago.*** We are pleased to put this matter behind us and look forward to continuing to provide consumers with a modern real estate experience.

154. However, this statement was false and misleading because it led investors to believe that the conduct alleged in the FTC complaint had not occurred during the Class Period, when in reality, Opendoor had continued its deceptive consumer practices throughout the entire Class Period. Specifically, as alleged by multiple former employees, throughout the Class Period, Opendoor continued manually adjusting the offer price and charging sellers for repairs that did not get done in order to pocket the extra money as profit. *See* Section V(C)-(D), *supra*.

155. Following the Company's false and misleading press release, Opendoor's stock rebounded the next day, closing up 1.25% on August 2, 2022, as Defendants' reassurances led investors to believe that the conduct alleged in the FTC complaint was limited to 2017 to 2019 when in reality Defendants continued engaging in the same fraudulent conduct at issue in the FTC complaint during the Class Period.

### M. Defendants Continue Misleading Investors as Housing Market Continues Declining

156. Then, on August 4, 2022, the Company held an earnings call discussing their second quarter 2022 financial results. During the earnings call, Defendant Wu acknowledged that the housing market had slowed significantly, however, Defendant Wheeler reassured investors that the Company's algorithm would work in the current, extremely volatile housing market. Specifically, Defendant Wheeler responded by reassuring "***our systems are doing exactly what they're designed to do, which is responding very, very quickly, adjusting prices to market*** within recent spreads and new acquisitions."

157. The next day, August 5, 2022, as a result of Defendants' false and misleading representations regarding the algorithm's ability to navigate the recently observed housing market volatility, the Company's stock price jumped 21.7% to close at $5.72 per share.

**N.    The Truth Emerges as Investors Learn that Opendoor's Algorithm Did Not Work in any Market**

158. Contrary to Defendants' repeated representations that Opendoor's algorithm was responsive to changes in macro- and micro-economic conditions, the algorithm was wildly inaccurate and unable to accurately predict changing economic conditions, causing the Company to sustain massive losses once the housing market cooled and median home prices began to decline.

159. On September 19, 2022, citing a review of industry data, Bloomberg reported that the Company lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties), stating, in relevant part:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.

> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.

> * * *

> 'Opendoor's metrics are in the danger zone,' DelPrete said in an interview. 'They are very close to where Zillow was in its worst moments.'

> The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase. When home prices were skyrocketing earlier in the year, Opendoor banked easy profits. Then dwindling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.

> By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of properties it had agreed to purchase when prices were rising.

                    * * *

                    The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday.
                    They were down 72% this year through the close on Sept. 16.

160.     Following the September 19, 2022 Bloomberg report, Opendoor's stock price fell $0.50 per share, or 12.32 percent, over the following two trading sessions, to close at $3.56 per share on September 20, 2022.

161.     However, investors did not know the full truth.  For example, on September 30, 2022, Motley Fool published an article entitled, "First Zillow, Now OpenDoor? Is iBuying Doomed?"   In the article, Motley Fool questioned whether Opendoor could withstand a housing market correction and stated that Opendoor was "on a similar trajectory as Zillow before its full retreat from the iBuying business."

162.      Investors learned the full truth on November 3, 2022, when Defendants reported the Company's financial results for the third quarter ended September 30, 2022.  On that day, Opendoor revealed that its contribution margin was **negative 0.7%**—well below the Company's 4% to 6% contribution margin range—which revealed for the first time that, contrary to Defendants' repeated representations, Opendoor's pricing algorithm could not protect the Company from changing market conditions and could not deliver a 4% to 6% contribution range in any market.

163.     On this news, Opendoor's stock fell more than 25% over the next two trading days, closing at $1.74 per share on November 7, 2022, as investors finally understood that Opendoor's pricing algorithm did not work in any market, and as a result, the Company could not deliver 4% to 6% contribution margins in any economic environment.

164.     For example, on November 23, 2022, *Seeking Alpha* posted an article titled "Opendoor Must Adapt Its Business Model To Improve Flexibility – Or Continue Value Freefall."   The article explained that Opendoor's algorithm could not adjust to changing economic cycles, and opined that the Company's pricing problem went beyond elevated interest rates and inflation.  Specifically, the article stated:

                    46

Of the 3 iBuying platforms that remain in operation, Opendoor recorded the largest losses, despite owning the largest market share. Profit margins tell a similar story, as all three of the remaining iBuyers struggle to achieve profitability even before accounting for any expenses besides COGS.

. . .

While these declines may be largely attributed to elevated inflation levels and spikes in interest rates (discussed further in next section), **the fact that these macroeconomic changes can wreak such havoc on the profitability of this business model illustrates the inflexibility of these businesses to respond to changing circumstances and reveals concerning underlying problems that perhaps go deeper than interest rates.** Additionally, while Redfin has other aspects of their business which provide a more diverse revenue stream, Opendoor and Offerpad do not have other sources of revenue that can help sustain the business in times of trouble.

165. Finally, on February 23, 2023, Opendoor reported financial results for its fourth quarter and year ended December 31, 2022, which revealed to investors that the Company's annual contribution margin for 2022 was 3.4%—below the annual contribution margin of 4% to 6% that Defendants repeatedly claimed was the range of outcomes because of the Company's supposedly superior pricing algorithm.

## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

166. Plaintiffs allege that the statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Exchange Act Defendants were aware of or were reckless in not knowing. As alleged herein, such statements artificially inflated or maintained the price of Opendoor's publicly traded common stock and operated as a fraud or deceit on all persons and entities that purchased common stock during the Class Period.

167. Throughout the Class Period, Defendants made a series of false and misleading statements regarding Opendoor's pricing algorithm in which they overstated the purported benefits and competitive advantages of the algorithm by claiming that it could adapt in real time to changing market conditions and economic cycles and ensure that the Company's

contribution margins stayed within a 4% to 6% range. Defendants also falsely told investors that their pricing decisions were based on the algorithm's fully automated process, while at the same time concealing the broader, more complicated human-driven process that drove the Company's pricing decisions which made Opendoor just as susceptible to changing housing markets as any other iBuying businesses and real estate company.

**A.      The December 21, 2020 Registration Statement**

168.      The Class Period begins on December 21, 2020, when Opendoor's post-Merger common stock began publicly trading on the NASDAQ. Before the market opened on that day, the Company filed a registration statement on Form S-1 with the SEC (the "December 21, 2020 Registration Statement"). The December 21, 2020 Registration Statement, which was signed by Defendants Wu and Wheeler, contained several false and misleading statements about the Company's business and the purported benefits of Opendoor's AI-powered algorithm.

169.      The December 21, 2020 Registration Statement contained the following false and misleading information about the Company's proprietary data and pricing algorithm:

> *Proprietary offline data*. We have conducted over 150,000 home assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. Once we have purchased a home, we can collect additional proprietary home-level data through visitor feedback, visitor traffic and duration of visits. These proprietary data points have led us to make over one billion annotations and corrections to Multiple Listing Services ("MLS") and tax assessor data, as well as build out new, non-traditional geospatial data assets, such as power line proximity and road noise level. The additional home level data we collect from local vendors provides structured feedback on each home and further strengthens our data moat.
>
> *Pricing accuracy*. Our unique data works in concert with our pricing algorithms. ***These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management.*** Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and

> scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.
>
> Advancements in model sophistication have accelerated our feedback loops, such that ***our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions.*** This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

170. The statement in ¶ 169 was false and misleading because as described in Section V(c) above, Opendoor's pricing decisions were driven by humans, not the algorithm. As explained by multiple former employees, Opendoor's algorithm was largely inaccurate and, as a result, the Company relied heavily on humans to price Opendoor's offers. For example, CW 2, who worked as a Pricing Analyst at Opendoor during the Class Period, explained that she adjusted the prices downward because the system was consistently overpricing the homes. Indeed, CW 2 said that about 90 percent of the final offers she submitted for approximately 4,000 homes she priced were below the number generated by the system.

171. The statement in ¶ 169 was also false and misleading because Defendants failed to disclose the broader, more complicated human-driven process that drove the Company's pricing decisions. As such, Defendants overstated the purported benefits and competitive advantages of the algorithm, and failed to disclose the known risk that the Company was just as susceptible to changing housing markets and economic conditions as other iBuying businesses and traditional home flippers, and thus was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations.

172. The statement in ¶ 169 was also false and misleading because Opendoor's algorithm could not adjust to leading market indicators or react to real-time macro- and micro-economic conditions. As explained above, the algorithm failed to adjust to the changing housing market, which started in early 2022 when interest rates started increasing and home prices stopped appreciating as they had been in late 2020 and throughout 2021. Therefore,

49

contrary to Defendants' representations, the algorithm could not "dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions."

173. The December 21, 2020 Registration Statement also falsely claimed that the Company's pricing algorithm drove the Company's profitability:

> **Pricing accuracy and automation.** We have invested significant engineering, data science, and operations resources in our pricing infrastructure. ***Our proprietary, machine learning-based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation.*** Based on our historical results, we believe pricing performance will continue to improve with operating experience and scale.

174. The statement in ¶ 173 was materially false and misleading because the Company's profitability was not driven by the algorithm, but rather, deceptive consumer practices such as lowering the algorithm's offer before submitting it to the seller and charging the seller for repairs that Opendoor did not make. *See* Sections V(C)-(D), *supra*.

175. The December 21, 2020 Registration Statement also misled investors about how the Company generated its revenue. Specifically, the December 21, 2020 Registration Statement stated:

> In order to finalize our offer, we conduct a free assessment to confirm all of the home details and identify any repairs that may need to be performed. We have developed purpose-built software to guide home assessment workflows and collect over 100 unique data points regarding a home's condition and quality, which we incorporate as structured data into our underlying pricing models. Once completed, we finalize our offer, taking into consideration any necessary repairs, and produce the purchase agreement for the seller. Our objective is to provide a competitive cash offer to sellers and we believe this approach builds trust with our potential customers. ***Our business model is designed to generate margins from our service charge to sellers and ancillary products and services associated with a transaction, and not from the spread between acquisition price and resale price***.

50

176.    The statement in ¶ 175 was materially false and misleading when made because the contrary to Defendants' statements, the Company's business model was in reality designed to generate margins from the spread between acquisition price and resale price, i.e., from buying low and selling high.  As the FTC found during its over two-year long investigation, although "Opendoor claimed that it did not make money from 'buying low and selling high,' . . . gains from selling homes for more than its offer price are a ***key contributor*** to [Opendoor's] revenue."  *See* ¶ 150, *supra*.

**B.    March 4, 2021 – 2020 Annual Report**

177.    On March 4, 2021, Opendoor filed its Form 10-K for Fiscal year 2020 (the "2020 Annual Report").  The 2020 Annual Report, which was signed by Defendants Wu and Wheeler, contained false and misleading statements about the algorithm's ability to accurately adjust to changing market conditions and economic cycles.  Specifically, Exchange Act Defendants mislead investors by stating that:

> *Pricing accuracy*. Our unique data works in concert with our pricing algorithms. ***These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management.*** Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.
>
> Advancements in model sophistication have accelerated our feedback loops***, such that our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions.*** Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

178.    This statement was false and misleading for the same reasons discussed in ¶¶ 170-72, *supra*.

51

179. The 2020 Annual Report also misled investors about how the Company generated its revenue. Specifically, the 2020 Annual Report stated:

> In order to finalize our offer, we conduct a free assessment to confirm all of the home details and identify any repairs that may need to be performed. We have developed purpose-built software to guide home assessment workflows and collect over 100 unique data points regarding a home's condition and quality, which we incorporate as structured data into our underlying pricing models. Once completed, we finalize our offer, taking into consideration any necessary repairs, and produce the purchase agreement for the seller. Our objective is to provide a competitive cash offer to sellers and we believe this approach builds trust with our potential customers. ***Our business model is designed to generate margins from our service charge to sellers and adjacent products and services associated with a transaction, and not from the spread between acquisition price and resale price.***

180. This statement was false and misleading for the same reasons discussed in ¶ 176, *supra*.

**C.     November 10, 2021 – Earnings Call**

181. On November 10, 2021—just over one week after Zillow announced that it was winding down Zillow Offers, its iBuying business, because its algorithm could not accurately price offers—Opendoor held an earnings call discussing the Company's third quarter 2019 financial results (the "November 10, 2021 Earnings Call"). During the earnings call, Exchange Act Defendants falsely reassured the market that Opendoor was different and would not face the same fate as Zillow because of Opendoor's superior pricing algorithm. In response to an analyst question about housing pricing volatility and how that would affect the Company's contribution margin, Defendant Wheeler falsely assured the market that Opendoor's pricing algorithm would work in ***all*** housing markets and economic conditions:

> **Nicholas Jones**
> *Citi*
>
> Great. Thanks for taking the questions. I guess, maybe two. One, can you touch on housing pricing volatility and how you feel your model

52

is kind of positioned to withstand that, and kind of detected given some of the turnover. And then if let's say, prices you could press a little bit, how much contribution margin compression can we expect and how much can the kind of model withstand given some of the other kind of headlines and outline over the last two weeks? Thanks.

**Carrie Wheeler**
*Chief Financial Officer*

Thanks, Eric. Hey, Nick. Embedding your question is how do we price for homes and how do we think about forecasting. A couple of comments; one, we're very good at this. This is core to what we do. We have built over the last seven years, very robust pricing systems. We have seven years of investment in the data, in the modeling and in our team that allows us continuously improve how we model and approach home price valuations. We operate our business with a tight discipline.

As Eric said, we are rigorously back testing our models every day. ***They're highly responsive. They have fast feedback loops and we can react to changing market conditions. Our forecasting accuracy was what allows us to manage the business within a reasonable range of outcomes and deliver margins within that 4% to 6% contribution margin range that we've guided to***. Ultimately, the proof of our ability to do that is in our results. I just want to mention again, Q4 will mark our 20th consecutive quarter of positive [contribution margin].

So that's housing and – so the housing and forecasting question in total. And the part two of your question was around contribution margins, and how they may fluctuate with changes in HPA. ***Important is that our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets.*** We've talked about this before. But we are a market maker. Like define that, that means we provided putting in the customers, we're pricing a certainty and we're taking a spread. We're getting paid for that. And we're managing that our business to that 46% range I just indicated if HPA were to go down, we would look to fluctuate increase our spreads to manage to that target margin range. So, I would not marry HPA trend and contribution margin trends together. We're driving for consistency within that range of outcomes

182.     Defendant Wheeler's statement was false and misleading because the algorithm could not react to changing market conditions or maintain contribution margins between 4%

53

to 6% in all markets. Indeed, despite Defendant Wheeler's unequivocal claim that the Company's model worked in all markets, including down markets, the Company's model did *not* work in a down market in 2022, causing the Company to lose money on most of its properties in key markets and deliver negative contribution margins for the third quarter 2022. Moreover, Defendant Wheeler's statements were false and misleading because they led investors to believe that the accuracy of Opendoor's algorithm allowed the Company to maintain positive contribution margins in any environment—thus shielding the Company from the risk of changing market conditions and economic cycles—while concealing the broader, more complicated human-driven process that drove the Company's pricing decisions and put Opendoor at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations. These misrepresentations were highly material to investors, especially considering that Zillow had just exited the iBuying business for its failure to accurately price its homes, which sparked investor concern over whether other iBuyers, like Opendoor, could work as a business model.

## VII. THE TRUTH GRADUALLY EMERGES AS DEFENDANTS CONTINUE MAKING MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. February 24, 2022 – First Partial Corrective Disclosure/Materialization of the Risk

183. The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were partially revealed and/or partially materialized on February 24, 2022, when Opendoor announced its fourth quarter and full year 2021 financial results and revealed massive losses. Specifically, the Company announced that its fourth quarter 2021 contribution margin was just 4%, a steep decline from a 12.6% contribution margin in the fourth quarter of 2020.

184. On this news, the Company's stock price tanked, dropping more than 23% the very next day to close at $8.44 per share on February 25, 2022.

185. According to an article published by *The Real Deal* on February 25, 2022, "[t]he selloff was widely attributed to a drop in Opendoor's contribution margin, a key profitability metric that factors in the costs of carrying and selling home inventory."

54

B. **March 4, 2022 – False and Misleading Statements During the Wedbush Real Estate Technology Conference**

186. Following the partial corrective disclosure/materialization of the risk on February 24, 2022, Defendants continued misleading investors about the purported strengths and benefits of Company's algorithm. Specifically, on March 4, 2022 Defendant Wheeler attended the Wedbush Real Estate Technology Conference, where she answered questions about the Company's pricing algorithm and contribution margins. Specifically, the conference's moderator, an analyst from Wedbush, asked the following question about the Company's ability to maintain its contribution margins in a flat or declining home price appreciation ("HPA") environment:

**Ygal Arounian**
**Moderator**
So going from 4Q to 1Q that the guide implies better our margins in 1Q. So, what's the bridge to get from where we were – see improvements in 1Q? And then, how do we think about the sustainability of your margins moving forward, when you've given the guideposts of that kind of 4% to 6% contribution margin, but maybe it's something that often comes up as how to think about that in a flat or declining HPA environment angle. Saw a couple quarters of flat HPA, it seems like it's sticking back up here again a little bit, but what about in a declining environment as well?

**Carrie Wheeler**
**Chief Financial Officer**
So, our Q1 guide as you mentioned, it does imply a sequential increase in contribution margins to around 5%, and as we indicated on the call and we are at a point where walking into Q1 in a real position of strength, very healthy inventories we indicated on our call. We right size our operational capacity and we're seeing strong demand for homes. So we feel good about our setup for Q1.

More broadly, you're [sic] bigger question about how do you manage margins over time relative to different HPA environments. ***Our business model is really designed to ensure that we can meet our annual margin target at 4% to 6% contribution margin, regardless of the home price environment we're operating in, and the way we do that is just how we price our homes***. We are earning a return for providing liquidity and delivering a superior experience with

55

certainty, and that return of the spread we need to earn is incorporated into every offer price that spray gets dynamically adjusted for every single home and it reflects the level of certainty we have for each home offer, certainly for us can it be impacted by factors like, what's the macro? What is the home price environment we're selling into? What's the rate of resale? As well as, a myriad of specific home conditions, age of digital home, death of (inaudible), a number of things.

If the level of certainty we have is lower, we are going to be more conservative on our offer price, and obviously the inverse can hold too. If we have a high degree of confidence in the offer price, we can be at the higher end of the range, when we submit an offer to the customer. ***But it's really, this ability to dynamically price homes in response to both micro and macro factors that allows us to manage first of all, within that 4% to 6%, annual margin range, and regardless of the home cycle we're operating in that's really important part of our business model.***

187. However, Defendant Wheeler's statement in ¶ 186 was false and misleading because Opendoor's algorithm could not price homes in response to changing macro- and micro-economic conditions and could not maintain contribution margins of 4% to 6% regardless of the home price environment. As explained above, the algorithm failed to adjust to the changing home price environment in 2022, when interest rates started increasing and home prices stopped appreciating as they had been in late 2020 and throughout 2021, leading the Company to post a negative contribution margin for the third quarter 2022 and a 3.4% contribution margin for the full year 2022. *See* Sections V(J)-(N).

188. Defendant Wheeler's statement in ¶ 186 was false and misleading for the additional reason that Defendant Wheeler led investors to believe that the Company's success—i.e., its strong contribution margins—was the result of the algorithm and its ability to accurately adapt to changing market conditions, without disclosing that much of the Company's success was driven by deceptive consumer practices that contributed to the Company's profitability, such as charging sellers for repairs that Opendoor never made and pocketed as profit. *See* Sections V(C)-(D), *supra*.

56

**C.    March 8, 2022 – False and Misleading Statements During the Morgan Stanley Technology, Media and Telecom Conference**

189.    On March 8, 2022, Defendant Wu continued misleading investors at the Morgan Stanley Technology, Media and Telecom Conference.  During the conference, one participant asked about the Company's strategy for maintaining margins as the housing market started slowing down.  In response, Defendant Wu relieved any investor concerns of the Company's ability to maintain its margins in a down market, stating:

> **Unidentified Participant**
> One of the other common discussions is around just the macro housing market. Housing market has been somewhat white hot for the last, let's call it, 12 months. Talk to us about how you think about philosophically, investing for growth as the housing market slows in the next couple of years as well as keeping safeguards in place to minimize balance sheet risk and have the- right checks and balances in place.
>
> **Eric Wu**
> **Chief Executive Officer**
> Yes. It's [not] . . . something that falls straight off. And so I would say a couple of things about risk. Obviously, this is something we study very closely and something we're very good at. There's four key points I want to make. One is that our homes are liquid listed assets, which is very different than a homebuilder or a REIT. And we hold homes for about 100 days, of which 50 days of that is under resale contract. That means we have a buyer, a deposit and a contract in place, right. So 50 days of that is on a resale contract. The other half is what you might call a listing exposure, right. And the second thing is that if you study the worst U.S. housing recession in history, which is the GFC or subprime crisis, the market moved much slower than people perceive. And so nationwide in the worst part of the recession, the prices moved a negative 2.8%. And obviously, our exposure is 50 days, but that's well within our margin of error vis-a-vis our contribution margin of 4% to 6%. ***And so if you run the business model through the worst recession in U.S. history, we would still have positive contribution margin.*** The third piece of that – that's assuming we don't know that there's a recession. So the third piece of that we've invested heavily in the data collection here. ***So we're tracking in real-time demand signals, both of our homes, visits, as well as market homes, clearance rates and what's happening in market, mortgage applications, all of the demand signals, then the***

57

*form of pricing. So there's never a disconnect between what we view with supply side pricing and demand side.* And so we're tracking the data very closely, and we're updating prices in real time. And then the fourth is really the debt structure. We have $11 billion of borrowing capacity, committed nonrecourse. If there's a dislocation, this gives us a tremendous amount of dry powder to actually capitalize on a dislocation.

190. Defendant Wu's statement in ¶ 189 was false and misleading because it led investors to believe that the Company's model worked in any housing market, including the "worst recession in U.S. history," which was false because, as explained above, the Company's model did not work in 2022's housing market, which was not the worst recession in U.S. history. Moreover, Defendant Wu's statement in ¶ 189 was also false and misleading because it overstated the purported benefits of the algorithm—namely that it collected data such as demand signals so that "there's *never* a disconnect between what we view with supply side pricing and demand side"—when, in reality, the algorithm could not forecast demand trends to price homes accurately. As explained by multiple former employees, the algorithm did not accurately price homes in late 2021/early 2022, leading to excess inventory that forced Opendoor to issue concessions and hire outside brokers, which cut into the Company's contribution margin. *See* Section V(J), *supra*.

191. Later during the same conference, one participant expressed skepticism about whether the Company could maintain positive contribution margins in a down market and, as evidence of that, noted that the Company's contribution margin slowed in the fourth quarter of 2021 as the housing market cooled off. The same participant asked whether Opendoor could scale the business, and cited Opendoor's competitors, including Zillow, as evidence that iBuyers have not been able to scale. Specifically, the participant asked:

> Thanks. Eric, [] relative to a lot of stocks in the market, the stocks underperformed a lot despite really positive revisions to revenue. You guys have been beating your numbers on revenue and gross margins. And what I hear most often a skepticism about the model itself. And I wanted to just kind of throw three [bear] cases [at] you in here, to get your response. The first is that . . . home price appreciation is the reason or kind of the necessary condition for you to have the types of gross margins that you did and that is home price appreciation

58

plateaued in the back half [of 2021]. We saw that with lower contribution margin in the fourth quarter [of 2021]. That's one. The second is that the business, it's a good business at small scale, but it just can't scale to the volumes that you guys have talked about over time. So Zillow started to grow big and they kind of got out of control and they're like, yes, let's get out of this. The other guys that are doing, iBuying are doing it at much smaller size. So the question is, can you guys do, can you scale the 50,000 homes or 75,000 homes or 100,000. Is that possible? And the third is that the adjusted gross profit that you report and adjusted EBITDA that you report isn't a really good representation of the economic value that you're creating and that, in particular, there's financing costs, you have cost of debt and mezzanine financing. And so whatever adjusted gross margin you're showing us or contribution margin, that's not really durable economic value. And I guess the question there is, do you have the ability to finance it and kind of generate working capital to create sustainable economics? Those are three.

192.    In response to the participant's question about Opendoor's ability to maintain its contribution margins in a declining market, Defendant Wu reiterated that the Company's algorithm would work in any market, including the worst housing market in the history of the United States.  Specifically, Defendant Wu answered the question as follows:

Yes, yes, what I would say is that the whole pricing function is to price the home with as much precision as possible given the risk in the system. And so we've already demonstrated that we can operate in a flat market. The company didn't benefit from 7% quarter-on-quarter appreciation when we started the company. And so I would say that I would point at the results over the past seven years in a less hot market. The other bear case literally two years ago was that we can operate in a hot market. And so now that we've demonstrated that we can actually make more margin in a hot market, there's more demand for the product, then there are many bear cases, can you operate in a declining HPA market. **We have empirical evidence that, obviously, not all zip codes, not all cities, not all states have all gone up at the same velocity. So we have good evidence that we can operate in declining market. And outside of like inducing a recession, I can't give you more confidence outside of that. What I can say is that, again, if you apply the business to the subprime crisis and do the analysis, the business actually is quite healthy.** And then the bull case is that demand flock to the site.

59

193. Defendant Wu's statement was false and misleading because it led investors to believe that the Company's model worked in any housing market—including the subprime crisis, which was one of the worst recessions in U.S. history—which was false because, as explained above, the Company's model did not work in 2022's housing market, which to date has not been as harmful to the U.S. economy or housing market.

### D. August 1, 2022 – False and Misleading Press Release

194. On August 1, 2022, the FTC announced the settlement with Opendoor over claims that Opendoor engaged in deceptive consumer practices. In connection with the settlement, the FTC released their complaint against Opendoor, which offered details about the FTC's investigation and findings. *See* Section V(L), *supra*.

195. Following the FTC's announcement, which was released during trading hours on August 1, 2022, the Company's stock price fell by 2.44% by the close of trading on that day.

196. However, after the market closed on the same day, Opendoor issued a false and misleading press release "strongly disagree[ing]" with the FTC's findings and claiming that the conduct only occurred between 2017 and 2019. Specifically, the August 1, 2022 press release stated:

> While we strongly disagree with the FTC's allegations, our decision to settle with the Commission will allow us to resolve the matter and focus on helping consumers buy, sell and move with simplicity, certainty and speed.
>
> Importantly, ***the allegations raised by the FTC are related to activity that occurred between 2017 and 2019 and target marketing messages the company modified years ago.*** We are pleased to put this matter behind us and look forward to continuing to provide consumers with a modern real estate experience.

197. However, the statement in ¶ 196 was false and misleading because it led investors to believe that the conduct alleged in the FTC complaint had not occurred during the Class Period, when in reality, Opendoor had continued its deceptive consumer practices

throughout the entire Class Period. Specifically, as alleged by multiple former employees, throughout the Class Period, Opendoor continued manually adjusting the offer price and charging sellers for repairs that did not get done in order to pocket the extra money as profit. *See* Section V(C)-(D), *supra*.

198. Following the Company's false and misleading press release, Opendoor's stock rebounded the next day, closing up 1.25% on August 2, 2022, as Defendants' reassurances led investors to believe that the conduct alleged in the FTC complaint was limited to 2017 to 2019 when in reality Defendants continued engaging in the same fraudulent conduct at issue in the FTC complaint during the Class Period.

**E.     August 4, 2022 – False and Misleading Statements During the Company's Earnings Call**

199. On August 4, 2022, the Company held an earnings call discussing their second quarter 2022 financial results. During the call, Defendant Wheeler reassured investors that the Company's algorithm would work in the current, extremely volatile housing market. Specifically, Defendant Wheeler responded by reassuring investors that, "***our systems are doing exactly what they're designed to do, which is responding very, very quickly, adjusting prices to market*** within recent spreads and new acquisitions."

200. Defendant Wheeler's statement in ¶ 199 was false and misleading because the Company's systems were not responding quickly or adjusting to the housing market. Indeed, the algorithm did not adapt to the changing housing market or demand, resulting in high levels of inventory throughout 2022. *See* Section V(J), *supra*. Things had gotten so bad by mid-2022 that Defendants Wu and Wheeler stated at a company-wide meeting in July 2022 that the Company needed to "quickly unload" properties because they were spending too much on inventory, and Defendant Wheeler stated, "We'll take anything right now."

201. Although Defendant Wheeler claimed in August 2022 that the algorithm was adjusting to the current market and doing exactly what it was designed to do, in reality, that month Opendoor was losing money on 42% of all transactions and over 50% in key markets and such as Los Angeles and Phoenix. *See* ¶ 159.

61

**F.     September 19, 2022 – Second Partial Corrective Disclosure/Materialization of the Risk**

202.     The truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were partially revealed and/or partially materialized on September 19, 2022, when Bloomberg published an article revealing for the first time that Opendoor lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties).   Specifically, the Bloomberg article stated:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.
>
> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.
>
> * * *
>
> The company's rocky summer is reminiscent of the pricing problems that doomed Zillow Group Inc.'s iBuying business last year, according to a research note from Mike DelPrete, a scholar-in-residence at the University of Colorado Boulder. That doesn't mean Opendoor is going to shut down the business, but it demonstrates the depth of the losses — and September is likely to be even worse than August, DelPrete's analysis shows.
>
> Opendoor's metrics are in the danger zone," DelPrete said in an interview. "They are very close to where Zillow was in its worst moments."
>
> The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase. When home prices were skyrocketing earlier in the year, Opendoor banked easy profits. Then dwindling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.

62

By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of properties it had agreed to purchase when prices were rising.

* * *

The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday. They were down 72% this year through the close on Sept. 16.

203. Following the September 19, 2022 Bloomberg report, Opendoor's stock price fell $0.50 per share, or 12.32%, over the following two trading sessions, to close at $3.56 per share on September 20, 2022.

204. Bloomberg's findings further revealed the truth about the Company's algorithm—namely that it could not adjust to changing market conditions. However, investors did not know the full truth about the Company's algorithm and still had questions about its ability to price homes in a down market. For example, on October 1, 2022, Motley Fool published an article stating that "given the recent Bloomberg coverage, investors should ask whether Opendoor will suffer a fate similar to (or worse than) Zillow's iBuying business or if there is hope for long-term success." While the article noted the differences between Zillow and Opendoor—mainly that Zillow failed in an up-market—it explained that: "Rapidly decreasing home prices mean Opendoor is likely struggling to sell homes fast enough to offset the decline in value between the time they buy a house and resell it. Investors will find out more when the company reports third-quarter earnings." In other words, investors were focused on the Company's third quarter earnings report to answer questions about whether Opendoor's pricing algorithm worked in a declining HPA environment.

## VIII. THE FULL TRUTH IS REVEALED AS DEFENDANTS DISCLOSE NEGATIVE CONTRIBUTION MARGIN

205. Investors learned the full truth about the Company's algorithm on November 3, 2022, when the truth and foreseeable risks concealed by Defendants' misconduct, misleading statements, and omissions during the Class Period were fully revealed and/or fully

materialized. After the market closed that day, the full truth was revealed to investors about the algorithm's failure to adjust to changes in macro- and micro-economic conditions and the Company's inability to deliver 4% to 6% contribution margins in any housing market.

206. On November 3, 2022, Opendoor reported its financial results for the third quarter ended September 30, 2022, which revealed that Opendoor's contribution margin for the third quarter 2022 was ***negative 0.7%***—well below the Company's 4% to 6% contribution margin range and well below the Company's contribution margin of 7.5% from the third quarter of 2021.

207. This information revealed to investors for the first time that, contrary to Defendants' repeated representations, Opendoor's pricing algorithm could not deliver 4% to 6% contribution margins in any market. Investors finally understood that Opendoor's pricing algorithm did not work in any market and could not protect the Company from changing market conditions.

208. On this news, Opendoor's stock fell more than 25% over the next two trading days, closing at $1.74 per share on November 7, 2022.

209. On November 23, 2022, *Seeking Alpha* posted an article titled "Opendoor Must Adapt Its Business Model To Improve Flexibility – Or Continue Value Freefall." The article explained that Opendoor's algorithm could not adjust to changing economic cycles, and opined that the Company's pricing problem went beyond elevated interest rates and inflation. Specifically, the article stated:

> Of the 3 iBuying platforms that remain in operation, Opendoor recorded the largest losses, despite owning the largest market share. Profit margins tell a similar story, as all three of the remaining iBuyers struggle to achieve profitability even before accounting for any expenses besides COGS.
>
> ***
>
> While these declines may be largely attributed to elevated inflation levels and spikes in interest rates (discussed further in next section), **the fact that these macroeconomic changes can wreak such havoc on the profitability of this business model illustrates the**

64

**inflexibility of these businesses to respond to changing circumstances and reveals concerning underlying problems that perhaps go deeper than interest rates.** Additionally, while Redfin has other aspects of their business which provide a more diverse revenue stream, Opendoor and Offerpad do not have other sources of revenue that can help sustain the business in times of trouble.

## IX. LOSS CAUSATION/ECONOMIC LOSS

210. During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of Opendoor common stock and operated as a fraud or deceit on the Class Period purchasers of Opendoor common stock by making the materially false and misleading statements recited above and failing to disclose and misrepresenting the adverse facts and material risks detailed herein.

211. Exchange Act Class members unknowingly and in reliance upon Defendants' materially false or misleading statements and/or omissions purchased Opendoor common stock at artificially inflated prices. But for Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Exchange Act Class members would not have purchased Opendoor stock at the artificially inflated prices at which it traded during the Class Period.

212. The relevant truth regarding Defendants' fraud was disclosed through a series of corrective disclosures and/or materializations of undisclosed risks beginning on September 19, 2022. During this period, Opendoor's stock fell precipitously as the artificial inflation caused by Defendants' unlawful conduct exited Opendoor's stock price. It was not until the final corrective disclosure and/or materialization of concealed risk on November 3, 2022 that the full truth was known to the market, such that there was no longer any artificial inflation in Opendoor's stock price attributable to the fraud.

213. The declines in Opendoor's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations or omissions.

214. As a result of their purchases of Opendoor common stock during the Class Period, Plaintiffs and the other Exchange Act Class members suffered economic loss (i.e., damages) under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Opendoor common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as approximately $39.24 per share on February 11, 2021.

215. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Opendoor's business. As the truth about the Company and the extent of the fraud was revealed to the market, the price of Opendoor common stock fell significantly. These declines removed the inflation from the price of Opendoor common stock, causing real economic loss to investors who had purchased Opendoor common stock during the Class Period.

216. Each decline in the price of Opendoor common stock, as detailed below, was a direct or proximate result of the nature and extent of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

217. The economic loss (i.e., damages) suffered by Plaintiffs and the other Exchange Act Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Opendoor common stock and the subsequent significant decline in the value of Opendoor common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

218. The market for Opendoor common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 14,338,159 shares during the Class Period. As a result of Defendants' misstatements and material omissions, as alleged herein, Opendoor's common stock traded at artificially inflated prices. Plaintiffs and other Exchange Act Class members purchased Opendoor common stock relying upon the integrity of the market relating to Opendoor common stock and suffered economic losses as a result thereof.

66

219. The declines in Opendoor common stock price on February 25, 2022, September 19, 2022, September 20, 2022, November 4, 2022, and November 7, 2022, were a direct result of the nature and extent of Defendants' prior misstatements and omissions being revealed to investors after the market closed on September 19, 2022 and November 3, 2022. The timing and magnitude of the declines in Opendoor common stock evidence the impact Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Plaintiffs and other Exchange Act Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

**A.     February 24, 2022 – First Partial Corrective Disclosure/Materialization of the Risk**

220. On February 24, 2022, after the market closed, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions during the Class Period were partially revealed and/or materialized in connection with the Company's announcement of its fourth quarter and full year 2021 financial results, which started to reveal that Defendants had overstated the purported benefits and competitive advantages of the algorithm and that the Company was equally susceptible to the same market fluctuations as every other iBuying and real estate Company in the world.

221. On that day, the Company announced that its fourth quarter 2021 contribution margin was just 4%, a steep decline from a 12.6% contribution margin in the fourth quarter of 2020.

222. As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, Opendoor's stock price fell by $2.54 per share, or 23.13%, to close at $8.44 per share on February 25, 2022.

223. Analysts attributed the drop in stock price to the revelation of the new information and/or materialization of undisclosed risks. For example, according to an article published by *The Real Deal* on February 25, 2022, "[t]he selloff was widely attributed to a

drop in Opendoor's contribution margin, a key profitability metric that factors in the costs of carrying and selling home inventory."

224. However, despite this disclosure, which removed some of the artificial inflation from Opendoor's stock price, its stock remained artificially inflated as Defendants knew but failed to disclose, or deliberately disregarded, that the Company's pricing decisions were based on a complicated, human-driven process and its results had been driven by a hot housing market and deceptive consumer practices and not the Company's purportedly superior pricing algorithm.

**B.** **September 19, 2022 – Second Corrective Disclosure/Materialization of the Risk**

225. On September 19, 2022, during the trading day, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions during the Class Period were partially revealed and/or materialized.

226. On September 19, 2022, Bloomberg published an article revealing for the first time that Opendoor lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties). Specifically, the Bloomberg article stated:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.
>
> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.
>
> * * *
>
> The company's rocky summer is reminiscent of the pricing problems that doomed Zillow Group Inc.'s iBuying business last year, according to a research note from Mike DelPrete, a scholar-in-residence at the University of Colorado Boulder. That doesn't mean

68

Opendoor is going to shut down the business, but it demonstrates the depth of the losses — and September is likely to be even worse than August, DelPrete's analysis shows.

Opendoor's metrics are in the danger zone," DelPrete said in an interview. "They are very close to where Zillow was in its worst moments."

The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase. When home prices were skyrocketing earlier in the year, Opendoor banked easy profits. Then dwindling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.

By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of properties it had agreed to purchase when prices were rising.

* * *

The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday. They were down 72% this year through the close on Sept. 16.

227. The Bloomberg report and the news related thereto was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representation and omissions concerning the Company's algorithm and its ability to react adjust to macro- and micro-economic changes and deliver contribution margins within a range of 4% to 6%.

228. Moreover, the Bloomberg report revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or was obscured by Defendants' prior misstatements and omissions regarding the Company's competitive advantage over its peers as a result of its pricing algorithm. This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions touting the Company's algorithm.

229. As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, Opendoor's stock price

69

fell $0.50 per share, or 12.32%, over the following two trading sessions, to close at $3.56 per share on September 20, 2022.

230. However, despite this disclosure, which removed some of the artificial inflation in Opendoor's stock price, its stock price remained artificially inflated after this announcement as Defendants knew but failed to disclose, or deliberately disregarded, that they had overstated the purported benefits and competitive advantages of the algorithm and that the Company was at an increased risk of sustaining significant and repeated losses due to residential real estate pricing fluctuations. Moreover, new information and/or foreseeable events related to the Company's misstatements had yet to occur.

**C. November 3, 2022 – Third Corrective Disclosure/Materialization of the Risk**

231. On November 3, 2022, after the market closed, the relevant truth and foreseeable risks concealed by Defendants' misconduct and false representations and omissions during the Class Period were fully revealed and/or fully materialized.

232. On that day, Opendoor reported its financial results for the third quarter ended September 30, 2022, which revealed that Opendoor's contribution margin for the third quarter 2022 was *negative 0.7%*—well below the Company's 4% to 6% contribution margin range and well below the Company's contribution margin of 7.5% from the third quarter of 2021.

233. This disclosure and the news related thereto was a foreseeable consequence of, and within the zone of risk concealed by, Defendants' representation and omissions concerning the Company's algorithm and its ability to adjust to macro- and micro-economic changes and deliver contribution margins within a range of 4% to 6%.

234. Moreover, this disclosure revealed new information that Defendants' misstatements, omissions, and fraudulent course of conduct previously concealed and/or was obscured by Defendants' prior misstatements and omissions regarding the Company's competitive advantage over its peers as a result of its pricing algorithm. This disclosure revealed the relevant truth concealed and/or obscured by Defendants' prior misstatements and omissions—namely that Opendoor's pricing algorithm could not adjust to changing housing

markets or economic conditions and could not deliver 4% to 6% contribution margins in any market.  Investors finally understood that Opendoor's pricing algorithm did not work in any market and could not protect the Company from changing market conditions.

235.  As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud, Opendoor's stock price fell $0.32 per share, or 13.68%, to close at $2.02 per share on November 4, 2022.  The next trading day, November 7, 2022, Opendoor's stock price fell an additional $0.29 per share, or 14.11%, to close at $1.74 per share—resulting in a decline of over 25% over the two trading days following the November 3, 2022 corrective disclosure and/or materialization of foreseeable risk concealed by Defendants' fraud.

236.  On November 23, 2022, *Seeking Alpha* posted an article titled "Opendoor Must Adapt Its Business Model To Improve Flexibility – Or Continue Value Freefall."  The article explained that Opendoor's algorithm could not adjust to changing economic cycles, and opined that the Company's pricing problem went beyond elevated interest rates and inflation.  Specifically, the article stated:

> Of the 3 iBuying platforms that remain in operation, Opendoor recorded the largest losses, despite owning the largest market share.  Profit margins tell a similar story, as all three of the remaining iBuyers struggle to achieve profitability even before accounting for any expenses besides COGS.
>
> * * *
>
> While these declines may be largely attributed to elevated inflation levels and spikes in interest rates (discussed further in next section), **the fact that these macroeconomic changes can wreak such havoc on the profitability of this business model illustrates the inflexibility of these businesses to respond to changing circumstances and reveals concerning underlying problems that perhaps go deeper than interest rates.** Additionally, while Redfin has other aspects of their business which provide a more diverse revenue stream, Opendoor and Offerpad do not have other sources of revenue that can help sustain the business in times of trouble.

71

## X. ADDITIONAL ALLEGATIONS OF SCIENTER

237. As detailed above, the Exchange Act Individual Defendants acted with scienter in that the Exchange Act Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

238. In addition to the facts alleged in Section V above, regarding Opendoor's and the Exchange Act Individual Defendants' personal knowledge and/or reckless disregard of the materially false misrepresentations and omissions, Opendoor's and the Exchange Act Individual Defendants' scienter is evidenced by the specific facts discussed below.

### A. Defendant Wu's Class Period Sales and Insider Trading Are Indicative of Scienter

239. Knowing all along that Opendoor's pricing decisions were based on a human-driven process and that the Company's success was driven by a hot housing market and deceptive consumer practices, Defendant Wu enriched himself at the expense of Opendoor investors. As explained above, while Defendants touted the algorithm as core to the Company's business and profitability, throughout the Class Period, Defendants concealed the broader, more complicated human-driven process as well as deceptive consumer practices, such as over-charging sellers for repairs that Opendoor never completed, that contributed to the Company's success during the Class Period. Armed with the knowledge that Opendoor's stock price was artificially inflated as a result of Defendants' false and misleading statements and omissions, Defendant Wu sold **over 6 million** shares in open market transactions, reaping almost **$112 million** in proceeds, at key, suspiciously timed points in the Class Period.

240. One such critical point occurred after Defendants falsely told investors that the Company's algorithm would work in any market, after concerns arose following Zillow's exit of the iBuying market. Specifically, as explained above, Zillow announced their exit from

the iBuying business on November 2, 2021. The market, fearing the long-term viability of the iBuying business in general, reacted swiftly and indisputably. On that day, Opendoor's stock price plummeted by **over 14%** as investors questioned whether Opendoor might face the same fate as Zillow.

241. However, just over a week later, on November 10, 2021, Defendants assuaged any concerns over the similarity between Zillow Offers and Opendoor. Specifically, Defendants falsely told investors that Opendoor was different than Zillow because of its superior pricing algorithm, which they claimed would work in any market or economic condition. During the earnings call held on that day, Defendant Wheeler touted to the power of Opendoor's algorithm models as being "***highly responsive . . . [that] can react to changing market conditions***" and that the Company's "***forecasting accuracy was what allows us to manage the business within a reasonable range of outcomes and deliver margins within that 4% to 6% contribution margin range that we've guided to***." Defendant Wheeler went on to claim that Opendoor's "***model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets***."

242. The market relied on Defendants' misrepresentations about its supposedly superior pricing algorithm, as Opendoor's stock price shot back up **by over 15%** the very next trading day.

243. Then, on November 16, 2021—merely three trading days after the November 10, 2021 false and misleading statements—Defendant Wu took advantage of the Company's artificially inflated stock. On that day, Defendant Wu sold 1,613,498 shares of his Opendoor stock, reaping proceeds of more than $35 million on a single transaction. Then, over the next two trading days, Defendant Wu made two additional open market sales. On November 17, 2021, Wu sold an additional 628,348 shares, reaping proceeds of more than $13 million; and on November 18, 2021, he sold an additional 443,182 shares, reaping proceeds of over $9 million. In total, Defendant Wu sold over 2.6 million shares of Opendoor stock just days after the November 10, 2021 misstatements, **reaping proceeds of over $57.6 million dollars in a span of three days**.

244. Notably, although there was a Rule 10b5-1 trading plan in place, Defendant Wu made these sales outside of the plan's parameters. As indicated on Defendant Wu's SEC Form 4 dated November 18, 2021, the three sales on November 16, 2021 and November 17, 2021 were not executed pursuant to any Rule 10b5-1 trading plan. Moreover, these transactions were by far Defendant Wu's largest sales of Opendoor stock historically.

245. In addition to his suspiciously-timed open market transactions, Defendant Wu made thirteen other sales throughout the Class Period.[8] Although these thirteen sales were made pursuant to a Rule 10b5-1 trading plan,[9] Defendant Wu knew that Opendoor's pricing decisions were based on a human-driven process, that the Company's success was driven by a hot housing market and deceptive consumer practices since well before the Class Period, and that the Company's profitability was therefore susceptible to changing market conditions.

246. In total, during the Class Period, Defendant Wu sold 6,064,444 shares, reaping over **$112 million in proceeds.** To put this considerable number into perspective, while Defendant Wu has turned himself into an extremely wealthy individual, **making $112 million in approximately 1.5 years**, the Company's stock price has plummeted to next to nothing—Opendoor's stock closed at $31.25 on the first day its shares traded on NASDAQ, and closed at $2.02 per share the day after the fraud was fully revealed, meaning there has been a **94 percent decline in the value of Opendoor stock as a direct result of Defendants' fraud**. Simply put, shareholders have lost billions of dollars in value while Defendants' fraud has made Defendant Wu extremely wealthy.

247. Accordingly, Defendant Wu's massive insider stock sales during the Class Period, which provided him with a motive to keep Opendoor's stock price artificially inflated in order to enrich himself, supports a strong inference of scienter.

---

[8] Defendants Wu's 13 sales of Opendoor common stock pursuant to a 10b5-1 trading plan were made on the following dates: July 16, 2021, August 5, 2021, August 16, 2021, October 14, 2021, October 15, 2021, October 18, 2021, November 17, 2021, January 19, 2022, February 16, 2022, April 18, 2022, May 17, 2022, July 18, 2022, and August 17, 2022.

[9] According to the Form 4s filed with the SEC in connection with Defendant Wu's trades, Wu made the thirteen other sales pursuant to a Rule 10b5-1 trading plan, however, no plan adoption date was included in the filings.

74

**B.      Core Operations: iBuying is Opendoor's Entire Business, and its Pricing Algorithm was Core to the Company's Success**

248.    Opendoor's entire business is iBuying.  Unlike Zillow—which generated a large portion of its revenue from other parts of its business, like its websites—Opendoor's core business was iBuying.

249.    Indeed, Defendants admitted that pricing was core to what they do.  For example, Defendant Wheeler explained during the Class Period, "pricing is absolutely core to what we do. It is something that Opendoor[] has been investing in religiously from day one as a core capability in eight years of investment and that's not going to abate." Similarly, Defendant Wu stated during the Class Period that pricing was "something that we treat [a]s proprietary and a large competitive mode that compounds as we get to scale overtime.  And so I would just say that since we started Opendoor, this has been core and foundational to the business."

250.    Similarly, the Company's 2021 Annual Report, which was filed with the SEC on February 24, 2022, stated that "[o]ur ability to price homes competitively is fundamental to our business model."

251.    Investors understood that iBuying was Opendoor's core business.  For example, on June 3, 2021, Wedbush issued an analyst report explaining that "[w]ith iBuying its core business, relative to Zillow which also has its Premier Agent business, Opendoor is incented to keep making purchases in order to push its business forward."

252.    Moreover, critical to the success of the Company's core iBuying business was its pricing algorithm.  This fact was evidenced by Zillow's failure, as they had to exit the iBuying market because their algorithm could not accurately price homes.  As Real Estate Tech Strategist Mike DelPrete wrote in a December 16, 2021 article: "being able to accurately predict house prices – not only today, but into the future – is a non-negotiable prerequisite for iBuyers."  DelPrete went on to state, "[a]s the Zillow Offers collapse has demonstrated, pricing is a true potential competitive advantage for iBuyers. Getting it right is a prerequisite for success, while getting it wrong can lead to catastrophic failures."

75

253. Investors understood the importance of pricing to Opendoor's iBuying business, and based on Defendants' misrepresentations, believed that Opendoor's pricing algorithm was what set it apart from its iBuying competitors. For example, on August 12, 2021, Wedbush issued an analyst report stating, "Opendoor expects to be a market maker in any market condition, and that its pricing capabilities let it optimize acquisition and resale across all market conditions. Opendoor's pricing capabilities have been best in class, and we believe its vast data is a significant asset . . . ." Similarly, on August 9, 2021, *Seeking Alpha* published an article stating that "Opendoor's pricing algorithm . . . is the secret sauce; the performant soul of iBuying."

## C. Defendants' Statements Themselves Support Scienter

254. As discussed above, Defendants spoke at length during the Class Period about Opendoor's pricing algorithm, claiming it was "highly responsive" and could "adjust to leading indicators and market conditions so that the business can react to real-time economic conditions." Defendants admitted that "[t]his responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility."

255. Defendants repeatedly told the market that the algorithm's responsiveness to changing market conditions allowed the Company to maintain healthy contribution margins, which is a key profitability metric for Opendoor. Specifically, Defendants told investors that the algorithm's "forecasting accuracy was what allows us to manage the business within a reasonable range of outcomes and deliver margins within that 4% to 6% contribution margin range." As Defendant Wheeler explained, Opendoor's "business model is really designed to ensure that we can meet our annual margin target at 4% to 6% contribution margin, regardless of the home price environment we're operating in, and the way we do that is just how we price our homes."

256. Defendants also spoke at length about the algorithm's ability to accurately price homes **in any market**. For example, during the third quarter 2021 earnings call, Defendant Wheeler touted Opendoor's algorithm and reassured investors that it would work **in any market**. Specifically, Defendant Wheeler told investors that what is "***[i]mportant is that our***

76

*model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets*." Further, during the March 4, 2022 Wedbush Real Estate Technology Conference, Defendant Wheeler further misrepresented the algorithm's abilities to drive consistent contribution margins: "*Our business model is really designed to ensure that we can meet our annual margin target at 4% to 6% contribution margin, regardless of the home price environment we're operating in, and the way we do that is just how we price our homes*."

257. Defendants also assured investors that the algorithm was back tested. For example, Defendant Wheeler stated on November 10, 2021 that the Company was "rigorously back testing our models every day." Indeed, Defendant Wu went so far as to assure investors that "*if you run the business model through the worst recession in U.S. history, [Opendoor] would still have positive contribution margin*."

258. Indeed, Defendants repeatedly answered questions from analysts about the Company's algorithm and its ability to work in any housing market. For example, during the November 10, 2021 Earnings Call, an analyst from Citi asked Defendant Wheeler if she could "touch on housing pricing volatility and how you feel your model is kind of positioned to withstand that, and kind of detected given some of the turnover[?]" Defendant Wheeler responded by touting the Company's pricing algorithm and its forecasting abilities, stating:

> . . . Embedding your question is how do we price for homes and how do we think about forecasting. *A couple of comments; one, we're very good at this. This is core to what we do.* We have built over the last seven years, very robust pricing systems. We have seven years of investment in the data, in the modeling and in our team that allows us continuously improve how we model and approach home price valuations. We operate our business with a tight discipline.
>
> As Eric said, we are rigorously back testing our models every day. They're highly responsive. They have fast feedback loops and we can react to changing market conditions. Our forecasting accuracy was what allows us to manage the business within a reasonable range of outcomes and deliver margins within that 4% to 6% contribution margin range that we've guided to. Ultimately, the proof of our ability

to do that is in our results. I just want to mention again, Q4 will mark our 20th consecutive quarter of positive CM.

So that's housing and – so the housing and forecasting question in total. And [] part two of your question was around contribution margins, and how they may fluctuate with changes in HPA. ***Important is that our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets.*** We've talked about this before. But we are a market maker. Like define that, that means we provided putting in the customers, we're pricing a certainty and we're taking a spread. We're getting paid for that. ***And we're managing [] our business to that 4[-]6% range I just indicated if HPA were to go down, we would look to fluctuate increase our spreads to manage to that target margin range.*** So, I would not marry HPA trend and contribution margin trends together. We're driving for consistency within that range of outcomes.

259. Similarly, during the March 4, 2022 Wedbush Real Estate Technology Conference, moderator Ygal Arounian asked Defendant Wheeler, "maybe you could just help share with investors a little bit more about the pricing algorithm, the model, why you've been successful there," to which Defendant Wheeler responded by reiterating the algorithm's dynamic pricing capabilities and impeccable responsiveness:

I can confirm for you that [] for us pricing is absolutely core to what we do. It is something that Opendoor's has been investing in religiously from day one as a core capability in eight years of investment and that's not going to abate. . . [W]e're like working on how do we accelerate our feedback loops all the time, because . . . being good at pricing is being dynamic about it, like we always want to be able to react every day to changes in macro and micro condition, and that responsiveness is critical to having quality pricing and certainly how do we manage our margins especially in periods of volatility.

260. Additionally, during the March 8, 2022 Morgan Stanley Technology, Media and Telecom Conference, an analyst asked Defendant Wu: "How do you think about the difference in your model versus any of the competitors? And how do you continue to drive the differentiation for sellers and buyers?" Once again, Defendant Wu responded by touting Opendoor's algorithm as the key differentiator among competitors:

> We have expertise in pricing, both off-line data collection and piping that into our models. We've built the lowest cost platform. We're 18 times more efficient at transacting than a realtor. And that's because we centralized, we've automated almost every step we possibly could and really invested heavily behind the scenes in that platform.

261. These false and misleading statements, and others like these, provide a strong inference that Defendants were aware or, at the very least, were reckless in not knowing, that the algorithm could not accurately adjust to changing house prices across all market conditions and economic cycles and as a result, Defendants had overstated the purported benefits and competitive advantages of the algorithm and put the Company at increased risk of significant and repeated losses due to residential real estate pricing fluctuations.

262. The market relied on these misrepresentations when reporting on the Company's success. For example, on March 4, 2021, Oppenheimer issued an analyst reported stating "[w]e believe the margin differential highlights the benefits of OPEN's advanced pricing technology and early success in the adoption of adjacent services." Similarly, on November 11, 2021, Wedbush issued an analyst report stating, "Management is confident it can reach 4-6% contribution margins in all markets and that it has a proprietary pricing model that is a clear competitive advantage."

263. By repeatedly touting the Company's algorithm and its ability to adjust to changing market conditions and drive consistent contribution margins of 4% to 6%, Opendoor and Defendants either: (1) knew that Opendoor's pricing algorithm could not accurately adjust to changing house prices across all market conditions and economic cycles; or (2) were reckless in not knowing that this was the case. Under any of these scenarios, there is a strong inference that Opendoor and Defendants made these statements with scienter.

**D.    The FTC Investigation and Findings Are Indicative of Scienter**

264. Since before the Class Period, Defendants knew or we reckless in not knowing about an FTC investigation relating to similar misconduct—that Opendoor manually adjusted its algorithm's offer and used deceptive consumer practices, such as charging for repairs that were never done—that contributed to the Company's success and profitability.

265. On August 18, 2019, the FTC issued a Civil Investigative Demand ("CID") to Opendoor Labs, Inc. asking for information as part of its non-public investigation looking into "whether [Opendoor] . . . has deceptively marketed home-buying services in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and whether Commission action to obtain monetary relief would be in the public interest."

266. According to the CID, Opendoor was required to contact the FTC "as soon as possible to schedule a meeting (telephonic or in person) to be held within fourteen (14) days" of receiving the CID. The CID contained several interrogatories requesting information about the Company's repair practices, including: "Describe the Company's method for determining what repairs it requires for the homes on which it had made an offer" and "Describe the Company's method for calculating the repair costs deducted from the price of a home it purchases."

267. The CID also contained several document requests, including "Documents sufficient to show each materially different version of the Company's policies regarding: (i) calculating offers to purchase homes; . . . [and] (c) assessing repairs that the Company will require homeowners to make or pay for as a condition of the Company purchasing their homes."

268. Finally, the CID required that the Company "designate and make available one or more officers, directors, or managing agents, or others who consent, to testify on its behalf." According to the CID, that person must be prepared to discuss, among other things, "[t]he Company's compliance with consumer protection laws and policies, practices, and procedures concerning compliance."

269. Then, on December 23, 2020, the FTC staff notified Opendoor that they intended to pursue an enforcement action against the Company and certain of its officers if the FTC was unable to reach a settlement with Opendoor. The parties thereafter engaged in settlement negotiations and nearly two years later, on August 1, 2022, the FTC announced the $62 million settlement with Opendoor.

270. According to the FTC's complaint, which was released to the public on August 1, 2022, the FTC found that since at least 2019, Opendoor had instituted a policy of **manually lowering the price of its offers without disclosing that they were less than market value**. The FTC found that although Opendoor's algorithm automatically generates offers, "[i]n many instances, **Opendoor's employees have manually adjusted these values** before presenting them to consumers as offers." Thus, since before the Class Period, Defendants knew that their offers were adjusted by humans, meaning Defendants knew that their Class Period statements that their offers "do not require any human intervention" were false and misleading when made.

271. The FTC complaint also found that Opendoor charged sellers for repairs that they did not make and that the Company pocketed the extra money as profit. Notably, according to the FTC, "[o]ne **internal study** found that for [redacted] of Opendoor's purchases, its deductions for repair costs were greater than Opendoor's actual costs, thereby 'taking away [redacted] of seller equity' in each of those sales." The FTC found that "Opendoor's **internal communications**" described this process "as a 'bait-and-switch' operation."

272. The FTC's findings, which were based on interviews and Opendoor's responses to interrogatories and document requests, support a strong inference that Defendants knew— since before the Class Period—that the Company's pricing algorithm relied on human intervention and that its success was at least in part attributable to deceptive consumer practices. Specifically, since before the Class Period, Defendants knew that Opendoor's success was driven by humans manually adjusting the algorithm's offer and deceptive consumer practices such as charging for "necessary" repairs that Opendoor did not complete before reselling the house.

**E. Zillow's Failure Supports Scienter**

273. Zillow's exit from the iBuying business because of its failure to accurately price homes supports an inference of scienter. Zillow was the second largest iBuyer at the time of its failure, and its inability to accurately forecast home prices was a warning sign for all

iBuyers about the importance of accurately pricing its offers. Indeed, Zillow's CEO explained that Zillow's inability to accurately forecast home prices created too much risk to continue: "fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in."

274. Thus, Defendants knew, or were reckless in not knowing, that their algorithm was not able to accurately price homes in any environment. Indeed, Defendants knew, or should have known, that Opendoor's human-driven process for pricing homes made Opendoor just as susceptible to changing housing markets and economic conditions as other iBuying businesses like Zillow. This inference is further supported by the fact that Defendants answered direct questions from analysts about the Company's pricing algorithm and how it was different than Zillow. In response to these questions, Defendant Wheeler falsely stated that Opendoor's algorithm worked in any housing market, thus leading investors to believe that Opendoor's AI was better and more reliable than Zillow's. Either Defendant Wheeler knew that was false or did not know and recklessly assured investors that Opendoor's algorithm shielded the Company from a fate like Zillow's. Either prong supports an inference of scienter.

275. Moreover, Defendant Wu's massive insider sales—just three trading days after Defendant Wheeler led investors to believe that Opendoor's algorithm made it a better and more sustainable business than Zillow Offers—supports an inference that he knew the statements were false and misleading.

**F. Defendants' Access to Data Such as Home Appreciation and Interest Rate Trends Supports an Inference of Scienter**

276. Defendants had access to the Company's "dashboard," which provided data such as mortgage rates and appreciation and depreciation trends. Defendants tracked these metrics frequently in order to set the strategic direction of the Company.

277. CW 8 stated that Defendant Wheeler, along with President Andrew Low Ah Kee and Chief Investment Officer Daniel Murillo, accessed the Company's internal dashboard every day, and that the dashboard provided current information on tons of metrics.

CW 8 added that she knew that Defendant Wheeler and Low Ah Kee accessed this information because Murillo had this access, and CW 8 knew this because she recalled Murillo often asking CW 8 for advice on what certain information from the dashboard meant.

278. CW 8 added that the key executives needed that information in order to set the strategic direction of the Company. CW 8's understanding was that the "executive team was plugged in from the AI perspective," and that the executive team looked at key metrics on the dashboard "every day," and that she was aware that they were also constantly tracking non-Opendoor data on a daily basis such as mortgage rates along with appreciation and depreciation rates.

279. Moreover, CW 8 explained that Wheeler and Low Ah Kee were normally focused on the buy side and that Murillo led and focused on the sales side except for when the Company entered "turbulent times" in mid-2022, and that Wheeler and Low Ah Kee also got involved on overarching strategic decisions on the sales side with Murillo. Indeed, after Defendant Wheeler's "lower the DIP" announcement in July or August 2022, Defendant Wheeler started attending bi-weekly sales side meetings led by Murillo, which CW 8 also attended.

280. Defendants' close monitoring of the financial data showing rising interest rates and falling home prices in 2022, paired with the fact that Defendants knew that Opendoor's inventory levels were extremely high and that its contribution margin was declining at that same time, supports an inference that Defendants knew the algorithm could not quickly adapt to changing housing markets.

281. Defendant Wheeler's close involvement in the day-to-day operations of the sales side, and later the buy side, supports an inference that she knew about the Company's human-driven process for pricing homes.

83

**G.    The Scienter of the Exchange Act Individual Defendants Is Imputed to Opendoor**

282.    The scienter of the Exchange Act Individual Defendants is imputed to Opendoor given that they were high managerial agents of Opendoor who reviewed, prepared, approved, furnished information for, ratified, and/or tolerated the misrepresentations and omissions.

283.    The Exchange Act Individual Defendants knowingly and/or with deliberate recklessness made, controlled, or had ultimate authority over the materially false and/or misleading statements and omissions alleged herein based on the fact that the Exchange Act Individual Defendants knew and/or were deliberately reckless in not knowing or disregarding that the Company's statements set forth in Sections VI and VII(B)-(E) were materially false and/or misleading, and/or omitted material facts at the times that such statements were made. Each of the Exchange Act Individual Defendants were among the most senior employees of the Company throughout the Class Period, were acting within the scope of their authority, and were members of the Company's senior management.  Their scienter may therefore be imputed to the Company.

284.    Further, the scienter of other senior-level executives, may be imputed to Opendoor under agency principles.  Finally, the scienter of any other employees who ordered or approved the misstatements or their making or issuance, or who furnished information or language for inclusion therein, or the like, may be imputed to the Company.

## XI.    CONTROL PERSON ALLEGATIONS

285.    The Exchange Act Individual Defendants, by virtue of their high-level and controlling positions at Opendoor, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information about the Company, its business, operations, internal controls, growth, financial statements, and financial condition as alleged herein.  As set forth below, the materially misstated information conveyed to the public was the result of the collective actions of these individuals.

286. Defendants Wheeler and Wu, as senior executives and directors of Opendoor—a publicly-held company whose common stock was, and is, traded on the NASDAQ, and governed by the federal securities laws—had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, internal controls, growth, financial statements, and financial condition, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Opendoor's publicly traded common stock would be based on accurate information. Each of the Exchange Act Individual Defendants violated these requirements and obligations during the Class Period.

287. Defendants Wheeler and Wu, because of their positions of control and authority as senior executive officers and directors of Opendoor, were able to and did control the content of Opendoor's SEC filings, press releases, and other public statements issued by or on behalf of Opendoor during the Class Period. Each would have been provided with copies of the statements made in the SEC filings at issue in this action before they were issued to the public and would have had the ability to prevent their issuance or cause them to be corrected. Accordingly, the Exchange Act Individual Defendants were responsible for the accuracy of the public statements alleged herein.

288. The Exchange Act Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Opendoor common stock by disseminating materially false and misleading information and concealing and omitting material adverse facts. The scheme deceived the investing public regarding Opendoor's business, operations, and management, and the intrinsic value of Opendoor's common stock, and caused Plaintiffs and members of the Class to purchase Opendoor common stock at artificially inflated prices.

## XII. CLASS ACTION ALLEGATIONS

289. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons and entities who or which, during the period from December 21, 2020 through November 3, 2022, inclusive, purchased the

publicly traded common stock of Opendoor on the NASDAQ or any U.S.-based trading platform during the Class Period and were damaged thereby. Excluded from the Exchange Act Class are: (i) Exchange Act Defendants; (ii) Securities Act Defendants; (iii) members of the immediate family of any Defendant who is an individual; (iv) any person who was an officer, director, and/or control person of Opendoor during the Class Period; (v) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (vi) Opendoor's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such.

290. The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Opendoor common stock actively traded on the NASDAQ. While the exact number of Exchange Act Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Exchange Act Class. Record owners and other members of the Exchange Act Class may be identified from records maintained by Opendoor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

291. Plaintiffs' claims are typical of the claims of the members of the Exchange Act Class as all members of the Exchange Act Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

292. Plaintiffs will fairly and adequately protect the interests of the members of the Exchange Act Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Exchange Act Class.

293. Common questions of law and fact exist as to all members of the Exchange Act Class and predominate over any questions solely affecting individual members of the

86

Exchange Act Class. Among the questions of law and fact common to the Exchange Act Class are:

      (a)    Whether Defendants violated the federal securities laws by their acts and omissions alleged herein;

      (b)    Whether statements Defendants made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

      (c)    Whether, and to what extent, the market price of Opendoor common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

      (d)    Whether Defendants acted with the requisite level of scienter;

      (e)    Whether the Exchange Act Individual Defendants were controlling persons of Opendoor; and

      (f)    Whether the members of the Exchange Act Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of such damages.

294. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Exchange Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Exchange Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

295. To the extent that Plaintiffs allege that Defendants made affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

87

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) The omissions and misrepresentations were material;

(c) Opendoor common stock is traded in an efficient market;

(d) The misrepresentations alleged would tend to induce a reasonable investor misjudge the value of the Company's common stock;

(e) Plaintiffs and members of the Class purchased, acquired and/or sold Opendoor common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts;

(f) Opendoor's common stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(g) As a regulated issuer, Opendoor filed periodic public reports with the SEC and NASDAQ;

(h) Opendoor regularly communicated with public investors via established market mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i) Opendoor was followed by numerous securities analysts employed by major brokerage firms including, but not limited to, Credit Suisse, Oppenheimer, Wedbush, and Truist Securities, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

296. As a result of the foregoing, the market for Opendoor common stock promptly digested current information regarding Opendoor from publicly available sources and

reflected such information in Opendoor's common stock price(s). Under these circumstances, all purchasers of Opendoor common stock during the Class Period suffered similar injury through their purchase of Opendoor common stock at artificially inflated prices and the presumption of reliance applies.

297. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Opendoor's common stock.

298. Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Exchange Act Class purchased shares of Opendoor common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

299. To the extent that the Defendants concealed or improperly failed to disclose material facts with respect to Opendoor's business, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XIV. NO SAFE HARBOR

300. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this pleading. First, many of the statements alleged to be false and misleading relate to historical facts or existing conditions. Second, to the extent any of the allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made. Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because, among other reasons, the risks that Defendants warned of had already come to pass.

301. To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

302. In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring the Exchange Act to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

303. Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because, among other reasons, any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Opendoor's iBuying algorithm could not accurately adjust to changing house prices across different market conditions and economic cycles and as a result, Defendants overstated purported benefits and competitive advantages of the algorithm putting the Company at increased risk of significant and repeated losses due to residential real estate pricing fluctuations.

304. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Opendoor who knew that the statement was false when made.

## XV. CAUSES OF ACTION

### COUNT I

**FOR VIOLATIONS OF SECTION 10(b) OF THE
EXCHANGE ACT AND RULE 10b-5 PROMULGATED
THEREUNDER AGAINST THE EXCHANGE ACT DEFENDANTS**

305. Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

90

306. This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule l0b-5 promulgated thereunder by the SEC.

307. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Exchange Act Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Exchange Act Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Opendoor common stock; and (iii) cause Plaintiffs and other members of the Exchange Act Class to purchase or otherwise acquire Opendoor common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

308. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Opendoor common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Opendoor's finances and business prospects.

309. By virtue of their positions at Opendoor, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the

Exchange Act Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants. Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth. In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

310. Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control. As the senior managers and/or directors of Opendoor, the Exchange Act Individual Defendants had knowledge of the details of Opendoor's internal affairs.

311. The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Opendoor. As officers and/or directors of a publicly held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Opendoor's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Opendoor common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Opendoor's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Exchange Act Class purchased or otherwise acquired Opendoor common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

312. During the Class Period, Opendoor common stock was traded on an active and efficient market. Plaintiffs and the other members of the Exchange Act Class, relying on the

92

materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Opendoor common stock at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiffs and the other members of the Exchange Act Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Exchange Act Class, the true value of Opendoor common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Exchange Act Class. The market price of Opendoor common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Exchange Act Class members.

313. By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

314. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

### COUNT II

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE EXCHANGE ACT INDIVIDUAL DEFENDANTS**

315. Plaintiffs repeat and incorporate each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

316. This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Exchange Act Individual Defendants.

93

317. The Exchange Act Individual Defendants had control over Opendoor and made the materially false and misleading statements and omissions on behalf of Opendoor within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive leadership positions, as alleged above, the Exchange Act Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend were false and misleading. The Exchange Act Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

318. In particular, the Exchange Act Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

319. By virtue of such wrongful conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Exchange Act Individual Defendants' wrongful conduct, Plaintiffs and the other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XVI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Exchange Act Class representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Exchange Act Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Exchange Act Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

95

# XVII. VIOLATIONS OF SECTIONS 11 AND 15 OF THE SECURITIES ACT

320.    The claims set forth below in Counts III through IV allege violations of §§11 and 15 of the Securities Act ("Securities Act Claims").    Plaintiffs bring these claims individually and on behalf of the class consisting of all persons and entities who or which purchased or otherwise acquired Opendoor common stock pursuant and/or traceable to the Offering Materials issued in connection with the de-SPAC Merger on or about December 21, 2020 (the "December 2020 Offering") and/or the Offering Materials issued in connection with Opendoor's secondary public offering on or about February 4, 2021 (the "February 2021 SPO") (the "Securities Act Class").[10]  The Securities Act Claims solely allege strict liability and negligence causes of action, and do not sound in fraud.  Accordingly, for the purpose of these Securities Act Claims, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud, intentional misconduct, or deliberately reckless misconduct.

# XVIII.     BACKGROUND FOR THE SECURITIES ACT CLAIMS

321.    Opendoor Technologies, Inc. ("Opendoor" or the "Company") operates a digital platform for buying and selling residential real estate in the United States, using a featured technology called "iBuying."

322.    Founded in 2014 by Ian Wong and Defendant Eric Wu, Opendoor was previously known as Opendoor Labs Inc. ("Legacy Opendoor") and operated as a private company for several years.  Since its founding, Opendoor's self-professed goal has been to "redefine residential real estate."  Opendoor uses artificial intelligence ("AI") to buy and resell homes quickly using its "proprietary" pricing algorithm.  Opendoor claims to use its algorithm

---

[10] The following are excluded from the Securities Act Class: (i) Exchange Act Defendants; (ii) Securities Act Defendants; (iii) members of the immediate family of any Defendant who is an individual; (iv) any person who was an officer, director, and/or control person of Opendoor during the Class Period; (v) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (vi) Opendoor's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such.

96

to make instant cash offers to buy homes, often within 24 hours, based on the values indicated by their pricing algorithms.

323.    As an iBuyer, Opendoor's AI-powered pricing algorithm was critical to its success and a key differentiating factor.  Opendoor claimed that unlike the traditional real estate industry—which does not have the data necessary to accurately price homes—Opendoor "ha[s] built world-class data science capabilities and systematized tooling to gather, aggregate and synthesize an expanding catalog of proprietary, hyperlocal data in order to improve and automate pricing decisions."  Similarly, Opendoor claimed that its machine-learning pricing algorithm was critical to the Company's profitability—specifically the Company's contribution margin, which is a key profitability metric for Opendoor.[11]

324.    In 2020, after several years operating as a private company, Legacy Opendoor decided to go public via a reverse merger with a Special Purpose Acquisition Company ("SPAC") known as Social Capital Hedosophia Holdings Corp. II ("SCH") (the "de-SPAC Merger" or "Merger").  This allowed the equity of Legacy Opendoor to become publicly traded in an expedited manner without much of the traditional regulatory scrutiny.

325.    In connection with the de-SPAC Merger, Legacy Opendoor merged with and into SCH, with the surviving entity changing its name to Opendoor Technologies Inc. ("Opendoor" or the "Company").  On December 21, 2020, newly issued shares of Opendoor's common stock began publicly trading on NASDAQ under the ticker symbol "OPEN" and Opendoor's warrants traded under the ticker symbol "OPENW."  This offering was conducted pursuant December 2020 Offering Documents (defined below), which registered the issuance of shares of Opendoor common stock issued in connection with the de-SPAC merger.

---

[11] Contribution margin is generally defined as a cost-accounting calculation that measures the profitability of a specific product or the revenue that is left after covering costs for that product. Here, the relevant product is the home that Opendoor buys and sells.  Contribution margin shows you the aggregate amount of revenue available after variable costs to cover fixed expenses and provide profit to the company.  Companies look to their contribution margin to understand how a specific product—here, the home that Opendoor buys and sells—contributes to the Company's profit (as opposed to profit margin, which measures the total amount by which revenue from sales exceeds costs).

326. The December 2020 Offering Documents included false information about the Company's business model and the purported benefits of the Company's AI-powered pricing algorithm. For example, the December 2020 Offering Documents falsely claimed that Opendoor's pricing algorithm drove pricing decisions and that the algorithm was what set Opendoor apart from its competitors because it allowed the Company to quickly adapt changing market conditions—thus shielding the Company from the risk of changing housing markets and economic cycles. These statements were false because humans—not the algorithm—drove the Company's pricing decisions, and as such, Opendoor was just as susceptible to changing housing markets and economic conditions as any other iBuying businesses and traditional home flippers.

327. Shortly after going public, the Company conducted a secondary offering on February 9, 2021 (the "February 2021 SPO"), which generated approximately $886 million in gross proceeds. Pursuant to the February 2021 SPO Documents (defined herein), the Company received proceeds from the February 2021 SPO of approximately $859.5 million. The February 2021 SPO Documents included the same false statements as the December 2020 Offering Documents about the Company's business model and the purported benefits of the Company's AI-powered pricing algorithm.

### A. Opendoor Goes Public Through a SPAC Called SCH

328. Rather than go public through a traditional IPO, Opendoor went public through being acquired by a SPAC, specifically through a reverse merger with a SPAC known as SCH. SPACs, also known as "blank check" companies, are publicly traded holding companies created for the sole purpose of acquiring a privately held business in order to take that business public. SPACs raise funds in an initial public offering ("IPO") by issuing shares in the SPAC. The SPAC then places those funds in "trust" for those investors while the SPAC seeks an acquisition target. The SPAC will then have a "completion window"—generally two years—to identify and execute a business combination. If the SPAC fails to do so during the completion window, then it must return the funds in trust to its public stockholders, and then the SPAC dissolves.

329. Once a SPAC identifies a target company and agrees to terms, the parties effect a business combination through a reverse Merger (also referred to as a de-SPAC merger). This transaction structure allows the target, a privately held company, to become publicly traded by merging with the SPAC (or a subsidiary of the SPAC). This allows the target to bypass the traditional IPO process while allowing their equity to become publicly traded in an expedited manner without much of the traditional regulatory scrutiny.

330. In this way, a SPAC merger fulfills the primary functions of a traditional IPO—the SPAC provides cash for growth and the formerly private company can issue registered shares that are freely tradeable. For these reasons, SPACs are now a major route to taking businesses public.

331. SCH was structured in this way. On April 30, 2020, SCH completed its IPO, generating approximately $414.0 million in capital, through issuing 41.4 million shares of new stock at a price of $10.00 to public investors. These SCH shares were redeemable when SCH proposed a merger, meaning that SCH shareholders could, at that time, elect to have their initial investment (of $10 per share) returned, plus interest, rather than remain as shareholders and have their shares converted into shares of the post-merger company.

332. Moreover, in a typical SPAC, founders receive, for a nominal price, "founder shares," amounting to a substantial portion of the SPAC's total equity. As Andrew Ross Sorkin of the New York Times wrote: "This is not pay for performance. It is pay before performance." Once the SPAC finds a business combination to effectively take a company public, these founder shares convert into regular, common stock of the post-Merger company, which is often valued at significantly higher than the nominal amount that the founders paid, but also higher than the IPO price. However, if the SPAC fails to find and acquire a target within the completion window, the founder shares are forfeited and the SPAC liquidates, meaning the sponsors are left with nothing to show for their efforts. Thus, the SPAC founders are incentivized to complete a business combination even if it is not necessarily in the best interest of the SPAC's shareholders.

333.   SCH's sponsors, SCH Sponsor II LLC,[12] purchased 8,625,000 shares of the Company's common stock ("Founder Shares") for an aggregate price of $25,000.[13] Importantly, the Founder Shares were deemed to be indirectly owned by Defendants Palihapitiya and Osborne.  Thus, the Founder Shares created enormous wealth for Defendants Palihapitiya and Osborne—for just a $25,000 investment, they received 10,350,000 shares of SCH stock, which would be worth over $100 million after the SPAC's IPO (at a $10.00/share value), and would be worth nearly 4 times that amount (approximately $403 million) during Opendoor's Class Period high of around $39.  In other words, once the Founder Shares were released from their lock up, Defendants Palihapitiya and Osborne could turn their $25,000 initial investment into hundreds of millions of dollars.

**B.     Summary of the December 2020 Offering**

334.   On September 15, 2020, SCH announced that it found its acquisition target— Legacy Opendoor—and had entered into an Agreement and Plan of Merger (the "Merger Agreement"), whereby SCH and Legacy Opendoor would merge, with the surviving company being renamed "Opendoor Technologies Inc."[14]

---

[12] Defendants Palihapitiya and Osborne were deemed to beneficially own shares held by SCH's sponsor by virtue of their shared control over the sponsor.

[13] In March 2020, the Sponsor transferred 100,000 Founder Shares to both Defendants David Spillane and Cipora Herman (two of SCH's independent directors) at their original per-share purchase price.  On April 27, 2020, SCH effected a pro rata share capitalization resulting in an increase in the total number of Founder Shares outstanding from 8,625,000 to 10,350,000 in order to maintain the ownership of Founder Shares at 20% of the issued and outstanding ordinary shares of SCH upon consummation of its initial public offering.  In connection with the merger with Opendoor Labs Inc., the Founder Shares automatically converted, on a one-for-one basis, into a share of Opendoor Technologies common stock.  The Sponsor agreed not to transfer, assign, or sell any of its Class B ordinary shares or Class A ordinary shares until the earlier of: (A) one year after the completion of a Business Combination and (B) subsequent to a Business Combination, (x) if the last reported sale price of the Class A ordinary shares equals or exceeds $12.00 per share (as adjusted for share splits, share dividends, rights issuances, subdivisions, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after a Business Combination, or (y) the date on which the Company completes a liquidation, merger, amalgamation, share exchange, reorganization or other similar transaction that results in all of the Company's shareholders having the right to exchange their Class A ordinary shares for cash, securities or other property.

[14] Specifically, the Merger Agreement was by and among SCH's merger sub, Hestia Merger Sub Inc., a Delaware corporation and a direct wholly owned subsidiary of SCH ("Merger Sub"), and Opendoor Labs Inc. ("Legacy Opendoor").  Pursuant to the Merger

Footnote continued on next page

335. According to the joint press release filed on September 15, 2020, the merger transaction valued Opendoor at an enterprise value of $4.8 billion, and was expected to raise up to $1.0 billion in cash proceeds, including a fully committed PIPE investment of $600 million[15] and up to $414 million of cash held in the trust account of SCH. Following the closing of the de-SPAC transaction, one hundred percent of the cash proceeds would be retained by Opendoor.

336. In connection with the merger, the Company filed the December 2020 Offering Documents (defined below), which registered the issuance of 546,189,092 newly issued shares of Opendoor common stock.

337. The 546,189,092 newly issued shares of Opendoor common stock included the registration of 41,400,000 Class A ordinary shares of SCH which would automatically convert into shares of Opendoor common stock in connection with the Merger. Specifically, the December 2020 Offering Documents stated:

> As a result of and upon the effective time of the Domestication, among other things, (1) each of the then issued and outstanding Class A ordinary shares, par value $0.0001 per share, of SCH (the "SCH Class A ordinary shares"), will convert automatically, on a one-for-one basis, into a share of common stock, par value $0.0001 per share, of Opendoor Technologies (the "Opendoor Technologies common stock"); (2) each then issued and outstanding redeemable warrant of SCH (the "SCH warrants") will convert automatically into a

Agreement—which was subject to approval by SCH's shareholders—among other things: (i) SCH would deregister as a Cayman Islands corporation and domesticate as a Delaware corporation (the "Domestication"); (ii) the Merger Sub would merge with and into Legacy Opendoor, with Legacy Opendoor as the surviving corporation and a wholly owner subsidiary of SCH (the "Merger"); and (iii) upon the consummation of the Merger, SCH shall immediately be renamed "Opendoor Technologies Inc."

[15] On September 15, 2020, concurrently with the execution of the Merger Agreement, SCH also announced that it entered into subscription agreements (the "Subscription Agreements") with certain investors (collectively, the "PIPE Investors") pursuant to, and on the terms and subject to the conditions of which, the PIPE Investors have collectively subscribed for 60 million shares of SCH Common Stock for an aggregate purchase price equal to $600 million (the "PIPE Investment"), a portion of which is expected to be funded by one or more affiliates of current Opendoor stockholders and of SCH Sponsor II LLC, SCH's sponsor (the "Sponsor"), respectively. The PIPE Investment will be consummated substantially concurrently with the closing of the transactions contemplated by the Merger Agreement, subject to the terms and conditions contemplated by the Subscription Agreements.

redeemable warrant to acquire one share of Opendoor Technologies common stock (the "Opendoor Technologies warrants"); and (3) each of the then issued and outstanding units of SCH that have not been previously separated into the underlying SCH Class A ordinary shares and underlying SCH warrants upon the request of the holder thereof (the "SCH units"), will be cancelled and will entitle the holder thereof to one share of Opendoor Technologies common stock and one-third of one Opendoor Technologies warrant. Accordingly, this proxy statement/prospectus covers (1) 41,400,000 shares of Opendoor Technologies common stock to be issued in the Domestication and (2) 13,799,962 Opendoor Technologies warrants to be issued in the Domestication.

338. The 546,189,092 newly issued shares of Opendoor common stock also included 504,789,092 additional shares of Opendoor common stock issued in connection with the Merger. Specifically, the December 2020 Offering Documents stated:

As a result of and upon the Closing (as defined below), among other things, all outstanding shares of Opendoor common stock (after giving effect to Opendoor Preferred Conversion, Opendoor Warrant Settlement and the Convertible Note Exchange (each as defined below), as more fully described elsewhere in this proxy statement/prospectus) as of immediately prior to the effective time of the Merger, and, together with shares of Opendoor common stock reserved in respect of Opendoor Awards (as defined below and as described further in the immediately succeeding paragraph) outstanding as of immediately prior to the Closing that will be converted into awards based on Opendoor Technologies common stock, will be cancelled in exchange for the right to receive, or the reservation of, an aggregate of 500,000,000 shares of Opendoor Technologies common stock (at a deemed value of $10.00 per share) or, as applicable, shares underlying awards based on Opendoor Technologies common stock, representing a pre-transaction equity value of Opendoor of $5.0 billion (the "Aggregate Merger Consideration") . . . . [T]his proxy statement/prospectus also relates to the issuance by Opendoor Technologies of 504,789,092 shares of Opendoor Technologies common stock issued in connection with the Merger described herein. In addition, this proxy statement/prospectus relates to the resale of such shares of Opendoor Technologies common stock. The holders of these shares may from time to time sell, transfer or otherwise dispose of any or all of these shares in a

102

number of different ways and at varying prices, and we will not receive any proceeds from such transactions.

339. Importantly, the December 2020 Offering Documents explained that the newly issued shares of Opendoor common stock would be listed on the NASDAQ under the symbol "OPEN" and the newly issued warrants of Opendoor would be separately listed on the NASDAQ under the symbol "OPEN.W." Specifically, the December 2020 Offering Documents stated:

> The SCH units, SCH Class A ordinary shares and SCH warrants are currently listed on the New York Stock Exchange ("NYSE") under the symbols "IPOB," "IPOB.U" and "IPOB.WS," respectively. SCH will apply for listing, to be effective at the time of the Business Combination, of Opendoor Technologies common stock and Opendoor Technologies warrants on The Nasdaq Global Select Market ("Nasdaq") under the proposed symbols "OPEN" and "OPEN[W]" respectively.

340. On December 17, 2020, in connection with the Extraordinary General Meeting held on December 17, 2020, shareholders of SCH approved the merger.

341. Then, on December 21, 2020, pursuant to the December 2020 Offering Documents, Opendoor's common stock and warrants began trading on NASDAQ under the symbols "OPEN" and "OPENW", respectively.

342. Because the de-SPAC merger here involved a registration statement on Form S-4 issuing registered Opendoor securities, Defendants are liable under Section 11 of the Securities Act for the materially false statements contained in the registration statement.[16] As the former Acting Director of the SEC's Division of Corporate Finance, John Coates, stated,

---

[16] *See, e.g.,* Adam Brenneman, et al., *Rising Threat of Securities Liability for SPAC Sponsors*, HARV. LAW SCHOOL FORUM ON CORP. GOVERNANCE, Nov. 9, 2020, https://corpgov.law.harvard.edu/2020/11/09/rising-threat-of-securities-liability-for-spac-sponsors/ ("[t]he de-SPAC also often involves a registered offering of the SPAC's shares, so there could also be claims under Section 11 of the Securities Act of 1933 (the 'Securities Act') against the issuer and its officers and directors"); *see also* Andrew F. Touch & Joel Seligman, *The Further Erosion of Investor Protection: Expanded Exemptions, SPAC Mergers, and Direct Listings*, 108 Iowa L. Rev. 303, 330 (2022) ("conventionally structured SPAC mergers may be required to use registration statements . . . . For any of these companies, Section 11 liability will arise . . . .").

"any material misstatement in or omission from an effective Securities Act registration statement as part of a de-SPAC business combination is subject to Securities Act Section 11."[17]

### C. Summary of the February 2021 Secondary Public Offering

343. On February 9, 2021, Opendoor completed a secondary public offering (the "February 2020 SPO"). On that day, the Company sold an additional 32,817,421 shares of its common stock at a public offering price of $27.00 per share. Through sales of common stock, the February 2021 SPO generated approximately $886 million in gross proceeds, and the Company received proceeds from the February 2021 SPO of approximately $859.5 million (net of underwriting discounts and commissions).[18]

344. In connection with the February 2021 SPO, the Company filed a registration statement on Form S-1 which was declared effective by the SEC on February 4, 2021 (the "February 2021 Registration Statement"). The Company also filed with the SEC a prospectus related to the offering on Form 424B4 on February 8, 2021 (with the February 2021 Registration Statement, the "February 2021 SPO Documents").

345. The December 2020 Offering Documents and the February 2021 SPO Documents are sometimes collectively referred to herein as the "Offering Documents."

346. The Offering Documents contained false statements of material fact and were not prepared in accordance with the rules and regulations governing their preparation.

---

[17] *See* John Coates, *SPACs, IPOs and Liability Risk under the Securities Laws*, SEC (Apr. 8, 2021), https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws.

[18] Specifically, on February 9, 2021, Opendoor completed the secondary public offering of 28,536,888 (the "Firm Shares") of its common stock at an offering price of $27.00 per share. Pursuant to the Underwriting Agreement, on February 9, 2021, Citigroup Global Markets Inc. and Goldman Sachs & Co. LLC, as representatives (the "Representatives") of the several underwriters named therein, exercised in full the option granted to them in the Underwriting Agreement to purchase up to 4,280,533 additional shares (the "Option Shares") of Common Stock, and the sale of the Option Shares was completed on February 11, 2021. In total, including the Firm Shares and the Option Shares, the Company sold 32,817,421 shares of its Common Stock at a public offering price of $27.00 per share. Through sales of common stock, the February 2021 SPO generated approximately $886 million in gross proceeds, and the Company received proceeds from the February 2021 SPO of approximately $859.5 million (net of underwriting discounts and commissions).

Specifically, the Offering Documents contained false statements regarding, *inter alia*, Opendoor's business model and the purported benefits and competitive advantages of the algorithm.

### D. Opendoor's Stock Plummets as it is Gradually Revealed that Opendoor's Algorithm Could Not Maintain Contribution Margins in any Market

347. Following the Offerings, a series of disclosures revealed declining contribution margins and profitability as a result of a changing housing market, which is something that the Offering Documents had claimed Opendoor was not susceptible to given its accurate AI-based pricing algorithm.

348. First, on February 24, 2022, Opendoor issued a press release and a shareholder letter announcing its financial results for the fourth quarter and year ended December 31, 2021. The press release revealed that the Company's fourth quarter 2021 contribution margin—a key profitability metric—was 4.0%, which was a significant decline from the Company's fourth quarter 2020 contribution margin of 12.6%.

349. Then, on September 19, 2022, citing a review of industry data, Bloomberg reported that the Company appeared to have lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties). Bloomberg further reported that the data was even worse in key markets such as Los Angeles, California, where Opendoor lost money on 55 percent of sales, and Phoenix, Arizona, where it lost money on 76 percent of sales. Worse, a global real estate tech strategist interviewed by Bloomberg, Mike DelPrete, predicted that, based on his analyses, September would likely be even worse for Opendoor than August.

350. Finally, on November 3, 2022, Opendoor revealed that its contribution margin for the third quarter 2022 was **negative 0.7%**—well below the Company's 4% to 6% contribution margin range and well below the Company's contribution margin of 7.5% from the third quarter of 2021.

351. Following the November 3, 2022 earnings announcement, Opendoor's stock price fell by $0.60 per share, or 25.85% over the next two trading days, to close at $1.74 per

share on November 7, 2022—**a 94.43% decline** from the Company's post-Merger closing stock price of $31.25 per share on December 21, 2020 (the "Initial Closing Price").

## XIX.  JURISDICTION

352.    These claims arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

353.    This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v).

354.    Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act.  Substantial acts related to the Offering occurred in this Judicial District.  Defendants made materially false representations to investors that were disseminated to investors in this District.

355.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, or the facilities of a national securities exchange.

## XX.    THE SECURITIES ACT PARTIES

### A.    Plaintiffs

356.    On February 1, 2023, the Court appointed Indiana Public Retirement System ("Indiana"), Oakland County Employees' Retirement System ("Oakland County ERS"), and Oakland County Voluntary Employees' Beneficiary Association ("Oakland County VEBA") (together, "Lead Plaintiffs") to serve as Lead Plaintiffs pursuant to the Private Litigation Reform Act of 1995 ("PSLRA").

357.    Plaintiffs Oakland County ERS and Oakland County VEBA (together, "Oakland County Funds"), provide retirement services and are headquartered in Michigan. The Oakland County Funds managed approximately $2.4 billion in net assets on behalf of thousands of members and their beneficiaries.  As set forth in Lead Plaintiffs' attached certifications, Plaintiff Oakland County Funds purchased Opendoor securities pursuant to and/or traceable to the Offering Materials at artificially inflated prices and have been damaged

thereby. Specifically, Oakland County Funds purchased Opendoor common stock on February 5, 2021 at $27.00 per share from Citigroup, an underwriter of the February 2021 SPO.

358. Additional Plaintiff Stuart Graham Hereford ("Additional Plaintiff" and together with Lead Plaintiffs, "Plaintiffs"). Additional Plaintiff purchased Opendoor and/or SCH common stock at a time when only shares registered in the December 2020 Offering were in the market. Specifically, as set forth in Additional Plaintiff's attached certification, Additional Plaintiff purchased shares pursuant and/or traceable to the December 2020 Offering Documents on December 18, 2020, December 28, 2020, and December 31, 2020. As described above, the October 5, 2020 registration statement, which was declared effective by the SEC on November 27, 2020, registered 546,189,092 newly issued shares of Opendoor common stock, which included 41,400,000 shares of SCH which automatically converted on a one-to-one basis to Opendoor common stock.

### B. Defendants

#### 1. Corporate Defendants

359. Defendant Opendoor Technologies Inc. is a Delaware corporation with its principal executive offices located at 410 N. Scottsdale Road, Suite 1600, Tempe, Arizona 85281. The Company went public via a reverse-merger with Social Capital Hedosophia Holdings Corp. II ("SCH"), a special purpose acquisition company (the "de-SPAC Merger"). Prior to the de-SPAC Merger, SCH's units, Class A ordinary shares, and warrants traded on the New York Stock Exchange under the ticker symbols "IPOB," "IPOB.U," and "IPOB.WS," respectively. In connection with the de-SPAC Merger, since December 21, 2020, the post-merger company's common stock and warrants have traded on the NASDAQ under the ticker symbols "OPEN" and "OPENW," respectively.

360. Defendant SCH was a blank check company incorporated on October 18, 2019 as a Cayman Islands exempted company and incorporated for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. SCH neither engaged in any operations nor

generated any revenue. On April 30, 2020, SCH consummated its initial public offering off its units, with each unit consisting of one SCH Class A ordinary share and one-third of one public warrant. The SCH units, SCH Class A ordinary shares, and SCH warrants were listed on the New York Stock Exchange ("NYSE") under the symbols "IPOB.U," "IPOB" and "IPOB.WS," respectively. Pursuant to the de-SPAC Merger, Hestia Merger Sub Inc., a newly formed subsidiary of SCH ("Merger Sub"), merged with and into Opendoor Labs Inc. Upon the completion of the transactions contemplated by the terms of the Merger Agreement, on December 18, 2020, the separate corporate existence of Merger Sub ceased, and Opendoor Labs Inc. survived the merger and became a wholly owned subsidiary of SCH. On December 18, 2020, SCH also filed a notice of deregistration with the Cayman Islands Registrar of Companies, together with the necessary accompanying documents, and filed a certificate of incorporation and a certificate of corporate domestication with the Secretary of State of the State of Delaware, under which SCH was domesticated as a Delaware corporation, changing its name from "Social Capital Hedosophia Holdings Corp. II" to "Opendoor Technologies Inc." Since December 21, 2020, the post-merger company's common stock and warrants have traded on the NASDAQ under the ticker symbols "OPEN" and "OPENW," respectively.

361. Defendants Opendoor Technologies Inc. and SCH are collectively referred to as "the Company."

### 2. Individual Defendants

362. Defendant Eric Wu ("Wu") co-founded Opendoor and served Opendoor's Chairman of the Board of Directors and Chief Executive Officer ("CEO") following the consummation of the Merger until December 1, 2022, when he resigned as CEO of Opendoor. Defendant Wu signed or authorized the signing of the February 2021 SPO Documents filed with the SEC.

363. Defendant Carrie Wheeler ("Wheeler") served as Opendoor's Chief Financial Officer ("CFO") following the consummation of the Merger until December 1, 2022, when she was appointed as CEO in place of former CEO Defendant Wu. Defendant Wheeler signed or authorized the signing of the February 2021 SPO Documents filed with the SEC.

364. Defendant Adam Bain ("Bain") served as a Director of Opendoor at all relevant times prior to consummation of the Merger and the February 2021 SPO. Bain signed or authorized the signing of the December 2020 Offering Documents and the February 2021 SPO Documents filed with the SEC.

365. Defendant Cipora Herman ("Herman") served as a Director of Opendoor at all relevant times prior to consummation of the Merger and the February 2021 SPO. Prior to the Merger, Herman served as a Director of SCH. Herman signed or authorized the signing of the December 2020 Offering Documents and the February 2021 SPO Documents filed with the SEC.

366. Defendant Pueo Keffer ("Keffer") served as a Director of Opendoor at all relevant times prior to consummation of the Merger and the February 2021 SPO. Keffer signed or authorized the signing of the February 2021 SPO Documents.

367. Defendant Glenn Solomon ("Solomon"), served as a Director of Opendoor at all relevant times prior to consummation of the Merger and the February 2021 SPO. Solomon signed or authorized the signing of the February 2021 SPO Documents.

368. Defendant Jason Kilar ("Kilar"), served as a Director of Opendoor at all relevant times prior to consummation of the Merger and the February 2021 SPO. Kilar signed or authorized the signing of the February 2021 SPO Documents.

369. Defendant Jonathan Jaffe ("Jaffe"), served as a Director of Opendoor at all relevant times prior to consummation of the Merger and the February 2021 SPO. Jaffe signed or authorized the signing of the February 2021 SPO Documents.

370. Defendant Chamath Palihapitiya ("Palihapitiya") served as SCH's CEO and Chairman of the Board of Directors at all relevant times prior to consummation of the Merger. Palihapitiya signed or authorized the signing of the December 2020 Offering Documents filed with the SEC.

371. Defendant Steven Trieu ("Trieu") served as SCH's CFO at all relevant times prior to consummation of the Merger. Trieu signed or authorized the signing of the December 2020 Offering Documents filed with the SEC.

109

372. Defendant Ian Osborne ("Osborne") served as SCH's President and a Director at all relevant times prior to consummation of the Merger. Osborne signed or authorized the signing of the December 2020 Offering Documents filed with the SEC.

373. Defendant David Spillane ("Spillane") served as a Director of SCH at all relevant times prior to consummation of the Merger. Spillane signed or authorized the signing of the December 2020 Offering Documents filed with the SEC.

374. Defendants identified in paragraphs 362-73, are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

375. As directors, executive officers, and/or major shareholders of the Company the Securities Act Individual Defendants participated in the solicitation of Opendoor common stock in the Merger and the SPO for their own benefit and the benefit of the Company. Many of the Securities Act Individual Defendants were key members of the Merger working group and executives of the Company who pitched investors to approve the Merger and the shares acquired in the Merger and/or promoted the shares issued in the SPO to investors.

### 3. Underwriter Defendants

376. Defendant Citigroup Global Markets Inc. is a financial services company incorporated in the state of New York and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

377. Defendant Goldman Sachs & Co. LLC is a financial services company incorporated in the state of New York and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

378. Defendant Barclays Capital Inc. is a financial services company incorporated in the state of Connecticut and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

379. Defendant Deutsche Bank Securities Inc. is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

380. Defendant Oppenheimer & Co. Inc. is a financial services company incorporated in the state of New York and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

381. Defendant BTIG, LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

382. Defendant KeyBanc Capital Markets Inc. is a financial services company incorporated in the state of Ohio and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

383. Defendant Wedbush Securities Inc. is a financial services company incorporated in the state of California and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

384. Defendant TD Securities (USA) LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

385. Defendant Zelman Partners LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

386. Defendant Academy Securities, Inc. is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

387. Defendant Loop Capital Markets LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

388. Defendant Samuel A. Ramirez & Company, Inc. is a financial services company incorporated in the state of New York and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

111

389.    Defendant Siebert Williams Shank & Co., LLC is a financial services company incorporated in the state of Delaware and performs significant business in this District, including acting as an underwriter on the February 2021 SPO.

390.    The defendants identified in paragraphs 376-89 (collectively, the "Underwriter Defendants") served as the underwriters for the February 2021 SPO.  Each of the Underwriter Defendants served as an underwriter for the February 2021 SPO.  The Underwriter Defendants' failure to conduct adequate due diligence in connection with the February 2021 SPO and the preparation of the February 2021 SPO Documents was a substantial factor leading to the harm complained of herein.

391.    Opendoor, SCH, the Underwriter Defendants, and the Securities Act Individual Defendants are sometimes referred to herein collectively, in whole or in part, as the "Securities Act Defendants."

392.    Opendoor, SCH, the Securities Act Individual Defendants, and the Underwriter Individual Defendants are sometimes collectively, in whole or in part, referred to herein as "Defendants."

### C.    Relevant Third Parties

393.    Confidential Witness ("CW") 1[19] was employed by Opendoor as Head of Brokerage – Homebase from April 2022 until November 2022.  According to CW 1, her responsibilities included brokering Opendoor properties to Real Estate Investment Trust ("REIT") buyers, adding that she was a "Head of Open Exchange," and that she lived and worked for Opendoor in the San Francisco Bay area.  In 2022, Opendoor's National Director of Brokerage, Chelsea Goyer, was speaking to CW 1 about inventory that was not selling, and asked CW 1 about the San Francisco Area.  At that point CW 1 volunteered to take a look at the current inventory of Opendoor properties in San Francisco and Southern California to see if she could provide insight into why it was not selling.

394.    CW 2 was a Pricing Analyst at Opendoor from July 2021 to July 2022.  CW 2 was based in Phoenix and priced homes in several cities in the Western United States,

---

[19] All CWs are described in the feminine to protect their identity.

including Phoenix, Tucson, Prescott, Los Angeles, San Bernadino County, San Diego, San Francisco, Sacramento, Portland, Boise, Albuquerque, Las Vegas, and Reno. CW 2 reported to the Pricing Escalation Manager for the Western United States. As a Pricing Analyst, CW 2 played a vital role in setting Opendoor's final offer price for homes.

395. CW 3 was a customer experience partner at Opendoor from March 2021 to November 2022. CW 3 initially worked with sellers throughout the nation, but later in her tenure she was regionalized to mostly working with sellers on the east coast. As a customer experience partner, CW 3 worked with customers through the process of obtaining an offer from Opendoor, and if accepted, selling their home to the company. CW 3 explained that she was the first and primary representative of the Company that customers interacted with during the process of selling their home.

396. CW 4 was an associate at Opendoor Home Loans during the period of December 21, 2020 through November 3, 2022 (the "Relevant Period"). According to CW 4, her responsibilities included working with the finance department. CW 4's geographic areas of responsibility included the southeast and parts of the east coast.

397. CW 5 was an Acquisition Associate at Opendoor from approximately November 2018 through March 2020. CW 5 described her job duties as pricing offers on properties that came in to Opendoor which could not be "taken on," or priced automatically, by the Company's underwriting and appraisal software or algorithm.

398. CW 6 was employed at Opendoor from approximately 2018 through November 2022. CW 6's most recent position was a Data Scientist. In that role, CW 6 reported to a Staff Research Scientist at Opendoor, who in turn reported to the Vice President of Investment Operations, Portfolio Management, and Strategy. CW 6 started at Opendoor working in Business Operations. CW 6 then moved into Data Science operations, initially for the Consumer team, then ultimately on the Pricing team. CW 6 explained the basic role of the Pricing Team was to analyze how much the company could list for homes to sell.

399. CW 7 was employed by Opendoor from November 2021 to September 2022 as a Senior Loan Officer, and she held the same title at RedDoor from April 2021 to November

113

2021, when she then transitioned over to Opendoor when Opendoor acquired RedDoor. CW 7's job responsibilities included originating home loans. In her final reporting structure, CW 7 reported someone she described as like a Head of Loans Operations, who reported to Head of Finance, who CW 7 believes reported to Defendant Wu.

400. CW 8 was employed by Opendoor from mid-2021 through the end of the Relevant Period as a staff research scientist. CW 8 was three levels removed from CEO Eric Wu. As a staff research scientist, CW 8 worked with Opendoor's algorithm on the sales side, including working closely with the Company's executives and senior level executives on adjusting the various algorithms that made up Opendoor's "valuation model" for pricing the sales of Opendoor properties, based on those executives' decisions and feedback.

## XXI. THE MATERIALLY FALSE STATEMENTS IN THE OFFERING MATERIALS

### A. Materially False Statements Contained in the December 2020 Offering Documents

401. October 5, 2020, the Company filed a registration statement on Form S-4 with the SEC in connection with the Merger, which, after several amendments, was declared effective by the SEC on November 27, 2020 (the "November 2020 Registration Statement"). On November 30, 2020, the Company filed the Proxy on Form 424B3 with the SEC in connection with the Merger, which formed part of the November 2020 Registration Statement (the "Proxy Statement/Prospectus" and, together with the November 2020 Registration Statement, the "December 2020 Offering Documents"). On December 21, 2020, Opendoor's post-merger common stock began publicly trading on the NASDAQ pursuant to the materially false statements and omissions contained in the December 2020 Offering Documents.

402. The December 2020 Offering Documents, which were signed by Defendants Palihapitiya, Trieu, Osborne, Bain, Spillane, and Herman, contained materially false statements about the Company's business and the purported benefits of the AI-powered algorithm. Specifically, the December 2020 Offering Documents claimed that Opendoor's algorithm is what drove pricing decisions and it could adjust to changing market conditions in order to maintain margins. Specifically, the 2020 Offering Documents stated:

114

*Pricing Accuracy.* Our unique data works in concert with our pricing algorithms. ***These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management.*** Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.

Advancements in model sophistication have accelerated our feedback loops, such that ***our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro- economic conditions.*** Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

403. These statements in ¶ 402 were materially false when made because Opendoor's pricing decisions were driven by humans, not the algorithm. As explained by multiple former employees, Opendoor's offers were generated largely by humans—specifically, the Company's pricing analysts. For example, CW 2, a Pricing Analyst at Opendoor, stated that what she and other pricing analysts were doing to price homes was no different than what any real estate agent would do to price a home for the market. Similarly, CW 5 stated that approximately 50% of the properties had to be sent to human beings for review. Moreover, the FTC's findings demonstrate that Opendoor relied on humans to drive its pricing decisions since before the December 2020 Offering Documents. Specifically, the FTC found that around 2018 Opendoor instituted a policy of manually lowering the price of its offers without disclosing that they were less than market value.

404. Moreover, the statement in ¶ 402 was also materially false when made because Opendoor's algorithm could not adjust to leading market indicators or react to real-time macro- and micro-economic conditions. As explained below, the algorithm failed to adjust to the changing housing market in early 2022 when interest rates started increasing and home

115

prices stopped appreciating as they had been in late 2020 and throughout 2021.  Therefore, contrary to the Exchange Act Defendants' representations, the algorithm could not "dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions."

405.    The December 2020 Offering Materials also falsely stated that the Company's pricing algorithm drove the Company's profitability:

> **Pricing accuracy and automation.**   We have invested significant engineering, data science, and operations resources in our pricing infrastructure. ***Our proprietary, machine learning-based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation.*** Based on our historical results, we believe pricing performance will continue to improve with operating experience and scale.

406.    This statement in ¶ 405 was materially false when made because the Company's profitability was not driven by the algorithm, but rather, deceptive consumer practices such as lowering the algorithm's offer before submitting it to the seller and charging the seller for repairs that Opendoor did not make.  According to the FTC, Opendoor engaged in this conduct before the December 2020 Offering Materials, *see* Section XXI(C)(2), *infra*, and according to multiple CWs, Defendants continued the misconduct throughout the Relevant Period.  *See* Section XXI(C)(3) *infra*.

407.    The December 2020 Offering Materials also contained false statements about how the Company generated its revenue.  For example, the 2020 Offering Materials stated:

> In order to finalize our offer, we conduct a free assessment to confirm all of the home details and identify any repairs that may need to be performed. We have developed purpose-built software to guide home assessment workflows and collect over 100 unique data points regarding a home's condition and quality, which we incorporate as structured data into our underlying pricing models. Once completed, we finalize our offer, ***taking into consideration any necessary repairs***, and produce the purchase agreement for the seller. Our objective is to provide a competitive cash offer to sellers and we believe this approach builds trust with our potential customers. ***Our***

116

> *business model is designed to generate margins from our service charge to sellers and ancillary products and services associated with a transaction, and not from the spread between acquisition price and resale price*.

408. The statement in ¶ 407 was materially false when made because contrary to Defendants' statements, the Company's business model was in reality designed to generate margins from the spread between acquisition price and resale price, i.e., from buying low and selling high. As the FTC found during its over two-year long investigation, although "Opendoor claimed that it did not make money from 'buying low and selling high,' . . . gains from selling homes for more than its offer price are a ***key contributor*** to [Opendoor's] revenue." *See* ¶ 436, *infra*.

**B.** **Materially False Statements Contained in the February 2021 SPO Documents**

409. On February 24, 2021, the Company filed with the SEC the February 2021 SPO Documents. The February 2021 SPO Documents contained substantively the same statements as referenced in paragraphs 402, 405, and 407, *supra*, regarding Opendoor's proprietary algorithm, the algorithm's purported pricing accuracy, and the algorithm's purported ability to adjust to macro- and micro-economic conditions.

410. Specifically, the February 2021 SPO Documents, which were signed by Defendants Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon, falsely stated that Opendoor's algorithm is what drove pricing decisions and it could adjust to changing market conditions in order to maintain margins. Specifically, the February 2021 SPO Documents stated:

> *Pricing Accuracy.* Our unique data works in concert with our pricing algorithms. ***These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management.*** Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we

117

have also been able to increase our number of fully automated home valuations.

Advancements in model sophistication have accelerated our feedback loops, such that ***our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions.*** Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

411. These statement in ¶ 410 was materially false when made for the reasons identified in ¶¶ 403-04, *supra*.

412. The February 2021 SPO Documents also falsely stated that the Company's pricing algorithm drove the Company's profitability:

**Pricing accuracy and automation.** We have invested significant engineering, data science, and operations resources in our pricing infrastructure. ***Our proprietary, machine learning-based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation.*** Based on our historical results, we believe pricing performance will continue to improve with operating experience and scale.

413. This statement in ¶ 412 was materially false when made for the reasons identified in ¶ 406, *supra*.

414. The February 2021 SPO Documents also contained false statements about how the Company generated its revenue. For example, the February 2021 SPO Documents stated:

In order to finalize our offer, we conduct a free assessment to confirm all of the home details and identify any repairs that may need to be performed. We have developed purpose-built software to guide home assessment workflows and collect over 100 unique data points regarding a home's condition and quality, which we incorporate as structured data into our underlying pricing models. Once completed, we finalize our offer, ***taking into consideration any necessary repairs***, and produce the purchase agreement for the seller. Our

118

objective is to provide a competitive cash offer to sellers and we believe this approach builds trust with our potential customers. ***Our business model is designed to generate margins from our service charge to sellers and ancillary products and services associated with a transaction, and not from the spread between acquisition price and resale price***.

415. The statement in ¶ 414 was materially false when made for the reasons identified in ¶ 408, *supra*.

**C.  Statements in the Offering Documents Were Materially False**

**1.  Former Opendoor Employees Reveal that the Pricing Algorithm Was Largely Inaccurate and Humans Drove Pricing Decisions**

416. Former employees reveal that humans played a large role in pricing Opendoor's offers, which made Opendoor susceptible to the same market fluctuations as every other iBuying and real estate company in the world.

417. CW 5 was an Acquisition Associate at Opendoor from approximately November 2018 through March 2020. CW 5 was brought in to price the initial offers sent to customers. CW 5 described her job duties as pricing any property that could not be priced automatically by the Company's underwriting and appraisal software or algorithm. CW 5 stated that management flagged certain properties that could not be processed through the algorithm to generate an offer. According to CW 5, approximately 50% of the properties had to be sent to human beings for review.

418. Similarly, according to CW 6, who worked at Opendoor from approximately 2018 through November 2022, the algorithm's initial offer price was reviewed by the human pricing analysts and portfolio managers. CW 6 added that the analysts and portfolio managers could use certain data to adjust the initial offer price based on specific details of the home in question and other market variables.

419. Other former employees reveal that humans, and not the algorithm, continued to drive Opendoor's pricing decisions after the December 2020 and February 2021 offerings.

420. For example, CW 2, who worked as a Pricing Analyst at Opendoor during the Relevant Period, CW 2 said the algorithm often priced homes incorrectly. "The automated system was never accurate," CW 2 said. "It had a lot of flaws. A lot."

421. Indeed, CW 2 explained that Pricing Analysts and their managers did not trust the pricing algorithm to generate an accurate final offer. CW 2 stated that both her managers—who were the Pricing Escalation Managers for the Western U.S.—continuously told her and other pricing analysts not to depend on the automatically generated number from the algorithm. When CW 2 first started at Opendoor, her manager told the team, "Don't look at what the system is coming in at." According to CW 2, the managers thought if analysts looked at the automatically generated number, the analyst's opinion would be biased about what the actual price should be. CW 2 recalled that her managers instructed her team: "What the automated system gave out, don't anchor to it because it's not going to be correct." CW 2's manager instructed pricing analysts to use their own best judgment to determine the correct final offer.

422. CW 2 explained that when pricing analysts got an automatically generated final offer price from the pricing algorithm, they could adjust it to better reflect what they thought the price should be or in response to guidance from their managers.

423. For example, in the spring and early summer of 2022, CW 2 said pricing analysts were instructed to go into the pricing system and adjust the pricings being generated by the algorithm in the Las Vegas market. According to CW 2, the Company's algorithm was dramatically overpricing homes in Las Vegas. CW 2 said "[t]he automated system offers were just insane offers that any seller would say yes, I'll take it right away."

424. CW 2 said that most of the final offers CW 2 submitted were lower than the algorithm-generated price. CW 2 said she adjusted the prices downward because the system was consistently overpricing the homes. Indeed, CW 2 said that about 90 percent of the final offers she submitted for approximately 4,000 homes she priced were below the number generated by the system.

425. CW 2 also explained that some markets had pricing caps, which meant if the algorithm generated a final offer higher than the cap, the pricing analyst had to adjust the price below the cap.

426. CW 2 said that Opendoor did not typically use its fully automated pricing algorithm to generate final offer prices for homes. Mostly, the Company used pricing analysts to participate in the process and inject subjective, human judgment into determining the final offer price. CW 2 said the only time the Company "turned on" the algorithm and let it generate final offers without any human input was when the queue of homes needing a final offer was overloaded. For example, if the queue was backed up with more than 1,000 homes, the Company would turn on the system and let the algorithm run independently and generate final offers for homes until the queue cleared out, CW 2 said. CW 2 said the fully automated system was only turned on three to four times a month and was on "just to help us clear out" the queue. According to CW 2, "The vast majority (of final offers) were human-made offers."

427. Ultimately, according to CW 2, what she and other pricing analysts were doing to price homes was no different than what any real estate agent would do to price a home for the market.

### 2. The FTC Investigation Reveals Human Involvement and Deceptive Practices Designed to Drive Contribution Margin

428. On August 1, 2022, the United States Federal Trade Commission ("FTC") issued a press release announcing a settlement with Opendoor and releasing its complaint against the Company.

429. The Complaint—which was based on an over two-year long investigation— offered significant details about the FTC's over two-year long investigation and corroborates the former employees' allegations that Opendoor's pricing decisions were driven by humans and that much of the Company's contribution margin success was the result of human-driven deceptive consumer practices, such as charging sellers for unnecessary repairs in order to keep the extra money as profit.

121

430. The FTC complaint found that Opendoor offered below market value for homes. The FTC complaint explained that Opendoor had an internal policy of **manually** adjusting the price that was supposedly generated solely by the Company's algorithm. Specifically, the FTC complaint explained that "Opendoor took various steps to reduce offers below what their internal valuation system deemed to be a home's market value." The FTC complaint found that around August 2018, Opendoor instituted a policy of manually lowering the price of its offers without disclosing that they were less than market value. The FTC complaint explained that although Opendoor's algorithm automatically generates offers, "[i]n many instances, **Opendoor's employees have manually adjusted these values** before presenting them to consumers as offers."

431. The FTC found, based on their review of internal Opendoor documents, that Opendoor conducted internal analyses regarding their manual adjustments. Specifically, the FTC Complaint alleged: "**Opendoor's internal analyses** showed that these manually adjusted offers were several percentage points below Opendoor's assessment of market value" and explained that "[b]eginning no later than 2019, **Opendoor instituted a policy** to reduce its manually adjusted offers to [redacted] below what Opendoor assessed as market value." Similarly, the FTC reviewed an "internal communication [which] stated bluntly, 'We don't offer a fair market value to our customers.'"

432. The FTC complaint also confirmed that Opendoor made money by charging sellers for repairs that they did not end up making. For example, the FTC complaint alleged that "Opendoor has sent consumers a list of required repairs with the cost it would charge consumers if they agree to deduct the costs from their sales proceeds. The list of repairs has been typically well beyond what consumers would be responsible for in a market sale." According to the FTC, many of these repairs were unnecessary: "Opendoor has routinely requested upgrades to, or replacement of, functional heating and cooling systems, flooring, and roofs. It has also frequently demanded cosmetic changes such as repainting and replacement of items that could be repaired at far lower cost."

433. The FTC complaint alleged that since Opendoor takes up to 18 days after their initial offer to provide the seller with a list of repairs, sellers could not walk away because they had already placed deposits on new homes. Notably, the FTC alleged that "Opendoor's **internal communications** have described the lag between the initial offer and the later, significantly lower offer as a 'bait-and-switch' operation."

434. Finally, the FTC complaint confirmed that Opendoor often pocketed the repair costs as extra profit. Specifically, the FTC complaint alleged that:

> If the consumer decides to authorize Opendoor to complete the repairs and deduct the estimated costs from the sale proceeds, Opendoor completes the repairs after it acquires the property. **If the repairs cost less than the amount deducted, Opendoor retains the excess as profit**, including the undisclosed Estimated Repair Credit that Opendoor deducted from its original offer.

435. According to the FTC, "[o]ne **internal study** found that for [redacted] of Opendoor's purchases, its deductions for repair costs were greater than Opendoor's actual costs, thereby 'taking away [redacted] of seller equity' in each of those sales."

436. The FTC complaint also found that Opendoor made money by buying low and selling high. The FTC complaint stated:

> Opendoor claimed that it did not make money from 'buying low and selling high,' but from 'charging a fee for [its] service.' **But gains from selling homes for more than its offer price are a key contributor to its revenue**. A 2019 financial analysis broke down revenue from Opendoor's fee and from 'net resale gain' and reported over [redacted] in resale gains in 2018 and [redacted] in project resale gains in 2019. Presentations to investors touted 'resale gain' as a significant contributor to Opendoor's revenue per home.
>
> * * *
>
> **Data from Opendoor's real estate transactions confirm that Opendoor makes money not just from its fees, but also from buying homes low and selling them high.** After purchasing homes, it lists them on the open market for resale. From 2016 through February 2020, Opendoor sold [redacted] percent of its homes for more than what it offered consumers. The average gain on these

123

homes was [redacted], or [redacted] percent of the homes' average offer price of [redacted].

437. In connection with the settlement agreement, Opendoor agreed to pay $62 million. The Director of the FTC's Bureau of Consumer Protection, Samuel Levine, stated in the FTC's press release announcing the settlement that, "Opendoor promised to revolutionize the real estate market but built its business using old-fashioned deception about how much consumers could earn from selling their homes on the platform. There is nothing innovative about cheating consumers."

438. The FTC findings demonstrate the falsity of the statements in the Offering Documents. Although the Offering Documents claimed that the Company's pricing decisions were driven by the Company's "proprietary, machine learning-based pricing models," in reality, the Company's pricing decisions were based on an undisclosed human-driven process and deceptive consumer practices. Moreover, although the Offering Documents claimed that the Company's business model was not designed to generate margins "*from the spread between acquisition price and resale price*," in reality, the FTC found that "gains from selling homes for more than its offer price are a **key contributor to its revenue**."

### 3. Former Employees Reveal that Opendoor Charged Sellers for Unnecessary Repairs and Pocketed the Extra Money as Profit

439. Former employees reveal that the Company continued its deceptive consumer practices after the Offerings in order to drive contribution margins. These former employees also reveal that Opendoor continued making money by buying low and selling high. For example, Opendoor regularly charged sellers for repairs in order to lower the final offer and then failed to perform those repairs—keeping the extra money as additional profit. Indeed, as the housing market changed in 2022, and Opendoor's algorithm was unable to adapt to the new market, Defendants doubled down and expanded their deceptive consumer practices in an attempt to remain profitable.

440. CW 4 recalled that in 2019, it was Opendoor's policy or practice to get the property repairs done as soon as possible either before or right after the Company took

124

possession of the property, and before it was put up for sale. However, according to CW 4, at some point in 2020, the Company changed the policy or practice of doing the repairs upfront, or just doing minimal repairs, and then waiting until the house was put up for sale and for a list of repairs by the outside appraiser or buyer to be provided. CW 4 recalled that this change was made because homes were typically on the market for 30 – 90 days, and that the decision was made to hold onto the funds for as long as possible.

441. Other former employees confirm that Opendoor changed its policy of doing all the repairs they charged the seller for. For example, CW 3—who worked directly with customers after an offer was made, including discussing the repairs that Opendoor assessed were needed—stated, "We didn't do every single repair we accounted for." CW 3 learned from the home team, the team that assessed repairs and subsequently managed the repair work, that it was common for Opendoor not to do all of the repairs.

442. CW 3 explained that after a potential seller requested an offer from the company via its online platform, CW 3 would reach out to set up a Zoom interview with the seller at their home. During the Zoom interview, CW 3 asked questions about "their situation," such as why they were selling, their financial needs, and what they expected to get out of the house. CW 3 then had the owners give her a video tour through the entire house, which was recorded and sent on to another department, the home team, that assessed the home's condition prior to Opendoor making a final purchase price offer to the sellers. According to CW 3, the home team also conducted an in-person visit to assess the exterior of the house and the neighborhood, and Opendoor's pricing team also got involved during this time period as well. CW 3 did not know how the pricing team made their decisions, but she understood they more closely looked at the home's attributes and problems, such as being located next to a school or large power transformers. CW 3 explained that Opendoor then made a final offer from which the repair costs were subtracted. After a final offer was made, CW 3 discussed it with the customer, including the list of repairs that Opendoor assessed were needed.

443. CW 3 stated that the Company instructed her and people in her position not to send sellers the itemized repair list that also included itemized costs. Instead of sending the

125

actual itemized list, which showed the amount the seller was charged for each repair, the Company told customer experience partners (like CW 3) to summarize the repairs verbally for the seller and not to itemize any costs for repair. So, instead of telling the seller they were being charged $200 for paint, $5,000 for new floors, $100 for new bath fixtures, CW 3 talked the seller through the full list of repairs needed, then at the end she told them how much Opendoor would take off the purchase price to cover the costs of all the repairs. CW 3 said she was instructed by her manager not to send the list, but CW 3 is confident the instruction came from her manager's supervisors.

444. CW 3 received a call from a seller who was upset by what she had learned from a friend who had toured the seller's former home once it was placed back on the market. During the tour, the friend saw that the repairs Opendoor charged the seller for had not been done, CW 3 recalled. CW 3 then went to the manager of the "home team," which was the group that assessed the property via the Zoom video recording and created the list of repairs needed for which the seller would be charged. CW 3 was told that Opendoor assesses repairs based on what they expect buyers will ask for, but if the sellers don't ask for and/or the company doesn't do the repairs, Opendoor "pockets the money" the seller was charged for those repairs.

445. CW 3 explained that if the home's AC unit is approaching the end of its expected lifespan, Opendoor would tell the owner the home needs a new AC unit, for which the seller would be charged $7,000. (An amount subtracted from the purchase price.) But if the next buyer does not request a new AC unit before purchasing the home, Opendoor would not replace the unit, CW 3 said. "They would pocket that $7,000 if the buyer didn't ask for it," CW 3 said, noting, "That's definitely another source of income" for Opendoor. From what CW 3 learned from the home team that assessed repairs and subsequently managed the repair work, it was common for Opendoor not to do all of the repairs.

446. CW 3 explained that when she first started at the Company, in March 2021, an average repair charge for a transaction was about $5,000, but by the end of her employment,

126

in November 2022, the amount Opendoor was charging sellers had increased dramatically, to "$15,000, $25,00, $30,000, big numbers."

447. CW 3 recalled the co-workers shared their shock and exclaimed something along the lines of: "Oh my gosh! These repair charges! There had not been a single one under 20 grand! What is going on?" CW 3 recalled that toward the end of her tenure the home team seemed to be determining that almost every home needed painting, even homes that CW 3 knew did not need it. According to CW 3, "I think there was logic behind it. (Paint) is something that is going to be on any home—let's just pump it up a threshold, and it still rings true." So, for instance, according to CW 3, $25 paint charges would get bumped up to a $100.

448. CW 3 recalled a specific example of a seller who had freshly painted their home in anticipation of selling it, but when the final offer came back, Opendoor said the house needed to be painted. CW 3 knew that repair was not needed, so she went to the home team and challenged them. CW 3 said that she would regularly feel the need to go back to the home team to challenge repair charges she did not agree with. CW 3 explained that she went back to the home team "probably once or twice a day."

**4. Former Employees Reveal that the Algorithm Could Not Adapt to the Changing Housing Market in 2022**

449. Former employees also reveal that Opendoor's algorithm could not adapt to changing market conditions, leading to excess inventory in 2022 as the housing market cooled off.

450. CW 4 stated that sometime in the second half of 2021, there was discussion on an MBR (Monthly Business Review) call that Opendoor's homes were staying on the market longer in some "problematic" states and that their selling prices were going down. CW 4 recalled that one of the problematic states was one of her regions—Arizona. CW 4 advised that MBR calls were monthly calls to update the Home Loans department of Opendoor and were led by Product Managers and Program Managers. CW 4 recalled that by the end of 2022, homes in all of her markets that she handled were staying on the market longer and that

127

this was occurring because of the dramatic increase in interest rates, which she advised nobody was expecting.

451. In 2022, CW 1 was asked by the National Head of Brokerage, Chelsea Goyer, to review the Opendoor properties in the San Francisco and Southern California markets to determine why the Company was having a difficult time selling its homes there. CW 1 was asked to do so because of her experience in California markets, specifically in the San Francisco area. CW 1 started her review in July 2022, and after reviewing over one hundred properties in the San Francisco Bay area and Southern California markets, CW 1 concluded that Opendoor "did not know" the market and was overpricing its homes, which caused Opendoor to hold onto those properties longer than they should have otherwise been. Opendoor also did not even do basic real estate marketing, which is saying that you did repairs or upgrades to explain the higher price, from when they purchased the property which CW 1 pointed out to them. Opendoor also put pictures in the marketing that were not ideal, such as backyard pictures with piles of weeds. Opendoor's marketing remarks did not match the house they were trying to sell either.

452. According to CW 1, the reason the houses were being priced too high was due to Opendoor's algorithm, which was not accounting for changes in the real estate market that were happening at that time. CW 1 told an Opendoor General Manager of Reselling that the algorithm was not accounting for the changing housing market conditions and was therefore inaccurate, and that Opendoor needed to put the houses up for sale at prices that were lower, more realistic, and more aligned with the current market values as of July 2022. However, the GM of Reselling told CW 1 that "this is how Opendoor does it," and did not indicate that changes were going to be made. Opendoor priced high and would just do price reductions every week to two weeks, CW 1 told them this was not good, because buyers would just sit and watch and wait for the price to get lower and lower and this was not good marketing strategy. CW 1 told this to the general manager, and was told this was how they did their pricing and they didn't care if this was not the best way to do it or that it was not the typical real estate way to do it.

453. The Exchange Act Defendants clearly knew that Opendoor's homes were staying on the market too long. For example, Defendants Wu and Wheeler participated in company-wide conferences where they expressed concern over the levels of inventory and directed Opendoor employees to give concessions—which would eat into the Company's contribution margins—in order to get rid of the property.

454. CW 7 explained that the Company regularly held company-wide video conferences, either on Zoom or Google, that were led by Defendants Wu and Wheeler. According to CW 7, Wu and Wheeler's demeanor changed on these calls from positive attitudes to "long faces" sometime in mid-2022. CW 7 recalled that during a video call around July 2022, Wu and Wheeler stated that the Company needed to "quickly unload" properties because they were spending too much on inventory. Indeed, according to CW 7, Wheeler stated, "We'll take anything right now," which CW 7 explained meant that any offer would be taken.

455. CW 8 recalled that in July or August 2022, during an all-hands conference call, Defendant Wheeler announced that the new priority for the Company was "to lower the DIP," which CW 8 stated was an acronym for "Days In Possession." CW 8 recalled that after the announcement, Defendant Wheeler and Andrew Low Ah Kee worked closely with Daniel Murillo to adjust models in order to sell properties more quickly.

456. Similarly, CW 3 recalled a meeting in mid-2022 during which leadership talked about its extensive inventory. CW 3 noted, "The longer we held the inventory, the more money we lost, and less profit we made when we could turn around and sell those homes again."

457. CW 7 also recalled that during an August 2022 video call, Wheeler gave the directive to provide credits and incentives to "outside assets," which she described as real estate agents and home mortgage companies, to help move the Company's inventory of properties. According to CW 7 it was also in July 2022, when she and her RedDoor legacy colleagues began writing loans for Opendoor, that CW 7 witnessed many credits and incentives identified in the loan paperwork to close a deal. CW 7 recalled some examples as

being an additional 1% being given to outside real estate brokers who presented home buyers that led to a sale, as well as a $2,000 lender credit and free appraisals. CW 7 advised that the amount of these credits and incentives were "uncommon" and that the properties whose portfolios she handled were depreciated assets with no repairs being done.

458. CW 7 went on to recall that when she was given loans to work on for the first time by Opendoor in July 2022, that she first worked on loans from California, and that she was then also working on loans from Texas and Arizona. According to CW 7, she witnessed Opendoor properties selling for less than what they were purchased for, with incentives and credits being given to unload the property, and without repairs being done, in all three states.

459. In addition to providing these credits and incentives, Opendoor had to pay outside brokers to help move their properties since the algorithm could not accurately price the homes, which also cut into the Company's contribution margin. For example, according to CW 1, for the properties in the San Francisco Bay area that she reviewed that had been unsold for a long period of time, Opendoor paid outside brokers to sell and list them properly, with accurate descriptions and better pictures. CW 1 explained that Opendoor would have had to pay a fee of around 2%, to list the house with an outside broker.

460. These issues continued throughout the summer of 2022, as Opendoor employees told Wu and Wheeler during a company-wide meeting that the Company was not accurately pricing its offers. For example, in September 2022, CW 7 recalled that there was a video call that she attended where Wheeler said that she's "seeing depreciated assets" and a lot of inventory on the books, and to "move the properties." CW 7 recalled complaints from some of the attendees on that call that the Company was overpaying for houses and no repairs were being done.

**D. The Underwriter Defendants Failed to Perform Adequate Due Diligence**

461. The February 2021 SPO was a firm commitment offering conducted by and through the Underwriter Defendants.

462. Defendants Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Oppenheimer & Co. Inc., BTIG, LLC,

130

KeyBanc Capital Markets Inc., Wedbush Securities Inc., TD Securities (USA) LLC, Zelman Partners LLC, Academy Securities, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Co., LLC, and Siebert Williams Shank & Co., LLC underwrote the Offerings yet failed to perform satisfactory due diligence with respect to the offering and issuance of Opendoor shares in accordance with their responsibilities.

463. Underwriters are intended to be gatekeepers and are supposed to serve as independent checks on management and to bring to light critical negative information and risks about the issuer to investors intending on purchasing shares in the offering. During the due diligence process, the underwriter is charged with reviewing all pertinent documents and interviewing all relevant individuals to identify all aspects of the issuer's operations that need to be disclosed. As the treatise "Due Diligence - Periodic Reports and Securities Offerings" describes it, "[t]he underwriter should look upon due diligence primarily as an attempt to find 'red flags' which indicate potential danger."

464. This process is intended to provide comfort that investors receive full and fair disclosure of all material facts. If, during their due diligence investigation, the underwriters learn of material negative information regarding the issuer, they must insist that such information be disclosed to the investing public or withdraw from the offering. Complete and adequate disclosure is the very purpose of due diligence. Thus, no amount of due diligence or investigation can serve as a defense or an excuse to an underwriter who possesses material negative information about an issuer and fails to disclose such information to the public.

465. An underwriter needs to conduct substantial due diligence in connection with each public offering to ensure the timeliness and accuracy of the information as of the date of the offering. Moreover, underwriters must conduct their due diligence with the reasonable care "required of a prudent man in the management of his own property." *See* 15 U.S.C. §77(k)(c).

466. Likewise, according to well-regarded treatises covering due diligence, "[m]aterial federal, state and local regulations affecting the target company should be understood and, where appropriate, reviewed with target company or special counsel." *See*

Due Diligence in Business Transactions, Lawrence, release 48, 2018, Law Journal Press, §1.05 [h]. Additionally, it may be desirable for a member of the target company's management to assemble a list of material licenses and permits that it possesses in connection with the operation of its business or the ownership of its property." *See id.*

467. Critically, in conducting due diligence, an underwriter cannot simply rely on management statements and representations, and instead must conduct a reasonable investigation to independently verify management's statements. Similarly, underwriters may not rely on an accountant's or auditor's report as adequate due diligence for financial statements. Rather, underwriters have a duty to perform their own financial analysis of the issuer and identify for themselves any red flags, inconsistencies, or areas of concern that impact the issuer's business and financial condition, and follow up on any issues that they uncover in their investigation. Underwriters are uniquely positioned to investigate non-audited financial statements and protect investors.

468. As discussed above, there were numerous red flags highlighting the falsity of the Offering Documents. For example, starting in 2019, the FTC had been investigating Opendoor for its human-driven process of cheating homeowners out of money, which included manually lowering the algorithm-generated offer and charging sellers for unnecessary repairs in order to boost the Company's contribution margin and profitability. The FTC was also investigating Opendoor for misleading consumers about the fact that Opendoor did not make money by "buying low and selling high," and indeed, the FTC's investigation revealed internal communications showing that Opendoor knew it made money on the spread between what they purchased the home for and what it sold for.

469. Here, the Underwriter Defendants failed to perform any such due diligence. Had they done so, they would have uncovered that Opendoor's claims about its algorithm were unsubstantiated and the Company's success was driven by humans and deceptive consumer practices designed to make money on the spread between purchase price and sale price. At a minimum, the Underwriter Defendants were negligent in not knowing, and failing to disclose in connection with the Offerings, the adverse information alleged herein that was

132

contrary to the disclosures in the Offering Documents, the omission of which rendered the Offering Documents false at the time they were made effective.

**E.    News About Declining Contribution Margins and Profitability Cause Opendoor's Stock to Crash**

470.   On February 24, 2022, Opendoor announced its fourth quarter and full year 2021 financial results and revealed massive losses.  Specifically, the Company announced that its fourth quarter 2021 contribution margin was just 4%, a steep decline from a 12.6% contribution margin in the fourth quarter of 2020.  According to an article published by *The Real Deal* on February 25, 2022, "[t]he selloff was widely attributed to a drop in Opendoor's contribution margin, a key profitability metric that factors in the costs of carrying and selling home inventory."[20]

471.   Then, September 19, 2022, Bloomberg published an article revealing for the first time that Opendoor lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties).  Specifically, the Bloomberg article stated:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.
>
> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.
>
> * * *
>
> The company's rocky summer is reminiscent of the pricing problems that doomed Zillow Group Inc.'s iBuying business last year, according to a research note from Mike DelPrete, a scholar-in-residence at the University of Colorado Boulder. That doesn't mean

[20] T.P. Yeats, *Opendoor stock plunges as losses soar along with revenue*, The Real Deal (Feb. 25, 2022), https://therealdeal.com/new-york/2022/02/25/opendoor-stock-plunges-as-losses-soar-along-with-revenue/.

Opendoor is going to shut down the business, but it demonstrates the depth of the losses — and September is likely to be even worse than August, DelPrete's analysis shows.

Opendoor's metrics are in the danger zone," DelPrete said in an interview. "They are very close to where Zillow was in its worst moments."

The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase. When home prices were skyrocketing earlier in the year, Opendoor banked easy profits. Then dwindling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.

By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of properties it had agreed to purchase when prices were rising.

* * *

The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday. They were down 72% this year through the close on Sept. 16.

472. Finally, on November 3, 2022, Opendoor reported its financial results for the third quarter ended September 30, 2022, which revealed that Opendoor's contribution margin for the third quarter 2022 was ***negative 0.7%***—well below the Company's 4% to 6% contribution margin range.

473. On this news, Opendoor's stock price fell by $0.60 per share, or 25.64% over the next two trading days, to close at $1.74 per share on November 7, 2022—**a 94.43% decline** from the Initial Closing Price.

## XXII. CLASS ALLEGATIONS

474. Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who or which purchased or otherwise acquired Opendoor common stock pursuant

134

and/or traceable to the Offering Materials issued in connection with the de-SPAC Merger on or about December 21, 2020 (the "December 2020 Offering") and/or the Offering Materials issued in connection with Opendoor's secondary public offering on or about February 4, 2021. Excluded from the Securities Act Class: (i) Exchange Act Defendants; (ii) Securities Act Defendants; (iii) members of the immediate family of any Defendant who is an individual; (iv) any person who was an officer, director, and/or control person of Opendoor during the Class Period; (v) any firm, trust, corporation, or other entity in which any Defendant (or members of the immediate family of any Defendant) has or had a controlling interest; (vi) Opendoor's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vii) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such.

475.  The members of the Securities Act Class are so numerous that joinder of all members is impracticable.  While the exact number of Securities Act Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believes there are at least thousands of members in the proposed Securities Act Class, as the Company registered over 546 million shares in the December 2020 Offering and offered over 28 million shares of common stock in the February 2021 SPO.  Record owners and other members of the Securities Act Class may be identified from records maintained by Opendoor or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

476.  Plaintiffs' claims are typical of the claims of the members of the Securities Act Class as all members of the Securities Act Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

477.  Plaintiffs will fairly and adequately protect the interests of the members of the Securities Act Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests antagonistic to or in conflict with those of the Securities Act Class.

478. Common questions of law and fact exist as to all members of the Securities Act Class and predominate over any questions solely affecting individual members of the Securities Act Class. Among the questions of law and fact common to the Securities Act Class are:

        (a)     Whether Defendants violated the Securities Act;

        (b)     Whether the December 2020 Offering Documents and/or the February 2021 SPO Documents contained false statements of material fact;

        (c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

479. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Securities Act Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Securities Act Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XXIII. CAUSES OF ACTION

### COUNT III

### FOR VIOLATIONS OF SECTION 11 OF THE SECURITIES ACT AGAINST OPENDOOR, SCH, THE SECURITIES ACT INDIVIDUAL DEFENDANTS, AND THE UNDERWRITER DEFENDANTS

480. Plaintiffs repeat and incorporate each and every allegation contained in paragraphs 320 – 479 as if fully set forth herein.

481. This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf all persons and entities who purchased or otherwise acquired Opendoor common stock pursuant and/or traceable to the Offering Documents issued in connection with the December 2020 Offering and the February 2021 SPO.

482. This cause of action is predicated upon the Securities Act Defendants' strict liability for making materially false statements in the Offering Documents.

136

483. This cause of action does not sound in fraud. Any proceeding allegations of fraud, fraudulent conduct, or improper motive are specifically excluded from this cause of action. Plaintiffs do not allege for this cause of action that the Securities Act Defendants had scienter or fraudulent intent, which are not elements of this claim. Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

484. The Registration Statements, which include the Prospectuses, issued in connection with the December 2020 Offering and the February 2021 SPO were inaccurate and contained untrue statements of material facts.

485. The Corporate Defendants were the issuers of the common stock purchased by Plaintiffs and the Securities Act Class. As such, the Corporate Defendants are strictly liable for the materially untrue statements contained in the Registration Statements and the failure of the Registration Statements to be complete and accurate. By virtue of the Registration Statements containing material misrepresentations, the Corporate Defendants are liable under Section 11 of the Securities Act to Plaintiffs and the Securities Act Class.

486. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and were not misleading.

487. Defendants Palihapitiya, Trieu, Osborne, Bain, Spillane, and Herman signed the December 2020 Offering Documents and caused its issuance, and Defendants Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon signed the February 2021 SPO Documents and caused its issuance. The Securities Act Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statements. They each had a duty to ensure that such statements were true and accurate. By virtue of each of the Securities Act Individual Defendants' failure to exercise reasonable care, the Registration Statements contained misrepresentations of

material facts. As such, each of the Securities Act Individual Defendants is liable under Section 11 of the Securities Act to Plaintiffs and the Securities Act Class.

488. Each of the Underwriter Defendants served as the underwriters for the February 2021 SPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the common stock to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants, as an underwriter of the common stock offered in the February 2021 SPO pursuant to the Registration Statement, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They each had a duty to ensure that such statements were true and accurate. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Registration Statement contained misrepresentations of material facts. As such, each of the Underwriter Defendants are liable under Section 11 of the Securities Act to Plaintiffs and the Securities Act Class.

489. None of the untrue statements in the Registration Statements alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Registration Statements did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

490. Each of the Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue written statements to the investing public that were contained in the Registration Statements, which misrepresented, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such defendant violated Section 11 of the Securities Act.

491. Plaintiffs and the Securities Act Class have sustained damages. The value of Opendoor common stock has declined substantially subsequent to and due to violations by Defendants named in this Count.

138

492. At the time of their purchases of Opendoor common stock, Plaintiffs and other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that this action was commenced. Less than three years have elapsed between the time that the common stock upon which this cause of action is brought were offered to the public and the time that this action was commenced.

## COUNT IV

### FOR VIOLATIONS OF SECTION 15 OF THE SECURITIES ACT AGAINST THE SECURITIES ACT INDIVIDUAL DEFENDANTS

493. Plaintiffs repeat and incorporate each and every allegation contained in paragraphs 320 – 479 as if fully set forth herein.

494. This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Securities Act Class, against each of the Securities Act Individual Defendants.

495. This cause of action does not sound in fraud. Plaintiffs do not allege that any of the Securities Act Defendants committed intentional or reckless misconduct or that any of the Securities Act Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim. This Count is based solely on negligence and/or strict liability. Plaintiffs expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Offerings are alleged to have been materially misstated statements of opinion or belief when made.

496. The Securities Act Individual Defendants each were control persons of Opendoor by virtue of their positions as directors and/or senior officers of Opendoor. The Securities Act Individual Defendants each had a series of direct and/or indirect business

139

and/or personal relationships with other directors and/or officers and/or major shareholders of Opendoor.

497. Each of the Securities Act Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the Offerings. Because of their positions of control and authority as senior officers and/or directors each of the Securities Act Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information.

498. Opendoor and the Securities Act Individual Defendants each were culpable participants in the violations of Section 11 of the Securities Act as alleged in the first cause of action alleged above, based on their having signed or authorized the signing of the Registration Statements and having otherwise participated in the process which allowed the Offerings to be successfully completing.

499. As a direct result of the aforementioned conduct, the Securities Act Class members suffered damages in connection with their purchases of Opendoor common stock. This claim is brought one year after the discovery of the false statements and within three years of the date of the Offerings.

## XXIV. PRAYER FOR RELIEF

500. WHEREFORE, Plaintiffs on behalf of itself and the other members of the Securities Act Class, prays for relief and judgment as follows:

(a) Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Securities Act Class defined herein;

(b) Awarding all damages and other remedies set forth in the Securities Act in favor of Plaintiffs and other Securities Act Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Securities Act Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and expert fees, and other costs and disbursements; and

(d)     Awarding Plaintiffs and the Securities Act Class such other relief as may be deemed just and proper by the Court.

## XXV. JURY TRIAL DEMANDED

501.     Plaintiffs hereby demand a trial by jury.

Dated: April 17, 2023

**LABATON SUCHAROW LLP**

By: */s/Michael P. Canty*
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

***Counsel for Plaintiffs***


**KELLER ROHRBACK L.L.P.**
Gary A. Gotto, AZ 007401
3101 North Central Avenue, Suite 1400
Phoenix, AZ 85012
Telephone: 602-248-0088
Fax: 602-248-2822
ggotto@kellerrohback.com

***Local Counsel for Plaintiffs***


**VANOVERBEKE MICHAUD & TIMMONY P.C.**

Aaron L. Castle (admitted *pro hac vice*)
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com

141

**GLANCY PRONGAY & MURRAY LLP**

Casey E. Sadler (*pro hac vice* motion forthcoming)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: rprongay@glancylaw.com
clinehan@glancylaw.com

***Additional Counsel for Plaintiffs***

142