**CLARK HILL PLC**
Darrell E. Davis, SBN #011442
14850 North Scottsdale Road, Suite 500
Scottsdale, Arizona 85254
Telephone: (480) 684-1100
Facsimile: (480) 684-1199
ddavis@clarkhill.com

*Local Counsel for Plaintiffs and Settlement Class*

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

*Lead Counsel for Plaintiffs and Settlement Class*

[Additional Counsel on signature page]

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| IN RE OPENDOOR TECHNOLOGIES INC. SECURITIES LITIGATION | Case No. 2:22-CV-01717-MTL<br><br>**PLAINTIFFS' MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION**<br><br>CLASS ACTION |

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... ii

MEMORANDUM OF POINTS AND AUTHORITIES .......... 1

PRELIMINARY STATEMENT .......... 1

PRELIMINARY APPROVAL AND THE NOTICE PROGRAM .......... 3

ARGUMENT .......... 4

- I. THE SETTLEMENT WARRANTS FINAL APPROVAL .......... 4
  - A. Standards Governing Approval of Class Action Settlements .......... 4
  - B. Rule 23(e)(2)(A): The Class Has Been Adequately Represented .......... 6
  - C. Rule 23(e)(2)(B): The Settlement Is the Product of Arm's-Length Negotiations Between Experienced Counsel .......... 7
  - D. Rule 23(e)(2)(C): The Relief Provided by the Settlement Is Adequate .......... 8
- II. THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION .......... 16
- III. NOTICE AND REACTION OF THE SETTLEMENT CLASS TO DATE .......... 16

CONCLUSION .......... 17

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apollo Grp. Inc. Sec. Litig.*,
2012 WL 1378677 (D. Ariz. Apr. 20, 2012) ........ 8

*Azar v. Blount Int'l, Inc.*,
2019 WL 7372658 (D. Or. Dec. 31, 2019) ........ 13

*In re Biolase, Inc. Sec. Litig.*,
2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) ........ 13

*In re Bluetooth Headset Prod. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ........ 7

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) ........ 4

*Churchill Vill., L.L.C. v. Gen. Elec.*,
361 F.3d 566 (9th Cir. 2004) ........ 5, 8, 17

*Ciuffitelli v. Deloitte & Touche LLP*,
2019 WL 1441634 (D. Or. Mar. 19, 2019) ........ 15

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992) ........ 16

*In re Extreme Networks, Inc. Sec. Litig.*,
2019 WL 3290770 (N.D. Cal. July 22, 2019) ........ 7, 8, 9

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) ........ 5, 6, 7, 8

*Jiangchen v. Rentech Inc.*,
2019 WL 5173771 (C.D. Cal. Oct 10, 2019) ........ 9, 17

*Nat'l Rural Telecomm. Coop. v. DirectTV, Inc.*,
221 F.R.D. 523 (C.D. Cal. 2004) ........ 8

*Nguyen v. Radient Pharms. Corp.*,
2014 WL 1802293 (C.D. Cal. May 6, 2014) ........ 12

*Officers for Justice v. Civil Serv. Comm'r*,
688 F.2d 615 (9th Cir. 1982) ........ 4

*Redwen v. Sino Clean Energy, Inc.*,
2013 WL 12303367 (C.D. Cal. July 9, 2013) .......... 9, 16

*In re Stable Rd. Acquisition Corp.*,
2024 WL 3643393 (C.D. Cal. Apr. 23, 2024) .......... 6

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1993) .......... 13

*Vataj v. Johnson*,
2021 WL 5161927 (N.D. Cal. Nov. 5, 2021) .......... 13

*In re Wells Fargo Sec. Litig.*,
991 F. Supp. 1193 (N.D. Cal. 1998) .......... 15

*Wood v. Ionatron, Inc.*
2009 WL 10673479 (D. Ariz. Sept. 28, 2009) .......... 7, 8

**Statutes**

15 U.S.C § 77k(e) .......... 10

15 U.S.C. § 77z-1(a)(4) .......... 15

15 U.S.C. §77z-1(a)(7) .......... 17

15 U.S.C. §78u-4(a)(4) .......... 15

**Rules**

Fed. R. Civ. P. 23 .......... 5, 6, 17

Fed. R. Civ. P. 23(a) .......... 3

Fed. R. Civ. P. 23(b)(3) .......... 3

Fed. R. Civ. P. 23(c)(2)(B) .......... 17

Fed. R. Civ. P. 23(e)(1)(B) .......... 16

Fed. R. Civ. P. 23(e)(2) .......... 1, 4, 5

Fed. R. Civ. P. 23(e)(2)(A) .......... 6, 7

Fed. R. Civ. P. 23(e)(2)(C) .......... 8

Fed. R. Civ. P. 23(e)(2)(C)(i) .......... 8

Fed. R. Civ. P. 23(e)(2)(C)(ii) .......... 13, 14

Fed. R. Civ. P. 23(e)(2)(C)(iii) .......... 15

Fed. R. Civ. P. 23(e)(2)(C)(iv) .......... 5

Fed. R. Civ. P. 23(e)(2)(D) .......... 15, 16

Fed. R. Civ. P. 23(e)(3) .......... 5

PLEASE TAKE NOTICE that Lead Plaintiffs Indiana Public Retirement System, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association ("Lead Plaintiffs") and additional plaintiff Stuart Graham Hereford (together with Lead Plaintiffs, "Plaintiffs"), on behalf of themselves and other members of the proposed Settlement Class, will move this Court on January 6, 2026 at 9:00 a.m., before the Honorable Michael T. Liburdi, for an Order, pursuant to Rule 23(e)(2) of the Federal Rules of Civil Procedure: (i) granting final approval of the proposed Settlement of the above-captioned Action, as set forth in the Stipulation and Agreement of Settlement, dated June 13, 2025 ("Stipulation"); (ii) certifying the Settlement Class and appointing Plaintiffs as Class Representatives and Lead Counsel as Class Counsel; and (iii) approving the proposed plan for allocating the proceeds of the Settlement to the Settlement Class.

The Motion is supported by the following Memorandum of Points and Authorities, and the accompanying Declaration of Michael P. Canty in Support of (I) Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Motion for an Award of Attorneys' Fees and Payment of Expenses, dated December 9, 2025 with annexed exhibits, filed herewith.

Pursuant to the Order granting preliminary approval of the Settlement (ECF No. 156) ("Preliminary Approval Order"), any objections and requests for exclusion from the Settlement Class must be received by December 16, 2025. Proposed orders granting the requested relief will be submitted with Plaintiffs' reply submission on or before December 30, 2025, after the deadline for objecting or requesting exclusion has passed.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **PRELIMINARY STATEMENT**

Lead Plaintiffs Indiana Public Retirement System, Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association and additional plaintiff Stuart Graham Hereford, respectfully submit this memorandum of

law in support of their motion for final approval of the proposed Settlement of the above-captioned class action in the amount of $39,000,000, in cash, pursuant to the terms of the Stipulation, previously filed with the Court (ECF No. 154-2).[1] The Settlement is with Defendants Opendoor Technologies Inc. ("Opendoor" or the "Company"), the Individual Defendants,[2] and the Underwriter Defendants (the Underwriter Defendants together with Opendoor and the Individual Defendants are "Defendants").

As described below and in the accompanying Declaration of Michael P. Canty, dated December 9, 2025 (the "Canty Decl."), the Settlement is an excellent result for the Settlement Class.[3] Facing significant challenges with respect to obtaining a greater recovery after summary judgment and trial, Plaintiffs and Lead Counsel were fully informed by their significant litigation efforts over the span of three years and reached a certain and beneficial settlement for the Settlement Class. While Plaintiffs believe the claims are meritorious and strong, they recognize there were substantial risks to continued litigation and trial. As discussed in the Canty Declaration and summarized below, among other things, Defendants would likely argue in future dispositive motions and at trial that,

---

[1] All capitalized terms used herein are defined in the Stipulation and have the same meanings as set forth therein. All internal quotations and citations are omitted unless otherwise noted.

[2] The "Individual Defendants" are Eric Wu, Carrie Wheeler, Chamath Palihapitiya, Steven Trieu, Ian Osborne, David Spillane, Adam Bain, Cipora Herman, Pueo Keffer, Glenn Solomon, Jason Kilar, Jonathan Jaffe. The Individual Defendants and Opendoor are the "Opendoor Defendants." The "Underwriter Defendants" are Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Oppenheimer & Co. Inc., BTIG, LLC, KeyBanc Capital Markets Inc., Wedbush Securities Inc., TD Securities (USA) LLC, Zelman Partners LLC, Academy Securities, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Company, Inc., and Siebert Williams Shank & Co., LLC.

[3] The Canty Declaration is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the litigation efforts; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation, among other things. Citations to "¶" in this memorandum refer to paragraphs in the Canty Declaration.

All exhibits herein are annexed to the Canty Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ -__." The first numerical reference is to the designation of the entire exhibit attached to the Declaration and the second reference is to the exhibit designation within the exhibit itself.

based on discovery, the Offering Documents contained no false and misleading statements or omissions because such statements were accurate. Defendants would likely put forward facts and several highly qualified experts in support of numerous affirmative defenses, such as due diligence and negative causation, which could absolve Defendants from liability or drastically reduce the amount of recoverable damages. The Settlement avoids these risks, as well as the further delay and expense of continued litigation – while providing a substantial and certain benefit to the Settlement Class.

Plaintiffs were actively involved throughout the litigation, diligently representing the Settlement Class, and have approved the Settlement. *See* Decl. of Jeffrey Gill on behalf of INPRS, dated December 5, 2025, Ex. 1; Decl. of Joseph Rozell on behalf of Oakland County, dated December 9, 2025, Ex. 2; Decl. of Stuart Graham Hereford, dated December 5, 2025, Ex. 3. The Settlement Class's reaction to date similarly reflects approval of the Settlement. Notice was provided to the Settlement Class beginning on November 4, 2025. *See* Decl. of Lance Cavallo on behalf of Verita Global LLC, dated December 9, 2025 ("Mailing Decl."), Ex. 5. Although the December 16, 2025 deadline to object to the Settlement or request exclusion from the Settlement Class has not yet passed, to date, no objections or requests for exclusion have been received.

In addition, the Plan of Allocation for the distribution of the proceeds of the Settlement, which was developed by Lead Counsel with the assistance of Plaintiffs' damages expert, is a fair and reasonable method for distributing the Net Settlement Fund to eligible Claimants and should also be approved by the Court.

**PRELIMINARY APPROVAL AND THE NOTICE PROGRAM**

On October 21, 2025, the Court preliminarily approved the Settlement, preliminarily certified the Settlement Class, and approved the forms and methods of providing notice to the Settlement Class. ECF No. 156.[4] Pursuant to, and in compliance with, the Preliminary Approval Order, beginning on November 4, 2025, the Court-

[4] In the Preliminary Approval Order, the Court provisionally certified the proposed Settlement Class pursuant to Fed.R.Civ.P. 23(a) and (b)(3). Nothing has occurred to alter the propriety of that determination.

appointed Claims Administrator Verita Global, LLC ("Verita"), caused the Postcard Notice to be disseminated to potential Settlement Class Members and banks, brokers, and other nominees ("Nominees"). *See* Ex. 5 at ¶¶2-8. To date, a total of 404,104 Postcard Notices have been mailed (or emailed). *Id*. at ¶8. On November 18, 2025, the Summary Notice was published in *The Wall Street Journal* and disseminated over the internet using *PR Newswire*. *Id*. at ¶9 and Ex. C attached thereto.

The Claim Form and the long-form Notice, along with other Settlement related documents, were posted on a website established by Verita. *Id*. at ¶¶11-12. The website also provides important dates and deadlines in connection with the Settlement. *Id*. Copies of the Postcard Notice, long-form Notice, and Claim Form are also available on Lead Counsel's website, www.labaton.com. ¶90.

To date, reaction to the Settlement has been very positive. While the deadline (December 16, 2025) for objecting and seeking exclusion has not yet passed, there have been no objections and no requests for exclusion. Should any be received, Plaintiffs will address them in their reply papers, which are due to be filed with the Court on December 30, 2025. Additionally, nothing has occurred to date to impact the Court's provisional certification of the Settlement Class.

## <u>ARGUMENT</u>

## I. THE SETTLEMENT WARRANTS FINAL APPROVAL

### A. Standards Governing Approval of Class Action Settlements

The Ninth Circuit recognizes a "'strong judicial policy that favors settlements, particularly where complex class action litigation is concerned.'" *Campbell v. Facebook, Inc*., 951 F.3d 1106, 1121 (9th Cir. 2020). It is well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution." *Officers for Justice v. Civil Serv. Comm'r*, 688 F.2d 615, 625 (9th Cir. 1982).

Rule 23(e)(2) provides that a court may approve a settlement that would bind class members "only after a hearing and only on finding that it is fair, reasonable, and adequate" after considering whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
(i) the costs, risks, and delay of trial and appeal;
(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
(iii) the terms of any proposed award of attorney's fees, including timing of payment; and
(iv) any agreement required to be identified under Rule 23(e)(3);[5] and
(D) the proposal treats class members equitably relative to each other.

Rule 23, as amended in December 2018, has not changed the established overall standard for approving a proposed class settlement, *i.e.*, evaluating whether it is fair, adequate, and reasonable. Fed. R. Civ. P. 23(e)(2).

In considering final approval, the Court may also consider the Ninth Circuit's long-standing approval factors, many of which overlap with the Rule 23(e)(2) considerations: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement." *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *see also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). The Advisory Committee Notes to the 2018 amendments to Rule 23 explain that the four Rule 23(e)(2) factors are not intended to "displace" any factor previously adopted by the courts, but "rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." Fed. R. Civ. P. 23 Adv.

[5] Rule 23(e)(2)(C)(iv) requires the disclosure of any agreement between the parties in connection with a settlement. Here, the Parties executed a settlement Term Sheet and on June 13, 2025 they executed the Stipulation and a Confidential Supplemental Agreement Regarding Requests for Exclusion, concerning the circumstances under which Opendoor can terminate the Settlement based upon the number of exclusion requests received. The Term Sheet, Stipulation, and the Supplemental Agreement are the only agreements concerning the Settlement entered into by the Parties.

Comm. Notes to 2018 Amendments, Subdivision (e)(2). All of these factors, whether in Rule 23 or Ninth Circuit jurisprudence, favor approval of the proposed Settlement.

**B. Rule 23(e)(2)(A): The Class Has Been Adequately Represented**

In determining whether to approve a class action settlement, courts consider whether "the class representative and class counsel have adequately represented the class." Fed. R. Civ. P. 23(e)(2)(A). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon,* 150 F.3d at 1020.

Here, Plaintiffs' claims are based on the same common course of alleged conduct by Defendants, are typical of all other Settlement Class Members, and Plaintiffs have no interests antagonistic to the Settlement Class. *See In re Stable Rd. Acquisition Corp*., 2024 WL 3643393, at *6 (C.D. Cal. Apr. 23, 2024) (finding lead plaintiff adequately represented the class where lead plaintiff's claims are typical of and coextensive with the claims of the settlement class with no antagonistic interests).

Furthermore, Plaintiffs and Lead Counsel have adequately represented the Settlement Class in both their vigorous prosecution of the claims and in their negotiation of the Settlement. Plaintiffs and Plaintiffs' Counsel developed a deep understanding of the facts of the case and merits of the claims by, *inter alia*: (i) conducting a rigorous investigation, including contacting and interviewing former employees of Opendoor, and consulting with experts on causation and damages issues, economics, and de-SPAC transactions; (ii) preparing and filing a detailed consolidated complaint (the "Complaint"), which expanded the scope of the initial complaint by adding additional misrepresentations and other allegations in support of the claims at issue; (iii) defeating, in part, Defendants' motions to dismiss the Complaint (after successfully asking the Court to reconsider its order dismissing the Complaint); (iv) opposing and defeating Defendants' motion to certify for interlocutory appeal the Court's order granting Plaintiffs' motion for reconsideration; (v) moving for class certification; (vi) researching, drafting, and

propounding discovery requests on Defendants; (vii) reviewing over 16,000 documents produced in discovery; (viii) preparing for, and participating in, a formal in-person arm's-length settlement mediation, exchanging extensive mediation briefing; and (ix) engaging and consulting with experts on causation and damages, economics, and de-SPAC transactions. *See generally* Canty Decl. at §§III.-V.

Plaintiffs regularly communicated with Plaintiffs' Counsel, reviewed material filings in the case, and responded to the discovery demands propounded by Defendants. Furthermore, Plaintiffs, through counsel, were involved in the ongoing settlement discussions and, with an informed understanding, agreed to the Settlement. *See* Exs. 1-3. Likewise, Lead Counsel, who is experienced in prosecuting and trying complex class actions, had a clear view of the strengths and risks of the case and was equipped to make an informed decision regarding the reasonableness of a potential settlement. *See Wood v. Ionatron, Inc.* 2009 WL 10673479, at *4 (D. Ariz. Sept. 28, 2009) (finding experience of counsel favored approval where counsel "has significant experience in …securities class action [lawsuits]"); *see generally* Canty Decl. at §§III.-VI. Lead Counsel is highly qualified and experienced in securities litigation, as set forth in its firm resume (*see* Ex. 6-G, Declaration on behalf of Labaton Keller Sucharow LLP). Accordingly, the Settlement Class has been, and remains, well represented.

### C. Rule 23(e)(2)(B): The Settlement Is the Product of Arm's-Length Negotiations Between Experienced Counsel

Rule 23(e)(2)(B) asks whether "the [settlement] proposal was negotiated at arm's length." This consideration (and Rule 23(e)(2)(A) discussed above) "overlaps with certain *Hanlon* factors, such as the non-collusive nature of negotiations, [6] the extent of discovery completed, and the stage of proceedings." *In re Extreme Networks, Inc. Sec. Litig.*, 2019

[6] The Settlement has none of the indicia of possible collusion identified by the Ninth Circuit, *see In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011), such as a "clear-sailing" fee agreement or a provision that would allow settlement proceeds to revert to Defendants. *See* Stipulation at ¶13 ("This is not a claims-made settlement. If the Settlement becomes effective . . . then there will be no reversion of any settlement funds to Defendants, their insurance carriers, or any other person or entity who or which funded the Settlement Amount.").

WL 3290770, at *7 (N.D. Cal. July 22, 2019).

Courts have long recognized the importance of arm's-length negotiations. *See, e.g., In re Apollo Grp. Inc. Sec. Litig.,* 2012 WL 1378677, at *6 (D. Ariz. Apr. 20, 2012) (finding "genuine arms-length negotiations" as a factor in support of approval); *Wood,* 2009 WL 10673479, at *5 ("finding the settlement was achieved free of collusion where it involved assistance from mediator). As explained in the Canty Declaration, the Parties met for a formal mediation session on February 7, 2025, before David Murphy, which included the exchange of robust mediation materials prior to the mediation. With the Parties still apart in their respective settlement positions after the mediation, they agreed to continue negotiations through the Mediator. On March 26, 2025, the Parties accepted a Mediator's recommendation and agreed in principle to settle the Action for $39 million in cash, subject to the negotiation of non-financial terms for the Settlement and Court approval. These negotiations were at all times adversarial and at arm's-length, and have produced a result that is in the best interests of the Settlement Class. ¶¶64-67.

**D. Rule 23(e)(2)(C): The Relief Provided by the Settlement Is Adequate**

The Court must consider whether "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P. 23(e)(2)(C). This factor overlaps with the Ninth Circuit factors that consider "the strength of the plaintiffs' case," "amount offered in the settlement," and "the risk, expense, complexity, and likely duration of further litigation" and the risk of maintaining class action status. *Churchill*, 361 F.3d at 575; *Hanlon*, 150 F.3d at 1026.

Through their efforts on behalf of the Settlement Class, Lead Counsel and Plaintiffs have concluded that the proposed Settlement is fair, reasonable, and adequate. As courts have often observed, "'[g]reat weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *Nat'l Rural Telecomm. Coop. v. DirectTV, Inc.,* 221 F.R.D. 523, 528 (C.D. Cal. 2004).

**1. Rule 23(e)(2)(C)(i): Risks of Continued Litigation**

"In general, securities fraud class actions are complex cases that are time-

consuming and difficult to prove." *Jiangchen v. Rentech Inc.,* 2019 WL 5173771, at *6 (C.D. Cal. Oct 10, 2019); *In re Extreme Networks, Inc. Sec. Litig.*, 2019 WL 3290770, at *8 ("[It is well-recognized that] securities actions in particular are often long, hard-fought, complicated, and extremely difficult to win."). Although Plaintiffs and Lead Counsel believe that the claims asserted against Defendants remain strong, they recognize the significant challenges and risks they would face moving forward, as well as the expense and length of continued litigation through the completion of fact discovery, expert discovery, class certification, summary judgment motions, trial, and undoubtedly appeals. *See, e.g., Redwen v. Sino Clean Energy, Inc.*, 2013 WL 12303367, at *6 (C.D. Cal. July 9, 2013) ("Courts experienced with securities fraud litigation 'routinely recognize that securities class actions present hurdles to proving liability that are difficult for plaintiffs to clear.'").

As set forth below, the benefits conferred on the Settlement Class by the $39 million Settlement far outweigh the costs, risks, and delay of further litigation, and confirm the adequacy of and reasonableness of the Settlement.

**Falsity and Materiality:** Regarding the allegations of false and misleading statements in the Offering Documents, the Court granted Defendants' Motions to Dismiss all alleged misstatements and omissions, except for a single misstatement contained in two registration statements issued in December 2020 and February 2021. Specifically, the Court found that only the statement in Opendoor's registration statements touting the capabilities of the Company's pricing algorithm—that Opendoor's pricing algorithms "***use machine learning to drive pricing decisions***" and that its "***systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions***"—was adequately alleged as false and misleading. Although the Court upheld the misstatement in the context of the Motions to Dismiss, there was a substantial risk that the misstatement would not have survived a summary judgment challenge, a jury could have found the statement to be too generic to hold Defendants liable, and that in light of other disclosures made by the Company, the statements were true. ¶¶76-77.

More specifically, based on available document discovery, Defendants would likely have argued that Opendoor's algorithm *could* "dynamically adjust" to changing market conditions at the time of the statements and that prior to the Offerings, there was no evidence that the algorithms were not performing as expected and consistent with disclosures made to the market. Similarly, Defendants would also likely argue that Opendoor expressly warned its investors that it could fail to appropriately price homes due to a wide range of factors, including changes in macro and micro-economic conditions. For example, a jury could have found that the registration statements contained adequate cautionary language that warned investors that Opendoor's pricing algorithms might be unable to price accurately and keep the Company's contribution margins positive in volatile housing markets. Opendoor's registration statements warned that the Company might "be unable to liquidate . . . inventory at prices that allow [it] to meet [its] margin targets or recover [its] costs" and could "incur significant losses" due to its "failure to accurately price homes." ¶¶78-79.

These arguments, if accepted by a jury, could have resulted in a finding that the registration statements were accurate and not misleading, and a verdict for Defendants.

**Due Diligence:** The Individual Defendants and the Underwriter Defendants would have asserted a due diligence defense. While Plaintiffs would have worked extensively with a due diligence expert to show that these Defendants were negligent in connection with the de-SPAC Merger and the February 2021 Offering, these Defendants would have put forth well-qualified experts of their own showing that they conducted a reasonable investigation and had reasonable grounds for their actions; especially in light of available document discovery that may have supported such due diligence. ¶81.

**Damages:** Another key hurdle in continuing the litigation was the difficulty of overcoming Defendants' negative causation defense, particularly the "disaggregation" of confounding or unrelated information from the stock price declines. *See* 15 U.S.C § 77k(e). Although Plaintiffs' consulting damages expert has estimated that maximum recoverable statutory damages for the upheld Section 11 claims were approximately $1.3

billion, that figure was based on a best-case-scenario and assumed that Defendants would not be able to demonstrate negative causation for any of the other stock price declines during the relevant period. In reality, Defendants and their experts likely would have pursued several arguments that any recoverable damages should be much lower, if not zero. Negative causation determinations would have substantially reduced the statutory damages, even if negative causation did not serve as a complete defense to the claims. Specifically, Defendants and their experts would have likely entered an event study and expert report demonstrating that many, if not all, of the stock price declines during the relevant period were attributable to factors other than the false statements in the offering documents and that therefore any recoverable damages should be much lower than $1.3 billion. For example, Defendants and their experts would likely argue that all declines in Opendoor's stock price other than in connection with the two allegedly corrective disclosures before the lawsuit was filed—*i.e.*, the disclosures on February 24, 2022 and September 19, 2022—were caused by something other than the alleged misstatements or omissions. If Defendants were successful in their argument and proved that the remaining drops (other than the two alleged corrective disclosures) were unrelated to the alleged misstatements, Plaintiffs' consulting damages expert estimates that damages could be as low as approximately $70 million. ¶¶83-84.

Similarly, Defendants would also likely argue that they are entitled to a complete negative causation defense by showing that the two alleged corrective disclosures were also not corrective or connected to the remaining misstatements. With respect to the first alleged corrective disclosure on February 24, 2022, Defendants would likely argue that an earnings release announcing that Opendoor achieved a previously disclosed financial target is not a corrective disclosure. Specifically, Defendants would likely argue that the Company had previously disclosed (in November 2021) that it expected the contribution margin for the quarter to be between 4% and 6%. Therefore, news of a 4% contribution margin cannot be a corrective disclosure. In addition, they would likely argue that the corrective disclosure did not mention specifically the capabilities of the algorithm, further

severing the connection to the alleged misstatements. Similarly, for the second allegedly corrective disclosure on September 19, 2022, Defendants would likely argue that the Bloomberg article disclosing that Opendoor suffered losses on homes sales in August 2022 also did not contain any new or corrective information because Opendoor had already previously disclosed (in August 2022) that it expected to incur losses on home sales during that quarter, due to faster-than-forecasted home price declines. If successful, these arguments could have resulted in no damages and prevented Plaintiffs from recovering anything in the case. ¶85.

Notably, in its Order dismissing the Complaint, the Court found that Defendants had established negative causation because none of the disclosures were "corrective disclosures." Although the Court rightly reconsidered this holding and found that Defendants had not proven a negative causation defense as a matter of law, Plaintiffs continue to face the risk of the Court granting summary judgment in Defendants' favor on this issue, a post-trial motion on this issue, and of course a likely appeal on this issue. ¶86.

These complex and nuanced issues would have come down to an unpredictable and hotly disputed "battle of the experts." The uncertainty as to which side's expert's view might be credited by the jury, or the Court, presents a formidable litigation risk in many securities actions and in this case in particular. *See, e.g., Nguyen v. Radient Pharms. Corp.*, 2014 WL 1802293, at *2 (C.D. Cal. May 6, 2014) (approving settlement in securities case where "[p]roving and calculating damages required a complex analysis, requiring the jury to parse divergent positions of expert witnesses in a complex area of the law" and "[t]he outcome of that analysis is inherently difficult to predict and risky").

**Favorable and Timely Recovery:** Assuming liability were established, the Settlement recovers approximately 3% of maximum estimated statutory damages ($1.3 billion), and 55% of Plaintiffs' expert's estimate of the more realistic estimate of recoverable damages ($70 million), without any risk to the Settlement Class's ability to recover. ¶84. In the sphere of securities class actions, Plaintiffs and Lead Counsel believe this is an excellent outcome.

According to Cornerstone Research, for Securities Act cases with total estimated damages of $150 million or more, the median percentage of recovery from 2015 to 2024 was 5.7% of total estimated damages, and the median percentage of recovery for all Securities Act cases from 2015 to 2024 was 7.9%. *See* Ex. 4 at 9. Courts also regularly approve settlements with comparable or lower percentage recoveries than obtained here. *See, e.g.*, *Vataj v. Johnson*, 2021 WL 5161927, at *6 (N.D. Cal. Nov. 5, 2021) (approving settlement recovering "slightly more than 2% of [] estimated damages" and noting that it was "consistent with the 2-3% average recovery that the parties identified in other securities class action settlements"); *Azar v. Blount Int'l, Inc.*, 2019 WL 7372658, at *7 (D. Or. Dec. 31, 2019) (approving settlement recovering "4.63 to 7.65 percent of the Class's total damages as Plaintiffs estimated"); *In re Biolase, Inc. Sec. Litig.*, 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (finding settlement recovering 8% of estimated damages "equals or surpasses the recovery in many other securities class actions").

Plaintiffs and Lead Counsel also believe the $39 million recovery is fair and reasonable when considering the median recovery of $14 million in other securities class actions, of all types, that settled in 2024, and the $12 million median in settlements related to a SPAC transaction. *See* Ex. 4 at 1. Likewise, it is almost four times the median settlement of $10.3 million for class actions that only alleged Securities Act claims and settled from 2015 to 2024. *Id*. at 8.

Lastly, the Settlement comes without the considerable risk, expense, and delay of summary judgment, trial, and post-trial litigation. *See, e.g.*, *Torrisi v. Tucson Elec. Power Co*., 8 F.3d 1370, 1376 (9th Cir. 1993) ("the cost, complexity and time of fully litigating the case all suggest that this settlement was fair"). In light of all the substantial risks and expense of continued litigation, and compared to the certain and prompt recovery of $39,000,000, Plaintiffs and Lead Counsel believe the Settlement is an excellent result.

**2. Rule 23(e)(2)(C)(ii): Effective Process for Distributing Relief to the Settlement Class**

Rule 23(e)(2)(C)(ii) instructs courts to consider whether the relief provided to the

class is adequate in light of the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."

Here, the proceeds of the Settlement will be distributed with the assistance of an experienced claims administrator, Verita, which will employ a well-tested protocol for the processing of claims in a securities class action. Claimants will submit, either by mail or online using the case website, the Court-approved Claim Form. Based on the trade information provided by Claimants, Verita will determine each Claimant's eligibility to recover by, among other things, calculating their respective "Recognized Claims" based on the Court-approved Plan of Allocation, and ultimately determine each eligible Claimant's *pro rata* portion of the Net Settlement Fund. *See* Stipulation at ¶25. Plaintiffs' claims will be reviewed in the same manner. Claimants will be notified of any defects or conditions of ineligibility and be given the chance to cure their claims. Stipulation at ¶31(d)-(e). Any claim disputes that cannot be resolved will be presented to the Court. *Id*.

After the Settlement reaches its Effective Date (*id*. at ¶40) and the claims process is completed, Authorized Claimants will be issued payments in the form of checks and wire transfers. If there are unclaimed funds after the initial distribution, and it would be feasible and economical to conduct a further distribution, Verita will conduct a further distribution of remaining funds (less the estimated expenses for the additional distribution, Taxes, and unpaid Notice and Administration Expenses). Additional distributions will proceed in the same manner until it is no longer economical to conduct further distributions. Thereafter, Plaintiffs recommend that any *de minimis* balance that remains in the Net Settlement Fund, after payment of any outstanding Notice and Administration Expenses and Taxes, be donated to the Council of Institutional Investors, a non-profit, non-sectarian 501(c) organization, or such other private, organization approved by the Court.[7] *Id* at ¶28; Ex. 5-B at ¶79.

---

[7] CII is a non-profit, non-partisan association of U.S. public, corporate, and union benefit funds, state and local entities charged with investing public assets, foundations, and endowments that seeks to educate its members, policymakers, and the public about corporate governance, shareowner rights, and investment issues. It has been approved as

**3. Rule 23(2)(C)(iii): Anticipated Legal Fees and Expenses**

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorneys' fees, including timing of payment." Fed. R. Civ. P. 23(e)(2)(C)(iii). As discussed in the Memorandum of Points and Authorities in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Expenses, submitted herewith, Lead Counsel seeks an award of attorneys' fees of 25% of the Settlement Fund, the Ninth Circuit benchmark, and Litigation Expenses of $502,887.04. Lead Counsel's Fee and Expense Application also includes a request by Plaintiffs for $18,768.2, in the aggregate, in connection with their work in the litigation, pursuant to the PSLRA. The attorneys' fee and expense request is not part of any agreement with Defendants, will be paid from the Settlement Fund, and the Settlement cannot be terminated based on any ruling on the fees or expenses.

**4. Rule 23(e)(2)(D): Settlement Class Members Are Treated Equitably Relative to One Another**

The Settlement does not improperly grant preferential treatment to either Plaintiffs or any segment of the Settlement Class. Rather, all members of the Settlement Class, including Plaintiffs, that submit an eligible claim will receive a distribution from the Net Settlement Fund pursuant to the Plan of Allocation approved by the Court, which is discussed below.[8] *See generally* long-form Notice at ¶¶57-80, Ex. 5-B; *see Ciuffitelli v. Deloitte & Touche LLP*, 2019 WL 1441634, at *18 (D. Or. Mar. 19, 2019) ("[t]he proposed Settlement does not provide preferential treatment to Plaintiffs or segments of the class" where "the proposed Plan of Allocation compensates all Class Members and Class Representatives equally in that they will receive a pro rata distribution based [sic] of the Settlement Fund based on their net losses").

---

a *cy pres* recipient in numerous securities class actions. *See, e.g.*, *Vancouver Alumni Asset Holdings Inc. v. Daimler AG*, No. 16-cv-02942, ECF No. 346 (C.D. Cal. Mar. 13, 2023); *In re Wells Fargo Sec. Litig.*, 991 F. Supp. 1193, 1198 (N.D. Cal. 1998).

[8] Plaintiffs' request for reimbursement of their reasonable costs and expenses directly related to their participation in the Action, noted above, would not constitute preferential treatment. *See* 15 U.S.C. §§ 77z-1(a)(4) and 78u-4(a)(4) (reimbursement of plaintiffs' costs explicitly contemplated by the PSLRA in addition to receiving their *pro rata* recovery).

## II. THE COURT SHOULD APPROVE THE PLAN OF ALLOCATION

In addition to seeking final approval of the Settlement, Plaintiffs also seek final approval of the Plan of Allocation. The Plan of Allocation, drafted with the assistance of Plaintiffs' consulting damages expert, is a fair, reasonable, and adequate method for allocating the proceeds of the Settlement among eligible Claimants and treats all Settlement Class Members equitably, as required by Rule 23(e)(2)(D). The standard for approval of a plan of allocation in a class action is the same as the standard applicable to approval of the settlement as a whole – the plan must be fair, reasonable, and adequate. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992). "[A] plan of allocation . . . fairly treats class members by awarding a pro rata share to every Authorized Claimant, even as it sensibly makes interclass distinctions based upon, *inter alia*, the relative strengths and weaknesses of class members' individual claims and the timing of purchases of the securities at issue." *Redwen*, 2013 WL 12303367, at *8.

Here, the objective of the Plan of Allocation is to distribute the Net Settlement Fund equitably among those Settlement Class Members who suffered economic losses with respect to shares of Opendoor common stock purchased or otherwise acquired: (i) pursuant and/or traceable to the de-SPAC Merger; (ii) pursuant and/or traceable to the February 2021 Offering; and or (iii) on the NASDAQ or any U.S.-based trading platform from December 21, 2020 through November 3, 2022, both dates inclusive. Given their dismissal, losses arising solely from the Section 10(b) claims have been discounted by 90%. The Plan of Allocation was fully described in the long-form Notice and, to date, there has been no objection to the proposed plan. *See* Ex. 5-B at ¶¶57-80.

It is respectfully submitted that the Plan of Allocation will result in a fair distribution of the proceeds among Settlement Class Members who submit valid claims.

## III. NOTICE AND REACTION OF THE SETTLEMENT CLASS TO DATE

Notice of a class action settlement must be directed "in a reasonable manner to all class members who would be bound" by the Settlement. Fed. R. Civ. P. 23(e)(1)(B). In granting preliminary approval of the Settlement, the Court approved Plaintiffs' proposed

notice plan. *See* ECF No. 156. The notice program's combination of individually mailed (or emailed if emails are provided) Postcard Notices to all Settlement Class Members who could be identified with reasonable effort, supplemented by the Summary Notice in a widely circulated publication, transmission over a business newswire, and publication on internet websites, satisfied all requirements of Rule 23, due process, and the PSLRA. *See, e.g., Rentech,* 2019 WL 5173771, at *8 (approving similar notice program that included mailing postcard notices to potential class members and nominees followed by publication notice and posting notice on a settlement website).

As detailed in the accompanying Mailing Declaration, as of December 8, 2025, 404,104 Postcard Notices have been mailed or emailed to potential Settlement Class Members, brokers, and nominees. *See* Ex. 5 at ¶¶2-8. In addition, the Summary Notice was published in *The Wall Street Journal* and transmitted over *PR Newswire* on November 18, 2025. *Id*. at ¶9. Verita also continues to maintain a dedicated settlement website, www.OpendoorSecuritiesSettlement.com. *Id*. at ¶¶11-12.

Notice of a class action settlement "is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'" *Churchill*, 361 F.3d at 575. The contents of the notices here collectively provided the necessary information for Settlement Class Members to make an informed decision regarding the Settlement and contained all of the information required by Rule 23(c)(2)(B) and the PSLRA, 15 U.S.C. §77z-1(a)(7).

While the objection and exclusion deadline – December 16, 2025 – has not yet passed, to date, no objections have been received by Lead Counsel or docketed by the Court, and no requests for exclusion have been received. The reaction to date supports approval of the Settlement and the proposed Plan of Allocation. Plaintiffs will address any objections and exclusion requests, if any, in their reply submission on December 30, 2025.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval to the proposed Settlement and approve the Plan of Allocation for the

distribution of the Net Settlement Fund. Proposed orders will be filed with Plaintiffs' reply submission, after the deadline for objecting or seeking exclusion has passed.

Dated: December 9, 2025

Respectfully submitted,

**LABATON KELLER SUCHAROW LLP**

By: /s/ *Michael P. Canty*
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

*Lead Counsel for Plaintiffs and Settlement Class*

**CLARK HILL PLC**
Darrell E. Davis, SBN #011442
14850 North Scottsdale Road, Suite 500
Scottsdale, Arizona 85254
Telephone: (480) 684-1100
Facsimile: (480) 684-1199
ddavis@clarkhill.com

*Local Counsel for Plaintiffs and Settlement Class*

**VANOVERBEKE MICHAUD & TIMMONY P.C.**

Aaron L. Castle (admitted *pro hac vice*)
79 Alfred Street
Detroit, Michigan 48201
Telephone: (313) 578-1200
Facsimile: (313) 578-1201
acastle@vmtlaw.com

**GLANCY PRONGAY & MURRAY LLP**

Casey E. Sadler (admitted *pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

csadler@glancylaw.com
*Additional Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 9, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and transmittal of a Notice of Service of Electronic Filing to the individuals registered with CM/ECF.

*/s/ Michael P. Canty*
MICHAEL P. CANTY