**CLARK HILL PLC**
Darrell E. Davis, SBN #011442
14850 North Scottsdale Road, Suite 500
Scottsdale, Arizona 85254
Telephone: 480-684-1100
Facsimile: 480-684-1199
ddavis@clarkhill.com

*Local Counsel for Plaintiffs and Settlement Class*

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (admitted *pro hac vice*)
James T. Christie (admitted *pro hac vice*)
Guillaume Buell (admitted *pro hac vice*)
Nicholas Manningham (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
gbuell@labaton.com
nmanningham@labaton.com

*Lead Counsel for Plaintiffs and Settlement Class*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE OPENDOOR TECHNOLOGIES INC. SECURITIES LITIGATION | Case No. 2:22-CV-01717-MTL <br><br> **DECLARATION OF MICHAEL P. CANTY IN SUPPORT OF (I) MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION AND (II) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND PAYMENT OF EXPENSES** <br><br> <u>CLASS ACTION</u> |

I, MICHAEL P. CANTY, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746:

1. I am a member of the law firm of Labaton Keller Sucharow LLP ("Labaton" or "Lead Counsel"), which serves as Court-appointed Lead Counsel for Lead Plaintiffs Indiana Public Retirement System ("INPRS"), Oakland County Employees' Retirement System, and Oakland County Voluntary Employees' Beneficiary Association ("Oakland County Funds") (collectively, "Lead Plaintiffs") and additional plaintiff Stuart Graham Hereford ("Additional Plaintiff" and, together with Lead Plaintiffs, "Plaintiffs") in the above-captioned litigation (the "Action").[1] I am admitted to practice before this Court *pro hac vice* and have been actively involved in overseeing the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my close supervision of and participation in the Action.

2. I respectfully submit this Declaration in support of Plaintiffs' motion pursuant to Rule 23(e) of the Federal Rules of Civil Procedure ("Federal Rules" or "Rules") for final approval of the proposed settlement with Defendants Opendoor Technologies Inc. ("Opendoor" or the "Company"), the Individual Defendants,[2] and the Underwriter Defendants (the Underwriter Defendants, together with Opendoor and the Individual Defendants, are "Defendants"), for $39,000,000 in cash.

---

[1] All capitalized terms herein that are not otherwise defined have the same meanings provided in the Stipulation and Agreement of Settlement, dated as of June 13, 2025 (the "Stipulation"), previously filed with the Court. ECF No. 154-2.

[2] The "Individual Defendants" are Eric Wu, Carrie Wheeler, Chamath Palihapitiya, Steven Trieu, Ian Osborne, David Spillane, Adam Bain, Cipora Herman, Pueo Keffer, Glenn Solomon, Jason Kilar, Jonathan Jaffe. The Individual Defendants and Opendoor are the "Opendoor Defendants." The "Underwriter Defendants" are Citigroup Global Markets Inc., Goldman Sachs & Co. LLC, Barclays Capital Inc., Deutsche Bank Securities Inc., Oppenheimer & Co. Inc., BTIG, LLC, KeyBanc Capital Markets Inc., Wedbush Securities Inc., TD Securities (USA) LLC, Zelman Partners LLC, Academy Securities, Inc., Loop Capital Markets LLC, Samuel A. Ramirez & Company, Inc., and Siebert Williams Shank & Co., LLC.

1

3. If approved, the Settlement will resolve all claims in the Action, and related claims, against Defendants on behalf of the Settlement Class, which consists of: (i) all persons and entities who or which purchased or otherwise acquired Opendoor common stock pursuant and/or traceable to the de-SPAC Merger Documents issued in connection with the de-SPAC Merger on or about December 21, 2020, and/or the February 2021 Offering Documents issued in connection with Opendoor's February 2021 Offering on or about February 4, 2021; and (ii) all persons and entities who or which, during the period from December 21, 2020 through November 3, 2022, inclusive, purchased the publicly traded common stock of Opendoor on the NASDAQ or any U.S.-based trading platform and were damaged thereby.[3] The Court preliminarily approved the Settlement and directed notice to the Settlement Class by Order dated October 20, 2025 ("Preliminary Approval Order"). ECF No. 156.

4. I also respectfully submit this Declaration in support of: (i) certification of the Settlement Class; (ii) approval of the proposed plan for allocating the net proceeds of the Settlement to eligible Settlement Class Members ("Plan of Allocation"); and (ii) Lead Counsel's motion, on behalf of Plaintiffs' Counsel,[4] for an award of attorneys' fees of 25% of the Settlement Fund, which includes accrued interest, payment of Litigation Expenses

---

[3] Excluded from the Settlement Class are: (i) Defendants and the Immediate Family Members of any Individual Defendant; (ii) any person who was an officer, director, and/or control person of Opendoor, SCH, or SCH Sponsor II LLC any time during the period of January 31, 2020 through November 3, 2022; (iii) any firm, trust, corporation, or other entity in which any Defendant (or Immediate Family Member of any Defendant) has or had a controlling interest; (iv) Opendoor's employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such; provided, however, that, notwithstanding anything set forth above, any "Investment Vehicle" (as defined in the Stipulation) shall not be excluded from the Settlement Class. Also excluded from the Settlement Class are any Persons who submit a timely and valid request for exclusion from the Settlement Class that is accepted by the Court.

[4] Plaintiffs' Counsel are: Lead Counsel, Labaton Keller Sucharow LLP; Local Counsel, Clark Hill PLC and Keller Rohrback, L.L.P.; Glancy Prongay & Murray LLP and The Law Offices of Frank R. Cruz, are additional counsel to Mr. Hereford; and VanOverbeke Michaud & Timmony P.C., is additional counsel to the Oakland County Funds. (Keller Rohrback is not seeking a fee award.)

incurred by Plaintiffs' Counsel in the total amount of $502,887.04, plus accrued interest, and, in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), payment of $18,768.20, in the aggregate, to Plaintiffs for costs incurred in connection with their representation of the Settlement Class ("Fee and Expense Application").

5.    For the reasons discussed below and in the accompanying memoranda,[5] I respectfully submit that: (i) the terms of the Settlement are fair, reasonable, and adequate in all respects and should be approved by the Court; (ii) the proposed Plan of Allocation is fair, reasonable, adequate and should be approved by the Court; and (iii) the Fee and Expense Application is fair, reasonable, supported by the facts and the law, and should be granted in all respects. Moreover, the Settlement, Plan of Allocation, and Fee and Expense Application have the full support of Plaintiffs—sophisticated investors that have actively supervised the Action since its inception. *See* Ex. 1 (Declaration on behalf of INPRS), Ex. 2 (Declaration on behalf of Oakland County Funds), and Ex. 3 (Declaration of Mr. Hereford.[6]

**I.    PRELIMINARY STATEMENT**

6.    The proposed Settlement now before the Court provides for the full resolution of the Action, and related Released Plaintiffs' Claims, in exchange for a cash payment of $39,000,000. As detailed herein, Plaintiffs and Lead Counsel respectfully submit that the Settlement represents an excellent result for the Settlement Class, particularly in light of the significant risks of continuing to litigate the Action.

---

[5] In conjunction with this Declaration, Plaintiffs and Lead Counsel are submitting Plaintiffs' Motion and Memorandum of Points and Authorities in Support of Final Approval of Class Action Settlement and Plan of Allocation ("Settlement Memorandum") and Lead Counsel's Motion and Memorandum of Points and Authorities in Support of an Award of Attorneys' Fees and Payment Expenses ("Fee and Expense Memorandum").

[6] All exhibits to the Motions are annexed hereto. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached hereto and the second reference is to the exhibit designation within the exhibit itself.

7. In choosing to settle, Plaintiffs and Lead Counsel took into consideration the substantial challenges associated with advancing the claims through dispositive motions and trial, as well as the duration and complexity of the legal proceedings that remained ahead. As discussed in detail below, had the Settlement not been reached, there were considerable barriers to a greater recovery, or any recovery at all. The decision to settle was informed by a comprehensive investigation into the claims and defenses in the Action, substantive motion practice and discovery, and vigorous arm's-length negotiations, based upon adequate information after consultation with experienced legal counsel.

8. The case—which was litigated efficiently and aggressively over the course of three years—was settled only after Plaintiffs, among other things: (i) conducted a rigorous investigation of the claims at issue, including contacting and interviewing former employees of Opendoor, and consulted with experts on loss causation and damages issues, economics, and de-SPAC transactions; (ii) prepared and filed a detailed consolidated complaint, which expanded the scope of the initial complaint by adding additional misrepresentations and other allegations in support of the claims at issue; (iii) defeated, in part, Defendants' motions to dismiss the Complaint (after successfully asking the Court to reconsider its order dismissing the Complaint); (iv) opposed and defeated Defendants' motion to certify for interlocutory appeal the Court's order granting Plaintiffs' motion for reconsideration; (v) moved for class certification; (vi) researched, drafted, and propounded discovery requests on Defendants; (vii) reviewed over 16,000 documents produced in discovery; (viii) prepared for and participated in a formal in-person arm's-length mediation; and (ix) engaged and consulted with experts on loss causation and damages, economics, and de-SPAC transactions.

9. The Settlement is above industry trends. The $39 million recovery is nearly three times the median recovery of $14 million in securities class actions of all types settled in 2024, and significantly more than the $12 million median in settlements related to a SPAC transaction. *See* Laarni T. Bulan and Eric Tam, *Securities Class Action Settlements*

– *2024 Review and Analysis* (Cornerstone Research 2025), Ex. 4 at 1. Likewise, it is almost four times the median settlement of $10.3 million for class actions that only alleged Securities Act claims and settled from 2015 to 2024. *Id*. at 8. Moreover, Plaintiffs consulted with experts in the fields of damages and loss causation who analyzed class-wide damages in light of the facts and circumstances presented in the case and developed through the discovery process to date. As detailed below in Section VI., Plaintiffs' consulting damages expert has estimated that maximum statutory damages for the upheld Section 11 claims were approximately $1.3 billion. However, if Defendants were successful in their negative causation arguments, Plaintiffs' consulting damages expert estimates that damages could be as low as $70 million.

10.    In addition to seeking approval of the Settlement, Plaintiffs seek approval of the proposed Plan of Allocation governing the calculation of claims and the distribution of the Settlement proceeds. As discussed below, the proposed Plan of Allocation was developed with the assistance of Plaintiffs' damages expert and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the alleged wrongdoing.

11.    With respect to Lead Counsel's request, on behalf of Plaintiffs' Counsel, for an award of attorneys' fees and payment of expenses, the requested fee of 25% would be fair both to the Settlement Class and counsel, and warrants the Court's approval. The fee request is the Ninth Circuit benchmark and well within the range of fee percentages frequently awarded in connection with similar settlements and, under the facts of this case, is justified considering the benefits conferred on the Settlement Class, the risks undertaken, the quality of the representation, the nature and extent of the legal services, and the fact that Plaintiffs' Counsel pursued the case at their own financial risk. Lead Counsel also seeks expenses in the total amount of $502,887.04, plus reimbursement to Plaintiffs, pursuant to the PSLRA, for their efforts on behalf of the Settlement Class in the aggregate

amount of $18,768.20. The expense amounts are less than the maximum amount of expenses of $650,000 provided for in the long Notice.

12. Lead Counsel has worked with the Court-authorized Claims Administrator, Verita Global, LLC ("Verita" or "Claims Administrator"), to disseminate notice of the Settlement to Settlement Class Members as directed in the Preliminary Approval Order. In this regard, Verita has provided 404,104 copies of the Postcard Notice to Settlement Class Members and their nominees.[7] Additionally, Verita has posted the long-form Notice and Claim Form, along with other relevant documents, on the Settlement website www.OpendoorSecuritiesSettlement.com, and has caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire*. *See* Mailing Decl., ¶9, Ex. 5 hereto. As ordered by the Court and stated in the notices, objections and requests for exclusion from the Settlement Class are due no later than December 16, 2025. To date, there have been no objections to any aspect of the Settlement and no requests for exclusion.[8]

## II.    SUMMARY OF PLAINTIFFS' CLAIMS

13. Plaintiffs' claims in this Action are set forth in the operative Consolidated Amended Complaint for Violations of the Federal Securities Laws, filed on April 17, 2023 (the "Complaint," ECF No. 39), which asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k and 77o.

---

[7] *See* Declaration of Lance Cavallo Regarding (A) Dissemination of Postcard Notice and Notice Packet; (B) Publication of Summary Notice; (C) Establishment of Telephone Hotline and Settlement Website; and (D) Report on Requests for Exclusion Received to Date, dated December 9, 2025, attached hereto as Exhibit 5 ("Mailing Decl."), ¶¶2-8.

[8] Plaintiffs and Lead Counsel will address any objections that may be received after this submission in their reply submission to be filed with the Court on or before December 30, 2025.

14. Among other things, the Complaint alleged that Defendants made materially false and misleading statements and omissions in their Offering Documents issued in connection with Opendoor's de-SPAC merger on or about December 21, 2020 (the "de-SPAC Merger"), and the Offering Documents issued in connection with Opendoor's public offering on or about February 4, 2021 (the "February 2021 Offering"). As alleged in the Complaint, the Offering Documents portrayed Opendoor as a tech disruptor that used AI-powered algorithms to buy and sell homes more profitably and efficiently than other traditional real estate companies. As alleged in the Complaint, unbeknownst to investors, Opendoor's algorithms were not accurate and could not adjust to changing economic conditions and, as a result, the Company's pricing decisions were driven by an undisclosed human-driven process.

15. The Complaint further alleged that the class was damaged when the truth was allegedly revealed through a series of partial corrective disclosures. First, on February 24, 2022, Opendoor announced that the Company's fourth quarter 2021 contribution margin was only 4%, a steep declined year-over-year from its contribution margin of 12.6% in the fourth quarter of 2020, which partially revealed that Defendants had overstated the supposed benefits and competitive advantages of the pricing algorithm. ¶22.[9] Next, on September 19, 2022, Bloomberg published an article detailing that Opendoor had lost money on 42 percent of its transactions in August 2022, further revealing that Defendants had allegedly overstated the benefits of the pricing algorithm. ¶26. Finally, on November 3, 2022, Opendoor announced that its contribution margin plummeted to negative 0.7 percent, which revealed that Opendoor's algorithm could not adjust to changing market conditions. ¶27.

---

[9] References to "¶" or "¶¶" are to paragraphs in the Complaint.

## III. RELEVANT PROCEDURAL HISTORY OF THE ACTION AND LEAD COUNSEL'S LITIGATION EFFORTS

### A. Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

16. On October 7, 2022, an initial class action complaint was filed against certain of the Opendoor Defendants in the Court alleging violations of Sections 11 and 15 of the Securities Act and Sections 10(b) and 20(a) of Exchange Act and Rule 10b-5 promulgated thereunder by the SEC. ECF No. 1.

17. On December 6, 2022, Lead Plaintiffs filed a motion to consolidate all related actions and for the appointment as lead plaintiff and approval of Lead Plaintiffs' selection of their counsel, Labaton. ECF No. 12. Further, other movants filed motions seeking the same relief, *see* ECF Nos. 9, 10, 11, 13, and later either filed a notice of non-opposition or withdrew their motions, *see* ECF Nos. 15, 16, 17, 19.

18. On February 2, 2023, the Court consolidated all related actions as *In re Opendoor Technologies Inc. Sec. Litig.*, No. 2:22-CV-01717-MTL. ECF No. 20. By the same Order, the Court appointed Lead Plaintiffs and approved Labaton as Lead Counsel. *Id.*

19. On February 27, 2023, the Court entered and so-ordered a joint stipulation filed by the Parties on February 16, 2023, providing that Lead Plaintiffs would file their amended complaint by April 3, 2023. ECF No. 30. On March 24, 2023, Lead Plaintiffs filed an unopposed motion for extension of time, seeking a two-week extension of the deadline to file the amended complaint, from April 3, 2023 to April 17, 2023. ECF No. 37. On March 24, 2023, the Court granted the extension. ECF No. 38.

### B. Lead Plaintiffs' Investigation and Filing of the Consolidated Amended Complaint

20. Prior to filing the Complaint, Plaintiffs' Counsel conducted an extensive investigation into the facts underlying potential claims. The investigation included reviewing: (i) documents filed publicly by the Company with the U.S. Securities and

8

Exchange Commission ("SEC"); (ii) publicly available information, including press releases, news articles, and other public statements issued by or concerning the Company and the Defendants; (iii) research reports issued by financial analysts concerning the Company; (iv) other publicly available information and data concerning the Company; and (v) the applicable law governing the claims and potential defenses. Lead Plaintiffs, through counsel, also identified and contacted approximately 169 former Opendoor employees and other persons with relevant knowledge, and interviewed 44 of them (eight of whom provided information for use in the Complaint as confidential witnesses "CWs"), and consulted with experts on loss causation and damages issues, economics, and de-SPAC transactions. Lead Plaintiffs also submitted requests to the Federal Trade Commission (the "FTC") pursuant to the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA").

21.     Plaintiffs' Counsel also conducted extensive legal research before filing the Complaint to determine which theories of liability to allege. For example, Counsel comprehensively researched the law in the Ninth Circuit relating to pertinent legal issues, such as pleading standards for allegations based on confidential witnesses, statutory standing for Securities Act claims, the materiality of allegedly false and misleading statements, scienter for the Opendoor Defendants, and loss causation.

22.     After the thorough investigation, on April 17, 2023, Lead Plaintiffs filed the 141-page Complaint, detailing Defendants' alleged violations of Sections 10(b) and 20(a) of the Exchange Act and Sections 11 and 15 of the Securities Act. ECF No. 39. The Complaint also added Stuart Graham Hereford as additional plaintiff and Glancy Prongay & Murray LLP as additional counsel.

23.     The Complaint asserted claims against (i) Opendoor Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and (ii) against the Individual Defendants under Section 20(a) of the Exchange Act; (iii) against all Defendants under Sections 11 of the Securities Act; and (iv) against the Individual Defendants under Section 15 of the Securities Act. The Complaint expanded the initially-

pled class period by roughly two months to include an additional alleged corrective disclosure on November 3, 2022, and added Jonathan Jaffe, Pueo Keffer, Jason Kilar, Glenn Solomon, and the Underwriter Defendants as defendants.

**C.    Defendants' Motions to Dismiss the Complaint and Plaintiffs' Oppositions**

24.    On June 30, 2023, the Opendoor Defendants and Underwriter Defendants each filed a motion to dismiss the Complaint in its entirety pursuant to Rule 12(b)(6). ECF Nos. 48, 51.

25.    In the Opendoor Defendants' 30-page motion to dismiss, the Opendoor Defendants cited 31 exhibits and argued that the Complaint should be dismissed on numerous grounds, including, among others, the following:

(a)    The Opendoor Defendants contended that Plaintiffs failed to identify any actionable false or misleading statements, arguing specifically that their statements concerning the Company's pricing algorithms, business model, and FTC settlement were not false or misleading.

(b)    The Opendoor Defendants contended that Plaintiffs failed to plead a "strong inference" of scienter required to plead liability for securities fraud. Specifically, in support of their argument, the Opendoor Defendants argued that (i) certain of the Individual Defendants' stock sales did not give rise to a strong inference of scienter; (ii) the Complaint's allegations that Opendoor's pricing strategy and pricing algorithm were core operations did not support an inference of scienter; (iii) Defendants' own statements did not support scienter; (iv) the FTC complaint did not give rise to an inference of scienter; (v) the Complaint's allegations that Zillow's exit from the "iBuying" space in November 2021 did not support scienter; and (vi) the Complaint's allegations that the Individual Defendants had "access to data" that contradicted the Company's public statements did not support scienter.

(c)    The Opendoor Defendants contended that Plaintiffs failed to establish loss causation as to the disclosures on February 24, 2022, September 19, 2022, and November 3, 2022 because they revealed no new information to the market and did not reveal the fraud. The Opendoor Defendants further contended that by demonstrating that none of the disclosures corrected the alleged fraud, the Opendoor Defendants had established negative causation.

(d)    The Opendoor Defendants argued that because Plaintiffs had not sufficiently alleged a primary violation of the securities law, it had failed to adequately plead Section 20(a) control person liability against any of the Individual Defendants.

10

26.    In the Underwriter Defendants' motion to dismiss, the Underwriter Defendants advanced similar arguments, including, among others, the following:

(a)    The Underwriter Defendants contended that Plaintiffs failed to plead a single false statement, arguing specifically that Opendoor's statements concerning the description of its pricing algorithm, the algorithm's ability to "dynamically adjust" to changing market conditions, Opendoor's profitability's reliance on its pricing algorithm, and Opendoor's business model were not false and misleading.

(b)    The Underwriter Defendants contended that the Underwriter Defendants had also established negative causation.

27.    Plaintiffs' Counsel reviewed and analyzed the Opendoor Defendants' and the Underwriter Defendants' motion to dismiss and the legal authority cited therein. Counsel also conducted extensive legal research into Defendants' arguments and potential responses thereto. On August 29, 2023, Plaintiffs filed a 30-page opposition to the Opendoor Defendants' motion to dismiss and a 17-page opposition to the Underwriter Defendants' motion to dismiss. ECF Nos. 55, 56. Plaintiffs rebutted the arguments and authorities in Defendants' motions to dismiss and argued that the Complaint adequately alleged all elements of its Exchange Act and Securities Act Claims. *Id.*

28.    Among other things, in their oppositions, Plaintiffs contended that Defendants' statements regarding Opendoor's pricing algorithm and its ability to dynamically adjust to changing market conditions in the Offering Documents issued in connection with the de-SPAC Merger and the February 2021 Offering, as well as during the Class Period, were highly material to investors and were false and misleading when made. Plaintiffs also argued that a strong inference of scienter was adequately pled, based on, for example, Defendant Wu's suspiciously-timed stock sales, the pricing algorithm's importance to Opendoor's business, and the Individual Defendants' close involvement with monitoring and maintaining the pricing algorithm. Plaintiffs also contended that loss causation with respect to the three corrective disclosures was adequately pled because each disclosure revealed new information to the market and revealed the "true financial health" of the Company concealed by Defendants' misrepresentations and omissions. Critically,

11

Plaintiffs argued that Defendants had not established negative causation. Finally, Plaintiffs argued that the Individual Defendants were control persons under Section 20(a).

29.     On October 13, 2023, the Opendoor Defendants and Underwriter Defendants each filed their reply brief in further support of their motion to dismiss. ECF Nos. 60, 62.

30.     On the same day, in connection with the Opendoor Defendants' reply brief, the Opendoor Defendants also filed a motion for an order directing the submission of counsel and confidential witness affidavits (the "CW Motion"), to which the Underwriter Defendants joined. ECF Nos. 57 and 61.

31.     On October 26, 2023, Plaintiffs filed an opposition to the CW Motion. ECF No. 63. The Court held oral argument on Defendants' motions to dismiss and Defendants' CW Motion, and on the very same day, January 17, 2024, the Court denied the CW Motion. ECF No. 75.

### D.     The Court's Opinion Granting Defendants' Motions to Dismiss

32.     On February 28, 2024, the Court entered its 33-page Opinion and Order granting Defendants' motions to dismiss ("MTD Order"). ECF No. 86. In the MTD Order, although the Court found that Defendants' statements concerning Opendoor's pricing algorithm's ability to accurately price home and adjust to changing market dynamics were false and misleading, Plaintiffs failed to allege scienter and loss causation for the Exchange Act Claims, and Defendants had established negative causation under Section 11 of the Securities Act. *Id.* at 7-10.

### E.     Plaintiffs' Motion for Partial Reconsideration and Defendants' Interlocutory Appeal

33.     After closely analyzing the Court's MTD Order and conducting extensive legal research, Lead Counsel, on behalf of Plaintiffs, determined that the Court had erroneously held that Defendants had established negative causation under Section 11 of the Securities Act.

12

34.     On March 13, 2024, Plaintiffs filed a 10-page motion for reconsideration ("Reconsideration Motion"). ECF No. 87. In the Reconsideration Motion, Plaintiffs argued that, among other things, the Court committed manifest error by finding Defendants had established negative causation under Section 11 of the Securities Act because (i) Defendants had not affirmatively proved that the misstatements and omissions did not cause Opendoor's stock price to decline; and (ii) Plaintiffs had demonstrated that Defendants' misrepresentation touches upon the reasons for Opendoor's declining stock price. *Id.* at 7-9.

35.     On March 28, 2024, Defendants opposed the Reconsideration Motion. ECF No. 89. On April 5, 2024, Plaintiffs filed their reply brief in further support of their Reconsideration Motion. ECF No. 91. Plaintiffs rebutted the arguments and authorities in Defendants' opposition to the Reconsideration Motion and argued that Defendants failed to meaningfully address binding Ninth Circuit precedent and instead relied on distinguishable district court and out-of-circuit cases. *Id.*

36.     On May 14, 2024, the Court issued an Opinion and Order granting the Reconsideration Motion ("Reconsideration Motion Order"). ECF No. 97. In the Reconsideration Motion Order, the Court ordered that (i) the MTD Order is vacated in part and amended to hold that Plaintiffs have adequately alleged claims under Sections 11 and 15 of the Securities Act; and (ii) Plaintiffs may file a second amended complaint no later than May 31, 2024. *Id.* at 3.

37.     On May 31, 2024, Plaintiffs filed a notice, informing the Court that they did not intend to file a second amended complaint. ECF No. 100.

38.     On June 18, 2024, Defendants filed a motion to certify the Reconsideration Motion Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) ("Interlocutory Appeal Motion"). ECF No. 104.

39.     Lead Counsel reviewed and analyzed the Interlocutory Appeal Motion and the legal authority cited therein. Lead Counsel also conducted extensive legal research into

Defendants' arguments and potential responses thereto. On July 1, 2024, Plaintiffs filed a 12-page opposition to the Interlocutory Appeal Motion. ECF No. 105.

40.    On July 8, 2024, Defendants filed their reply brief in support of their Interlocutory Appeal Motion. ECF No. 106.

41.    On July 12, 2024, the Opendoor Defendants and Underwriter Defendants each filed their answer to the Complaint, denying all allegations of wrongdoing or damages, and asserting numerous affirmative defenses. ECF Nos. 107, 108.

42.    On September 4, 2024, Lead Counsel, on behalf of Plaintiffs, appeared and argued before the Court in connection with the Interlocutory Appeal Motion, arguing that Defendants failed to meet their heavy burden of showing that an interlocutory appeal is warranted. ECF No. 116. On September 9, 2024, the Court denied Defendants' Interlocutory Appeal Motion. ECF No. 125.

**F.    Plaintiffs' Motion for Class Certification**

43.    On September 5, 2024, the Court issued a Scheduling Order that set a schedule requiring class certification to be fully briefed by March 25, 2025; fact discovery to close on July 14, 2025; and expert discovery to close on December 8, 2025. ECF No. 118.

44.    On December 23, 2024, the Parties submitted a joint mediation plan and stipulation for extension to time to file motion for class certification, extending the deadline for filing Plaintiffs' motion for class certification from January 4, 2025 to February 21, 2025. ECF No. 141. The Court granted the request on December 30, 2024. ECF No. 142.

45.    On February 28, 2025, Plaintiffs filed their motion to certify the class, appoint class representatives, and appoint class counsel, along with a Declaration of Joseph Rozell on Behalf of Oakland County Employees' Retirement System and Oakland County Voluntary Employees' Beneficiary Association System in Support of Plaintiffs' Motion for Class Certification, dated February 28, 2025 and a Declaration of Stuart Graham

Hereford in Support of Plaintiffs' Motion for Class Certification, dated February 24, 2025. ECF Nos. 145, 146.

## IV.     PLAINTIFFS' DISCOVERY EFFORTS

### A.     Scheduling Order and Initial Discovery Efforts

46.     On August 23, 2024, the Parties submitted a joint proposed case management report. ECF No. 114. The Parties' joint proposed case management report highlighted seven scheduling issues on which the Parties were at an impasse: (i) the deadline for amending the pleadings; (ii) the deadline for substantial completion of document production; (iii) the deadline for completing fact discovery; (iv) the deadline for expert disclosure and completion of expert discovery; (v) the deadlines for class certification briefings; (vi) the deadlines for briefings on dispositive motions; and (vii) the deadlines for pre-trial motions.

47.     On September 5, 2024, the Court issued a Scheduling Order that set a schedule requiring class certification to be fully briefed by March 25, 2025; fact discovery to close on July 14, 2025; and expert discovery to close on December 8, 2025.  ECF No. 118. The Court further ordered that the deadline for amending pleadings is July 14, 2025; and briefings on dispositive motions should be completed by April 2, 2026. *Id.*

48.     On August 16, 2024, Plaintiffs began formal discovery efforts. Until that point, discovery had been stayed pursuant to the PSLRA. *See* 15 U.S.C. § 78u-4(b)(3)(B). Plaintiffs' efforts thereafter included: (i) propounding formal discovery requests on Defendants and responding to discovery requests served by Defendants; and (ii) propounding formal discovery request on relevant third parties. As detailed below, the Parties' discovery included the review of over 16,000 documents produced by Defendants and third parties.

49.     The discovery efforts set forth herein provided Plaintiffs with a thorough understanding of the strengths and weaknesses of its claims and assisted Lead Counsel in considering and evaluating the fairness and adequacy of the Settlement.

15

**B.      Initial Disclosures and Protective Order**

50.      The Parties exchanged initial disclosures pursuant to Rule 26(a) on August 16, 2024.

51.      The Parties also engaged in a series of meet and confers to negotiate a protective order ("Protective Order") to govern the confidentiality of material produced in discovery and an electronically stored information protocol. On September 5, 2024, Defendants filed stipulation and joint motion for entry of stipulated protective order. ECF No. 120.

52.      On September 9, 2024, the Court approved and so ordered both the proposed Protective Order. ECF No. 124.

**C.      Discovery Propounded on Defendants**

53.      Plaintiffs served their first set of requests for production of documents to the Opendoor Defendants and Underwriter Defendants on September 5, 2024. On October 3, 2024, Plaintiffs served their first set of interrogatories to the Opendoor Defendants and Underwriter Defendants.

54.      On October 25, 2024, Plaintiffs served their second set of requests for production to the Opendoor Defendants.

55.      The Parties engaged in multiple meet-and-confer conferences and exchanged meet-and-confer letters and emails, as to the scope and manner of the requested document productions and interrogatories, including issues pertaining to search terms, relevant time periods, document custodians, and other disputes related to the requests and interrogatories, including the definitions of key terms, the relevancy of key terms, and relevant time period. Through this comprehensive effort, the Parties were able to reach an understanding as to the scope of Plaintiffs' discovery and reached many compromises without having to seek the Court's assistance.

56.      In advance of the February 7, 2025 mediation, Defendants produced, and Plaintiffs reviewed, approximately 16,575 documents. Plaintiffs' Counsel conducted an

16

efficient review of those documents. A team of experienced attorneys reviewed and analyzed the productions. These attorneys specialize in securities litigation and are experienced in utilizing the latest technology with respect to document review. These attorneys were integral to the litigation team and focused on reviewing defendants' document productions for the purpose of preparing for settlement discussions as well as continued litigation, such as fact depositions, expert reports, depositions, and trial preparation.

57.    To efficiently focus on the most relevant documents, the attorneys used the Relativity eDiscovery platform's search and data analytic software tools to analyze the data and target the most significant communications, workpapers, and reports. The review was conducted with a combination of linear review, targeted search terms, and custodial document review using the Relativity eDiscovery platform.

58.    The attorneys conducted targeted searching through text, file names, document type, dates, bates numbers, etc. to identify relevant, irrelevant, and "hot" documents for additional review, and to create collections of documents sorted by issue. Through experience and their increasing familiarity with the documents, the review team identified additional swaths of important documents, which were also run through the analytics and search functions to derive the most significant documents.

**D.    Discovery Propounded on Plaintiffs**

59.    Defendants sought discovery from Plaintiffs in connection with the class certification motion. On September 16, 2024, the Opendoor Defendants served their first set of interrogatories and requests for production to Plaintiffs.

60.    Plaintiffs objected to many of the Opendoor Defendants' requests and interrogatories on the basis that they were exceedingly broad, were not limited to a reasonable scope or time period, and sought information that was protected by various privileges and other protections. As a result of the breadth of the Opendoor Defendants' requests and interrogatories, the Parties engaged in extended meet-and-confer conferences

and exchanged multiple meet-and-confer letters and emails to negotiate the scope of discovery. The Parties were able to reach a compromise on Plaintiffs' productions without seeking the Court's assistance. Specifically, Plaintiffs produced certain documents to Defendants related to Plaintiffs' transactions in Opendoor securities.

### E.   Discovery Propounded on Third Parties

61.   On October 3, 2024, Plaintiffs served subpoenas on third parties, Depository Trust Company and Computershare Inc., seeking the production of documents related to Opendoor's de-SPAC merger. On November 11, 2024, Depository Trust Company served its responses and objections to Plaintiffs' subpoena together with a small production in response thereto. Lead Counsel, on behalf of Plaintiffs, reviewed and analyzed these documents.

62.   On November 8, 2024, Plaintiffs served subpoenas on additional third parties, The Social+Capital Partnership, L.L.C., Hedosophia Services LLC, Continental Stock Transfer & Trust Company, and Equiniti Trust Company, seeking the production of documents related to Opendoor's de-SPAC merger.  On December 12, 2024, Equiniti Trust Company responded to Plaintiffs' subpoena.

63.   On October 22, 2024, the Opendoor Defendants served subpoenas to produce documents and testify at a deposition to six non-party individuals named in the Complaint. On October 25, 2024, the Opendoor Defendants served subpoena to produce documents and testify at a deposition on Plaintiffs' investment managers, T. Rowe Price Group Inc. and Rhumbline Advisers LP.

## V.   THE SETTLEMENT

### A.   The Parties' Settlement Negotiations

64.   In late November 2024, the Parties began to discuss the possibility of resolving the Action and agreed to engage in mediation with David Murphy of Phillips ADR Enterprises (the "Mediator"), a highly experienced mediator of complex securities litigation. Thereafter, in partial response to Plaintiffs' pending document requests,

Defendants produced approximately 16,575 documents to Plaintiffs. Plaintiffs also produced certain documents to Defendants related to Plaintiffs' transactions in Opendoor securities.

65.    On February 7, 2025, Lead Counsel and Defendants' Counsel, among others, participated in a full-day, in-person mediation session before the Mediator. In advance of the session, the Parties submitted detailed mediation statements to the Mediator, together with numerous supporting exhibits, which addressed both liability and damages issues. The session ended without any agreement being reached. The Parties continued discussions with the Mediator following the mediation to further explore the possibility of a settlement.

66.    On March 26, 2025, the Parties accepted a Mediator's recommendation and agreed in principle to settle the Action subject to the Parties' execution of a settlement term sheet ("Term Sheet") and formal settlement stipulation. The Term Sheet was executed by the Parties on May 2, 2025, subject to the execution of a formal settlement agreement, related papers, and approval by the Court.

67.    On May 2, 2025, the Parties informed the Court of their agreement to settle the Action and requested that the Court enter an Order staying all pending deadlines until any final approval of a settlement, and on the same day, the Court granted the Parties' request for a stay. *See* ECF Nos. 149-50.

**B.    Terms of the Settlement and Preliminary Approval Motion**

68.    Once the Parties agreed in principle to settle the Action, they worked diligently to negotiate the full settlement terms set forth in the Stipulation and its exhibits, as well as a confidential supplemental agreement regarding requests for exclusion ("Supplemental Agreement"). On June 13, 2025, the Parties executed the Stipulation setting forth the full terms and conditions of the Settlement, and the Supplemental Agreement. ECF No. 154-2.

69.    The Settlement provides, among other things, that Opendoor will pay, or cause to be paid, $39 million in cash into an interest-bearing Escrow Account. *See*

Stipulation at ¶6. The Settlement Amount, plus accrued interest, after the deduction of Court-awarded attorneys' fees and Litigation Expenses, Notice and Administration Expenses, Taxes, and any other costs or fees approved by the Court (the "Net Settlement Fund"), will be distributed to Settlement Class Members who submit timely and valid Claims, in accordance with a plan of allocation approved by the Court.

70.     In exchange for payment of the Settlement Amount, on the Effective Date of the Settlement, Plaintiffs and the Settlement Class will release the Released Defendant Parties from all of Released Plaintiffs' Claims, and Defendants will release the Released Plaintiff Parties from all Released Defendants' Claims. *See* Stipulation ¶¶1(ii)-(oo), 4, and 5. The Settlement is not "claims-made" and there is no reversion of unclaimed funds. *See* Stipulation ¶13.

71.     On June 13, 2025, Plaintiffs submitted their unopposed motion for an order preliminarily approving the Settlement, approving the manner and form of notice to be sent to Settlement Class Members, and scheduling a hearing for final approval of the Settlement ("Preliminary Approval Motion"). ECF No. 154.

72.     On October 21, 2025, the Court entered an order granting Plaintiffs' Preliminary Approval Motion and scheduled the final settlement hearing for January 6, 2026. ECF No. 156.

## VI.     RISKS OF CONTINUED LITIGATION

73.     As explained above, the Settlement is the result of extensive litigation efforts and deliberation by fully informed Plaintiffs and their Counsel, and represents a very favorable result for the Settlement Class when considered on its own and when evaluated in light of the risks and challenges of continued litigation. Plaintiffs and Lead Counsel understood that while Plaintiffs' claims were strong and Plaintiffs believe they have adduced substantial evidence to support the Settlement Class's claims at summary judgment and trial, there were a number of factors that made the outcome of continued litigation uncertain, weighing in favor of a settlement.

74. Principally, and as discussed below, although the Court granted Plaintiffs' Motion for Reconsideration (and thereby denied, in part, Defendants' Motions to Dismiss), there was a strong possibility that the Court would credit Defendants' negative causation argument at summary judgment or in post-trial motions. If that were the case, then Plaintiffs and the Settlement Class might not recover anything without pursuing, and prevailing, on appeal. And, even if Defendants could not prove negative causation, Plaintiffs understand that they faced significant risks in establishing the required elements to sustain the remaining securities claims through class certification, summary judgment, and trial.

75. Overall, the factual record developed to date, and the Parties' settlement negotiations, allowed Plaintiffs and Lead Counsel to undertake a comprehensive evaluation of the strengths and weaknesses of the claims. Based on that evaluation, Lead Counsel (a firm with extensive experience in the prosecution and trial of complex securities litigation) together with Plaintiffs (including sophisticated institutional investors with billions of dollars in assets under management) determined that the Settlement was in the best interests of the Settlement Class.

### A. Risks Related to Proving Material Falsity

76. Plaintiffs faced several challenges with respect to proving that the remaining misrepresentations were materially false and misleading. The Court granted Defendants' Motions to Dismiss the alleged misstatements and omissions except for a single misstatement contained in two registration statements issued in December 2020 and February 2021.

77. Specifically, the Court found that the statement in Opendoor's registration statements touting the capabilities of the Company's pricing algorithm—that Opendoor's pricing algorithms "*use machine learning to drive pricing decisions*" and that its "*systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions*" (¶402, 410)—was adequately pled as false and misleading.

However, there was a substantial risk that the Court could have changed course at summary judgment or, if not dismissed in pre-trial motions, that a jury could have found the statement was too generic to hold Defendants liable and that in light of other disclosures made by the Company, the statements were true.

78.    In this regard, Defendants would likely have continued to maintain that Plaintiffs could not prove that Defendants misled investors about the capabilities of Opendoor's pricing algorithms. In particular, Defendants would likely argue that Opendoor's algorithm could "dynamically adjust" to changing market conditions at the time of the statements and that prior to the Offerings, there was no evidence that the algorithms were not performing as expected. Indeed, Defendants likely would have been able to point to document discovery and expert testimony that Opendoor's algorithm did consider macro and micro economic factors, did dynamically adjust to those factors, and that therefore the alleged statements were true.

79.    Similarly, Defendants would also likely continue to maintain that Opendoor expressly warned its investors that it could fail to appropriately price homes due to a wide range of factors, including changes in macro and micro-economic conditions. For example, a jury could have found that the registration statements contained adequate cautionary language that warned investors that Opendoor's pricing algorithms might be unable to price accurately and keep the Company's contribution margins positive in volatile housing markets. Opendoor's registration statements warned that the Company might "be unable to liquidate . . . inventory at prices that allow [it] to meet [its] margin targets or recover [its] costs" and could "incur significant losses" due to its "failure to accurately price homes."

80.    The above facts, if accepted by a jury, could result in a finding that the registration statements were accurate and not misleading and, thus, a jury verdict in favor of Defendants.

22

81.     Moreover, the Individual Defendants and the Underwriter Defendants would likely have asserted a due diligence defense. While Plaintiffs would have worked extensively with a due diligence expert to show that these Defendants were negligent in connection with the de-SPAC Merger and the February 2021 Offering, these Defendants would have put forth well-qualified experts of their own showing that they conducted a reasonable investigation and had reasonable grounds for their actions; especially in light of available document discovery that may have supported such due diligence.

**B.     Risks Related to Recovering Damages**

82.     Even if Plaintiffs were successful in proving falsity with respect to the remaining misstatements upheld by the Court, they faced significant challenges and uncertainty with respect to proving damages.

83.     Most notably, Plaintiffs would have to overcome Defendants' negative causation defense, particularly the "disaggregation" of confounding or unrelated information from the stock price declines. *See* 15 U.S.C § 77k(e). Although Plaintiffs' consulting damages expert has estimated that maximum statutory damages for the upheld Section 11 claims were approximately $1.3 billion, that number is based simply on the difference between the price at which the securities were offered to the public and the price at the time the lawsuit was filed on October 7, 2022. In other words, the estimate of $1.3 billion represents Plaintiffs' best case scenario, which includes every single stock price decline during the period between the misstatements and when the lawsuit was filed.

84.     However, that best-case number was not the most likely outcome. Defendants would likely have been able to put forth expert testimony and an event study showing that many of the stock price declines that occurred during the relevant time period were attributable to factors other than the alleged misstatements in the Offering Documents. Because many of the stock price declines during the relevant period were attributable to non-misstatement related factors, Defendants' negative causation defense would have substantially reduced the statutory damages. Indeed, there was a substantial

23

risk that a successful negative causation defense would result in just two stock price declines remaining in the case, and potentially a complete defense to the claims resulting in no damages. Specifically, Defendants and their experts would likely argue that all declines in Opendoor's stock price other than in connection with the two alleged corrective disclosures before the lawsuit was filed—*i.e.*, the disclosures on February 24, 2022 and September 19, 2022—were caused by something other than the alleged misstatements or omissions. If Defendants were successful in this argument and proved that all drops (other than the two corrective disclosures) were unrelated to the alleged misstatements, Plaintiffs' consulting damages expert estimates that damages could be as low as $70 million. Accordingly, the Settlement recovers between 3% and 55% of estimated aggregate damages.

85.    Similarly, Defendants would also likely argue that they are entitled to a complete negative causation defense by showing that the two alleged corrective disclosures were not corrective or connected to the remaining misstatements. For the first corrective disclosure on February 24, 2022, Defendants would likely argue that an earnings release announcing that Opendoor achieved a previously disclosed financial target is not a corrective disclosure. Specifically, Defendants would argue that the Company had previously disclosed (in November 2021) that it expected the contribution margin for the quarter to be between 4% and 6%. Therefore, news of a 4% contribution margin cannot be a corrective disclosure. In addition, they would likely argue that the corrective disclosure did not mention specifically the capabilities of the algorithm, further severing the connection to the alleged misstatements. Similarly, for the second corrective disclosure on September 19, 2022, Defendants would likely argue that the Bloomberg article disclosing that Opendoor suffered losses on homes sales in August 2022 did not contain any new or corrective information because Opendoor had also already previously disclosed (in August 2022) that it expected to incur losses on home sales during that quarter, due to faster-than-

forecasted home price declines. If successful, these arguments could have resulted in no damages and prevented Plaintiffs from recovering anything in the case.

86. Notably, Defendants' arguments were so compelling that in its Order on the Motions to Dismiss, the Court found as a matter of law that Defendants had established negative causation because none of the disclosures were "corrective disclosures." Although the Court rightly reconsidered this holding and found that Defendants had not proven a negative causation defense as a matter of law, Plaintiffs would continue to face the risk of the Court granting summary judgment in Defendants' favor on this issue, or ruling in their favor in post-trial motions, or an appellate court crediting these arguments.

## VII. COMPLIANCE WITH THE PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

87. As required by the Court's Preliminary Approval Order, Verita, working at Lead Counsel's direction, began disseminating notice of the Settlement on November 4, 2025. Ex. 5 at ¶¶2-8. Specifically, Verita has, among other things: (i) mailed by First-Class Mail a copy of the Postcard Notice to potential Settlement Class Members using information gathered to date; (ii) mailed a copy of the Postcard Notice to brokers and nominees that may have purchased Opendoor traded common stock on behalf of Settlement Class Members ("Nominees; (iii) published the Summary Notice in *The Wall Street Journal* and transmitted it over *PR Newswire*; and (iv) created a website, www.OpendoorSecuritiesSettlement.com, to provide information about the Action and the Settlement. *Id*. at ¶¶2-9, 11.

88. Collectively, the Settlement notices contain important information about the Action and the Settlement, including, among other things, the definition of the Settlement Class, a description of the proposed Settlement, information regarding the claims asserted in the Action, Settlement Class Members' options in connection with the Settlement, and the deadlines for objecting, seeking exclusion, and submitting claims. *See generally id*., Ex. 5-A to C. The long-form Notice, available on the website or from Verita upon request,

provides more detail about the Action and Settlement, including the Plan of Allocation. The notices also inform recipients of Lead Counsel's intent to apply for attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for payment of Litigation Expenses incurred by Plaintiffs' Counsel in an amount not to exceed $650,000. *Id*.

89.     In accordance with the Preliminary Approval Order, as of December 8, 2025, Verita has provided 404,104 copies of the Postcard Notice to potential Settlement Class Members and their Nominees. *Id*. at ¶8. In addition, Verita caused the Summary Notice to be published in *The Wall Street Journal* and transmitted over *PR Newswire* on November 18, 2025. *Id*. at ¶9.

90.     In connection with the notice dissemination, Verita developed a website for the Settlement in order to provide information concerning the case and important dates and deadlines in connection with the Settlement, as well as access to an online claim portal and downloadable copies of the notices, Claim Form, Stipulation, Preliminary Approval Order, and other relevant documents. *Id*. at ¶11. Copies of the notices and Claim Form are also available on Lead Counsel's website, www.labaton.com. Additionally, Verita maintains a toll-free telephone number and email for inquiries regarding the Settlement. *Id*. at ¶10.

91.     The deadline for Settlement Class Members to file an objection to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion, is December 16, 2025. To date, not a single objection to any aspect of the Settlement has been received. In addition, Verita has received no requests for exclusion. *Id*. at ¶13.

92.     Lead Counsel will file reply papers on or before December 30, 2025 that will address any objections and report on requests for exclusion and claims received.

## VIII.   THE PLAN FOR ALLOCATING THE NET SETTLEMENT FUND TO THE SETTLEMENT CLASS IS FAIR, REASONABLE, AND ADEQUATE

93.     In accordance with the Preliminary Approval Order, and as explained in the notices, Settlement Class Members who wish to participate in the distribution of the Net

Settlement Fund (*i.e.*, the Settlement Fund less: (i) any Taxes; (ii) any Notice and Administration Expenses; (iii) any Litigation Expenses awarded by the Court; (iv) any attorneys' fees awarded by the Court; and (v) any other costs or fees approved by the Court) must submit a valid Claim and all required supporting documentation to the Claims Administrator by mail or online at www.OpendoorSecuritiesSettlement.com. As provided in the long-form Notice, the Net Settlement Fund will be distributed to Authorized Claimants in accordance with the plan for allocating the Net Settlement Fund approved by the Court. The plan of allocation proposed by Lead Plaintiff (*i.e.*, the "Plan of Allocation" or "Plan") is set forth on pages 12-17 of the Notice. *See* Ex. 5-B.

94.     The objective of the Plan is to distribute the Net Settlement Fund equitably among those Settlement Members who suffered economic losses as a result of the alleged violations of the federal securities laws with respect to shares of Opendoor common stock purchased or otherwise acquired: (i) pursuant or traceable to the de-SPAC Merger on or about December 21, 2020; (ii) pursuant or traceable to the February 2021 Offering on or about February 4, 2021 through February 9, 2021, both dates inclusive; and/or (iii) on the NASDAQ or any U.S.-based trading platform during the period from December 21, 2020 through November 3, 2022, both dates inclusive.

95.     Lead Counsel developed the Plan in consultation with Plaintiffs' consulting damages expert. The Plan, however, is not a formal damages analysis. The calculations made pursuant to the Plan are not intended to estimate, or be indicative of, the amounts that Settlement Class Members might have been able to recover as damages at trial. Nor are the calculations, including the Recognized Loss formulas, intended to estimate the amounts that will be paid to Authorized Claimants. The computations under the Plan are only a method to weigh the claims of Authorized Claimants against one another for purposes of making *pro rata* allocations of the Net Settlement Fund, and the Recognized Claim amounts are the basis upon which the Net Settlement Fund will be proportionately allocated to Authorized Claimants.

96.    Claims asserted in the Action pursuant to Section 11 of the Securities Act and Section 10(b) of the Exchange Act serve as the basis for the calculation of the Recognized Loss Amounts under the Plan of Allocation. Section 11 of the Securities Act provides a statutory formula for the calculation of damages under that provision. The Section 11 formulas, which were developed by Lead Counsel's damages expert, generally track the statutory formula with respect to purchases pursuant or traceable to the de-SPAC Merger and the February 2021 Offering. Given their dismissal, losses arising solely from the Section 10(b) claims have been discounted by 90%.

97.    Verita, as the Claims Administrator, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund by dividing the Authorized Claimant's Recognized Claim (*i.e.*, the sum of the Claimant's Recognized Loss Amounts for each purchase, as calculated under the Plan) by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. Plaintiff's losses will be calculated in the same manner.

98.    Once Verita has processed all submitted Claim Forms and provided claimants with an opportunity to cure any deficiencies in their claims or challenge the rejection of their claims, processed responses, and made claim determinations, distributions will be made to Authorized Claimants in the form of checks and wire transfers.

99.    As set forth in the Plan, if there is any balance remaining in the Net Settlement Fund (whether by reason of uncashed checks, or otherwise), after at least six (6) months after the initial distribution, and after payment of any unpaid fees and expenses incurred in administering the Settlement, and Taxes, the Claims Administrator will, if feasible, reallocate such balance among Authorized Claimants who have cashed their initial distribution checks in an equitable and economic fashion. Redistributions will be repeated until the balance in the Net Settlement Fund is no longer feasible or economical to distribute. Any balance that still remains in the Net Settlement Fund after re-distribution(s),

28

which is not feasible or economical to reallocate, after payment of Notice and Administration Expenses and Taxes, shall be contributed to the Council of Institutional Investors, a non-profit, non-sectarian 501(c) organization, or such other organization approved by the Court. *See* Ex. 5-C at ¶79.

100.    The structure of the Plan is similar to that of numerous other plans of allocation that have been used in securities class actions involving both Securities Act and Exchange Act claims.

101.    To date, no objections to the Plan have been filed.

102.    In sum, the proposed Plan of Allocation, developed in consultation with Plaintiffs' consulting damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants. Accordingly, Lead Counsel respectfully submits that the proposed Plan is fair, reasonable, and adequate and should be approved.

## IX.    THE FEE AND EXPENSE APPLICATION

103.    In addition to seeking final approval of the Settlement and approval of the Plan of Allocation, Lead Counsel, on behalf of Plaintiffs' Counsel, is applying to the Court for an award of attorneys' fees and payment of expenses incurred by Plaintiffs' Counsel during the course of the Action under the "common fund" doctrine.[10] Specifically, Lead Counsel is applying for attorneys' fees in the amount of 25% of the Settlement Fund, or $9,750,000, plus interest earned at the same rate as earned by the Settlement Fund, and for Litigation Expenses in the amount of $502,887.04. Lead Counsel also seeks reimbursement in the aggregate amount of $18,768.20 to Plaintiffs for their costs, including lost wages, incurred in connection with their representation of the Settlement Class in accordance with the PSLRA, 15 U.S.C. §§ 77z-1(a)(4) and 78u-4(a)(4). *See* Ex. 1 at ¶¶9-11; Ex. 2 at ¶¶9-12; Ex. 3 at ¶¶9-11.    As noted above, Lead Counsel's Fee and Expense Application is

---

[10] Any determination with respect to Lead Counsel's application for an award of attorneys' fees and Litigation Expenses will not affect the Settlement, if approved.

consistent with the amounts set forth in the notices and, to date, not one objection regarding the maximum fee and expense amounts in the notices has been received.

104.    Below is a summary of the primary factual bases for Lead Counsel's Fee and Expense Application. The time and expense detail for Plaintiffs' Counsel is set forth in the Declaration of Michael Canty on behalf of Labaton Keller Sucharow LLP ("Labaton Fee and Expense Decl."), attached hereto as Exhibit 6, the Declaration of Darrell Davis on behalf of Clark Hill PLC ("Clark Hill Fee and Expense Decl."), attached hereto as Exhibit 7, and the Declaration of Casey Sadler on behalf of Glancy Prongay & Murray LLP ("GPM Fee and Expense Decl."), attached hereto as Exhibit 8.  The Law Offices of Frank R. Cruz and VanOverbeke Michaud & Timmony P.C. will share in any fees awarded by the Court to Plaintiffs' Counsel, but they are not submitting their individual time and they are not seeking expenses.

105.    The Fee & Expense Declarations set forth the names of the attorneys and professional support staff members who worked on the Action, their hourly rates, the lodestar value of the time expended by such attorneys and professional support staff, the tasks performed, the expenses incurred, and the background and experience of the firms. Pursuant to Local Rule 54.2, and the Court's individual Scheduling Order, spreadsheets detailing the time and expenses will be emailed to the Court and filed herewith under seal, together with copies of supporting documentation of the expenses. The Fee & Expense Declarations also explain any agreements about the allocation of fees.

106.    A full analysis of the factors considered by courts within the Ninth Circuit and this District when evaluating requests for attorneys' fees and expenses from a common fund, as well as the supporting legal authority, is presented in the accompanying Fee and Expense Memorandum.

### A.    Lead Counsel's Fee Request Is Fair and Reasonable and Warrants Approval

#### 1.    The Result Achieved

107.    The Settlement provides for a recovery of $39 million in cash for the benefit of the Settlement Class. For the reasons set forth above, and in light of the substantial risks of continued litigation, Lead Counsel believes that the Settlement represents an excellent result for the Settlement Class. Indeed, given the serious challenges that Plaintiffs faced in this case—most significantly, proving that the remaining misstatements were materially false and misleading at summary judgment and trial and proving damages—there was significant risk that there would be no recovery at all. In contrast, the Settlement avoids the potential impact of these challenges and other risks and achieves a fair and certain result.

108.    Indeed, as discussed herein, the Settlement represents a meaningful portion of the Settlement Class's reasonably recoverable damages, as estimated under various potential scenarios analyzed by Plaintiffs' damages expert. If the class's claims survived summary judgment, trial, post-trial motions, and appeals completely intact, then maximum statutory damages were estimated to be approximately $1.3 billion. However, Defendants would have undoubtedly continued to press their negative causation defense at each of those stages, which could have reduced recoverable damages to $70 million or, indeed, zero. Accordingly, the Settlement recovers a range of approximately 3% to 55% of potential damages.

109.    Moreover, as a result of the Settlement, numerous Settlement Class Members will benefit and receive compensation for their losses and avoid the substantial risks of a lesser, or no, recovery in the absence of settlement.

### B.    The Risks of the Litigation and the Contingent Nature of the Fee

110.    The risks faced by Plaintiffs' Counsel in prosecuting this Action are highly relevant to the Court's consideration of an award of attorneys' fees, as well as its approval of the Settlement.  Here, Defendants adamantly deny any wrongdoing and, if the Action

had continued, would have aggressively litigated their defenses through a trial, and the appeals that would likely follow. As detailed in Section VI. above, Plaintiffs' Counsel and Plaintiffs faced significant risks to proving Defendants' liability and damages at all stages of the litigation.

111.   These case-specific litigation risks are in addition to the risks accompanying securities litigation generally, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws and was undertaken on a contingent-fee basis. From the outset, Plaintiffs' Counsel understood that this would be a complex, expensive, and potentially lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and financial expenditures that vigorous prosecution of the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources (in terms of attorney and support-staff time) were dedicated to prosecuting the Action, and that funds were available to compensate vendors and consultants and to cover the considerable out-of-pocket costs that a case like this typically demands. With an average lag time of several years for these cases to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an hourly, ongoing basis. Counsel have dedicated 8,700 hours to prosecuting the Action for the benefit of the Settlement Class, yet have received no compensation for their efforts.

112.   Plaintiffs' Counsel also bore the risk that no recovery would be achieved. Lead Counsel is aware that despite the most vigorous and competent efforts, a law firm's success in contingent litigation such as this is never guaranteed. Moreover, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to persuade sophisticated defendants to engage in serious settlement negotiations at meaningful levels. Lead Counsel is aware of many hard-fought lawsuits in which, because of the discovery of facts unknown when the case commenced, or changes in the law during the pendency of the case, or a decision of a judge

32

or jury following a trial on the merits, excellent professional efforts by a plaintiff's counsel produced no fee for counsel.

113. Successfully opposing a motion to dismiss and a motion for summary judgment is no guarantee that plaintiffs will prevail at trial. While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007) (tried by Labaton), and *In re Tesla, Inc. Securities Litigation*, Case No. C-18-04865 (N.D. Cal. Feb. 3, 2023), or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

114. Even plaintiffs who succeed at trial may find their verdict overturned by a post-trial motion for a directed verdict or on appeal. *See, e.g.*, *In re BankAtlantic Bancorp, Inc.,* No. 07-cv-61542-UU, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2010) (in case tried by Labaton, after plaintiffs' jury verdict, court granted defendants' motion for judgment as a matter of law on loss causation grounds), *aff'd,* 688 F. 3d 713 (11th Cir. 2012) (trial court erred, but defendants entitled to judgment as matter of law on lack of loss causation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice). And, the path to maintaining a favorable jury verdict can be arduous and time consuming. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting

33

unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id*.) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

115.    The United States Supreme Court and numerous other courts have repeatedly recognized that the public has a strong interest in having experienced and able counsel enforce the federal securities laws through private actions. *See, e.g.*, *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (Private securities actions provide '"a most effective weapon in the enforcement' of the securities laws and are a 'necessary supplement to [SEC] action.'") (citations omitted). Vigorous private enforcement of the federal securities laws can only occur if private investors can obtain some parity in representation with that available to large corporate defendants. If this important public policy is to be carried out, courts should award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action as well as the economics involved.

116.    Plaintiffs' Counsel's efforts, in the face of substantial risks and uncertainties, have resulted in what Lead Counsel believes to be a significant (and certain) recovery for the Settlement Class. In these circumstances, and in consideration of their hard work and the excellent result achieved, Lead Counsel believes the 25% fee request is fair and reasonable and should be approved.

**C.    The Skill Required to Navigate the Difficult Questions Presented and Quality of Counsel's Representation**

117.    The skill and diligence of Lead Counsel also support the requested fee. As demonstrated by the firm biography included as Exhibit G to the Labaton Fee and Expense Declaration, Lead Counsel is among the most experienced and skilled law firms in the securities litigation field, with a long and successful track record representing investors in such cases, and is consistently ranked among the top plaintiffs' firms in the country. *See,*

*e.g., In re Am. Int'l Grp, Inc. Sec. Litig.*, No. 04-8141 (S.D.N.Y.) (representing the Ohio Public Employees Retirement System, State Teachers Retirement System of Ohio, and Ohio Police & Fire Pension Fund and reaching settlements of $1 billion); *In re Dell Techs. Inc. Class V S'holders Litig.*, Consol. C.A. No. 2018-0816-JTL (Del. Ch.) (securing $1 billion shareholder settlement); *In re HealthSouth Corp. Sec. Litig.*, No. 03-1500 (N.D. Ala.) (representing the State of Michigan Retirement System, New Mexico State Investment Council, and the New Mexico Educational Retirement Board and securing settlements of more than $600 million); and *In re Countrywide Sec. Litig.*, No. 07-5295 (C.D. Cal.) (representing the New York State and New York City Pension Funds and reaching settlements of more than $600 million). *See* Ex. 6-G. Here, Labaton attorneys have devoted considerable time and effort to this case, thereby bringing to bear their collective experience, which was needed to navigate the complex and nuanced issues in this case.

118. The quality of the work performed by Lead Counsel in obtaining the Settlement should also be evaluated in light of the quality of opposing counsel. Defendants in this case were represented by experienced counsel from Allen Overy Shearman Sterling US LLP and O'Melveny & Myers LLP, two prominent litigation firms that vigorously and ably defended the Action on behalf of Defendants. In the face of this formidable defense, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Settlement Class.

### D.    The Time and Labor Dedicated to the Action

119. As more fully described above, Plaintiffs' Counsel: (i) conducted an extensive investigation of the claims at issue, including interviews with approximately 44 former Opendoor employees (eight of whom provided information for use in the Complaint); (ii) prepared and filed a detailed Complaint, which expanded the scope of the initial complaint by adding particularized allegations supporting claims that Defendants misled investors; (iii) opposed Defendants' wide ranging motions to dismiss the Complaint

through briefing and oral argument; (iv) moved for—and won—a motion for reconsideration after the Court initially granted Defendants' motions to dismiss; (v) successfully opposed Defendants' motion for an interlocutory appeal; (vi) moved for class certification; (vi) researched, drafted, and propounded discovery requests on Defendants; (vii) reviewed over 16,000 documents in connection with the mediation process; (viii) prepared for and participated in a formal mediation process, including drafting and analyzing extensive mediation statements; and (ix) consulted with experts in the fields of damages and loss causation. *See supra* Sections III.-V. Counsel's efforts were driven and focused on advancing the litigation to achieve the most successful outcome for the Settlement Class, whether through settlement or trial, by the most efficient means possible.

120.    Throughout the litigation, Lead Counsel worked efficiently and maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this Action. Experienced attorneys at Labaton were involved in motion practice, mediation, and the settlement negotiations. More junior attorneys and paralegals worked on matters appropriate to their skill and experience level, such as drafting pleadings, legal research, discovery matters, and document review.

121.    The time devoted to this Action by Plaintiffs' Counsel is set forth in the Labaton Fee and Expense Declaration, the Clark Hill Fee and Expense Decl., and the GPM Fee and Expense Decl., attached hereto as Exhibits 6, 7 & 8. Included with the declarations are schedules that summarize the time expended by attorneys and professional support staff, as well as expenses ("Fee and Expense Schedules"). The Fee and Expense Schedules also report each person's resulting "lodestar," *i.e.*, their hours multiplied by their current hourly rates, and break the lodestar into categories of work.[11]

122.    The hourly rates of Plaintiffs' Counsel here range from $800 to $1,375 per hour for partners, $750 to $975 per hour for of counsels, $350 to $735 per hour for

---

[11] Exhibit 9 is a Summary Table listing Lead Counsel's, Clark Hill's, and GPM's time and expenses.

associates, $390 to $475 for staff/contract attorneys, and $225 to $415 for paralegals. *See* Ex. 6-A, 7-A, 8-A. These hourly rates are reasonable for this type of complex litigation. Exhibit 10, attached hereto, is a table of hourly rates for defense firms compiled by Labaton from fee applications submitted by such firms nationwide in bankruptcy proceedings in 2024. The analysis shows that across all types of attorneys, Plaintiffs' Counsel's hourly rates here are consistent with, or lower than, the firms surveyed.

123.    In total, from the inception of this Action to date, Plaintiffs' Counsel expended 8,700 hours on the investigation, prosecution, and resolution of the claims against Defendants representing a total lodestar of $5,160,227.00.[12] Thus, pursuant to a lodestar "cross-check," Lead Counsel's fee request of 25% of the Settlement Fund (or $9,750,000, plus interest), if awarded, would yield a multiplier of approximately 1.9 on Plaintiffs' Counsel's lodestar, which is within the range of fee multipliers awarded in comparable securities class actions and in other class actions involving significant contingency fee risk, in the Ninth Circuit. *See* Fee and Expense Memorandum, §I.C.6.

**E.    Plaintiffs' Endorsement of the Fee and Expense Application**

124.    Plaintiffs are sophisticated investors that have closely supervised, monitored, and actively participated in the prosecution and settlement of the Action. Plaintiffs have evaluated and fully support Lead Counsel's fee and expense request. As set forth in the declarations submitted on behalf of INPRS, the Oakland County Funds, and Mr. Hereford (Exs. 1, 2 and 3), Plaintiffs have concluded that the requested fee has been earned based on the efforts of Plaintiffs' Counsel and the favorable recovery obtained for the Settlement Class in a case that involved serious risk.

---

[12]   Lead Counsel will continue to perform legal work on behalf of the Settlement Class should the Court approve the Settlement. Additional resources will be expended assisting Class Members with their Claim Forms and related inquiries and working with the Claims Administrator to ensure the smooth progression of claims processing. No additional legal fees or litigation expenses will be sought for this work.

125.    Plaintiffs' endorsement of Lead Counsel's Fee and Expense Application further demonstrates its reasonableness, and this endorsement should be given meaningful weight in the Court's consideration of the fee award.

**F.      Lead Counsel's Request for Litigation Expenses Warrants Approval**

**1.      Lead Counsel Seeks Payment of Reasonable and Necessary Litigation Expenses from the Settlement Fund**

126.    Lead Counsel seeks payment from the Settlement Fund of $502,887.04 for expenses that were reasonably and necessarily incurred in connection with the Action. *See* Ex. 6-C & D, Ex. 7-C, Ex. 8-C, Ex. 9. The notices inform the Settlement Class that Lead Counsel will apply for payment of Litigation Expenses in an amount not to exceed $650,000, including the request for reimbursement of the reasonable costs and expenses (including lost wages) incurred by Plaintiffs directly related to their representation of the Class in accordance with 15 U.S.C. §§ 77z-1(a)(4) and 78u-4(a)(4). The amount of Litigation Expenses requested by Lead Counsel, along with the aggregate amount requested by Plaintiffs, is below the maximum expense amount set forth in the notices.

127.    From the inception of the Action, Plaintiffs' Counsel were aware that they might not recover any of the expenses incurred in prosecuting the claims against Defendants and, at a minimum, would not recover any expenses until the Action was successfully resolved. Plaintiffs' Counsel also understood that, even assuming the Action was ultimately successful, an award of expenses would not compensate counsel for the lost use or opportunity costs of funds advanced to prosecute the claims against Defendants. Lead Counsel was motivated to take appropriate steps to avoid incurring unnecessary expenses and to minimize costs without compromising the vigorous and efficient prosecution of the Action.

128.    Plaintiffs' Counsel's expenses include fees and costs for, among other things: (i) experts and other professionals in connection with various stages of the litigation; (ii) mediation; (iii) litigation support related to electronic discovery; (iv) work-related travel;

and (v) online factual and legal research. Courts have consistently found that these types of expenses are payable from a fund recovered by counsel for the benefit of a class.

129. The largest component of Lead Counsel's expenses (*i.e.*, $338,765.38, or approximately 67% of total expenses) was incurred for experts. As noted above, Lead Counsel retained consulting experts to analyze causation and damages issues, economics, traceability, and de-SPAC transactions. Among other things, the experts used stock market, real estate market, and macro and micro economic data to analyze the connection between Opendoor's pricing algorithm and reported financial performance compared to competitors and the market as a whole. In addition, the experts assessed damages in the matter based on the different alleged causes of action and in connection with the de-SPAC Merger and secondary offering at issue. Lead Counsel also consulted with an expert to draft the proposed Plan of Allocation. *See* Ex. 6-C & D.

130. Plaintiffs' Counsel incurred $33,372.50, or approximately 7% of total expenses, in connection with counsel retained by certain of the Confidential Witnesses to respond to subpoenas served by defendants. *See* Ex. 6-C & D.

131. Lead Counsel also incurred $32,500 (or approximately 6.5% of total costs) in connection with the services of David M. Murphy of Phillips ADR Enterprises and the mediation in the Action.

132. The costs of computerized research services, such as Lexis, Westlaw, and PACER, amounted to $38,711.08. *See* Ex. 6-C, 8-C. It is standard for attorneys to use online services to assist them in researching legal and factual issues and, indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class.

133. Another component of the expenses (*i.e.*, $12,943.33 or approximately 3% of total expenses) relates to the fees of an outside investigation firm, which was retained to assist with the factual development in the case given the substantial number of former employees and third parties that were identified in the investigation. In all, we identified

39

and contacted approximately 169 former Olaplex employees and other persons with relevant knowledge and interviewed 44 of them. *See* Ex. 6-C.

134.   $11,128.40 was incurred for document hosting and management related to electronic discovery. *See* Ex. 6-D. As noted above, among other things, Lead Counsel retained a third-party vendor to host the productions in the case in its sophisticated electronic database and litigation support platform to facilitate an efficient review and analysis by Plaintiffs' Counsel.

135.   The other expenses for which Lead Counsel seeks payment are the types of expenses that are necessarily incurred in litigation and routinely paid in non-contingent cases. These expenses include, among others, court and service fees, duplicating costs, work-related travel costs, and overnight delivery expenses. All of the Litigation Expenses were reasonable and necessary to the successful litigation of the Action.

## 2.   PSLRA Reimbursement to Plaintiffs Would Be Fair and Reasonable

136.   The PSLRA specifically provides that an "award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class" may be made to "any representative party serving on behalf of a class." 15 U.S.C. §§ 77z-1(a)(4) and 78u-4(a)(4). Accordingly, Plaintiffs seek reimbursement for the time they spent in connection with their efforts on behalf of the Settlement Class. Specifically, INPRS seeks reimbursement of $9,300 for the 62 hours it dedicated to the Action (Ex. 1 at ¶¶5, 10-11); Oakland County Funds collectively seek $3,468.20 for the 44 hours they dedicated to the Action (Ex. 2 at ¶¶9-11); and Mr. Hereford seeks $6,000 for the 75 hours he dedicated to the Action (Ex. 3 at ¶¶9-11). Plaintiffs' efforts required them to devote considerable time and resources to this Action that would otherwise have been devoted to the retirement systems and their beneficiaries, and other work.

137.   As discussed in the Fee and Expense Memorandum and in Plaintiffs' supporting declarations, Plaintiffs have been fully committed to pursuing the Settlement

40

Class's claims since they became involved in the litigation. Plaintiffs provided valuable assistance to Lead Counsel during the prosecution and resolution of the Action. The efforts expended by Plaintiffs during the course of this Action, as set forth in Exhibits 1 through 3 included communicating with Lead Counsel, reviewing pleadings and motion papers, responding to discovery requests, preparing for and attending the mediation session (in the case of INPRS), and communicating with counsel regarding the settlement negotiations, are precisely the types of activities courts have found support reimbursement to class representatives, and fully support the request for reimbursement here.

## X.    MISCELLANEOUS EXHIBITS

138.    Attached hereto as Exhibit 11 is a compendium of unreported cases, in alphabetical order, cited in the accompanying Fee and Expense Memorandum.

## XI.    CONCLUSION

139.    For all the reasons set forth above, Lead Counsel respectfully submits that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.  Lead Counsel further submits that the requested fee in the amount of 25% of the Settlement Fund should be approved as fair and reasonable, and the requests for payment of Litigation Expenses in the total amount of $502,887.04, plus interest, and reimbursement of Plaintiffs' costs in the total amount of $18,768.20 should also be approved.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed in New York, New York this 9th day of December, 2025.

MICHAEL P. CANTY

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2025, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

/s/ Michael P. Canty
MICHAEL P. CANTY